## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GENUS MEDICAL TECHNOLOGIES LLC )
207 Chesterfield Towne Center )
Chesterfield, MO  63005 )
            )
            )
    Plaintiff, )   Case No. 19-CV-544
            )
   v. )
            )
UNITED STATES FOOD )
AND DRUG ADMINISTRATION, )
200 Independence Avenue, S.W. )
Washington, DC 20201 )
            )
    Defendant. )
            )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Genus Medical Technologies LLC ("Genus") brings this complaint for declaratory and injunctive relief, and states the following in support thereof:

## NATURE OF ACTION

1.  This is an action for declaratory and injunctive relief arising from a legally erroneous classification decision by Defendant, the U.S. Food and Drug Administration (FDA), under the Federal Food, Drug, and Cosmetic Act (FDCA).  Plaintiff's products, Vanilla SilQ Barium Smoothie, Vanilla SilQ HD, Vanilla SilQ MD (collectively "Vanilla SilQ") all meet the statutory definition of a "medical device" (devices) subject to regulation by FDA's Center for Devices and Radiological Health (CDRH) under the

device authorities in the FDCA. For decades, FDA regulated products like the Plaintiff's as devices. Even today, FDA does not dispute that these products meet the statutory definition of a device. Yet, FDA has classified them as "drugs" to be reviewed and regulated by FDA's Center for Drug Evaluation and Research (CDER) under the drug authorities in the FDCA. Plaintiff brings this action to vacate FDA's classification decision.

2.      Vanilla SilQ products are barium sulfate oral solution contrast agents, which are swallowed – but not metabolized – for diagnostic purposes. Vanilla SilQ meets the statutory definition of "device" because it does not achieve its primary intended purposes through chemical action within or on the body or by being metabolized. As such, Vanilla SilQ legally must be regulated as a "device" with product jurisdiction in CDRH. FDA's illegal and arbitrary determination to the contrary, if permitted to stand, would cause irreparable hardship to Genus because the prerequisites to legal marketing of Vanilla SilQ as a drug are far more time-consuming, difficult, and expensive than the path to marketing Vanilla SilQ as a device. Further, FDA has been clear that Genus is subject to potential enforcement action for marketing an unapproved drug until an abbreviated new drug application (ANDA) has been approved.

3.      In making its determination on Vanilla SilQ, FDA implemented a novel, unjustifiable, and unlawful interpretation of the definitions of "device" and "drug" set forth in the FDCA without complying with the Administrative Procedure Act's (APA) requirements for establishing new rules of general applicability. In essence, FDA claims that all products that meet the statutory definition of a device also meet the statutory

2

definition of a drug.  Therefore, according to FDA, it has unfettered discretion to regulate a device as if it were a drug.

4.     FDA also failed to comply with APA requirements in adopting a blanket rule for all contrast agents without issuing a draft regulation and providing the requisite public notice and opportunity for public comment.

## PARTIES

5.     Plaintiff Genus is a corporation duly organized and existing under the laws of Missouri, with its principal place of business in St. Louis, Missouri.  Genus is focused on developing imaging products that meet the clinical and economic needs of the current healthcare environment.  Genus developed Vanilla SilQ to provide consumers with a safe, effective, and affordable oral contrast option.

6.     Defendant FDA is an agency within the U.S. Department of Health and Human Services, an Executive Department of the U.S. government.

## JURISDICTION AND VENUE

7.     This action arises under the FDCA, 21 U.S.C. §§ 301 *et seq.*, the APA, 5 U.S.C. §§ 551-559, 701-706, and 28 U.S.C. §§ 1361, 2201-2202.  The declaratory, injunctive, and other relief requested by Plaintiff is authorized by 5 U.S.C. §§ 702 and 706, and 28 U.S.C. §§ 1361, 1651, 2201-2202, and this Court's general equitable powers.

8.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361.

9.      This Court has personal jurisdiction over Defendant FDA because it resides within this District.

10.     Venue in this District is proper under 28 U.S.C. § 1391(e).

## STATUTORY AND REGULATORY BACKGROUND

11.     In general, a company must obtain marketing authorization from FDA before it can market a new drug or a new device.  If a product is a "device" (with exceptions not applicable here), it is subject to the regulatory authority of CDRH.  If a product is a "drug" (with certain exceptions not applicable here), it is subject to the regulatory authority of CDER.

