# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GENUS MEDICAL TECHNOLOGIES<br>207 Chesterfield Towne Center<br>Chesterfield, MO  63005<br><br>   Plaintiff,<br><br> v.<br><br>UNITED STATES FOOD<br>AND DRUG ADMINISTRATION,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201<br><br>   Defendant. | Case No. 1:19-cv-0544-JEB |

## GENUS'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Genus Medical Technologies ("Genus"), by and through its attorneys, respectfully moves this Court for an order granting summary judgment pursuant to Fed. R. Civ. P. 56.  The United States Food and Drug Administration ("FDA"), a federal agency with delegated authority to administer the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*., wrongly decided to regulate Genus's product Vanilla SilQ (including Vanilla SilQ Barium Smoothie, Vanilla SilQ HD, and Vanilla SilQ MD) as a drug product rather than as a medical device, even though FDA admits that Vanilla SilQ meets the statutory definition of a device.  In so doing, FDA has violated the FDCA, which requires FDA to classify Vanilla SilQ as a medical device and to regulate it accordingly.  FDA has acted arbitrarily, capriciously, contrary to law, and in excess of statutory authority, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1), 706(2)(A), (C), and (D).

Genus seeks an order declaring that:

(i)     Vanilla SilQ is a medical device under the statutory definition set forth in
21 U.S.C. § 321(h);

(ii)    FDA's failure to, within the period set by statute, issue a classification
decision to respond to Genus's request to classify Vanilla SilQ as a device
dictates that Genus's recommendation be adopted as FDA's final
determination;

(iii)   FDA violated the FDCA and APA when it decided to regulate Vanilla SilQ as
a "drug" and failed to classify it as a device; and

(iv)    FDA must classify Vanilla SilQ as a medical device.

The legal basis for this order is that Vanilla SilQ does not achieve its primary intended
purposes through chemical action within or on the body or after being metabolized.  Therefore,
Vanilla SilQ meets the statutory definition of a medical device.  FDA has admitted this crucial
fact.  As such, there is no genuine issue as to any material fact.  Accordingly, Genus is entitled to
judgment as a matter of law as set forth in the Proposed Order.  Genus hereby submits a
Memorandum of Points and Authorities in support of its position.


Dated: May 30, 2019

                                        Respectfully submitted,

                        By:     /s/Sara Wexler Koblitz
                                Douglas Farquhar (D.C. Bar No. 386573)
                                Sara W. Koblitz (D.C. Bar No. 1017284)
                                Hyman, Phelps & McNamara, P.C.
                                700 13th Street, N.W., Suite 1200
                                Washington, D.C.  20005
                                Phone:    (202) 737-5600
                                Fax:      (202) 737-9329
                                *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Sara W. Koblitz, hereby certify that I caused the foregoing Motion for Summary

Judgment and supporting documents to be served via the District Court's Electronic Filing

System (ECF) upon counsel for the federal defendant:

> JASON LEE
> Trial Attorney
> Civil Division, Federal Programs Branch
> United States Department of Justice

This 30th day of May 2019.

> _/s/Sara Wexler Koblitz
> Sara W. Koblitz (D.C. Bar No. 1017284)
> Hyman, Phelps & McNamara, P.C.
> 700 13th Street, N.W., Suite 1200
> Washington, D.C. 20005
> Phone: (202) 737-5600
> Fax: (202) 737-9329

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GENUS MEDICAL TECHNOLOGIES<br>207 Chesterfield Towne Center<br>Chesterfield, MO  63005 | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-0544-JEB |
| v. | ) ) | |
| UNITED STATES FOOD<br>AND DRUG ADMINISTRATION,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN
## SUPPORT OF GENUS MEDICAL TECHNOLOGIES'
## MOTION FOR SUMMARY JUDGMENT

Douglas Farquhar (D.C. Bar No. 386573)
Sara W. Koblitz (D.C. Bar No. 1017284)
Hyman, Phelps & McNamara, P.C.
700 13th Street, N.W., Suite 1200
Washington, D.C.  20005
Phone:     (202) 737-5600
Fax:        (202) 737-9329

**Table of Contents**

I.    INTRODUCTORY STATEMENT ............................................................................1

II.   FACTUAL AND LEGAL BACKGROUND ......................................................4

    A.    Product at Issue ...........................................................................................4

        1.    Description of Barium Sulfate...........................................................4

        2.    Prior Regulatory Treatment of Barium Sulfate .............................6

    B.    Legal Framework for FDA Classification and Regulation of Products.................8

        1.    The Statutory Distinction Between Drug and Device ................................8

        2.    The Significant Differences in Drug and Device Regulatory Schemes .......9

        3.    The Statutory Process for Determining Classification of Products............11

        4.    FDARA Provisions Relating to Contrast Agents .......................................13

        5.    FDA's Regulations and Guidance on the Distinction Between Drug and Device ...............................................................................................13

    C.    FDA's Product Classification of Vanilla SilQ ...................................................14

        1.    FDA Communications with Genus Prior to RFD Process. ........................14

        2.    Genus's Filing of an RFD, and FDA's Response.......................................16

III.  ARGUMENT ...................................................................................................19

    A.    Genus Meets the Standards Required for Summary Judgment.............................21

    B.    FDA's Failure to Comply with Section 563 of the FDCA Requires FDA to Classify Barium Sulfate as a Device.................................................................22

    C.    FDA Violated the FDCA When it Decided that Barium Sulfate Is Not a Medical Device.................................................................................................23

        1.    FDA's Decision Contravenes the Plain Meaning of the FDCA....................29

        2.    Pursuant to the 1990 SMDA Amendments, Genus's Barium Sulfate Product Must Be Classified as a Device ................................................29

        3.    The Statutory Definition of a Device Is Not Superseded by FDARA............31

    D.    FDA's Novel Interpretation of the "Device" Definition Is Not Based on a Permissible Construction of the Statute................................................................32

        1.    FDA's Decision Applies a Different Analysis to Barium Sulfate than to Other Products.................................................................................33

        2.    FDA Created New Regulatory Requirements for Barium Sulfate that Did Not Go Through Notice and Comment Rulemaking. ...............................39

IV.     CONCLUSION ................................................................................................................43

# Table of Authorities

## Cases

*ALDRICH v. SEC*, 139 F.3d 221 (D.C. Cir. 1998) .................................................... 33, 38

*Alston v. Lew*, 950 F. Supp. 2d 140 (D.D.C. 2013) ...................................................... 21

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987)....................................... 39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 21

*Astoria Fed. Savs. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) .......................... 24

*Bellarno Int'l, Ltd. v. FDA*, 678 F. Supp. 410 (E.D.N.Y. 1988).................................. 42

*Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) .................... * * *

*Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010) ...................... 39

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)................... 24, 28, 44

*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943 (D.C. Cir. 1987)................................ 33, 39

*Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769 (D.C. Cir. 1988)............................... 34

*Corley v. United States*, 556 U.S. 303 (2009)................................................................ 24

*Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016)......................................... 30

*D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204 (1932) ......................................... 24

*Diamond v. Atwood*, 43 F.3d 1538 (D.C. Cir. 1995)................................................... 21

*Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918 (D.C. Cir. 1982)................................. 34

*Ethicon, Inc. v. FDA*, 762 F. Supp. 382 (D.D.C. 1991)............................................... 27

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................... 28

*Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006) ...................................................... 33

*Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018)................................................ 30

*Hall v. Sebelius*, 770 F. Supp. 2d 61 (D.D.C. 2011).................................................... 21

*Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 13 (D.D.C. 2008).......................... 21

*Int'l Rehabilitative Sci., Inc. v. Kessler*, No. SA-93-CA-0242 (W.D. Tex. June 29, 1993)......... 34

*Marco Sales Co. v. FTC*, 453 F.2d 1 (2d Cir. 1971) ................................................... 34

*MCI Telecoms. Corp. v. AT&T*, 512 U.S. 218 (1994) ................................................ 26

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ............................... 28

*Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747 (D.C. Cir. 2000) ........................ 30

*Nutritional Health All. v. FDA*, 318 F.3d 92 (2d Cir. 2003) ....................................... 28

*Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997) .......... 39

*Pereira v. Sessions*, 138 S. Ct. 2105 (2018) ............................................................... 28

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) ............................................. 39

*Prevor v. FDA*, 67 F. Supp. 3d 125 (D.D.C. 2014) ............................................. 21, 28

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ................ 24

*Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120 (D.C. Cir. 2006) ................................... 24

*RxUSA Wholesale, Inc. v. HHS*, 467 F. Supp. 2d 285 (E.D.N.Y. 2006) ..................... 33

*SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202 (D.C. Cir. 2014) .............................. 34

*Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) .................................... 43

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997) ........................... 39, 41, 42

*Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010) ........................ 28

*United States v. Diapulse Corp. of Am.*, 748 F.2d 56 (2d Cir. 1984) ........................... 34

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................... 33

*USPS v. Postal Regulatory Comm'n*, 785 F.3d 740 (D.C. Cir. 2015) .......................... 33

*Westar Energy, Inc. v. FERC*, 473 F.3d 1239 (D.C. Cir. 2007) ................................... 34

*Whitfield v. United States*, 543 U.S. 209 (2005) ....................................................... 26

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ............................................. 26

**Statutes**

21 U.S.C. § 321 ..................................................................................................31

21 U.S.C. § 321(g) ........................................................................................ passim

21 U.S.C. § 321(h) ........................................................................................ passim

21 U.S.C. § 321(c) ..............................................................................................13

21 U.S.C. § 336 ..................................................................................................26

21 U.S.C. § 353(g) (FDCA § 503(g)) .......................................................... passim

21 U.S.C. § 355(y) ..............................................................................................18

21 U.S.C. § 360(k) ........................................................................................15, 17

21 U.S.C. § 360bbb-2 (FDCA § 563) .......................................................... passim

21 U.S.C. § 360bbb-2(a) .....................................................................................22

21 U.S.C. § 360bbb-2(b) ...............................................................................12, 22

21 U.S.C. § 360bbb-3 ..........................................................................................27

21 U.S.C. § 360c(a) ..................................................................................10, 25, 27

21 U.S.C. § 360d(a) .............................................................................................27

21 U.S.C. § 360e ..................................................................................................10

21 U.S.C. § 360j(p) ........................................................................................18, 31

21 U.S.C. § 379h(a) .............................................................................................27

5 U.S.C. § 552 .....................................................................................................41

5 U.S.C. § 553 ...............................................................................................39, 41

5 U.S.C. § 706(2) ........................................................................................3, 21, 23

5 U.S.C. Chapter 5 ..............................................................................................41

FDARA, Pub. L. No. 115-52, 131 Stat. 1005 ....................................................13