12.     The FDCA defines a "drug" as an article "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C. § 321(g)(1).

13.     In relevant part, the FDCA defines a "device" as an instrument, apparatus, implement, machine, or other similar or related article:

   a.   which is intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease,

   b.   which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals, and

   c.   which is not dependent upon being metabolized for the achievement of its primary intended purposes.  *Id.* § 321(h).

14.     The distinction between drug and device arises from the mechanism by which the product achieves its "primary intended purposes." *Id.*  Products that do not

achieve their primary intended purposes through metabolization or chemical action within the body meet the statutory definition of devices; products that do are drugs. *Id.* Products are assigned to a specific Center within FDA based on this statutory definition.

15.     FDA relies on the sponsor to distinguish a device from a drug as defined in the statute.  According to FDA guidance, all that is required for a sponsor to make such a distinction to be classified as a device are data demonstrating that a proposed product does not achieve its primary intended purpose through chemical action so that it "meets the definition of a device."  FDA, Guidance: Classification of Products as Drugs and Devices & Additional Product Classification Issues, 6 (Sept. 2017), https://www.fda.gov/RegulatoryInformation/Guidances/ucm258946.htm.

16.     When the primary jurisdiction of a product is unclear, a sponsor can file a Request for Designation (RFD) with FDA's Office of Combination Products (OCP) under section 563 of the FDCA to obtain a determination from FDA as to which Center will have primary jurisdiction over the product.  21 U.S.C. § 360bbb-2(a); 21 C.F.R. § 3.7(a).  FDA must specify in a Letter of Designation the Center that will have jurisdiction for the premarket review and regulation of the product.  21 C.F.R. § 3.8(b).  If FDA does not timely respond to an RFD, the sponsor's classification position applies.  21 C.F.R. § 3.8(b).  OCP makes a determination as to the classification of the product based upon the FDCA definitions applicable to the product, which in this instance are the "drug" or "device" definitions.

17.     The APA requires executive agencies to follow certain processes when formulating, amending, or repealing statements of general or particular applicability and

future effect to interpret law or policy. Agencies must conduct notice-and-comment rulemaking when promulgating or amending certain rules. 5 U.S.C. § 553(b)-(c).

18.     The FDCA also requires FDA to ensure public participation before implementing changes to guidance that amend its interpretations of a statute or regulation, or of its longstanding policy, provided that the amendments are of more than a minor nature. 21 U.S.C. § 371(h)(1)(C).

## FACTUAL BACKGROUND

### *Description and Intended Use of Barium Sulfate*

19.     Genus's Vanilla SilQ products are barium sulfate oral solution contrast agents, which are swallowed – but not metabolized – for diagnostic purposes. Barium sulfate is an inert metal salt used to improve visualization of the gastrointestinal tract (esophagus, stomach, intestines) on plain X-ray or computed tomography. World Health Organization, Model Formulary § 14.2 (2008).

20.     Barium sulfate is a heavy metal with a high atomic number (Z=56), which results in an opacity helpful for visualization in X-ray or other radiologic procedures. It also has a K-shell binding energy (K-edge of 37.4 keV), which is very close to that of most diagnostic X-ray beams. These characteristics render barium sulfate an ideal medium for the absorption of X-rays. The barium sulfate suspension covers the mucosal surface of the gastrointestinal tract, which helps to delineate this structure upon exposure to X-rays.

21.     As a biologically inert material, barium sulfate cannot mediate a bodily response at the cellular or molecular level. E-Z-HD (barium sulfate), Clinical

Pharmacology Review, NDA 208036 (Aug. 12, 2015).  It cannot combine with or modify
an entity so as to alter its interaction with the body of man or other animals.  *Id.*  Barium
sulfate, therefore, cannot achieve its purposes as a contrast agent through chemical
action.