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................21

**Regulations**

21 C.F.R. § 3.2(f) ...................................................................................................37

21 C.F.R. § 3.2(g) ..................................................................................................37

21 C.F.R. § 3.2(k) .............................................................................................13, 37

21 C.F.R. § 3.3 .......................................................................................................13

21 C.F.R. § 3.3(b) ..................................................................................................37

21 C.F.R. § 3.4 .......................................................................................................37

21 C.F.R. § 3.5 .......................................................................................................10

21 C.F.R. § 3.7 ................................................................................................ passim

21 C.F.R. Part 3 .....................................................................................................16

21 C.F.R. § 314.126 ...............................................................................................10

21 C.F.R. § 807.92 .................................................................................................17

**Other Authorities**

Barosperse (barium sulfate), Package Insert (rev'd Feb. 2009).....................................5

FDA, Overview of Medical Device Regulation: General Controls for Medical Devices (Mar. 22, 2018).................................................................................................................31

Josh Makower, *FDA Impact on Medical Technology Innovation* (Nov. 2010)...........................11

Rick Mullin, *Cost to Develop New Pharmaceutical Drug Now Exceeds $2.5 Billion*, Sci. Amer. (Nov. 24, 2014) .....................................................................................................11

I.    **INTRODUCTORY STATEMENT**

Plaintiff Genus Medical Technologies ("Genus") filed this action against the Defendant, the U.S. Food and Drug Administration ("FDA"), seeking declaratory and injunctive relief. This case presents only questions of law that should be resolved in Genus's favor on summary judgment.

The product at issue in this case, barium sulfate, has been safely used as a radiologic contrast agent since the 1890s. It is an inert metal salt ingested by humans to improve visualization of the gastrointestinal tract on an X-ray image or computed tomography (commonly referred to as a "CT" scan). In addition to its well-established safety profile, barium sulfate is a very effective and affordable oral contrast agent. Because it is intended to aid in diagnosing health conditions or diseases, barium sulfate falls under the purview of FDA.

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), FDA regulates products – including drugs and medical devices – intended to treat, cure, diagnose, or prevent disease. *See* 21 U.S.C. § 321(g) (defining "drug"), (h) (defining "device"). Although the intended uses of drugs and devices are the same, Congress has carefully delineated the distinction between a drug and a device in the FDCA, centered on how a particular product achieves its intended purpose. *Id.* Based on these definitions, Congress established entirely separate regulatory schemes for drugs versus devices and set forth standards for differentiating between – or classifying – the two classes of products. *Id.* § 360bbb-2. Yet, despite clear language and intent on the part of Congress to distinguish between drugs and devices, FDA has taken the position in this case that it has unfettered discretion to dictate that any and all products meeting the definition of a device may instead be regulated as drugs, if the agency so chooses.

Specifically, after Genus undertook the statutory process for seeking a formal classification of its barium sulfate product – a classification that Genus is entitled to under the relevant statutory provisions – and requested that FDA classify Genus's barium sulfate as a medical device, FDA's decision actually *never classified the product*.[1]  Indeed, FDA ducked the issue – and the statutory requirement that it classify the product as a drug *or* a device under section 563 of the FDCA (21 U.S.C. § 360bbb-2) – by omitting any decision about how the product should be classified.  FDA instead merely asserted that barium sulfate "will be *regulated* as a drug" under the FDCA.[2]

FDA argues that it may regulate any device as a drug because the "intended use" portions of the drug and device definitions overlap.  But the classification provision in section 563 requires that FDA classify a product as either a drug or a device (or a biologic or combination product).  FDA failed to comply with section 563 by straightforwardly classifying Genus's barium sulfate products as a device.  Instead, FDA agreed it met the definition of a device, asserted it also met the definition of a drug, failed to classify it as one or the other, and assigned it to the Drug Center for regulation as if it were a drug.

Barium sulfate, as both parties agree, meets the entire statutory definition of a medical device (not just the portion overlapping with the drug definition) because it "does not achieve its primary purposes through chemical action within or on the body of man or other animals" and "is not dependent upon being metabolized for the achievement of its primary intended purposes."

---

[1] Letter from Leigh Hayes, OCP (Jan. 10, 2019), FDA000005.  In this memorandum, citations to the Administrative Record will refer to the Bates number of the relevant pages, beginning with the prefix "FDA" followed by six digits.

[2] *Id.* (emphasis added).

*Id*. § 321(h).  This unique requirement was inserted into the statute specifically to distinguish drugs and devices.

FDA has made its position clear in several recent responses to administrative challenges raised by Genus relating to Genus's Vanilla SilQ product (including Vanilla SilQ Barium Smoothie, Vanilla SilQ HD, and Vanilla SilQ MD).  Each time, the Agency admitted that Vanilla SilQ meets the statutory definition of a device but insisted that FDA has authority nonetheless to choose to regulate it as a drug for reasons of administrative convenience and policy.

FDA's assertion of authority in this case does great violence to the entire statutory scheme.  Congress created a clear and unambiguous distinction between drug and device, as demonstrated by the plain language, structure, and purpose of the FDCA.  FDA's insistence on regulating barium sulfate as a drug rather than a device without classifying it as a drug exceeds FDA's statutory authority and is arbitrary and capricious – and contrary to law – in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  FDA's decision also constitutes a change in settled FDA policy that would require notice and an opportunity for industry to comment on the proposed change, a notice and comment rulemaking process that FDA did not offer or perform.  Moreover, because securing approval and maintaining authorization to market a drug cost vastly more than similar costs for marketing a medical device, Genus will be seriously damaged by FDA's erroneous and illegal decision, unless FDA's decision is reversed by this Court.

II.    **FACTUAL AND LEGAL BACKGROUND**

A.    **Product at Issue**

1.  **Description of Barium Sulfate**

Genus manufactures a line of barium sulfate oral solution contrast products, Vanilla SilQ, which are swallowed to opacify the gastrointestinal tract for diagnostic purposes.[3]  Vanilla SilQ is available either in liquid form or in a powder that patients reconstitute with water and ingest prior to undergoing radiographic procedures.  Since 2015, Genus has focused on developing imaging products that meet the clinical and economic needs of the current healthcare environment.  Genus developed Vanilla SilQ to provide consumers with a safe, effective, and affordable oral contrast option.[4]

Barium sulfate, in various formulations, has a long history of safe and effective use in X-ray and computed topography examinations dating back to 1896.[5]  *See* Dennis D. Patton, *Insight on the Radiologic Centennial:  A Historical Perspective.  Part 4.  Of Gastrointestinal Radiology, Bread and Butter; or, the Flowering of Barium Sulfate*, 29(4) Investigative Radiology 472 (1994), attached as Exhibit A.[6]  Barium sulfate has been marketed commercially as an X-ray contrast agent since as early as 1913.[7]  *See* V.H. Wallingford, *The Development of Organic Iodine Compounds as X-ray Contrast Media*, 42(12) J. Am. Pharm. Assoc. 721, 721 (1953), attached as Exhibit B.  An inert metal salt and a heavy metal with a high atomic number (Z=56),

---

[3] Decl. of John Edward Powers (May 30, 2019), attached to this Memorandum, ¶ 6.

[4] *Id.*

[5] *Id.*

[6] The term "Exhibit" throughout this Memorandum refers to the exhibits appended to the Declaration of John Edward Powers.  Other attachments which are not the subject of discussion in the Powers Declaration will be referred to as "Attachments," rather than Exhibits.

[7] Decl. of John Edward Powers ¶ 9.

barium sulfate, when ingested, results in an opacity that is useful to delineate the structures of the gastrointestinal tract.  WHO, Model Formulary § 14.2 (2008), attached as Exhibit C.  Barium Sulfate, PubChem Compound Summary for CID 24414 § 9.6, attached as Exhibit D.  Once swallowed, barium sulfate coats the inside of the esophagus, stomach lining, or intestines, and, due to its high molecular density, its physical presence in the gastrointestinal tract causes absorption of X-rays.  Exhibits C and D.  As a result of these properties, an X-ray examination will show light for areas representing tissue coated with barium sulfate and dark for surrounding tissues not coated.  This contrast permits radiologists to better visualize the gastrointestinal tract.[8]

Unlike some other contrast agents, barium sulfate suspension does not chemically interact with human cells or tissue to serve its purpose.  E-Z-HD (barium sulfate), Clinical Pharmacology Review, NDA 208036, 8 (Aug. 12, 2015), Exhibit E.  As discussed further below, the intended effects of barium sulfate arise from the physical action of coating of the gastrointestinal tract and absorbing X-rays.[9]  The consumption of barium sulfate in no way affects the chemical bonds or molecular structure of the gastrointestinal system nor does it form a new substance after energy is absorbed.[10]  While the physical presence of barium sulfate causes the absorption of X-rays, its presence is not permanent and has no lasting effects on the molecules in the gastrointestinal system or on the gastrointestinal system itself.[11]

Barium sulfate is neither absorbed nor metabolized when used as a contrast agent.  It is instead eliminated intact from the body in a manner similar to other non-absorbed inorganic materials.  *See* Barosperse (barium sulfate), Package Insert (rev'd Feb. 2009),

---

[8] Decl. of John Edward Powers ¶ 11.

[9] *Id*. ¶¶ 10, 11.

[10] *Id.* ¶¶ 11, 12.

[11] *Id.* ¶¶ 10-12.

https://www.drugs.com/pro/barosperse.html.  FDA explained in its review of Bracco Imaging's

E-Z-HD (a product virtually identical to Genus's Vanilla SilQ HD product) New Drug

Application ("NDA") that "[b]arium sulfate is an insoluble compound and is biologically inert.

The systemic absorption of barium sulfate is extremely limited; it is not metabolized and is

eliminated unchanged in the feces."  Exhibit E at 4.

Indeed, it is the *lack* of absorption by tissue and of metabolization that makes the product

useful as a benign, radiopaque aid to X-ray diagnosis in gastrointestinal and colorectal

examinations.[12]  "Characterized by extreme insolubility, chemically pure barium sulfate is non

toxic to humans."  U.S. Dep't of Health and Human Servs., Pub. Health Serv., Agency for Toxic

Substances and Disease Registry, *Toxicological Profile for Barium and Barium Compounds*, 105

(Aug. 2007), Attachment 1.  In a study of urine submitted to FDA in support of NDA approval

for Bracco's barium sulfate products, less than 1% of the product was detected.  Exhibit E, at 7.