      22.    The coating of the gastrointestinal tract with barium sulfate occurs through
physical rather than chemical action.  There is no change on a molecular level to the
gastrointestinal system resulting from the consumption of barium sulfate nor is a new
substance formed after energy is absorbed.  Barium sulfate may coat the gastrointestinal
tract and absorb X-rays, but it does not change the chemical bonds of the gastrointestinal
tract.  It is only the physical presence of barium sulfate that causes the absorption of the
X-rays; its presence is not permanent and has no lasting effects on the molecules in the
gastrointestinal system or on the gastrointestinal system itself.  Because a physical
change in the gastrointestinal system does not arise from the consumption of barium
sulfate and a new substance is not formed, it cannot be considered a chemical change.

      23.    Further, barium sulfate is not dependent upon being metabolized for the
achievement of any of its primary intended purposes.  Indeed, barium sulfate is neither
absorbed nor metabolized and is eliminated intact from the body in a similar manner as
other non-absorbed inorganic materials.  This *lack* of absorption and metabolization
makes the product useful as a benign, radiopaque aid to X-ray diagnosis in
gastrointestinal and colorectal examinations.

### FDA's Regulatory Treatment of Barium Sulfate

24.     FDA cleared several barium sulfate products as medical devices between
1976 and 1980.  These clearances include barium sulfate suspensions and barium sulfate
powders for suspension:  K760736, K800459, K800839, K800840, K800841, K800842,
K800843, and K800844.  However, Bracco Imaging, a competitor of Genus, received
marketing approval for its E-Z-HD Barium Sulfate oral suspension under NDA numbers
208036 and 208143.  Bracco's products were approved in 2016.

### Description of Vanilla SilQ

25.     Genus has been marketing its Vanilla SilQ product line since 2015.

26.     Vanilla SilQ is available either in liquid form or in a powder that patients
reconstitute with water and ingest prior to undergoing radiographic procedures.  Vanilla
SilQ contains barium sulfate, used for the purposes described above, vanilla used as a
flavoring enhancement, and citric acid, natural and artificial flavors, benzoic acid,
suspending agent, potassium sorbate, purified water, sodium saccharin, sodium citrate,
simethicone, sodium benzoate, sorbitol, emulsifiers, and thickening agents.

### FDA's Treatment of Vanilla SilQ

27.     On May 2, 2017, FDA's Kansas City District Office issued a Warning
Letter to Genus stating that the Company's Vanilla SilQ Barium Sulfate liquid
suspension and powder for suspension products are unapproved new drugs distributed in
violation of the FDCA.

28.     Genus replied to that Warning Letter on May 19, 2017 explaining that
barium sulfate must be regulated as a device under the statutory definitions set forth in

8

the FDCA.  In its letter, Genus offered to meet with FDA to discuss the possibility of

submitting a 510(k) submission for its barium sulfate products or to further discuss the

regulatory status of the products.  This request was repeated shortly thereafter in a phone

call between Genus's attorneys and the FDA Office of Chief Counsel.  Genus received no

response from FDA for 16 months.

29.     On September 6, 2018, FDA's Office of Regulatory Affairs, Division of

Pharmaceutical Quality Operations III, replied to Genus's May 19, 2017 response to the

Warning Letter affirming FDA's position that the Vanilla SilQ products are unapproved

new drugs.

30.     On September 27, 2018, Genus responded with an explanation of its

position that its products are legally classified and regulated as medical devices.

31.     On November 7, 2018, Genus submitted an RFD to OCP recommending

that FDA determine that Vanilla SilQ is a "device" and assign jurisdiction to CDRH for

premarket review and regulation.  As part of this RFD, Plaintiff submitted information

demonstrating that Vanilla SilQ's primary intended purpose is physical/mechanical (that

is, device-like) and not chemical (or drug-like).  The RFD was filed on November 14,

2018.

32.     Dismissing this and other information contained in the RFD, on January 10,

2019, OCP issued a Letter of Determination (hereafter "OCP Letter") wrongly

concluding that Vanilla SilQ is a drug regulated by CDER simply because all contrast

agents are drugs.  Of critical importance, OCP agreed that the Vanilla SilQ products meet

the statutory definition of medical devices.  But OCP also claimed that the Vanilla SilQ

products meet the statutory definition of drug "because the definitions of drug and device are overlapping." As such, OCP claimed, FDA can choose to regulate barium sulfate as either a drug or a device at its discretion.