### 2.  Prior Regulatory Treatment of Barium Sulfate

Though used for decades prior, FDA first classified barium sulfate products (including

barium sulfate suspensions and barium sulfate powders for suspension) in the late 1970s.  *See,*

*e.g.*, Barimex, 510(k) Premarket Notification, K760736 (Nov. 9, 1976), attached as Exhibit G.

Pursuant to a statutory "device" definition not materially different from the one currently in

place, FDA at that time classified "barium sulfate" products as devices.  Barium sulfate products

continued to be regulated as devices for years thereafter.  In addition to the Barimex device

clearance (Exhibit G), FDA cleared several other barium sulfate products for marketing as

medical devices, including barium sulfate in suspension under K800459 (Exhibit H) and Barium-

13 under K800867 (Exhibit I), both cleared in May 1980.

---

[12] *Id.* ¶ 10.

However, on January 29, 1982, FDA published in a proposed rule a determination "that all radiologic contrast media, including barium enema kits, are to be regulated by FDA as drugs under section 201(g) of the act (21 U.S.C. § 321(g)(1)) and not as devices." This "proposal" was presented as a completed determination, and FDA did not solicit – or even permit – public feedback. *See* Radiology Devices; Development of General Provisions and Classification of 73 Devices, 47 Fed. Reg. 4406, 4412 (proposed Jan. 29, 1982), Attachment 2. FDA never actually finalized this proposal.

Instead, more than a decade later, the Agency responded to several Citizen Petitions with its position that all contrast agents – without specific reference to barium sulfate – would henceforth be regulated as drugs rather than devices, regardless of their physical properties and intended use, for purposes of administrative efficiency and regulatory consistency. *See* FDA, Consolidated Response to Pending Citizen Petitions on the Regulation of Ultrasound Contrast Agents, Docket No. 96P-0511, 53 (July 25, 1997), Attachment 3. Although the Citizen Petitions addressed by these responses related to ultrasound contrast agents – rather than contrast agents used in radiographic procedures, like barium sulfate – the language cited above did not exclude radiographic contrast agents (including barium sulfate) from "all contrast agents" that FDA would henceforth classify as drugs, and the Citizen Petition Response mentioned the 1982 proposed rule favorably.

For nearly 20 years, between 1997 and 2016, there was no further regulatory activity related to barium sulfate. But in 2016, in line with the policy announced in the 1982 proposed (but never finalized) rule, FDA approved Bracco Diagnostics Inc.'s ("Bracco's") seven versions of barium sulfate as separate drug products. No other barium sulfate manufacturer has received FDA approval to market the product as a drug. Thus, in the absence of Court reversal of FDA's

erroneous classification of Vanilla SilQ as a drug, there will be no commercially available competitor to Bracco's barium sulfate products.

      **B.    Legal Framework for FDA Classification and Regulation of Products**

        **1.  The Statutory Distinction Between Drug and Device**

     The FDCA sets forth two dramatically different regulatory schemes for drugs and devices based on their respective statutory definitions.  The FDCA defines the term "drug" to mean:

> (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C) . . . .

21 U.S.C. § 321(g).  The definition of "device" is notably more narrow than the drug definition:

> [A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is –
>
> (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
>
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
>
> (3) intended to affect the structure or any function of the body of man or other animals, and
>
> **which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes**.

*Id.* § 321(h) (emphasis added).

The key statutory distinction between a drug and a device, therefore, is that a device does not achieve "its primary intended purposes through chemical action within or on the body of man" and "is not dependent upon being metabolized for the achievement of its primary intended purpose." *Id*. In amending the "device" definition, the Medical Device Amendments of 1976 ("MDA") sought both to give FDA enhanced authority over medical devices, and to "draw a clear distinction between a 'device' and a 'drug.'" H.R. Rep. No. 94-853, at 14 (1976), Attachment 4. Congress at the time recognized that, prior to the 1976 changes, the "[e]xisting statutory definitions of 'device' and 'drug,' although *legally mutually exclusive*, [were] functionally overlapping and, thus, confusing to the device industry, the general public and the courts." *Id*. at 13 (emphasis added).

Before 1976, the only distinction between a "device" and a "drug" was that the statute referred to a drug as an "article" and to a device as an "instrument[], apparatus, and contrivance[]. . . ." *See* 21 U.S.C. § 321(g), (h) (1938). Nevertheless, this distinction was important because FDA only had authority to review *drugs* for safety and effectiveness. *Id*. Congress carved out from the "device" definition a product that achieves "any of its principal intended purposes" through chemical or metabolic action. *Id.* § 321(h) (1976).

In 1990, Congress again modified the "device" definition – changing the phrase "any of its principal" intended purposes to more narrowly focus only on the product's "primary" intended purposes. *See* Safe Medical Devices Act of 1990 ("SMDA"), Pub. L. No. 101-629, 104 Stat. 4511. Attachment 5.

### 2.  The Significant Differences in Drug and Device Regulatory Schemes

The statutory and regulatory distinctions between "device" and "drug" have meaningful practical consequences that go far beyond the definitions of those terms. Indeed, whether a

product is classified as a drug or is classified as a device has enormous impact on a sponsor seeking to market the product. Drugs and devices are so different that FDA has established separate bureaucratic centers for drugs and devices, each applying its own set of statutory and regulatory provisions.

Primary jurisdiction over devices is allocated to the Center for Devices and Radiological Health ("CDRH") while the Center for Drug Evaluation and Research ("CDER") has primary jurisdiction over drugs. *See* 21 U.S.C. § 353(g)(1); 21 C.F.R. § 3.5. Each center has its own requirements for marketing authorization, with a far more rigorous approval process on the drug side. Drug marketing approval, for example, typically requires the submission of at least two randomized and controlled clinical studies demonstrating a product's safety and efficacy. 21 C.F.R. § 314.126. Devices, in contrast, are reviewed for marketing based on risk. 21 U.S.C. § 360c(a)(1). Unlike drugs, devices are categorized by FDA as Class I, II, or III. Devices with the lowest risk are placed in Class I and exempt from most premarket requirements and some regulatory controls. Devices of the highest risk are placed in Class III – and even these devices classified as most high-risk require the submission of substantially less robust data than drugs and may not even require full clinical studies. *See* 21 U.S.C. § 360e. For this reason, the development of drugs often takes many years while the development of a medical device is significantly quicker.

Further, significant cost differences exist in both the development and the continued sale of drug and device products. For a single drug application – even a generic drug application – from a small company, user fees total at least $300,000 in filing and program fees in the first year. After the first year, registration fees total at least $186,217 per year. Conversely, for a 510(k) notification for the same product from a small company when regulated as a device, user

fees total only $7,600, inclusive of Annual Establishment Registration fees, which are significantly lower than drug listing fees. And the testing requirements for drugs are much more demanding than for devices. It is estimated that the cost of bringing a new drug or a generic drug to market averages $2.6 billion (Rick Mullin, *Cost to Develop New Pharmaceutical Drug Now Exceeds $2.5 Billion*, Sci. Amer. (Nov. 24, 2014), https://www.scientificamerican.com/article/cost-to-develop-new-pharmaceutical-drug-now-exceeds-2-5b/), whereas, for devices in general, the costs are significantly lower (approximating $31 million for a 510(k) and $94 million for a PMA) (Josh Makower, *FDA Impact on Medical Technology Innovation* (Nov. 2010), https://www.advamed.org/sites/default/files/resource/30_10_11_10_2010_Study_CAgenda_makowerreportfinal.pdf). For Genus, the costs of seeking clearance to market Vanilla SilQ as a device are estimated to be $60,000, whereas to seek approval to market as a drug would be $556,000 plus continuing annual costs of $186,217.[13] As such, there are significant regulatory and economic differences in the review of the two types of products.

### 3. The Statutory Process for Determining Classification of Products

So important is the distinction between drugs and devices that Congress in 1997 added to the FDCA § 563, "Classification of Products" (21 U.S.C. § 360bbb-2). That provision applies when it is in dispute or unclear whether a product meets the statutory definition of "device" or "drug" (or if it is a "combination product"). In such cases, the statute as amended permits the sponsor of a product to request a classification decision for a product or a decision about which component will regulate the product. The statute states in full:

---

[13] Decl. of John Edward Powers ¶ 31.

**§360bbb–2. Classification of products**

**(a) Request**
A person who submits an application or submission (including a petition, notification, and any other similar form of request) under this chapter for a product, may submit a request to the Secretary respecting the classification of the product as a drug, biological product, device, or a combination product subject to section 353(g) of this title or respecting the component of the Food and Drug Administration that will regulate the product. In submitting the request, the person shall recommend a classification for the product, or a component to regulate the product, as appropriate.

**(b) Statement**
Not later than 60 days after the receipt of the request described in subsection (a), the Secretary shall determine the classification of the product under subsection (a), or the component of the Food and Drug Administration that will regulate the product, and shall provide to the person a written statement that identifies such classification or such component, and the reasons for such determination. The Secretary may not modify such statement except with the written consent of the person, or for public health reasons based on scientific evidence.

**(c) Inaction of Secretary**
If the Secretary does not provide the statement within the 60-day period described in subsection (b), the recommendation made by the person under subsection (a) shall be considered to be a final determination by the Secretary of such classification of the product, or the component of the Food and Drug Administration that will regulate the product, as applicable, and may not be modified by the Secretary except with the written consent of the person, or for public health reasons based on scientific evidence.

In general, a product classified as a device will be regulated by CDRH. However, a few classes of devices are regulated by FDA's Center for Biological Evaluation and Research ("CBER"), applying the device authorities (not the biologic authorities). Section (a) permits a sponsor to request a decision as to either the classification or the component.

To make a request, a sponsor must submit a Request for Designation ("RFD") to FDA's Office of Combination Products ("OCP"), which is part of the Office of the FDA Commissioner, to obtain a binding determination of the classification for a product or determine which component of the bureaucracy will regulate it. 21 C.F.R. § 3.7. Within 60 days of the

submission of the RFD, if requested to decide classification under subsection (a) of Section 563,

FDA "*shall* determine the classification of the product under subsection (a)." 21 U.S.C. §

360bbb-2(b) (emphasis added). Under subsection (b), if FDA does not provide a statement "that

identifies such classification" within 60 days, the sponsor's recommendation as stated in the

RFD is considered the final classification determination that may not be modified without the

sponsor's written consent or for public health reasons based on scientific evidence. *Id.* § 321(c).