33.     FDA explained that it had previously determined that all contrast agents should be regulated the same, regardless of their mechanism of action. Because "not all contrast agents meet the definition of a device, but all of them do meet the definition of a drug, the Agency has for many years regulated these products, including recently approved barium sulfate contrast agents, as drugs in order to regulate them consistently under the same authority." OCP Letter, 3 (Jan. 10, 2019). As FDA explained in a footnote in the OCP Letter, "FDA determined that the contrast agents at issue should be regulated as drugs by CDER because consolidating review in one agency center, under one statutory scheme, would promote administrative efficiency and regulatory consistency and minimize the burden on industry and practitioners that a dual regulatory scheme might impose." *Id.* at n.5.

34.     FDA is wrong. Characterizing barium sulfate products as drugs is inconsistent with the unambiguous language of the FDCA. Administrative convenience cannot justify violation of the statute, and agency action must be set aside where it exceeds the agency's authority or where the agency has relied on factors which Congress has not intended it to consider. Moreover, industry must be able to rely on the plain meaning of the statute, and the implementation of changes that directly impact the applicability of the statute to a specific type of product must be public and subject to comment.

35.     FDA's insistence on treating all contrast agents as drugs, regardless of their mechanism of action, is unfounded in the law.  The OCP Letter determination is based on the premise that the definitions of drug and device are overlapping, and, as such, FDA has statutory authority to regulate every single type of medical device as a drug if it chooses to do so.  But the FDCA does not give FDA this discretion, or anything like it.

36.     Further, FDA's determination that all contrast agents must be regulated as drugs violates the APA in that FDA adopted such a requirement without undertaking the required notice and comment process.

37.     FDA's determination that Vanilla SilQ should be regulated as a drug is a final agency action subject to judicial review.

### Vanilla SilQ is a "Device," and FDA's Jurisdictional Determination is Contrary to Law, Arbitrary, and Capricious

38.     Vanilla SilQ barium sulfate products meet the plain meaning of the definition of a "device" contained in the FDCA because:

> a.  they are intended to diagnose a disease or condition (intended for use as a contrast agent in X-rays),
>
> b.  they do not achieve their primary intended purposes through chemical action (the evidence in the administrative record demonstrates that primary intended purposes of X-ray absorption and delineation of internal structures is achieved by providing a physical coating on tissue that absorbs X-rays), and

    c. they are not dependent upon being metabolized (indeed they are not metabolized at all).

39.    Congress separately defined drugs and devices for purposes of the FDCA. Under the separate definitions, an article is a drug if it is intended to diagnose or treat disease or affect the structure or function of the body. An article is a device, however, only if it is intended to diagnose or treat disease or affect the structure or function of the body, but does not achieve its intended purposes by chemical or metabolic activity. Different regulatory factors and analysis apply to products that are chemically interactive with the body – or that are metabolized – because of the very different and potentially long-lasting effects that can occur due to that interaction, with added data required to analyze potential differences among patients in how a product interacts with the body or is metabolized.

40.    Vanilla SilQ is a device under the statutory definition. Even FDA agrees with this assertion and explicitly admitted to it in the OCP Letter. Nonetheless, OCP erroneously and unlawfully classified the product as a drug.

41.    FDA's interpretation is contrary to the plain language, structure, and intent of the FDCA, which unambiguously intended to create a clear distinction between drug and device. Nothing in the FDCA suggests that an article can be classified as both a drug and a device, allowing FDA to choose which way to regulate it. To the contrary, the statute is built around two entirely different regulatory schemes that rest on the exclusive classification of an article as either a drug *or* a device. Congress did not grant FDA discretion to reclassify a product at its whim.

42.     FDA argues that, in the interest of regulatory consistency and administrative efficiency, all contrast agents are regulated as drugs because not all contrast agents meet the definition of a device and can therefore be regulated as devices. That is, rather than evaluating the method of achieving primary intended purpose for a given medical product as required by both statute and FDA policy, FDA appears to have adopted, *sua sponte*, a class-wide standard based on the functionality of only *some* contrast agents. FDA did so without input from industry, without statutory authorization, and in contradiction of decades of regulating many contrast agents, including barium sulfate, as medical devices.