### 4. FDARA Provisions Relating to Contrast Agents

Congress did not approve legislation specifically mentioning contrast agents until 2017.

In 2017, Congress passed the Food and Drug Administration Reauthorization Act of 2017

("FDARA"), which contains provisions governing FDA's approval of diagnostic-imaging

devices intended for use with contrast agents that are regulated as drugs. *See* FDARA, Pub. L.

No. 115-52, § 706, 131 Stat. 1005, 1058. Those FDARA provisions govern only approval or

clearance of a device for use with contrast agent drug products if the use is different from the

intended use approved in the contrast agent drug's labeling. *See* H.R. Rep. 115-201, at 49

(July 11, 2017). Attachment 6. In this legislation Congress does define "contrast agent" – but

only for "purposes of this subsection" and these specific circumstances – as including "a drug

that is approved under section 505." *Id*. at 188. However, FDA relies on this definition in its

communications with Genus about barium sulfate as confirming that contrast agents are

"appropriately" regulated as drugs.

### 5. FDA's Regulations and Guidance on the Distinction Between Drug and Device

FDA regulations adopt and repeat the statutory distinction between devices and drugs

based on whether chemical or metabolic action is necessary to achieve an article's "primary

intended purpose." 21 C.F.R. § 3.2(k)(2). These regulations, addressing the classification of

products, apply both to combination products and to "[a]ny product" when it is unclear or "in dispute" in which center a product should be regulated (*i.e.*, "the agency component"). *Id.* §§ 3.3, 3.7. The FDA regulations require a product sponsor to provide for FDA's analysis, among other details, a "[d]escription of all known modes of action, the sponsor's identification of the single mode of action that provides the most important therapeutic action of the product, and the basis for that determination." *Id.* § 3.7(c)(2)(ix). This information is an important element of FDA's classification decision for single-entity products or center assignment for combination products.

An FDA guidance, expressing FDA's policy, amplifies the procedures set forth in the regulations: the Agency will classify a product as a device where the product sponsor provides "mode of action" data demonstrating that a proposed product does not achieve its primary intended purposes through chemical action so that it "meets the definition of a device."[14] Notably, the guidance explicitly states that "for a sponsor seeking to classify its proposed product as a device, those data should demonstrate that its product meets the definition of a device."[15]

**C.    FDA's Product Classification of Vanilla SilQ**

**1.    FDA Communications with Genus Prior to RFD Process.**

On May 2, 2017, Genus received a Warning Letter from FDA, which Genus contends is incorrect, stating that Genus's Vanilla SilQ barium sulfate liquid suspension products are

---

[14] FDA, Guidance for Industry, Classification of Products as Drugs and Devices & Additional Product Classification Issues (Sept. 2017) ("Classification Guidance"), FDA000213. Guidance documents represent FDA's current policy, but are not binding on either FDA or the public. While guidance documents typically reflect the regulatory scheme at the time of publication and remain in effect until withdrawn or replaced, FDA suggests that guidance documents should be viewed only as recommendations.

[15] *Id.*

unapproved new drugs distributed in violation of the FDCA.[16]  Genus responded to the Warning

Letter on May 19, 2017 outlining its position that its products are medical devices under the

statutory definition of device set forth in section 201(h) of the FDCA (21 U.S.C. § 321(h)).[17]

Genus repeatedly tried to contact FDA to discuss the submission of a premarket notification

under section 510(k) of the FDCA (21 U.S.C. § 360(k)) to initiate the regulatory review process

for a medical device.[18]  Genus received no response to these requests.[19]

In fact, Genus received no response to its letter for over a year.  It was not until

September 6, 2018 that FDA finally replied to Genus's May 19, 2017 letter.[20]  FDA's September

2018 Letter admits that Genus's Vanilla SilQ meets the statutory definition of device ("Although

your products appear to meet the definition of 'device' at section 201(h) of the FD&C Act

. . .").[21]  In this letter, FDA argued that even though Genus's barium sulfate meets the statutory

definition of a medical device, the Agency regulates all contrast agents as drugs because doing so

"would promote administrative efficiency and regulatory consistency, make better use of agency

resources, and minimize the burden on industry and practitioners that a dual regulatory scheme

might impose."[22]

FDA stated its position that because the drug and device definitions overlap, all articles

meeting the definition of a device also meet the definition of a drug (but not the reverse).  In such

---

[16] FDA, Warning Letter to Genus (May 2, 2017), FDA000134.

[17] Response to Warning Letter from Ed Powers, Genus, to Miguel Hernandez, FDA (May 19, 2017), FDA000037.

[18] Decl. of John Edward Powers ¶ 15.

[19] *Id*.

[20] Letter from Russell K. Riley, FDA, to John E. Powers, Genus, FDA000033 (Sept. 6, 2018) ("September 2018 Letter").

[21] *Id.*

[22] *Id.*

cases, FDA claims discretion to regulate the article as a device or a drug.  Consequently, according to FDA, because barium sulfate meets both definitions, FDA has discretion to regulate Genus's barium sulfate as a drug if it chooses to do so.[23]  Further, FDA claimed that the 2017 enactment of the FDA Reauthorization Act ("FDARA") added definitions of contrast agent to the FDCA that "support FDA's longstanding position that contrast agents are appropriately regulated as drugs, regardless of how they achieve their primary intended purposes."[24]

Genus responded to this letter on September 27, 2018, reiterating its discussion of the statutory definitions of drug and device, vehemently disagreeing with FDA's interpretation of the FDARA provisions, and committing to submit a Request for Designation ("RFD") under section 563 of the FDCA.[25]

### 2.  Genus's Filing of an RFD, and FDA's Response.

On November 7, 2018, Genus submitted an RFD to OCP requesting a classification of its products as devices and again detailing the scientific evidence demonstrating that Vanilla SilQ products meet the statutory definition of a device.[26]  FDA accepted the RFD for filing on November 14, 2018 and assigned it the file number RFD 180050, but only after requiring Genus to add an explanation to the RFD as to which FDA center Genus recommends to regulate the product – a factor that is not relevant to the decision of how a product should be classified (although in the case of a noncombination product, the center that will regulate the product is usually clear).[27]  In the RFD, Genus expressly recommended that "its Vanilla SilQ barium sulfate

---

[23] *Id.*

[24] *Id.*

[25] Letter from Ed Powers, Genus, to Eric Mueller, FDA (Sept. 27, 2018), FDA000022.

[26] RFD from Ed Powers, Genus, to OCP (Nov. 7, 2018), FDA000007.

[27] Decl. of Ed Powers ¶ 25; 21 C.F.R. Part 3.

products be classified as medical devices under the regulatory authority of the Center for Devices and Radiological Health (CDRH)"[28] and explained that barium sulfate does not achieve its primary intended purposes of X-ray absorption and delineation of internal structures as a result of chemical action or metabolization, but rather by providing a physical coating on tissue that absorbs X-rays.[29]  As such, Genus stated, barium sulfate meets the statutory definition of device under the FDCA, as confirmed earlier by FDA.[30]

    In its RFD, in addition to repeating the history of classification of barium sulfate described above, Genus provided two examples of contrast agents that are classified as medical devices cleared under 510(k) submissions: sitzmarks and radiopaque tissue markers.[31]  Sitzmarks are contrast agent capsules containing 24 radiopaque markers that are visible throughout the digestive tract under X-rays.  Similar to barium sulfate, Sitzmarks are used to determine the extent of marker elimination to assess gastrointestinal conditions.  Radiopaque tissue markers are contrast agents used to radiographically mark soft tissue during surgical procedures.

    Genus also pointed out that FDARA – which had been cited earlier by FDA as justifying the Warning Letter – narrowly defined contrast agents as drugs *only* for the purposes of the relevant section of FDARA, which applies only in the context of medical imaging devices (*i.e.*, X-ray, magnetic resonance imaging, CT scans, ultrasound) that rely on drugs approved as

---

[28] RFD from Ed Powers, Genus, to OCP, FDA000017 (Nov. 7, 2018).  While Genus did ask that barium sulfate be regulated by and assigned to CDRH, in no way did Genus concede or even suggest that its product is a combination product regulated by its primary mechanism of action. Indeed, Genus plainly stated that its products are "properly classified as medical devices."

[29] RFD from Ed Powers, Genus, to OCP, FDA000013 (Nov. 7, 2018).

[30] RFD Response, FDA000003.

[31] A 510(k) clearance is FDA's process of determining whether a medical device is substantially equivalent to a marketed device; as such, a 510(k) clearance indicates FDA's acceptance of a sponsor's premarket notification of intent to market.  *See* 21 U.S.C. § 360(k); 21 C.F.R. § 807.92; RFD from Ed Powers, Genus, to OCP, FDA000017 (Nov. 7, 2018).

contrast agents to provide image contrast enhancement and improve visualization. These provisions list the premarket review requirements and additional controls at FDA's disposal to ensure the safety and efficacy of the *devices* intended for use with contrast agents, as well as application procedures for those contrast agent drugs intended for use with such devices. *See* 21 U.S.C. §§ 360j(p), 355(y). In its RFD, Genus pointed out that nowhere in FDARA does Congress define all contrast agents as drugs, but merely accepts that some contrast agents are drugs.

On January 10, 2019, FDA issued its decision on Genus's RFD, providing its determination that Vanilla SilQ would not be regulated as a device, *without classifying Vanilla SilQ as either a drug or device*.[32] Instead, FDA assigned Vanilla SilQ to CDER to be "regulated" as a drug based on its overlapping definition theory of the drug and device definitions in section 201 of the FDCA. Repeating verbatim the language from the September 2018 Letter, OCP stated that:

> [T]he definitions of drug and device are overlapping, rather than mutually exclusive. While FDA generally regulates products that meet the definition of a device under the device authorities, we regulate certain types of products that meet both definitions as drugs. Because not all contrast agents meet the definition of a device, but all of them do meet the definition of a drug, the Agency has for many years regulated these products, including recently approved barium sulfate contrast agents, as drugs in order to regulate them consistently under the same authority.[33]

Notably absent from FDA's response to Genus's RFD was a *classification* decision. The paragraph cited above, which is the operative part of the decision, merely observes that Vanilla SilQ meets "both definitions" without classifying the product as a device or a drug. Then, this paragraph moves on to focus on which component will regulate barium sulfate. In short, Genus

---

[32] RFD Response, FDA000001.