43.     If FDA's adoption of a class-wide intended use standard for contrast agents were consistent with the plain statutory language, which it is not, it could have been implemented only after notice to the public and opportunity for public comment. The mass classification of contrast agents ignores significant differences between contrast agents that exist precisely because different contrast agents operate very differently; applying a single general standard to contrast agents is not treating similar products similarly because all contrast agents are not similar products.

44.     That FDA refuses to perform the same analysis and adhere to the same standard for barium sulfate as it does for other medical products purporting to be devices is intrinsically disparate treatment. Therefore, FDA's blanket classification of contrast agents notwithstanding the articulated definitions and classification standards is arbitrary and capricious in violation of the APA.

45.     For the reasons alleged above, FDA violated the FDCA when it determined that Vanilla SilQ products are drugs.  Under the FDCA, Defendant FDA should have determined that Vanilla SilQ was to be regulated as a device.

## PLAINTIFF'S CLAIMS FOR RELIEF

### Count I
### (Action Not in Accordance with Law)

46.     The allegations in paragraphs 1-45 are incorporated herein by reference.

47.     FDA illegally classified as a drug a product that clearly meets the definition of and predefined criteria for a "device" under the FDCA.  Plaintiff is entitled to a finding that Vanilla SilQ is a device.

48.     FDA's decision was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of authority granted by law, and without observance of procedure required by law, in violation of the APA.

### Count II
### (APA – Agency Action in Excess of Statutory Authority)

49.     The allegations in paragraphs 1-48 are incorporated herein by reference.

50.     The OCP Letter determination that Vanilla SilQ is a drug, predicated on discretion imputed from a supposed overlap in the statutory definition, is an exercise of statutory authority based on an interpretation of the statutory provision defining and distinguishing between drugs and devices that violates every canon of statutory interpretation.  The FDCA in no way grants FDA discretion to determine that a product is a drug or device based on administrative convenience disregarding the statutory

definitions.  Thus, FDA's Order is in excess of its statutory authority under the FDCA

and in violation of 5 U.S.C. § 706(2)(C).

## Count III
## (Failure to Convene Rulemaking)

51.     The allegations in paragraphs 1-50 are incorporated herein by reference.

52.     FDA failed to initiate rulemaking to classify all contrast products as drugs,

as required by APA, 5 U.S.C. § 553(b)-(c).

53.     Application of this novel requirement without proper rulemaking was

illegal because it applied a different standard, without reasoned explanation and without

lawful notice-and-comment, to a class of products in spite of principles articulated in the

governing statute for distinguishing between drugs and devices.  FDA established new

legal criteria for determining the regulatory classification of a product without complying

with the APA requirements for establishing new rules.

54.     Defendant further imposed new legislative or substantive rules on contrast

agents creating new duties on sponsors without undertaking the rulemaking process.

When changing a long-standing policy, imposing substantial costs and requirements on

stakeholders, an agency is required under the APA to consider input from industry and

the public.

55.     For the foregoing reasons, FDA's conduct was arbitrary, capricious, an

abuse of discretion, otherwise not in accordance with law, in excess of authority granted

by law, and without observance of procedure required by law.

## **PRAYER FOR RELIEF**

56.     WHEREFORE, Plaintiff Genus prays that this Court grant the following relief:

    a.    Injunctive relief and a Declaratory Judgment that:

        i.    Vacates FDA's designation of Vanilla SilQ as a drug;

        ii.    Declares that FDA's jurisdictional determination was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of authority granted by law, and without observance of procedure required by law; and

        iii.    Declares that Vanilla SilQ is a "device."

    b.    Award to Plaintiff of its costs and attorneys' fees.

    c.    Such other relief as may be just and proper.

Dated:  February 28, 2019

Respectfully submitted,

Genus Medical Technologies

By: _____

Douglas Farquhar (D.C. Bar No. 386573)
Hyman, Phelps & McNamara, P.C.
700 13th Street, N.W., Suite 1200
Washington, D.C.  20005
Phone:    (202) 737-5600
Fax:        (202) 737-9329
*Attorney for Plaintiff*

16