[33] *Id.* at FDA000003.

requested a classification decision but received only a component decision (which it did not ask for).  Note that Genus's request, as initially filed, did not include even a component recommendation – until Genus was instructed to add it on pain of not having its RFD accepted.

Elsewhere in the RFD Response, FDA justifies its component decision by pointing to the contrast imaging-related statutory provisions enacted in FDARA as supportive of "FDA's longstanding position that contrast agents are appropriately regulated as drugs, regardless of how they achieve their primary intended purposes."[34]  FDA also dismissed Genus's arguments about other contrast agents that are regulated as devices based on their intended uses – visualization of tissues and organs compared to visualization of the marker to demarcate previous surgery sites – rather than their physical properties.  FDA simply asserted that because of these intended use differences and notwithstanding their technological similarities, "Vanilla SilQ products are more appropriately regulated in the same way as other contrast agents used for diagnostic imaging purposes, which include other barium sulfate products used for contrast imaging."[35]

## III.    ARGUMENT

The manifest statutory distinctions between drugs and devices described above evince Congress' clear intent that the definitions of devices and of drugs be "mutually exclusive."  Attachment 4 at 13.  Nonetheless, FDA has unlawfully refused to adhere to its statutory mandate with respect to barium sulfate, and to classify Genus's barium sulfate product as a device.

Genus has demonstrated that its barium sulfate meets each element of the statutory definition of "device."  FDA has agreed, stating, on more than one occasion (including in a legally binding decision under section 563 of the FDCA), that Genus's "products also appear to

---

[34] *Id.* at FDA000004.

[35] *Id.*

meet the definition of 'device' at section 201(h) of the FD&C Act."[36]  The material facts –

namely, that barium sulfate is a device under the FDCA definition, and that OCP did not classify

barium sulfate as a device as required by statute in response to Genus's RFD – are not in dispute.

All that remains is a legal dispute about FDA's classification responsibilities under section 563

of the FDCA.

OCP's RFD Response was not a "classification" under section 563 of the FDCA,

contrary to the plain language of the statute, which requires FDA to provide a "written statement

that identifies such classification" (determining whether the product is a drug, a biological

product, a device, or a combination product) when the classification of the product is in dispute,

and when the sponsor submits a request for classification (which Genus undeniably did).  But

FDA did not make a classification decision in response to Genus's RFD.  FDA instead

determined that barium sulfate is *both* a device *and* a drug, without classifying it as a

combination product.  FDA then proceeded to allocate unto itself – in violation of the plain

statutory language – discretion to regulate barium sulfate as either a drug or device.  As such,

FDA failed to provide the required "written statement that identifies such classification" within

the statutory 60-day period, and pursuant to section 563(c) of the FDCA, the absence of a

classification decision dictates that Genus's recommendation to classify barium sulfate as a

device is to be adopted as the final determination.

But even if OCP's RFD Response is viewed as an implicit classification decision, *i.e.*, the

decision to "regulate" Vanilla SilQ as a drug in the Drug Center is equated to classifying it as a

drug, FDA does not have discretion to classify any or all devices as drugs in the interest of

---

[36] *Id.* at FDA000003; September 2018 Letter, FDA000033.

administrative convenience or policy.[37]  FDA is not entitled to discretion on this matter,

inasmuch as FDA ignores and rejects clear statutory language defining a product with properties

like Vanilla SilQ as a device.  Nor did FDA engage in notice and comment rulemaking required

to make such a significant change in established FDA regulatory policy.

### A.    Genus Meets the Standards Required for Summary Judgment

The standards for deciding a motion for summary judgment are well established.  *See*

*Hall v. Sebelius*, 770 F. Supp. 2d 61, 62-63 (D.D.C. 2011).  A court must grant summary

judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Summary

judgment has been recognized repeatedly by courts – especially this Court and the U.S. Court of

Appeals for the D.C. Circuit – as the appropriate mechanism to resolve disputes, like this, where

the agency's interpretation of a statutory and regulatory provisions, as applied to undisputed

facts, results in an agency action which is "arbitrary, capricious, or otherwise not in accordance

with law," pursuant to the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).  *See also Alston*

*v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013) ("Summary judgment thus serves as the

mechanism for deciding, as a matter of law, whether the agency action is supported by the

administrative record and otherwise consistent with the APA standard of review."); *Hi-Tech*

*Pharmacal Co. v. FDA*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008) (stating the same).  Indeed, similar

to the result Genus seeks here, this Court granted summary judgment to reverse FDA's

classification decision on a product, deciding in *Prevor v. FDA*, 67 F. Supp. 3d 125, 140 (D.D.C.

---

[37] RFD Response, FDA000003; September 2018 Letter, FDA000033.

2014) that FDA's decision to designate a particular product as a drug-device combination product with a drug primary mode of action was erroneous.

**B.    FDA's Failure to Comply with Section 563 of the FDCA Requires FDA to Classify Barium Sulfate as a Device.**

Under Section 563, FDA has a limit of 60 days to provide a "classification" decision in response to an RFD requesting classification of a single-entity product, but OCP provided no such classification in response to Genus's RFD. The RFD response, although timely provided, does not actually provide the statutorily required statement that identifies the classification of Vanilla SilQ "as a drug, biological product, device, *or* a combination product subject to section 353(g)." 21 U.S.C. § 360bbb-2(a) (emphasis added). By its plain language, the statute contemplates that a product is in one or another of these categories. Nothing in this language indicates that Congress thought a product could be classified as a drug *and* a device at the same time.

The RFD response does not even purport to provide a classification of any kind. By failing to choose, and instead merely observing that Vanilla SilQ appears to meet the statutory definition of a device and a drug, FDA has failed to provide a timely statement of classification. The statute is specific about the type of response that is necessary. FDA was asked to classify Vanilla SilQ and the statutory obligation was to provide a "written statement that identifies such classification." *Id.* § 360bbb-2(b). Nowhere in the OCP's letter is the word "classify" or "classification" applied to Vanilla SilQ. Nowhere is there an identification of the classification of this product. The OCP's general observation that Vanilla SilQ meets both the drug and device definitions due to the overlap in these definitions is actually applicable to every single medical device. Yet, FDA has otherwise managed to classify thousands of devices as devices. This observation is not a classification decision. OCP was asked to make one here and it punted.

Accordingly, OCP's failure to classify Vanilla SilQ within 60 days of Genus's RFD requesting such classification necessitates the acceptance of the recommendation of the sponsor under 563(c) of the FDCA. Genus recommended classification as a device. That recommendation is now final under the plain language of the statute.

### C. FDA Violated the FDCA When it Decided that Barium Sulfate Is Not a Medical Device.

Because FDA did not comply with section 563 of the FDCA by issuing a classification decision within 60 days, Genus's recommendation to classify barium sulfate as a device should stand – and that should be the end of this inquiry. But even if this Court determines that the RFD Response implicitly classified barium sulfate as a drug – and FDA will undoubtedly argue that is the case – FDA's insistence that barium sulfate is a drug still fails. FDCA § 563 requires FDA to choose *one* category to classify barium sulfate, and, based on the statutory definitions of drug and device, that one category can be only a device. Any other categorization renders FDA's discretion totally unfettered to classify any and all devices as drugs (subjecting them to the drug authorities) in contravention of the statutory scheme.

#### 1. FDA's Decision Contravenes the Plain Meaning of the FDCA.

FDA's decision to regulate barium sulfate as a drug rather than a device based on the overlapping definitions of drug and device in the FDCA is a paradigm of arbitrary and capricious agency action in violation of the APA. FDA's determination renders the careful statutory distinction between drug and device set forth by Congress meaningless, effectively arrogating to the Agency the decision about whether to regulate every device as a device or as a drug. This breathtaking usurpation of authority is contrary to the FDCA and, hence, is a failure to act in accordance with law. It also inevitably facilitates arbitrary and capricious decision making outside the constraints of the FDCA. 5 U.S.C. § 706(2)(A), (C).

In reviewing an Agency's statutory interpretation, a court first determines whether Congress has "directly spoken to the precise question at issue," looking at the text, purpose, and structure of the statute. *See Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006). If Congress has so spoken, the court's duty is to give effect to the "unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (*Chevron* Step One).  This analysis, when applied to FDA's action here, dictates a finding that FDA's classification decision violated both the FDCA and the APA.

In analyzing the statutory text, the Court must give effect to every clause and word and construe the statute "so as to avoid rendering [any statutory language] superfluous." *See*, *e.g.*, *Astoria Fed. Savs. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (limiting a statutory provision where a broad reading would have left a second provision without effect). "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal citations omitted).  Further, if a narrower or more specific provision is applicable, the more specific provision supersedes a more general provision. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (stating that where a general authorization and a more specific authorization exist side-by-side, the terms of the specific statute must be followed to avoid "the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute'" (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

In light of these canons of statutory interpretation, the plain meaning of the definition of device in the FDCA requires FDA to classify barium sulfate as a device.  The FDCA plainly sets forth two different regulatory pathways predicated on the statutory definitions of drug and

device.  Though devices, like drugs, are intended to diagnose disease or other conditions, the statute distinguishes devices from drugs based on the means in which its primary intended purpose is fulfilled.  The so-called "exclusionary clause" mandates that an article is a device if it "does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and . . . is not dependent upon being metabolized for the achievement of any of its primary intended purposes."  *See* 21 U.S.C. § 321(h)(2).  Accordingly, an article is a device if this narrowing definitional clause is satisfied.  If, as FDA contends, any article may be regulated as a drug simply because it is "intended for use in the diagnosis of disease," the more restrictive part of the definition of "device" (the exclusionary clause) becomes superfluous.

FDA's incorrect interpretation merging the "device" definition into the "drug" definition, the key distinction between drug and device, specifically the exclusionary clause, is effectively superfluous to the statute.  It also destroys the careful distinction between drugs and devices that is embedded in the entire structure of the FDCA, a structure that includes two entirely different premarket review and postmarket compliance regimes for drugs and devices based upon this key distinction.  But nowhere in the clear, plain language does Congress leave room for FDA to interpret this distinction further, much less to ignore such a distinction or ignore the mandate to provide a classification based on this distinction as set forth in section 563 of the FDCA.

Under FDA's theory, numerous other provisions of the FDCA would be rendered meaningless or absurd.  For example, even though the statute specifically requires that devices be regulated according to level of risk, with different regulatory treatment based on the level of risk (21 U.S.C. § 360c(a)(1)), in FDA's view the Agency could evade this requirement entirely and regulate a device as a drug instead.

It is axiomatic that the U.S. Congress does not make sweeping grants of discretionary authority by implication.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("we found it 'highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion – and even more unlikely that it would achieve that through such a subtle device . . . .'") (quoting *MCI Telecoms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994)).  Congress "does not, one might say, hide elephants in mouseholes."  *Id*.

Congress knows how to award FDA discretion when it means to.  *See Whitfield v. United States*, 543 U.S. 209, 216 (2005) ("Congress has included an express overt-act requirement in at least 22 other current conspiracy statutes, clearly demonstrating that it knows how to impose such a requirement when it wishes to do so.").  For example, section 503(g) of the FDCA provides express authority and careful guidance to FDA in deciding which authorities and lead center to apply to, for instance, a drug-device combination product.  FDA is required to determine the primary mode of action based upon a specific statutory definition or algorithm and apply it to the combination product at hand.  Yet, FDA effectively maintains that Congress granted even more momentous decision-making discretion to classify any and all devices as drugs without an stating an express grant of authority and with no identified limits on this discretion or rules of decision embedded in the statute.

As another example of express grants of authority, Congress explicitly delegated to FDA prosecutorial and enforcement discretion in section 309 of the FDCA, stating that:  "Nothing in this chapter shall be construed as requiring the Secretary to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or ruling."

21 U.S.C. § 336.  Similarly, with respect to FDA's regulation of devices, Congress clearly

"directed that the effectiveness of a device be determined 'in accordance with regulations

promulgated by the Secretary, on the basis of well-controlled investigations,' gave the

Secretary *discretion* to determine when valid scientific evidence exists concerning a device, and

provided that the Secretary '*may* by regulation, promulgated in accordance with this section,

establish a performance standard.'"  *Ethicon, Inc. v. FDA*, 762 F. Supp. 382, 386 (D.D.C. 1991)

(citing 21 U.S.C. §§ 360c(a)(3)(A), 360c(a)(3)(B), and 360d(a)(1)).  In even more explicit

language, section 564 of the FDCA states that FDA's authority to authorize medical products

for use in emergencies is "committed to agency discretion."  21 U.S.C. § 360bbb-3.  And FDA

is delegated "sole discretion to refund" user fees for withdrawn NDAs.  *Id.* § 379h(a)(1)(G).

Nowhere in 21 U.S.C. § 321(g) or (h) does Congress even imply that it intended to delegate

similar authority to FDA to further interpret (or conflate) the definitions of drug and device.

    Not only did Congress include a clear distinction between drugs and devices, it also set

forth a separate *specific* definition of device.  Because the rules of statutory construction require

that the more specific provision supersedes the more general provision, a product that meets the

definition of a device *must* be regulated as a device.  Indeed, FDA even concedes that the

definition of a device is more restrictive than that of the definition of a drug ("For a medical

product also to meet the *more restrictive* device definition under section 201(h) of the FD&C

Act, it must . . . .").[38]  Fundamentally, FDA's admission should provide an end to the inquiry into

plain statutory language.

    The record demonstrates, and FDA has agreed, that Vanilla SilQ's primary intended

purpose as a contrast agent is not achieved through chemical action nor is it achieved through

---

[38]  Classification Guidance, FDA000212 (emphasis added).

metabolization.[39]  Notwithstanding this, FDA, absent any statutory authority to do so and in direct conflict with the exclusionary clause, refuses to classify barium sulfate as a device. FDA's interpretation is therefore contrary to the plain language, structure, and intent of the FDCA, which unambiguously created a clear distinction between drug and device.  Giving effect to each word in the statute, as FDA and this Court are required to do, Vanilla SilQ meets the definition of "device."  Since Congress has spoken directly to the issue, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 843; *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018) ("the Court need not resort to *Chevron* deference, as some lower courts have done, for Congress has supplied a clear and unambiguous answer to the interpretive question at hand.").

Courts have not hesitated to overturn FDA actions where the agency has acted unlawfully or in excess of its statutory authority.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (overturning FDA's classification of cigarettes and other tobacco products as drugs and devices because FDA's authority was not rooted in the statute); *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1315 (D.C. Cir. 2010) (rejecting FDA's argument that the plain language of the statute required FDA's decision, and finding that it conflicted with the structure of the FDCA); *Nutritional Health All. v. FDA*, 318 F.3d 92 (2d Cir. 2003) (holding that FDA's requirement of unit-dose packaging for iron-containing dietary supplements was in excess of statutory authority based on the plain language of the FDCA); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1069 (D.C. Cir. 1998) (rejecting FDA's interpretation of the FDCA as "inconsistent with the text and structure of the statute"); *Prevor v. FDA*, 67 F. Supp. 3d at 140

---

[39] RFD from Ed Powers, Genus, to OCP (Nov. 7, 2018), FDA000007; RFD Response, FDA000003.

(vacating FDA's decision to designate DSW as a drug-device combination product with a drug primary mode of action).

In this case, as a matter of law, based upon the admitted facts, there is no discretion for FDA to do anything other than classify Vanilla SilQ as a device.  Furthermore, under Section 563, FDA's failure to do so within 60 days means that Genus's recommendation to that effect must be adopted as final.  Hence, there would be no purpose to remanding this case to FDA for further decision making: as a matter of law, Vanilla SilQ is a device.  FDA should be ordered to adopt such a classification.

### 2. Pursuant to the 1990 SMDA Amendments, Genus's Barium Sulfate Product Must Be Classified as a Device.

As FDA correctly noted, the Safe Medical Device Act of 1990 removed a portion of the FDCA definition of drugs that excluded any items considered to be a device.  Attachment 3. However, FDA has incorrectly argued that the removal of that provision meant that devices could be regulated as drugs.  *Id.*  The provisions of the SMDA makes clear that nothing of the sort was contemplated.  Rather, the provision was removed to enable combination drug/device products to be regulated as drugs in appropriate cases.  S. Rep. No. 101-513, Attachment 7. ("Section 19 alters the drug and device definitions in section 201 of the Act. Language is removed from the drug definition that will permit an approval of a drug/device combination.") *Id.* at 43.  Further, the Senate Report re-emphasized that the critical distinction between drugs and devices remained, except in the case of combination products.  *Id.* at 28 (revisions to the FDCA "will provide the Secretary with firm ground rules to direct products promptly to that part of the FDA responsible for reviewing the article that provides the primary mode of action of the combination product;" "[b]y deleting this language, a product whose primary mode of action is

29

attributable to a drug, but has a device component, may be reviewed under this Acts drug authority").

The SMDA did nothing to alter the definition of both drug and device, supporting the entirely disparate regulatory pathways for each, a system so well-established that Congress was undoubtedly aware of the important distinction, and chose not to change the statutory definitions of drug and device.  Congress earlier (in 1976) approved legislation to clarify the distinctions between drugs and devices, recognizing that the "[e]xisting statutory definitions of 'device' and 'drug,' although *legally mutually exclusive*, [were] functionally overlapping and, thus, confusing to the device industry, the general public and the courts." Attachment 4, at 13 (emphasis added). Similarly, in the 1990 SMDA, Congress intended to maintain the strict distinction between devices and drugs, but created and added a rational process to address combination products.

FDA's obliteration of the statutory distinction between drugs and devices rests upon a perverse application of the drug and device definitions in conflict with Congress's intent to delineate devices separate from drugs for purposes of FDA regulation.  Though some language in the "drug" and "device" definitions overlap, as discussed, there is no indication that Congress silently delegated to FDA unfettered discretion to regulate all devices as drugs.  *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142-44 (2016) (evaluating the purpose and legislative history of the *inter partes* review statute to determine whether Congress delegated rulemaking authority); *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018) ("If the intent of Congress is clear, that is the end of the matter . . .  In making that determination, the reviewing court 'must first exhaust the "traditional tools of statutory construction" to determine whether Congress has spoken to the precise question at issue.'" (quoting *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000) (citation omitted)).  Congress drew a very bright

dividing line because it recognized that the presence (or absence) of such activity is the key to how an article should be regulated. Accordingly, Congress erected two entirely different premarket review and postmarket compliance regimes for drugs and devices based upon this key distinction.

### 3. The Statutory Definition of a Device Is Not Superseded by FDARA.

FDA points to the definition of "contrast agents" set forth in the recently enacted section 706 of FDARA and claims that this language supports the regulation of contrast agents as drugs.[40] But the issue is whether the FDA properly complied with section 563 of the FDCA. Nothing about FDARA addresses that question.

FDA argues that FDARA defines "contrast agent" as "a drug that is approved under section 505." But that argument relies on a misreading of the statutory language of the provision. Indeed, the FDARA definitions upon which FDA seeks to rely are narrowly applicable only to contrast agents *approved* under sections 505 of the FDCA or 351 of the Public Health Service Act. But the definition in FDARA of "contrast agent" is exclusively and explicitly for the "purposes of this **subsection**." 21 U.S.C. § 360j(p)(4) (emphasis added). Specifically, this definition is relevant only to device controls for diagnostic-imaging devices intended for use with contrast agents that are regulated as drugs.[41] If Congress intended that this definition should control the entirety of contrast agents (rather than just with respect to FDA's

---

[40] September 2018 Letter, FDA000033.

[41] Device controls provide FDA with the means to regulate devices to ensure safety and effectiveness. They include statutory authority to enforce and regulate with respect to adulteration; misbranding; device registration and listing; premarket notification; banned devices; notification, including repair, replacement, or refund; records and reports; restricted devices; and good manufacturing practices. *See* FDA, Overview of Medical Device Regulation: General Controls for Medical Devices (Mar. 22, 2018). Section 520(p) of the FDCA details FDA's authority to require premarket review for medical imaging devices that intended for use with contrast agents.

authority to implement controls on devices), it could have added the definition to the definitions articulated "for purposes of this *chapter*" in 21 U.S.C. § 321 (emphasis added), but it did not do so.

Further, and in contrast to FDA's interpretation, Congress in FDARA neither accepted FDA's position nor opined on the propriety of regulating all contrast agents as drugs.  The FDARA provisions FDA cites for this purpose were enacted to ease the regulatory pathway to marketing of a device for use with contrast agents without burdening sponsors with the need to persuade a drug manufacture to update labeling.  *See* Attachment 6, at 49.  Congress also enacted reciprocal authority for contrast drug sponsors to update product labeling following marketing authorization of a medical imaging device utilizing its contrast agent.  *Id.*  Given that these provisions were enacted to address burdens on combination products regulated across FDA centers, *i.e.*, medical imaging devices using contrast agent drugs, they naturally address only situations in which a new imaging device is intended for use with a contrast agent regulated as a drug.  In no way does FDARA support or condone FDA's regulation of *all* contrast agents as drugs or even *all* contrast agents for use with medical imaging devices as drugs.  Instead, in FDARA, Congress merely accepts that *some* contrast agents for use with medical imaging devices are regulated as drugs – a point that Genus does not refute.

Simply put, the FDARA definitions relied upon by FDA do not support ignoring the medical device definition elsewhere in the statute, which broadly governs the overall distinction between drugs and devices.

### D.    FDA's Novel Interpretation of the "Device" Definition Is Not Based on a Permissible Construction of the Statute.

Even if the statute were ambiguous, which it is not, FDA's action cannot withstand scrutiny.  This Court must consider the intent of Congress in crafting the definition of "device,"

looking at the words of the statute in context. *See, e.g.*, *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006).

Agency action merits deference depending on the "degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). There is no deference due to an agency, however, if it interprets the statute inconsistently, like FDA did here. *See id.* at 231-32; *see also USPS v. Postal Regulatory Comm'n*, 785 F.3d 740, 744 (D.C. Cir. 2015) (finding that the U.S. Postal Service's ratemaking scheme "lack any coherence" as an unintelligible standard and is therefore not owed deference); *RxUSA Wholesale, Inc. v. HHS*, 467 F. Supp. 2d 285 (E.D.N.Y. 2006), *aff'd*, 285 F. App'x 809 (2d Cir. 2008) (finding FDA's regulation inconsistent with the agency's stated position and the twenty-year history of reliance on that position). Nor is there deference due when FDA imposes new regulatory obligations on industry without notice and comment. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 945-46 (D.C. Cir. 1987).

### 1.   FDA's Decision Applies a Different Analysis to Barium Sulfate than to Other Products.

No deference to an agency's interpretation is warranted where the agency's opinion "yields no clear and coherent standard," since a court "cannot defer to an agency when [it is] at a loss to know what kind of standard [the agency] is applying or how it is applying that standard to [the] record." *ALDRICH v. SEC*, 139 F.3d 221, 225 (D.C. Cir. 1998). In this case, FDA provided only a blanket determination that all contrast agents are drugs without any discussion of the analysis it typically affords to classification decisions.[42] In fact, FDA erroneously dismissed

---

[42] September 2018 Letter, FDA000033.

the long-applied standard here as irrelevant based on its argument that discretion is afforded to FDA by the overlap in the drug and device definitions in the statute.[43]  Despite the fact that FDA regulated barium sulfate as a device from 1976 through 1980, FDA pointed to the fact that FDA has regulated contrast agents as a drug "for many years" as justification for its departure from the standards used for delineating a drug from device as set forth in the Classification Guidance, even though not a single barium sulfate product was approved as a drug until 2016.[44]

That an agency must address similar circumstances in a similar manner is a fundamental tenet of the Administrative Procedure Act.  *See, e.g.*, *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) (a "fundamental norm of administrative procedure requires an agency to treat like cases alike."); *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988) ("But the Commission's dissimilar treatment of evidently identical cases . . . seems the quintessence of arbitrariness and caprice."); *SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1221 (D.C. Cir. 2014) ("What's up is that the Department is treating similar cases dissimilarly, the paradigmatic arbitrary and capricious agency action.").  This is particularly true for FDA-regulated companies.  *See, e.g.*, *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997) ("Government is at its most arbitrary when it treats similarly situated people differently") (quoting *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982)); *United States v. Diapulse Corp. of Am.*, 748 F.2d 56, 62 (2d Cir. 1984) (holding that FDA must act "evenhandedly" and may "not 'grant to one person the right to do that which it denies to another similarly situated'") (quoting *Marco Sales Co. v. FTC*, 453 F.2d 1, 7 (2d Cir. 1971)); *Int'l Rehabilitative Sci., Inc. v. Kessler*, No. SA-93-CA-0242, Medical Devices Reports (CCH) ¶

---

[43] *Id.*

[44] *Id.*

15,181 (W.D. Tex. June 29, 1993) (finding that FDA's "divergent treatment" of two muscle stimulator devices was "glaring evidence of arbitrary action."). That FDA applied a different analysis to determining the regulatory classification of barium sulfate than it has to any other product subject to an RFD is inherently arbitrary and capricious.

FDA depicts its group classification of contrast agents as a necessary consequence of *Bracco Diagnostics v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997), in its September 2018 Letter. But this position is insupportable. In *Bracco*, this Court enjoined FDA from approving or reviewing any injectable contrast imaging agents for use with diagnostic ultrasound equipment until FDA could adopt uniform rules applicable to all similarly situated contrast imaging agents. In *Bracco*, FDA classified one party's contrast agent as a device while another "functionally indistinguishable" contrast agent was treated as a drug since at least one of the "microbubbles" in one of the products are "created inside the body as the heat from the patient's body vaporizes the suspension liquid to create gas bubbles." *Id.* at 24. This discrepancy resulted in both CDER and CDRH regulating ultrasound contrast agents "applying very different standards to assess the safety and effectiveness of essentially identical products." *Id.* The Court concluded that Plaintiffs were entitled to injunctive relief and were likely to succeed on the merits because FDA "failed to treat similarly situated products in the same fashion and that such conduct is arbitrary and capricious." *Id.* at 31.

*Bracco v. Shalala* may have required regulation of "similar cases in a similar manner," but this reasoning necessarily assumes that "similar treatment" would not result in FDA exceeding its statutory authority. Moreover, FDA is bound to treat similar cases similarly "unless [the Agency] can provide a legitimate reason for failing to do so." 963 F. Supp. at 27. FDA seems to take the position that because the Court in *Bracco v. Shalala* determined that the

Agency failed to adequately justify disparate treatment of functionally indistinguishable products in that case, there can never be a legitimate reason for disparate treatment. This is a perversion of the Court's holding in *Bracco* and should be rejected.

To be sure, Genus is not suggesting that FDA should treat two barium sulfate contrast agents differently. The point is that *all* contrast agents should not be classified in a group because they are not functionally indistinguishable, like the products at issue in *Bracco*. Some contrast agents, like other FDA-regulated products, are appropriately regulated as drugs based on their use of chemical action and metabolization for the achievement of their primary intended purposes, but barium sulfate is not. And while it is true that Bracco's barium sulfate is currently regulated as a drug, Genus contends that Bracco's product should be classified as a device based on the demonstrated lack of chemical and metabolic action. As FDA well knows, every product – for FDA to determine classification – needs to be evaluated based upon its specific modes of action.

Further, the dictum in the *Bracco* decision on which FDA so heavily relies – that the relevant products there could be regulated as a drug or a device (963 F. Supp. at 28) – is also inapplicable here. Perhaps most importantly, the ultrasound product at issue in *Bracco* functioned partially as a drug product, unlike the barium sulfate product here (the *Bracco* court stated that one product was "not dependent upon being metabolized for the achievement of its primary intended purposes," while another was not metabolized, 936 F. Supp. at 24). Moreover, the language FDA emphasizes relied on section 503(g) of the FDCA to support FDA's "discretion in determining how to treat" products that meet "*both* the definition of a drug and the definition of a device" under the FDCA (emphasis added), but, as discussed, section 503(g) is not applicable to the barium sulfate inquiry. The only relevant provision to FDA's classification

decision in this instance is section 563 of the FDCA, which had not been adopted at the time of *Bracco*, and FDA is not afforded any such discretion under section 563. Further, even at that time, section 503(g) would not have been relevant to Genus's barium sulfate, as it stated that "the Secretary shall designate a component of the Food and Drug Administration to regulate products that constitute *a combination* of a drug, device, or biological product." (Emphasis added.) Unlike the products at issue in *Bracco*, there is no cogent argument that barium sulfate can constitute a combination product. As such, the *Bracco* dictum is meaningless in this context.

If FDA can decide not to apply its clear drug and device standards to a product based only on regulatory convenience, the Agency is unlawfully holding such products to a different regulatory standard. Indeed, FDA has accepted the clear statutory differences between drugs and devices and has articulated a standard by which medical products are classified; however, FDA unlawfully refuses to apply this standard to Genus's barium sulfate. For purposes of product jurisdiction, FDA's regulations explicitly adopt the statutory definitions in sections 201(g) and (h) of the FDCA and further state that the means by which a product achieves an intended therapeutic effect or action is determinative of the product's jurisdiction. *See* 21 C.F.R. § 3.2(f), (g), (k); *id.* § 3.4 (though the "mode of action" regulations are phrased to address combination products, 21 C.F.R. § 3.3(b) clearly states that the Product Jurisdiction section of Title 21 of the U.S. Code applies to "[a]ny product where the agency component with primary jurisdiction is unclear or in dispute"). FDA further reiterates this position when it states in the Classification Guidance that "FDA's determination of whether to classify a product as a drug or device is based on statutory definitions, as set forth in sections 201(g) and 201(h) of the FD&C Act, respectively."[45]

---

[45] Classification Guidance, at FDA000211.

To address the disparate treatment of barium sulfate, FDA points to language in the guidance document indicating that a product that meets the definition of a device under 21 U.S.C. § 321(h) will be classified as a device "unless it falls within a special category."[46]  The FDA's Classification Guidance notes that a product that meets both the definition for drug under 21 U.S.C. § 321(g) and for device at 21 U.S.C. § 321(h) "would be classified as a device, unless it falls within a special category (for example, apparatuses used in the preparation of compounded positron emission tomography drugs are classified as drugs, *see* 21 U.S.C. 321(ii))."[47]  Positron emission tomography (PET) products are the only example listed in the guidance and are statutorily *required* to be regulated as drugs.  But there is no discussion of enumerated factors for determining when a product would fall into this "special category" in either guidance or regulation, ultimately suggesting that the "special category" applies only to statutorily defined products.  Unlike PET products, Congress did not place barium sulfate or contrast agents in a "special category" for classification purposes.  Without a clear and coherent standard for this special category, a court cannot defer to the agency.  *See ALDRICH v. SEC*, 139 F.3d at 225.

Both 21 C.F.R. § 3.7 and the Classification Guidance emphasize that FDA relies on the sponsor to distinguish a device from a drug based on the FDCA statutory definitions.  All that is required for a sponsor to make such a distinction to be classified as a device are data demonstrating that a proposed product does not achieve its primary intended purpose through chemical action so that it "meets the definition of a device."[48]  Genus provided such data in its RFD for Vanilla SilQ, and FDA does not dispute that Genus has demonstrated that Vanilla SilQ

---

[46] *Id.* at FDA000219.

[47] *Id*. at FDA000219.

[48] Classification Guidance, at FDA000213.

does not achieve its primary intended purpose through chemical action or metabolization. Barium sulfate is a device under FDA's clear and explicit device classification standards.

That FDA refuses to perform the same analysis and adhere to the same standard for Genus's barium sulfate as it does for any other medical product demonstrated to be a device is intrinsically disparate treatment.  Therefore, FDA's classification of contrast agents as drugs, regardless of the agency's inconsistency with the relevant articulated definitions and classification standards, is arbitrary and capricious, in violation of the APA.

**2.      FDA Created New Regulatory Requirements for Barium Sulfate that Did Not Go Through Notice and Comment Rulemaking.**

The courts have long recognized that an agency policy creating new rights or duties is a "substantive" rule that requires notice and comment rulemaking. *See Cmty. Nutrition Inst.*, 818 F.2d at 946; *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (stating that substantive rules are alternately called "legislative" rules); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (holding that FDA's "notice" stating that PET radiopharmaceuticals should be regulated as drugs required notice and comment rulemaking); *see also* APA, 5 U.S.C. §§ 553, 706(2)(D); Attorney General's Manual on APA (1946).  A substantive rule is one that is binding on the agency itself and imposes new regulatory obligations on the regulated industry. *See Cmty. Nutrition Inst.*, 818 F.2d at 945-946 (ruling that FDA's "nonbinding statements of agency enforcement policy" was actually a legislative rule subject to notice and comment requirements); *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010).

"Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."  *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 585-86 (D.C. Cir. 1997), overturned on other grounds, *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199

(2015) (holding that notice and comment rulemaking is required only for legislative rules and not interpretative). But FDA did just that when it adopted, *sua sponte*, a class-wide standard based on the functionality of only *some* contrast agents rather than evaluating the method of achieving primary intended purpose for a given medical product as required by both statute and FDA policy. And FDA did so without input from industry, without statutory authorization, and in contradiction of decades of regulating many contrast agents, including barium sulfate, as medical devices.

As a result of this change, not only is barium sulfate subject to an entirely different regulatory scheme, but putative sponsors are now subject to extraordinarily higher development costs, and the drug approval regime is vastly different from that for clearance to market medical devices.[49] The significant difference in application submission fees alone totals over $200,000 while annual fees are approximately $184,000 less expensive for devices than drugs.[50] Further, drug approval typically requires three phases of clinical trials in large study populations; extensive chemistry, manufacturing, and control information; substantial labeling negotiations; and sometimes patent litigation while device clearance requires merely comparative testing to a marketed product. These costly and time-consuming differences between seeking approval of a new drug and seeking clearance of a medical device based on similarity to a previously marketed medical device are precisely the types of regulatory burdens that courts have forbidden agencies to impose without implementing and completing the notice and comment rulemaking process. *See, e.g., Bracco Diagnostics v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997). The classification of barium sulfate as a drug without notice and comment is inherently a violation of the APA.

---

[49] Decl. of John Edward Powers ¶¶ 31-33; *see also Bracco*, 963 F. Supp. at 28-29.

[50] Decl. of John Edward Powers ¶¶ 31-33

As discussed, FDA points to the regulation of "apparatuses used in the preparation of compounded PET drugs" as an example of a device that falls under a "special category" and has been regulated as a drug.[51]  But the history of PET drugs proves Genus's point: in 1997, this Court held that FDA violated the APA when it announced through a Notice without undergoing the notice and comment process that PET products, which were previously exempt from drug regulations, would then be regulated as drugs.  *See Syncor Int'l Corp.*, 127 F.3d at 95.  Though Congress ultimately codified FDA's determination that PET products are subject to drug regulations, such classification was Congress's decision, not FDA's.  The same situation applies here: FDA is trying to do the exact same thing with barium sulfate that the Court said it could not with PET drugs – except FDARA does not neatly codify FDA's interpretation like Congress did for the PET provisions in 1997.

If FDA wanted in 1982 and 1997 to change longstanding FDA policy with respect to barium sulfate and contrast agents, it needed to do so through the rulemaking process governed by the Administrative Procedure Act (APA).  5 U.S.C. Chapter 5.  As required under the APA, in order to make new regulations, an agency must develop and typically publish a proposed rule in the *Federal Register* and solicit comments from the public on the regulatory proposal.  *Id.* § 553.  After the agency considers the public feedback and makes appropriate changes, it then publishes the final rule in the *Federal Register. Id.* § 552.

FDA's adoption of a class-wide intended use standard for contrast agents could have been implemented (if it is legal at all) only after notice to the public and an opportunity for public comment.

---

[51] Classification Guidance, at FDA000219.

Here, FDA did not follow the required rulemaking procedure to alter the classification of contrast agents from devices to drugs.  Instead, FDA attempted to simply announce a reversal of years of policy and adjudication by fiat, contradicting the governing statute.  The January 29, 1982 proposed rule included a determination "that all radiologic contrast media, including barium enema kits, are to be regulated by FDA as drugs under section 201(g) of the act (21 U.S.C. § 321(g)(1)) and not as devices" while the 1997 CP decision made a determination, without room for industry input, that all ultrasound contrast agents would be regulated as drugs rather than devices.  Attachment 2; Attachment 3.  Guidance published later further assumes that all contrast agents are drugs.[52]  But, for any of these pronouncements, FDA never undertook the required notice and comment processes to change the regulatory classification of barium sulfate – or any other relevant contrast agent – from a device to a drug.

That FDA reclassified barium sulfate in a Citizen Petition response and a guidance document instead of a rulemaking does not insulate FDA's actions from notice and comment requirements.  Indeed, as various federal courts have held, publishing a document as a "guidance" does not mean it is not a substantive or legislative rule.  *See Bellarno Int'l, Ltd. v. FDA*, 678 F. Supp. 410, 415 (E.D.N.Y. 1988) (holding an import alert entitled "Guidance" a legislative rule is unlawful because FDA failed to undertake notice and comment procedures); *Syncor Int'l Corp.*, 127 F.3d at 95 (holding that a "Notice," referred to alternatively in its text as "guidance" and a "policy statement," announcing that PET radiopharmaceuticals should be regulated as drugs constitutes a substantive rule).  Any proclamation that creates new rights or

---

[52] FDA, Guidance for Industry: New Contrast Imaging Indication Considerations for Devices and Approved Drug and Biological Products (Dec. 2009), FDA000374.

duties, like the reclassification of a device to a drug, is a substantive rule that requires notice and comment.

The fact that FDA's wrongful determination that all contrast agents for radiological purposes must be characterized as drugs is 35 years old cannot excuse FDA's contravention of statutory language.  An agency cannot "switch from one consistently long followed permissible interpretation to a new one without providing an opportunity for notice and comment."  *Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2001).  Here, FDA previously classified contrast agents as devices; the switch to classifying contrast agents as drugs was impermissible without notice and comment.  The fact that the reclassification was not challenged in court reflects the fact that, until now, the only other distributor of barium sulfate for use as a contrast agent decided not to challenge the reclassification, perhaps recognizing that requiring prospective competitors to face the drug approval process would create barriers to entry that would turn its virtual monopoly in the marketplace into a complete monopoly.

## IV.  <u>CONCLUSION</u>

In issuing a determination that FDA will regulate Vanilla SilQ as a drug assigned to CDER as the FDA center with primary jurisdiction, FDA has failed to make a classification decision in accordance with section 563 of the FDCA.  As such, Genus's classification recommendation should become the final determination, by statute.

Further, the determination that FDA *did* make was inconsistent with the statutory language of section 563 in that it decided that barium sulfate meets definitions of drug and device, leaving the appropriate regulatory scheme to FDA's discretion.  FDA's decision to do so relied upon a convoluted and erroneous interpretation of the statutory definition of "device" that is an impermissible construction of unambiguous statutory language.  It is clear from the plain

text, the legislative intent, and the related statutory scheme that Congress intended to create a clear distinction between drugs and devices. FDA does not deserve deference under *Chevron*, and FDA's interpretation cannot stand.

Even if FDA's interpretation were permissible, FDA failed to provide the requisite opportunity for notice and comment to industry stakeholders when deviating from the agency standard procedures for regulatory classification. FDA has historically distinguished drugs from devices based on the mode of action required to achieve the product's primary intended purposes, but FDA arbitrarily and capriciously refused to perform such an analysis here for Vanilla SilQ based on a *sua sponte* class-wide standard for contrast agents with various modes of action. If FDA wants to lawfully adopt such a class-wide standard for contrast agents, it must do so in accordance with the APA. FDA failed to do so here, and, as such, the classification is invalid.

In view of the above, we respectfully request that this Court: (1) set aside FDA's determination that Vanilla SilQ must be regulated a "drug" under 21 U.S.C. § 321(g) and not a device under 21 U.S.C. § 321(h); (2) declare that Vanilla SilQ meets the definition of "device" and is a device under 21 U.S.C. § 321(h); (3) declare that Vanilla SilQ is effectively classified as a device because Genus requested this classification and FDA did not explicitly reject it; (4) declare that FDA illegally failed to initiate rulemaking before imposing a class-wide novel standard for contrast agents; and (5) declare that FDA otherwise violated the APA in making its decision on barium sulfate.

Dated:  May 30, 2019

Respectfully submitted,


Genus Medical Technologies


By:    /s/  Sara W. Koblitz
       Douglas Farquhar (D.C. Bar No. 386573)
       Sara W. Koblitz (D.C. Bar No. 1017284)
       Hyman, Phelps & McNamara, P.C.
       700 13th Street, N.W., Suite 1200
       Washington, D.C.  20005
       Phone:    (202) 737-5600
       Fax:      (202) 737-9329
       *Attorneys for Plaintiff*