**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GENUS MEDICAL TECHNOLOGIES | ) | |
| 207 Chesterfield Towne Center | ) | |
| Chesterfield, MO  63005 | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19-cv-0544-JEB |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOOD | ) | |
| AND DRUG ADMINISTRATION, | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, DC 20201 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>JOINT APPENDIX</u>

Pursuant to Rule 7(n), the parties submit this Joint Appendix containing agreed-upon excerpts from the administrative record.

Dated: September 25, 2019

| Document Name | Date | Bates Number |
|---|---|---|
| Designation Letter for RFD180050 | 1/10/2019 | FDA000001–FDA000005 |
| Incoming RFD180050 | 11/14/2018 | FDA000006–FDA000021 |
| Genus' Reply to FDA Response to Warning Letter | 9/27/2018 | FDA000022–FDA000031 |
| FDA Response to Warning Letter Response | 9/6/2018 | FDA000032–FDA000036 |
| Response to Warning Letter | 5/19/2017 | FDA000037–FDA000133 |
| Warning Letter for Genus' Vanilla SilQ Products | 5/2/2017 | FDA000134–FDA000139 |
| FDA response to Citizens Petitions filed by Bracco Diagnostics et al | 7/28/1997 | FDA000140–FDA000206 |
| Final Guidance - Classification of Products as Drugs and Devices | September 2017 | FDA000207–FDA000219 |
| NDA 208036 Approval | 1/11/2016 | FDA000220–FDA000227 |
| NDA 208143 Approval | 1/15/2016 | FDA000244–FDA000251 |
| NDA 208844 Approval | 10/14/2016 | FDA000269–FDA000272 |
| Guidance for Industry: Developing Medical Imaging Drug and Biological Products; Part 1: Conducting Safety Assessments | June 2004 | FDA000298–FDA000318 |
| Guidance for Industry: Developing Medical Imaging Drug and Biological Products; Part 2: Clinical Indications | June 2004 | FDA000319–FDA000339 |
| Guidance for Industry: Developing Medical Imaging Drug and Biological Products; Part 3: Design, Analysis, and Interpretation of Clinical Studies | June 2004 | FDA000340–FDA000373 |
| Guidance for Industry: New Contrast Imaging Indication Considerations for Devices and Approved Drugs and Biological Products | December 2009 | FDA000374–FDA000397 |
| Letter from Thinh X. Nguyen, OCP | October 26, 2018 | FDA000399-FDA000401 |

Respectfully submitted,

By: __/s/ _Sara W. Koblitz_____

Douglas Farquhar (D.C. Bar No. 386573)
Sara W. Koblitz (D.C. Bar No. 1017284)
Hyman, Phelps & McNamara, P.C.
700 13th Street, N.W., Suite 1200
Washington, D.C.  20005
Phone:     (202) 737-5600
Fax:         (202) 737-9329

*Attorneys for Plaintiff*

Of Counsel:

ROBERT P. CHARROW
General Counsel

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
Department of Health and Human
Services

ANNAMARIE KEMPIC
Deputy Chief Counsel for Litigation

JULIE B. LOVAS
Senior Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 31, Room 4520
Silver Spring, MD 20993-0002
(301) 796-8575

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General
Civil Division

GUSTAV W. EYLER
Director, Consumer Protection Branch

ANDREW CLARK
Assistant Director, Consumer Protection Branch

__/s/_____ _Jason Lee_____
JASON LEE (CA Bar No. 298140)
Trial Attorney
United States Department of Justice
Civil Division, Consumer Protection Branch
450 5th St. NW
Washington, DC 20001
(202) 514-0515
(202) 514-8742 (fax)
Jason.Lee3@usdoj.gov

*Counsel for Defendant*

CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2019 I caused this document to be electronically filed with the United States District Court for the District of Columbia using the Court's CM/ECF system. I certify that all counsel of record are registered as ECF filers and will be served by the CM/ECF system.

/s/  *Sara W. Koblitz*



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
Silver Spring, MD 20993

Office of Combination Products
WO 32, Room 5129
10903 New Hampshire Avenue,
Silver Spring, MD 20993

January 10, 2019

Ed Powers
President and CEO
Genus Medical Technologies
215 Chesterfield Business Parkway
Chesterfield, MO 63005

Re:     Request for Designation
        Vanilla SilQ Barium Smoothie, Vanilla SilQ HD, Vanilla SilQ MD
        <u>Our file:  RFD 180050</u>
        Dated:  November 7, 2018
        Received:  November 7, 2018
        Filed:  November 14, 2018

Dear Mr. Powers:

        The Food and Drug Administration (FDA) has completed its review of the request for
designation (RFD) for the Vanilla SilQ Barium Smoothie, Vanilla SilQ HD, Vanilla SilQ MD
("Vanilla SilQ" or "products") that you submitted.  We conclude that the products are drugs that
will be reviewed and regulated by the Center for Drug Evaluation and Research (CDER).

<u>Products' Descriptions</u>

        According to the RFD, your products are indicated for single use as a contrast agent in
radiographic studies.  Specifically, the Vanilla SilQ products are barium sulfate oral solution
contrast agents, which are swallowed for diagnostic purposes.  You explain that barium sulfate is
an inert metal salt used to improve visualization of the gastrointestinal tract (esophagus, stomach,
intestines) on plain X-ray or computed tomography.  Moreover, you state that barium sulfate is a
heavy metal with a high atomic number, which, due to its high molecular density, results in an
opacity helpful for visualization in X-ray or other radiologic procedures.[1]

        The RFD explains that Genus has three formulations of Vanilla SilQ Barium Sulfate
products: Vanilla SilQ (Smoothie), Vanilla SilQ MD, and Vanilla SilQ HD, which all contain

---

[1] You further explain that barium sulfate is a white crystalline solid, and it occurs as the mineral barite.

FDA000001

Genus Medical Technologies
January 10, 2019
Page 2

barium sulfate, either in powder form or as a liquid suspension.[2]  Additionally, the product contains the following inactive ingredients: citric acid; natural and artificial flavors (vanilla flavor); benzoic acid; suspending agent; potassium sorbate; purified water; sodium saccharin; sodium citrate; simethicone; sodium benzoate; sorbitol; emulsifiers; and thickening agents (xanthan gum, bentonite, tragacanth, lambda car, acacia).  The SilQ MD and the SilQ HD require the user to add water, necessary for reconstitution, prior to ingestion.  The Vanilla SilQ (Smoothie) does not require water to be added prior to ingestion, and it includes a 5 ml flavor pack (available in orange, banana, and berry flavors) to improve taste.

    The RFD states that timing, sequencing, volume, and concentration of the products are determined by the individual technique of radiography professionals and may vary with differing patient and procedure characteristics.  You further explain that the barium sulfate passes through the gastrointestinal tract; and it is excreted at rate that it is a function of the gastrointestinal transit time, but the time to reach the small bowel is generally from 15 to 90 minutes.

    The SilQ products have not received any prior approvals or clearance.

    You recommend that the Vanilla SilQ products be classified as medical devices and assigned to the Center for Devices and Radiological Health (CDRH).  You base your recommendation on your contention that your products do not achieve their primary intended purposes via chemical action and are not metabolized by the body.  In addition, you claim that your product is similar to tissue markers regulated by CDRH, suggesting that your product should also be regulated by that Center.

Background

    On May 2, 2017, FDA's Kansas City District Office issued a Warning Letter to Genus stating that Genus's Vanilla SilQ Barium Sulfate liquid suspension and powder for suspension products are unapproved new drugs distributed in violation of the Federal Food, Drug, and Cosmetic Act (the FD&C Act or the Act).  On May 19, 2017, you replied to this Warning Letter explaining your disagreement with the District Office's conclusions.  On September 6, 2018, FDA's Office of Regulatory Affairs, Division of Pharmaceutical Quality Operations III (DPQO III), replied to this letter affirming its position that your products are unapproved new drugs.  On September 27, 2018, you replied reiterating your disagreement with DPQO III's findings; you also expressed your intention to submit this RFD.

Classification Analysis and Jurisdictional Assignment:  Drug Assigned to CDER

    We have considered the information in the RFD, and we have discussed the issues with staff at CDER, CDRH, and the Office of Chief Counsel.  We have determined that your products, which contain the active ingredient barium sulfate and are intended to act as a contrast agent in radiography procedures, meet the definition of a drug under section 201(g) of the Act

---

[2] You explain that the barium sulfate is supplied as an oral suspension available in 2.1 % w/v, (2.0 % w/w) (Vanilla SilQ) or as powder for reconstitution in 96% w/w (Vanilla SilQ MD) and 98% w/w (Vanilla SilQ HD) for oral administration.

FDA000002

Genus Medical Technologies
January 10, 2019
Page 3

(21 U.S.C. § 321(g)), because these articles are intended for use in the diagnosis of disease.[3] Your products also appear to meet the definition of "device" at section 201(h) of the FD&C Act.[4] As DPQO III explained in its September 6, 2018 letter, this is because the definitions of drug and device are overlapping, rather than mutually exclusive. While FDA generally regulates products that meet the definition of a device under the device authorities, we regulate certain types of products that meet both definitions as drugs. Because not all contrast agents meet the definition of a device, but all of them do meet the definition of a drug, the Agency has for many years regulated these products, including recently approved barium sulfate contrast agents, as drugs in order to regulate them consistently under the same authority. This approach is consistent with *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997).[5]

FDA's longstanding regulation of contrast agents as drugs is supported by the new contrast imaging-related statutory provisions recently enacted as part of the FDA Reauthorization Act of 2017 (FDARA). As DPQO III previously explained, section 706 of FDARA, which added sections 505(y) and 520(p) to the FD&C Act, permits FDA to approve, clear, or classify a medical imaging device intended to be used with an approved contrast agent for certain uses different from those for which the contrast agent is approved, provided certain criteria are met. New section 520(p)(4)(B) defines "contrast agent" to mean "a *drug* that is approved under section 505 [of the FD&C Act] or licensed under section 351 of the Public Health Service Act" (emphasis added), where the drug is intended for use in conjunction with an applicable medical imaging device, and

(i) is a diagnostic radiopharmaceutical, as defined in section 315.2 and 601.31 of title 21, Code of Federal Regulations (or any successor regulations); or

---

[3] Under the Act, the term "drug" includes, in relevant part, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and articles (other than food) intended to affect the structure or any function of the body of man or other animals. Section 201(g) of the Act, 21 U.S.C. § 321(g).

[4] Under the Act, the term "device" includes, in relevant part, an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes. Section 201(h) of the Act, 21 U.S.C. § 321(h).

[5] In *Bracco*, several manufacturers of injectable contrast imaging agents for use with diagnostic ultrasound equipment challenged FDA's decision to treat their contrast imaging agents as new drugs while treating a competitor's similar product as a device. The court opined that the FD&C Act's definitions of "drug" and "device" are not mutually exclusive, stating that the products at issue "all likely meet both the definition of a drug and the definition of a device under the [FD&C Act], and the FDA therefore has discretion in determining how to treat them." *Bracco*, 963 F.Supp. at 28. In exercising such discretion, the court found that FDA must either treat all the products at issue the same way or provide a rational basis for treating them differently. *See id.* Consistent with this ruling, FDA determined that the contrast agents at issue should be regulated as drugs by CDER because consolidating review in one agency center, under one statutory scheme, would promote administrative efficiency and regulatory consistency and minimize the burden on industry and practitioners that a dual regulatory scheme might impose. (FDA response to Citizen Petitions filed by Bracco Diagnostics Inc., DuPont Merck Pharmaceutical Company, ImaRx Pharmaceutical Corp., and Sonus Pharmaceuticals, Inc. (July 28, 1997, Docket 96P-0511) at 58, 62).

FDA000003

Genus Medical Technologies
January 10, 2019
Page 4

(ii) is a diagnostic agent that improves the visualization of structure or function within the body by increasing the relative difference in signal intensity within the target tissue, structure, or fluid.

These new provisions make clear that contrast agents are appropriately regulated as drugs under the FD&C Act, in contrast to the medical imaging devices intended to be used with such contrast agents.[6]

In your RFD, you assert that because the definition of contrast agent found in new section 520(p)(4)(B) is limited to that subsection and not all of chapter 9 of title 21 of the U.S. Code, it does not apply to the rest of the Act. FDA does not take the position, however, that section 520(p)(4)(B) defines "contrast agent" for the purposes of the Act as a whole. Rather, the enactment of section 706 of FDARA, which added a new set of rules for the premarket review of certain contrast imaging products is premised on FDA's continued regulation of contrast agents as drugs under the FD&C Act. Therefore, these new provisions support FDA's longstanding position that contrast agents are appropriately regulated as drugs, regardless of how they achieve their primary intended purposes.

Prior Products

We also note that your comparison of your products to gold nanoparticles used to treat cancer and Sitzmarks and radiopaque tissue markers is inapposite. Gold nanoparticles are not contrast imaging agents, and they are not used for diagnostic purposes, and so they do not serve as an appropriate comparator for your barium sulfate products.

The other products you cite (Sitzmarks and radiopaque tissue markers) also differ from yours in significant respects. For example, your product is indicated to improve visualization of tissue/organs by increasing the relative differences of imaging signal intensities of adjacent tissue. Neither of these other types of products are intended for this purpose; rather, the barium sulfate in these markers is meant to facilitate visualization of the marker itself, for example to demarcate previous surgery sites. Your Vanilla SilQ products are more appropriately regulated in the same way as other contrast agents used for diagnostic imaging purposes, which include other barium sulfate products used for contrast imaging.

---

[6] In your RFD, you cite FDA's guidance document, *Classification of Products as Drugs and Devices & Additional Product Classification Issues, Guidance for Industry and FDA Staff*, which states that if a product meets the definition of a drug and the definition of a device, such a product would generally be classified as a device, unless it falls within a special category. The guidance notes apparatuses used in the preparation of compounded positron emission tomography drugs, defined at Section 201(ii) of the Act, as one such example. You suggest that because contrast agents have not been "enumerated by Congress in a special category in [Section 201]" and FDA has not engaged in rulemaking to establish a special category for contrast agents, contrast agents do not fall within such a "special category." We do not agree that regulating contrast agents containing barium sulfate as drugs is inconsistent with the guidance; as discussed above, there are particular reasons FDA regulates these products as drugs even though they also meet the device definition.

FDA000004

Genus Medical Technologies
January 10, 2019
Page 5

Finally, while we agree that barium sulfate—and other radiographic contrast agents—used for imaging purposes operate based on different imaging principles than ultrasound contrast agents, both ultrasound contrast agents and radiographic contrast agents are used to differentiate a structure or tissue from its surroundings and present similar questions of safety and effectiveness, and so are appropriately regulated in the same manner.  FDA has previously approved several NDAs[7] for radiographic contrast agents, including those containing barium sulfate.[8]

<u>Conclusion</u>

For the reasons explained above, we have determined that your product will be regulated as a drug under the FD&C Act, and we have assigned it to CDER.  CDER's Division of Medical Imaging Products will have responsibility for the product's premarket review and regulation. For further information about review requirements and how to proceed, please contact Ms. Kyong (Kaye) Kang, Chief, Project Management Staff, via telephone at (301) 796-1970 or via email at kyong.kang@fda.hhs.gov.  Please include a copy of this letter with your initial submission to CDER.

As explained in the May 2, 2017 Warning Letter to you, your product is currently being illegally marketed; in order for your product to be legally marketed, you must obtain an appropriate marketing authorization from the agency.

If you have any other questions about this letter, please contact me at combination@fda.gov.  Finally, OCP is available to you as a resource for questions or issues that may arise throughout the development of your product.  You may reach us at the above address or by email at combination@fda.gov.

Sincerely,

Leigh Hayes
Product Assignment Officer
Office of Combination Products

cc:  Kyong (Kaye) Kang

---

[7] See NDA 208036, NDA 208143, and NDA 208844.
[8] In your RFD, you cite several barium sulfate products that were cleared as devices between 1976 and 1980.  Those clearances predated FDA's current policy regarding the regulation of contrast agents, the development of which was prompted in part by the 1997 *Bracco* decision.  That policy, as we mention above, is also supported by the recent enactment of new statutory provisions regarding contrast agents.

# CONFIDENTIAL - REQUEST FOR DESIGNATION

**Office of Combination Products**
**Food and Drug Administration**

**10903 New Hampshire Avenue**
**WO32, Suite 5129**
**Silver Spring, MD 20993-0002**
**301-796-8930; 301-847-8619 (FAX)**

|  |  |
|---|---|
| **Date:** | November 14, 2018 |
| **To:** | Sherry Lard,Ph.D., CBER, 301-827-0379,FAX:301-827-2290<br>Kristina Lauritsen, CDER, 301-796-8936<br>James Bertram, CDRH, 301-796-9588, FAX:301-847-8127 |
| **From:** | Leigh Hayes |
| **Re:** | Request for Designation<br>Product |
| **RFD File Number:** | RFD180050 |
| **Company:** | Genus Medical Technologies |
| **Product:** | Genus Barium Sulfate |
| **Product description:** | Genus's Vanilla SilQ products are barium sulfate oral solution contrast agents used to improve visualization of the gastrointestinal tract (esophagus, stomach, intestines) on plain X-ray or computed tomography. |
| **Review Required By:** | **CBER**<br>**CDER** ☑<br>**CDRH** ☑ |
| **Date Received/Filed:** | November 7, 2018 / November 14, 2018 |
| **Center Final Review:** | December 12, 2018 |
| **60-Day Designation Deadline:** | January 11, 2019 |



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

*Ed Powers*
*President*

November 7, 2018

Office of Combination Products
Office of the Commissioner
Food and Drug Administration
WO32 Hub/Mail Room #5129
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002
email: combination@fda.gov

RE:     **Genus Barium Sulfate – Request for Designation**

Genus Medical Technologies (Genus) hereby submits a Request for Designation as provided for in Section 563 of the Federal Food, Drug, and Cosmetic Act (FDCA) for Genus's Vanilla SilQ Barium Sulfate products (collectively "Vanilla SilQ products" or "Vanilla SilQ"). The following information is provided to assist in this determination as identified in 21 CFR 3.7(c) and the Agency's guidance on "How to Write a Request for Designation (RFD)." Although FDA's Center for Drug Evaluation and Research (CDER) has issued a Warning Letter to Genus classifying the Vanilla SilQ products as drugs, for the reasons expressed below and in Genus's earlier correspondence to CDER (links are provided below), the products are properly classified as medical devices.

1.    **Contact Information**, Section 3.7(c)(1):

**Company Name**
Genus Medical Technologies
215 Chesterfield Business Pkwy
Chesterfield, MO 63005

**Establishment Registration Number**: 3011028213

**Contact Person**
Ed Powers
President, CEO, Genus Medical Technologies
Email:   ed.powers@genusmedical.com
Phone:  314-899-2991

2.    **Product Name**, Sections 3.7(c)(2)(i), 3.7(c)(2)(ii), and 3.7(c)(2)(iii):

| | |
|---|---|
| Name: | Genus Barium Sulfate |
| Proprietary Name: | Vanilla SilQ Barium Smoothie, Vanilla SilQ HD, Vanilla SilQ MD |
| Common Name: | Barium Sulfate Contrast Agent |
| Generic Name: | Barium Sulfate |
| Classification: | Medium, Contrast, Radiologic |



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

Product Code:    KTA
Review Panel:    Radiology

**3.    Description of the Product**, Section 3.7(c)(2):

Genus's Vanilla SilQ products are barium sulfate oral solution contrast agents, which are swallowed – but not metabolized – for diagnostic purposes.  Barium sulfate is an inert metal salt used to improve visualization of the gastrointestinal tract (esophagus, stomach, intestines) on <u>plain X-ray</u> or <u>computed tomography</u>.  WHO, Model Formulary § 14.2 (2008).  Barium sulfate is a heavy metal with a high atomic number (Z=56), which results in an opacity helpful for visualization in X-ray or other radiologic procedures.  It also has a K-shell binding energy (K-edge of 37.4 keV).

Barium sulfate is an inorganic compound with the chemical formula $BaSO_4$ and a molecular weight of 233.38 g/mol.  It is a white crystalline solid that is odorless and insoluble in water.  It occurs as the mineral barite, which is the main commercial source of barium and materials prepared from it.  Barium sulfate, due to its high molecular density is opaque to X-rays and therefore acts as a positive contrast agent for radiographic studies.  It has the following chemical structure:

$$\left[\; O = \overset{\displaystyle O}{\underset{\displaystyle O}{\overset{\|}{S}}} = O \;\right]^{2-} \quad Ba^{2+}$$

Barium sulfate is not absorbed by the body nor does it chemically interact with cells or tissues to achieve its intended use.  It is practically insoluble in water solutions of acids, alkalies, and organic solvents.

Genus's Vanilla SilQ products are not sold or distributed with any additional components.  One of Genus's products is sold and distributed with a 5 mL flavor pack, as described in section 5, which is typically regulated as a food product.

**4.    Prior Approvals and Agreements**, Section 3.7(c)(2)(iv):

Genus's Vanilla SilQ products have not received any prior approvals or clearance.

**5.    Chemical, Physical, or Biological Composition**, Section 3.7(c)(2)(v):

Genus has three formulations of Vanilla SilQ Barium Sulfate products:  Vanilla SilQ (Smoothie), Vanilla SilQ MD, and Vanilla SilQ HD:



**Genus Medical Technologies, LLC**
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

Genus's Vanilla SilQ  is a barium sulfate suspension 2.1% w/v 2.0% w/w for oral administration. Each 100 mL contains 2.1 g barium sulfate.

Genus's Vanilla SilQ MD is a barium sulfate for suspension 96% w/w for oral administration. Each 100 g contains 96 g sulfate.

Genus's Vanilla SilQ HD is a barium sulfate for suspension 98% w/w.  Each 100 g contains 98 g sulfate.

     Inactive ingredients in the SilQ products include citric acid, natural and artificial flavors, benzoic acid, suspending agent, potassium sorbate, purified water, sodium saccharin, sodium citrate, simethicone, sodium benzoate, sorbitol, emulsifiers, and thickening agents.  The inactive ingredients are all considered "Generally Recognized as Safe" as food additives or ingredients.

     The composition of each of the three products is as follows:

|  | INGREDIENTS | FUNCTION | WT% |
|---|---|---|---|
| Vanilla SilQ | Water | Diluent | 93.27% |
| Vanilla SilQ | Sorbitol Solution 70 % | Sweetener | 3.50% |
| Vanilla SilQ | Barium Sulfate | Contrast | 2.00% |
| Vanilla SilQ | Xanthan Gum | Thickener | 0.55% |
| Vanilla SilQ | Simethicone | Antifoaming Agent | 0.05% |
| Vanilla SilQ | Benzoic Acid | Preservative | 0.05% |
| Vanilla SilQ | Sodium Citrate | Preservative / Emulsifier | 0.05% |
| Vanilla SilQ | Potassium Sorbate | Preservative | 0.10% |
| Vanilla SilQ | Sodium Benzoate | Preservative | 0.05% |
| Vanilla SilQ | Sodium Saccharin | Sweetener | 0.03% |
| Vanilla SilQ | Vanilla Flavor Ce-157284 | Flavoring Agent | 0.30% |
| Vanilla SilQ | Citric Acid | Preservative / Emulsifier | 0.05% |
|  |  |  |  |
| Vanilla SilQ MD | Barium sulfate | Contrast | 96.00% |
| Vanilla SilQ MD | Sodium Citrate | Emulsifier | 1.00% |
| Vanilla SilQ MD | Saccharin Sodium | Sweetener | 0.02% |
| Vanilla SilQ MD | Sorbitol | Sweetener | 1.15% |
| Vanilla SilQ MD | Simethicone | Antifoaming Agent | 0.15% |
| Vanilla SilQ MD | Xanthan Gum | Thickener | 0.06% |
| Vanilla SilQ MD | Bentonite | Thickener | 1.49% |



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

| | | | |
|---|---|---|---|
| Vanilla SilQ MD | Tragacanth | Thickener | 0.03% |
| Vanilla SilQ MD | Lambda Car | Thickener | 0.04% |
| Vanilla SilQ MD | Vanilla flavor | Flavoring Agent | 0.07% |
| | | | |
| Vanilla SilQ HD | Barium Sulfate 10 micron | Contrast | 68.65% |
| Vanilla SilQ HD | Barium Sulfate 1 micron | Contrast | 29.35% |
| Vanilla SilQ HD | Sodium Citrate | Emulsifier | 0.50% |
| Vanilla SilQ HD | Saccharin Sodium | Sweetener | 0.02% |
| Vanilla SilQ HD | Sorbitol | Sweetener | 1.03% |
| Vanilla SilQ HD | Simethicone | Antifoaming Agent | 0.13% |
| Vanilla SilQ HD | Acacia | Thickener | 0.06% |
| Vanilla SilQ HD | Lambda Car | Thickener | 0.06% |
| Vanilla SilQ HD | Vanilla flavor | Flavoring Agent | 0.19% |

The addition of water to Vanilla SilQ MD and Vanilla SilQ HD, which is not provided with the product, is necessary for reconstitution.  Water is added for reconstitution outside the body prior to ingestion.

Additionally, the Genus Vanilla SilQ (Smoothie) is sold and distributed with a 5 mL flavor pack for ease of consumption (i.e. better taste).  The composition of the flavor packs are as follows;

| | INGREDIENTS | FUNCTION | WT% |
|---|---|---|---|
| Orange | Water | Diluent | 75 - 100% |
| Orange | Polysorbate 80 | Emulsifier | 1.0 - 10% |
| Orange | Natural and Artificial Flavors | Flavoring Agent | 0.1 - 1.0% |
| Orange | Sodium Benzoate | Preservative | 0.1 - 1.0 % |
| Orange | Citric Acid | Preservative | 0.1 - 1.0% |
| | | | |
| Banana | Propylene Glycol | Solvent / Preservative | 75 - 100% |
| Banana | Natural and Artificial Flavors | Flavoring Agent | 1.0 - 10% |
| | | | |
| Berry | Propylene Glycol | Solvent / Preservative | 75 - 100% |
| Berry | Natural and Artificial Flavors | Flavoring Agent | 1.0 - 10% |

FDA000010



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO  63005*

*Ed Powers*
*President*

As discussed in section 3, barium sulfate is an inorganic compound.  It is designated chemically as $BaSO_4$ with a molecular weight of 233.43 g/mol, and a density of 4.5 g/cm$^3$.  It has the following chemical structure:

$$Ba^{2+} \left[ O\underset{\underset{O}{\|}}{\overset{\overset{O}{\|}}{S}} O \right]^{2-}$$

Barium sulfate is a heavy metal with a high atomic number (Z=56) and a K-shell binding energy (K-edge of 37.4 keV), which is very close to that of most diagnostic X-ray beams.  These characteristics render barium sulfate an ideal medium for the absorption of X-rays.  Barium Sulfate, PubChem Compound Summary for CID 24414 § 9.7.  The barium sulfate suspension covers the mucosal surface of the gastrointestinal tract, which helps to delineate this structure upon exposure to X-rays.

**6. Developmental Work and Testing**, Section 3.7(c)(2)(vi):

Genus has undertaken developmental work and testing with respect to barium sulfate.  This research includes CT scan comparisons of Genus's barium sulfate product to Bracco Imaging's barium sulfate (approved as a drug by CDER), as well as an antimicrobial effectiveness test.  Genus has also performed an audit of its manufacturer and routinely performs sterility, validity, batch, and other testing in accordance with Good Manufacturing Practices and Quality System Requirements.

**Summaries of Research and Development to Date**

**Barium Attenuation Comparison**

Three barium suspensions were scanned using a GE Light Speed 64 slice scanner set to 120 kV and 200 mA.  One was a lab batch, prepared by the laboratory conducting the test, with a known barium percentage of 2%.  The other two were from the manufacturing line for the Genus barium sulfate products at Relion, Inc., Genus's contract manufacturer.  The latter two batches were development batches of the Genus product which is labeled as 2% w/w.  Genus product specification requires that the barium sulfate content in its solution not exceed +/- 10% of the intended target.

The objective was to compare attenuation of the three batches by measuring the Hounsfield Units (Hu) taken from 33 readings to confirm that the average Hu from the readings falls within a range of +/- 10%.

FDA000011



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

The average attenuation from scans of the lab batch was 362.29 Hu. The average attenuation from Batch 1 was 342.24 Hu (94.46% of the lab batch). The average attenuation from scans of Batch 2 was 360.27 Hu (99.44% of the lab batch). The chart below demonstrates that the average attenuation from all scans of Batches 1 and 2 was within the upper and lower limits of our specification.



This exercise demonstrates that not only do the manufacturing batches meet the barium content specification, but also that the attenuation from the contrast is equivalent to the lab batch. Additional research was completed to verify that the manufacturing process is valid – including the use of XRF scanning as a second means of measuring content and attenuation.

**Antimicrobial Effectiveness Test**

This study evaluated the effectiveness of antimicrobial preservatives against microbial contamination while stored using USP 37, Section 51, Antimicrobial Effectiveness Testing, and USP 37, Section 61, Neutralization/Removal of Antimicrobial Activity with a modification of the neutralization acceptance criteria. Here, neutralization was considered acceptable when recovery of the test organisms in the sample is at least 70% of that of the control. The test organisms included Staphylococcus aureus, Candida albicans, Escherichia coli, Pseudomonas aeruginosa, and Aspergillus brasiliensis.

The results of this testing were:

**Log $B_{10B}$ CFU/g**

|  | *Staphylococcus aureus* | *Escherichia coli* | *Pseudomonas aeruginosa* | *Candida albicans* | *Aspergillus brasiliensis* |
|---|---|---|---|---|---|
| Inoculum level | 5.78 | 6.05 | 6.14 | 5.38 | 5.48 |
| Day 14 | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |

FDA000012



| Day 28 | <1.00 | <1.00 | <1.00 | <1.00 | <1.00 |
|--------|-------|-------|-------|-------|-------|
| Validation | + | + | + | + | + |

+ indicates that the preservative system was neutralized by a 1:10 dilution and chemical means.

The criteria for antimicrobial effectiveness were:

> Bacteria: Not less than 1.0 log reduction from the initial count at 14 days, and no increase from the 14 days' count at 28 days.
> Yeast and Molds: No increase from the initial calculated count at 14 and 28 days.

Thus, the test showed that the antimicrobial preservatives in Genus's barium sulfate products are effective in preventing colonization during storage.

**7. Manufacturing Information**, Section 3.7(c)(2)(vii):

The manufacturing processes for all of Genus's Vanilla SilQ barium sulfate products are completed by a contract manufacturer, Relion Manufacturing, Inc. Relion maintains facilities in Asheville, NC and is properly registered with FDA under Establishment Number 85629765.

**8. Proposed Use or Indications**, Section 3.7(c)(2)(viii):

Genus's Vanilla SilQ barium sulfate products are indicated for use as a contrast agent in radiographic studies.

**9. Modes of Action and Primary Mode of Action**, Section 3.7(c)(2)(ix):

Under the FDCA, the definition of a "drug" includes "articles intended for . . . the . . . treatment, or prevention of disease" or "intended to affect the structure or any function of the body of man or other animals." *Id.* § 201(g). A "device" has the same definition, but also has a clause requiring that an article "does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and . . . is not dependent upon being metabolized for the achievement of any of its primary intended purposes." *Id.* § 201(h). An article is a device if this exclusionary clause is satisfied.

Barium sulfate satisfies the exclusionary clause because it does not achieve its primary intended purposes as a contrast agent through either chemical action within or on the body or after being metabolized. It is therefore a "device" under the statutory definition. The primary intended purposes of X-ray absorption and delineation of internal structures is achieved not as a result of chemical action or metabolization, but rather by providing a physical coating on tissue that absorbs X-rays.

**A. Chemical Action**

It is well established that the mere absorption of X-rays does not constitute chemical action under the FDCA. In guidance, FDA defines an article as exhibiting "chemical action" if it interacts at the molecular level with bodily components to mediate a bodily response or if it

FDA000013



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO  63005*

*Ed Powers*
*President*

interacts with foreign entities (e.g., organisms or chemicals) so as to alter that entity's interaction with the body. FDA, Guidance: Classification of Products as Drugs and Devices & Additional Product Classification Issues, 7 (Sept. 2017) ("Classification Guidance"). Interaction at the molecular level occurs through chemical reaction, intermolecular forces, or both. *Id.* Even a product that has a chemical action may still be a device as long as its primary intended purpose is not achieved through that chemical action. *Id.* "The mere exchange of non-chemical energy . . . between a product and the body would not constitute 'chemical action.'" *Id.* at n.12.

Barium sulfate is an inert compound with no effect on intermolecular forces. Statement of Daniel Didier, Attachment A (with his resume as Attachment B). As a biologically inert material, it cannot mediate a bodily response at the cellular or molecular level. E-Z-HD (barium sulfate), Clinical Pharmacology Review, NDA 208036 (Aug. 12, 2015). It cannot combine with or modify an entity so as to alter its interaction with the body of man or other animals. *Id.* Barium sulfate, therefore, does not achieve its purposes through chemical action.

As an inert contrast agent with a high molecular density ingested for diagnostic purposes, Vanilla SilQ barium sulfate coats the mucosal lining of the gastrointestinal tract and absorbs X-ray energy as it passes through the body. Barium sulfate is a heavy metal with a high atomic number (Z=56) and a K-shell binding energy (K-edge of 37.4 keV), which is very close to the mean energy of most diagnostic X-ray beams. Consequently, the K-shell binding energy is ideal for absorption of X-rays. Due to these properties, an X-ray examination will show light for areas representing tissue coated with barium sulfate and dark for surrounding tissues not coated. This contrast permits radiologists to better visualize the gastrointestinal tract.

The coating of the gastrointestinal tract with barium sulfate occurs through physical rather than chemical action. There is no change on a molecular level to the gastrointestinal system resulting from the consumption of barium sulfate nor is a new substance formed after energy is absorbed. Barium sulfate may coat the gastrointestinal tract and absorb X-rays, but it does not change the chemical bonds of the gastrointestinal tract. It is only the physical presence of barium sulfate that causes the absorption of the X-rays, but its presence is not permanent and has no lasting effects on the molecules in or the gastrointestinal system itself. Because a physical change in the gastrointestinal system does not arise from the consumption of barium sulfate and a new substance is not formed, it cannot be considered a chemical change.

The lack of chemical action of barium sulfate is similar to that of gold nanoparticles, which are classified as devices under FDA's final Classification Guidance when indicated to treat cancer. The Guidance explains that "[w]hen gold nanoparticles are injected into a tumor site and exposed to electromagnetic energy, they absorb the electromagnetic energy and convert it to thermal energy, and this heat is transferred to the surrounding cells or tissue." Classification Guidance at 10. Because the heat transfer – rather than a binding interaction with the nanoparticle – causes the cell to die, the nanoparticles do not work by way of chemical action or metabolization and are therefore considered devices. *Id.* Similarly, barium sulfate does not achieve its intended purposes through binding interaction but by the absorption of X-ray energy as it passes through the body to highlight and delineate bodily

FDA000014



structures. Barium sulfate may even be a *stronger* example of a product that does not achieve its primary intended purpose through chemical action, as the barium sulfate absorbs the energy, but does not convert it to heat or transfer heat to the tissue. Neither product has any effect on intermolecular forces.

**B.      Metabolization**

Further, barium sulfate is not dependent upon being metabolized for the achievement of any of its primary intended purposes. Indeed, barium sulfate is neither absorbed nor metabolized and is eliminated intact from the body in a similar manner as other non-absorbed inorganic materials. Barosperse (barium sulfate), Package Insert (rev'd Feb. 2009), https://www.drugs.com/pro/barosperse.html. FDA has explained in its review of Bracco Imaging's E-Z-HD (a product virtually identical to Genus's Vanilla SilQ HD product) that "[b]arium sulfate is an insoluble compound and is biologically inert. The systemic absorption of barium sulfate is extremely limited; it is not metabolized and is eliminated unchanged in the feces." E-Z-HD (barium sulfate), Clinical Pharmacology Review, NDA 208036, at 4.

FDA further detailed the metabolic properties of barium sulfate in the Clinical Pharmacology section of the Summary Basis of Approval for Bracco Imaging's E-Z-HD, NDA 208036:

> Atomic absorption spectrometry has been used to measure urinary excretion of barium after oral and rectal administration of Barium Sulfate suspensions. After oral ingestion of a Barium Sulfate preparation, $0.16\text{-}0.26 \times 10^{-6}$ of the ingested dose was excreted via the urinary tract whereas urinary excretion of rectally administered. Barium sulfate was in the range of $0.02\text{-}0.09 \times 10^{-6}$ of the administered dose. ***By subtraction, greater than 99.99% of the dose is not absorbed.*** The clinical significance of absorption of such small amounts is speculative.

*Id.* (emphasis added).

This *lack* of absorption and metabolization makes the product useful as a benign, radiopaque aid to X-ray diagnosis in gastrointestinal and colorectal examinations. "Characterized by extreme insolubility, chemically pure barium sulfate is non toxic to humans." U.S. Dep't of Health and Human Servs., Pub. Health Serv., Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Barium and Barium Compounds*, 105 (Aug. 2007). Less than 1% of the product was detected in a urinary study in the Bracco NDA. E-Z-HD (barium sulfate), Clinical Pharmacology Review, NDA 208036, at 7.

Since barium sulfate is plainly not metabolized, it cannot be dependent upon being metabolized to achieve the primary intended contrast agent purposes. In fact, the World Health Organization notes that "due to the limited absorption of barium sulfate from the gastrointestinal tract or skin, it is unlikely that any significant systemic effects would occur." WHO, Concise International Chemical Assessment Document 33, *Barium and Barium Compounds* (2001).



**Genus Medical Technologies, LLC**
**207 Chesterfield Towne Center**
**Chesterfield, MO 63005**

*Ed Powers*
*President*

\*       \*       \*

Barium sulfate differs from other contrast agents in its mode of action. For example, unlike ultrasound contrast material, barium sulfate is not absorbed, does not enter the bloodstream, and is not dependent upon systemic circulation. Nor does barium sulfate cross tissue barriers in the body as ultrasound contrast does when it passes through capillaries. Ultrasound contrast agents cause a physical effect from chemical interaction or the product is metabolized – or both – but the same is not true for barium sulfate.

Barium sulfate falls squarely within the definition of a device under the FDCA, because it is intended to aid in diagnosis, but its primary intended purposes of physical coating, energy absorption, and internal structure delineation are not achieved via chemical or metabolic activity. FDA has even conceded this point in correspondence to Genus, stating that "your products appear to meet the definition of 'device' at section 201(h) of the FD&C Act. . . ."[1] Letter from Russell K. Riley, FDA, to John E. Powers, Genus, 2 (Sept. 6, 2018).

**10. Schedule and Duration of Use**, Section 3.7(c)(2)(x):

Vanilla SilQ products are intended for single use during the process of radiography. Timing, sequencing, volume, and concentration of the product are determined by the individual technique of radiography professionals and may vary with differing patient and procedure characteristics. Barium sulfate passes through the gastrointestinal tract in an unchanged form and is absorbed only in pharmacologically insignificant amounts. Excretion rate is a function of gastrointestinal transit time, but the time to reach the small bowel is generally from 15 to 90 minutes.

**11. Dose and Route of Administration**, Section 3.7(c)(2)(xi):

Barium sulfate is supplied as an oral suspension available in 2.1% w/v, (2.0 % w/w) or as powder for reconstitution in 96% w/w and 98% w/w for oral administration. The powder form is reconstituted with water then ingested prior to radiography. All of the products are administrated orally, but dosage, volume, and concentration of the product are determined by the individual technique of radiography professionals and may vary with differing patient and procedure characteristics in accordance with the following recommendations:

| PRODUCT | DOSAGE* | ADMINISTRATION |
|---|---|---|
| Vanilla SilQ | 450 – 900 mL | Oral |
| SilQ HD | 65 – 135 mL | Oral |
| SilQ MD | 150 – 750 mL | Oral |

*\* Volume and other characteristics are determined by individual technique, and may vary with differing patient and procedure characteristics.*

---

[1] FDA makes this concession in an effort to argue that all devices may be regulated as drugs at FDA's discretion. This position is inconsistent with the language of the FDCA.



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

**12. Related Products**, Section 3.7(c)(2)(xii):

FDA cleared several barium sulfate products as devices between 1976 and 1980. These clearances include barium sulfate suspensions and barium sulfate powders for suspension: K760736, K800459, K800839, K800840, K800841, K800842, K800843, and K800844.

Bracco Imaging has also received approval for its E-Z-HD Barium Sulfate oral suspension under New Drug Application numbers 208036 and 208143.

Barium sulfate is similar to Sitzmarks, which are Class 2 devices cleared under 510(k) K881609. Sitzmarks are contrast agent capsules containing 24 radiopaque markers that are visible throughout the digestive tract under X-rays. Similar to barium sulfate, Sitzmarks are used to determine the extent of marker elimination to assess gastrointestinal conditions. Additionally, barium sulfate is similar to radiopaque tissue markers. Radiopaque tissue markers are contrast agents used to radiographically mark soft tissue during surgical procedures. These too are regulated as devices, for example, the Radiopaque Tissue Marker cleared under 510(k) K170026.

**13. Other Relevant Information**, Section 3.7(c)(2)(xiii):

Genus is submitting this RFD after receiving a Warning Letter dated May 2, 2017 incorrectly stating that Genus's Vanilla SilQ Barium Sulfate liquid suspension products are unapproved new drugs distributed in violation of the FDCA. Genus strongly disagrees that its products are drugs. Rather, Genus believes that its products fall under the definition of a medical device for the reasons discussed in sections 9 and 14 and must be regulated as such. Genus replied to this Warning Letter outlining its position on May 19, 2017. CDER replied to this letter again alleging unapproved new drug and misbranding violations on September 6, 2018. Genus replied to this letter on September 27, 2018, reiterating its position and committing to the submission of this Request for Designation. These letters are too voluminous to include in this submission, but may be obtained from the sponsor as necessary.

**14. Sponsor's Recommendation**, Section 3.7(c)(3):

Genus recommends that its Vanilla SilQ barium sulfate products be classified as medical devices under the regulatory authority of the Center for Devices and Radiological Health (CDRH). Barium sulfate is a device under the statutory definition of a device. Section 201(h) of the FDCA (21 U.S.C § 321(h)) defines a "device" as:

an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or . . . intended to affect the structure or any function of the body of man or other animals, **and *which does***



**Genus Medical Technologies, LLC**
**207 Chesterfield Towne Center**
**Chesterfield, MO 63005**

**Ed Powers**
**President**

*not achieve its primary intended purposes through chemical action* **within or on the body of man or other animals and** *which is not dependent upon being metabolized for the achievement of its primary intended purposes* (emphasis added).

An article is a device only if it does not achieve its primary intended purposes through chemical action and is not dependent upon being metabolized for the achievement of its primary intended purpose. In this case, barium sulfate is an inert contrast agent ingested for diagnostic purposes to better visualize the gastrointestinal tract during radiological procedures. As discussed in section 9, barium sulfate does not achieve its primary purposes as a contrast agent through either chemical action within or on the body or metabolization. Therefore, barium sulfate is a "device" under the statutory definition.

FDA guidance states that a product that meets the definition for drug under 21 U.S.C. § 321(g) and for device at 21 U.S.C. § 321(h) "would be classified as a device, unless it falls within a special category (for example, apparatuses used in the preparation of compounded positron emission tomography drugs are classified as drugs, see 21 U.S.C. 321(ii))." Classification Guidance at 12. Unlike positron emission tomography drugs, contrast agents are neither enumerated by Congress in a special category in 21 U.S.C. § 321 nor has FDA engaged in a rulemaking to set forth a special category for contrast agents. While section 520(p)(4) of the FDCA appears to affirmatively categorize contrast agents as drugs, this provision is not relevant to the general classification of barium sulfate. The definitions enumerated in this section are limited exclusively and explicitly to the "purposes of *this subsection*," which applies only to device controls for diagnostic imaging devices intended for use with contrast agents. 21 U.S.C. § 360j(p)(4) (emphasis added). For this provision to apply in all circumstances, it would not have been limited to this subsection and would have been added to the definition to the definitions articulated "for purposes of this *chapter*" in 21 U.S.C. § 321 (emphasis added).

For all the foregoing reasons, barium sulfate must be regulated under the device authorities and assigned to CDRH.

Please feel free to contact Ed Powers at the telephone number and email address listed above, or Genus's attorneys Douglas Farquhar (202 737 9624, email dfarquhar@hpm.com) or Sara Koblitz (202 737 9623, email skoblitz@hpm.com) with any questions or concerns.

Sincerely,

J. Edward Powers

Ed Powers
President and Chief Executive Officer

ATTACHMENT A

**Statement of Daniel Didier Relating to Barium Sulfate**

**Q1  Is barium sulfate, when administered to humans as a radiological contrast agent, metabolized after ingestion [and, if so, is it metabolized for the achievement of its primary intended purposes]?**

ANSWER

No.  Barium sulfate passes through the human digestive tract intact, and is not metabolized. Even if it were to be metabolized, the result of metabolization would hinder the product's role in achievement of its primary intended purpose.  It is certainly would not assist in the achievement of the product's primary purposes for the product to be metabolized.

**Q2  Does barium sulfate depend upon chemical reaction to achieve its primary intended purpose?**

ANSWER

No.  By virtue of its inert nature, barium sulfate does not cause a chemical reaction in the body of humans or animals.

**Q3  Does barium sulfate depend upon intermolecular forces to achieve its primary intended purpose?**

ANSWER:

Intermolecular forces are the forces which mediate interaction between molecules, including forces of attraction or repulsion which act between molecules and other types of neighboring particles.  Barium sulfate is an inert compound which cannot exert dipole-dipole interactions, ion-dipole and ion-induced dipole forces, or van der Waals forces.  Barium sulfate is an inert radiopaque material which is not absorbed or metabolized, and is eliminated intact from the body in a manner similar to other non-absorbed inorganic materials.  As an inert material barium sulfate cannot mediate a body response at the cellular or molecular level.  Further, as an inert material barium sulfate cannot combine with or modify an entity so as to alter that entity's interaction with the body of man or other animals.

FDA000019

**Q4  Are there characteristics of barium sulfate that separate it from the drug-nature of ultrasound contrast as represented in FDA's 1997 summary response to the Citizen's Petitions?**

ANSWER:

Yes.  It is clear that there are three distinct features of ultrasound contrast material which FDA appears to reference as reasons the product was classified as a drug, and which do not apply to barium sulfate:

1. Barium sulfate is not absorbed (not bioavailable), so it does not enter the bloodstream and is therefore not dependent upon systemic circulation to achieve its primary intended effect.
2. Barium sulfate does not cross tissue barriers in the body like ultrasound contrast does — i.e. when it passes through capillaries
3. While there may be a propensity for cellular uptake to occur with ultrasound contrast, there is no cellular uptake that occurs with the administration of barium sulfate, particularly since barium sulfate is not absorbed through the gastrointestinal tract.

Respectfully submitted,

Daniel Didier
May 18, 2017

ATTACHMENT B

**DANIEL K. DIDIER**
**13030 Ray Trog Ct**
**St Louis, Missouri 63146**
**314-780-6806**
**dandidier7@aol.com**

## EXPERIENCE

| | |
|---|---|
| **THERMOFISHER SCIENTIFIC** | **2003-2016** |
| Public Health Director – ThermoFisher/Life Technologies | 2009-2016 |
| Head of Strategic Global Accounts – Life Technologies/Applied Biosystems | 2005-2009 |
| Director of Informatics – Applied Biosystems | 2003-2005 |
| | |
| **CYTOGENOMICS Inc.** | **2001-2003** |
| President and CEO | 2003 |
| Board of Directors | 2001-2003 |
| | |
| **INCYTE GENOMICS** | **1999-2003** |
| President of Operations, Incyte Genomics Asia | 2001-2003 |
| Senior Director Global Sales | 1999-2003 |
| | |
| **COGENT NEUROSCIENCE** | **1998-2002** |
| Scientific and Business Advisor | |
| | |
| **PROMEGA CORPORATION** | **1995-1999** |
| Drug Discovery Manager | 1997-1999 |
| Field Application Specialist | 1995-1997 |
| | |
| **MONSANTO COMPANY** | **1989-1995** |
| Molecular Biologist and Director of High Throughput Screening | |
| | |
| **HOWARD HUGHES MEDICAL INSTITUTE** | **1981-1989** |
| Research Associate | |

## EDUCATION

M.S., in Molecular Biology, University of Missouri

B.S., in Biology and Chemistry, Illinois State University

FDA000021



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

September 27, 2018

By E-MAIL/CONFIRMATION COPY BY MAIL

Eric Mueller
Compliance Officer
Division of Pharmaceutical Quality Operations III
300 River Place, Suite 5900
Detroit, MI 48207
ORAPHARM3_RESPONSES@fda.hhs.gov

Re:    Reply to FDA Response to Warning Letter Dated
       September 6,  2018 (FEI number 3011028213)

Dear Mr. Mueller:

Genus Medical Technologies, LLC (Genus) has received the Food and Drug
Administration's (FDA) letter of September 6, 2018 (September 2018 Letter).  FDA's
letter is a reply to Genus's letter of May 19, 2017, responding to FDA's Warning Letter.
Genus vehemently disagrees with FDA's position that barium sulfate is a drug; barium
sulfate is indisputably a device under the statutory text of the Federal Food, Drug, and
Cosmetic Act (FDC Act), 21 U.S.C. § 301 et seq.  FDA's contention that any device can
be regulated as a drug is preposterous and contravenes the entire regulatory structure that
Congress crafted in the FDC Act.  As such, FDA's insistence on regulating barium
sulfate as a drug rather than a device, despite the statutory and regulatory definitions, is
arbitrary and capricious in violation of the Administrative Procedure Act (APA),
5 U.S.C. § 500 et seq.

For the reasons expressed below, Genus intends to pursue a Request for
Designation from the Office of Combination Products with respect to barium sulfate.  As
such, Genus requests that FDA refrain from taking enforcement action against Genus for
distribution of its barium sulfate products as unapproved products while its Request for
Designation is pending.

I.    **Barium Sulfate indisputably meets the definition of device under the plain**

FDA000022



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

text of the FDC Act; therefore, it may not be regulated as a drug.

Barium sulfate is a device under the statutory definition of a device.  Section 201(h) of the FDC Act (21 U.S.C § 321(h)) defines a "device" as:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or . . . intended to affect the structure or any function of the body of man or other animals, **and *which does not achieve its primary intended purposes through chemical action* within or on the body of man or other animals and *which is not dependent upon being metabolized for the achievement of its primary intended purposes*** (emphasis added).

The bolded language is known as the "exclusionary clause."  An article is a device only if the exclusionary clause is satisfied.  In this case, barium sulfate is an inert contrast agent ingested for diagnostic purposes to better visualize the gastrointestinal tract during radiological procedures.  It does not achieve its primary purposes as a contrast agent through either chemical action within or on the body or metabolization.  Therefore, the exclusionary clause is satisfied, and barium sulfate is a "device" under the statutory definition.

FDA's September 2018 Letter admits that barium sulfate meets the statutory definition of device.  Letter from Russell K. Riley, FDA, to John E. Powers, Genus, 2 (Sept. 6, 2018) ("September 2018 Letter").  Thus, it is undisputed that Genus's barium sulfate product is a medical device under the FDC Act.

Genus's simple position is that, because its products are a medical device, they are subject to regulation as a medical device.  To evade this obvious syllogism, FDA takes the position that the drug and device definitions overlap, that barium sulfate meets both definitions and, therefore, FDA has discretion to regulate barium sulfate as a drug. The logical conclusion of this position, if upheld, is that FDA has statutory authority to regulate every single type of medical device as a drug if it chooses to do so.  It is, according to FDA, only by the grace of the agency that any particular medical device is not regulated as a drug.

This breathtaking assertion of authority does great violence to the entire statutory scheme.  Congress separately defined drugs and devices for purposes of this statute. Under the separate definitions, an article can be either a drug or device if it is intended to diagnose or treat disease or affect the structure or function of the body.  An article can be



**Genus Medical Technologies, LLC**
**207 Chesterfield Towne Center**
**Chesterfield, MO 63005**

**Ed Powers**
**President**

a device, however, only if it satisfies the exclusionary clause and does not achieve its intended purposes by chemical or metabolic activity.

Congress drew this very bright dividing line because it recognized that the presence (or absence) of such activity is the key to how an article should be regulated. Accordingly, Congress erected two entirely different premarket review and postmarket compliance regimes for drugs and devices based upon this key distinction. It is almost impossible to overstate how different these regimes are. They are so different that FDA has established separate bureaucratic centers for drugs and devices, each applying its own entirely different, non-overlapping set of statutory and regulatory provisions.

So important is the distinction between drugs and devices that Congress added to the FDC Act Section 563, "Classification of Products." This provision entitles any person to obtain a binding classification of its product as a drug or device with the reasons for the decision. That allows a person to reliably know whether the product will be regulated as drug or device, with all the attendant differences between the two regimes. Section 563 forbids FDA from altering the decision "except with the written consent of the person, or for public health reasons based on scientific evidence." 21 U.S.C. § 360bbb-2(b).

Yet, under FDA's theory, a product could be classified in a binding decision as a device, but FDA may in its discretion instead apply the drug authorities and regulations to the product. FDA's theory essentially obliterates the protection of Section 563. It also obliterates the careful distinction between drugs and devices that is embedded in the entire structure of the FDC Act. For example, under FDA's theory, even though the statute requires that devices be regulated in Class I, II, or III according to level of risk, with different regulatory treatment based on the level of risk, a device may be regulated as a drug and not placed into one of these three classes.

At its core, FDA's obliteration of the statutory distinction between drugs and devices rests upon a perverse application of the drug and device definitions. As noted, an article is a device if (i) it is intended to diagnose/treat disease or affect the structure/function of the body AND (ii) does not operate via chemical or metabolic activity. If it fails to comply with condition (ii), then it still meets the definition of a drug, which only requires that condition (i) be met.

FDA's position is that even when conditions (i) and (ii) are met, the article can still be classified as a drug because that definition only requires condition (i). FDA's notion that an article can be both a device and a drug at the same time cannot be found in the statutory scheme. On the contrary, Section 563 requires FDA to uniquely classify each article "as a drug, biological product, device, **or** a combination product."

FDA000024



(Emphasis added.) There is not an option to classify an article as a drug *and* a device. If an article meets the definition of a device, it cannot also be a drug. There is not a single provision in the FDC Act that can be read to suggest that an article can be classified as both a drug and a device, allowing FDA to choose which way to regulate it. The statute is built around two entirely different regulatory schemes that rest on the exclusive classification of an article as either a drug *or* a device.

In this case, FDA has already conceded that barium sulfate is a device because it achieves its intended diagnostic contrast agent use without chemical or metabolic activity. Accordingly, it must be regulated as a device.

## II. Under the basic tenets of statutory interpretation, FDA's regulation of a device as a drug cannot stand.

Under the FDC Act definition, devices, like drugs, are intended to diagnose disease or other conditions. 21 U.S.C. § 321(h)(2) (FDC Act § 201(h)(2)). If, as FDA contends, any article may be regulated as a drug simply because it is "intended for use in the diagnosis of disease," Congress would not have included this same language in the definition of device. Indeed, FDA's argument that any device can also be regulated as a drug renders the *more restrictive* definition of "device" meaningless.

In FDA's interpretation, the distinct definition of device is superfluous to the statute. Congress need not have distinguished a device from a drug if the application of such distinction is at FDA's discretion. But not only did Congress include such a distinction, it also set forth a *specific* definition of device. The most basic of interpretative canons holds that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal citations omitted). FDA's conflation of drug and device ignores the device definition, rendering it insignificant, and consequently cannot withstand scrutiny.

FDA concedes that that the definition of a device is more restrictive than that of the definition of a drug. FDA, Guidance: Classification of Products as Drugs and Devices & Additional Product Classification Issues, 5 (Sept. 2017) (emphasis added) ("Classification Guidance"). Fundamentally, FDA's admission should provide the end to the inquiry. It is an indisputable tenet of statutory interpretation that the more specific provision supersedes the more general provision if the more specific provision applies. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (stating that where a general authorization and a more specific authorization exist side-by-side, the terms of the specific statute must be followed to avoid "the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

possible, effect shall be given to every clause and part of a statute.'" (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

FDA's interpretation is therefore contrary to the plain language, structure, and intent of the FDC Act, which unambiguously intended to create a clear distinction between drug and device.

### III.   FDA has created a standard to distinguish between drugs and devices, but arbitrarily and capriciously refuses to apply this standard to barium sulfate.

FDA has accepted the clear statutory differences between drugs and devices and has articulated a standard by which medical products are classified; however, FDA inexplicably refuses to follow this standard with respect to barium sulfate. As noted, the statutory definition of device differentiates devices from drugs because devices do not achieve their "primary intended purposes through chemical action within or on the body of man or other animals." 21 U.S.C. § 321(h)(3). A medical device "is not dependent upon being metabolized for the achievement of its primary intended purposes." *Id.*

The Classification Guidance demonstrates that FDA relies on the sponsor to distinguish a device from a drug, as defined in the statute. According to this guidance, all that is required for a sponsor to make such a distinction to be classified as a device are data demonstrating that a proposed product does not achieve its primary intended purpose through chemical action so that it "meets the definition of a device." Classification Guidance at 6.

A product exhibits "chemical action" if it interacts at the molecular level with bodily components to mediate a bodily response or if it interacts with foreign entities (*e.g.*, organisms or chemicals) so as to alter that entity's interaction with the body. *Id.* at 7. Interaction at the molecular level occurs through chemical reaction, intermolecular forces, or both. *Id.* Even a product that has a chemical action may still be a device as long as its primary intended purpose is not achieved through that chemical action. *Id.*

FDA is clear that "[t]he mere exchange of non-chemical energy . . . between a product and the body would not constitute 'chemical action.'" *Id.* at n.12. Because the only "effect" that occurs with barium sulfate in the human body is a change in non-chemical energy, barium sulfate meets FDA's clear standards for classification as a device. Barium sulfate is not metabolized and does not interact at the molecular level with bodily components. Importantly, it can neither mediate a bodily response at the cellular or molecular level nor combine with or modify an entity so as to alter the entity's interaction with the body. Therefore, barium sulfate is a device under FDA's



**Genus Medical Technologies, LLC**
**207 Chesterfield Towne Center**
**Chesterfield, MO 63005**

*Ed Powers*
*President*

clear and explicit device classification standards. FDA, however, refuses to apply this standard to barium sulfate.

FDA guidance states that a product that meets the definition for drug under 21 U.S.C. § 321(g) and for device at 21 U.S.C. § 321(h) "would be classified as a device, unless it falls within a special category (for example, apparatuses used in the preparation of compounded positron emission tomography drugs are classified as drugs, see 21 U.S.C. 321(ii))." Classification Guidance at 12. Unlike positron emission tomography drugs, contrast agents are neither enumerated by Congress in a special category in 21 U.S.C. § 321 nor has FDA engaged in a rulemaking to set forth a special category for contrast agents. While FDA implicitly argues that the recently enacted section 706 of the Food and Drug Reauthorization Act (FDARA) sets forth a special category for contrast agents by defining contrast agents as drugs, the definitions referenced, as discussed further below, are narrowly applicable only to sections 505(y) and 520(p) of the FDC Act, and therefore do not affect the statutory classification designations discussed above.

In response to the extensive detail in Genus's May 2017 Warning Letter Response about the medical device status of Genus products, FDA concedes that barium sulfate is a device under the statutory definition, but dismisses the argument as irrelevant. FDA argues that, in the interest of regulatory consistency and administrative efficiency, all contrast agents are regulated as drugs because not all contrast agents meet the definition of a device and can therefore be regulated as devices. That is, rather than evaluating the method of achieving primary intended purpose for a given medical product as required by both statute and FDA policy, FDA appears to have adopted, *sua sponte*, a class-wide standard based on the functionality of only *some* contrast agents. And FDA did so without input from industry, without statutory authorization, and in contradiction of decades of regulating many contrast agents, including barium sulfate, as medical devices.

Of note, contrary to FDA's contention (as expressed in the September 2018 Letter), not *all* contrast agents are regulated as drugs. Sitzmarks, for example, are Class 2 devices cleared under a 510(k), K881609. Sitzmarks are contrast agent capsules containing 24 radiopaque markers that are visible throughout the digestive tract under X-rays. Similar to barium sulfate, Sitzmarks are used to determine the extent of marker elimination to assess gastrointestinal conditions. Further, radiopaque tissue markers are contrast agents used to radiographically mark soft tissue during surgical procedures. These too are regulated as devices, such as the Radiopaque Tissue Marker cleared under 510(k) K170026.



**Genus Medical Technologies, LLC**
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

FDA's adoption of a class-wide intended use standard for contrast agents could have been implemented (if it is legal at all) only after notice to and opportunity for public comment. The mass classification of contrast agents ignores significant differences between contrast agents that exist precisely because various contrast agents operate very differently; applying a single general standard to contrast agents is not treating similar products similarly because all contrast agents are not similar products. Unlike ultrasound contrast material, barium sulfate is not absorbed and does not enter the bloodstream and is therefore not dependent upon systemic circulation. Nor does barium sulfate cross tissue barriers in the body like ultrasound contrast does when it passes through capillaries. Because ultrasound contrast agents cause a physical effect from chemical interaction or the product is metabolized – or both – ultrasound contrast agents may very well qualify as a drug, but the same is not true for barium sulfate. These differences are critical to the classification of a medical product as a drug or device.

Because barium sulfate and injectable ultrasound contrast agents act differently in the body, there is sound reason to treat them differently. While FDA depicts its group classification of contrast agents as a result of *Bracco Diagnostics Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) in its September 2018 Letter, this position is disingenuous. FDA claims that *Bracco v. Shalala* required regulation of "similar cases in a similar manner," but this requirement applies "unless [the agency] can provide a legitimate reason for failing to do so." 963 F. Supp. at 27. That FDA did not provide a reason does not mean that such reasons do not exist. Such an analysis – subject to public input – should have been performed before categorizing a single class as including differently functioning products.

In fact, barium sulfate acts more similarly to gold nanoparticles than to ultrasound contrast agents. The FDA final Classification Guidance explicitly classifies gold nanoparticles indicated to treat cancer as devices, explaining that "[w]hen gold nanoparticles are injected into a tumor site and exposed to electromagnetic energy, they absorb the electromagnetic energy and convert it to thermal energy, and this heat is transferred to the surrounding cells or tissue." Classification Guidance at 10. Because the heat transfer – rather than a binding interaction with the nanoparticle – causes the cell to die, the nanoparticles do not work by way of chemical action or metabolization and are therefore considered devices. *Id.* Similarly, barium sulfate does not operate through binding interaction, as it is an inert compound with no effect on intermolecular forces. The barium sulfate absorbs x-ray energy as it passes through the body to highlight and delineate bodily structures. As similarly functioning products, gold nanoparticles and barium sulfate should be regulated similarly.



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

Further, even though FDA relies heavily on *Bracco v. Shalala*, the District Court there only mentioned in passing that the relevant contrast agents "all likely meet both the definition of a drug and the definition of a device" under the FDC Act, and that "FDA therefore has discretion in determining how to treat them." 963 F. Supp. at 28. This finding was not discussed further, and it is only *dictum*. *See id.* As such, it was neither critical nor supportive of the court's decision and has not been subject to further judicial review. *Bracco v. Shalala* stands for the proposition that FDA sent *similar products* down *different* tracks while here, FDA is sending *different products* down the *same* track. The only similarity between Bracco's products and Genus's barium sulfate products is that FDA failed to carefully analyze the product under the statute and make an appropriate classification decision. The comment in *Bracco v. Shalala* about FDA's discretion is irrelevant to the Court's conclusion.

FDA's unnecessary and elective decision to categorize all contrast agents as drugs after *Bracco v. Shalala* without regard to either the statutory definitions or its specified distinction standards is arbitrary and capricious in violation of the APA. Though the Court in *Bracco v. Shalala* noted that disparate treatment of functionally indistinguishable products is arbitrary and capricious, FDA apparently recently made a sweeping determination that all contrast agents are functionally indistinguishable without input from many of the affected stakeholders. Industry should have had the opportunity to demonstrate that barium sulfate is not the same as injectable ultrasound contrast agents. FDA's failure to provide such opportunity is inherently arbitrary and capricious.

That FDA refuses to perform the same analysis and adhere to the same standard for barium sulfate as it does for any other medical product purporting to be a device is intrinsically disparate treatment. As FDA noted in its September 2018 Letter, "[t]he disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious." September 2018 Letter at 3 (citing *Bracco v. Shalala*, 963 F. Supp. at 28). Therefore, FDA's blanket classification of contrast agents notwithstanding the articulated definitions and classification standards is arbitrary and capricious in violation of the APA.

## IV. Despite FDA's assertions, section 706 of FDARA does not establish contrast agents as drugs.

FDA argues in its September 2018 Letter that section 706 of FDARA confirms that contrast agents are drugs under the FDC Act, but FDA again misinterprets plain statutory language. The September 2018 Letter dismisses as moot Genus's arguments with respect to barium sulfate as a device because provisions added to sections 505(y)



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

and 520(p) of FDC Act by section 706 of FDARA "make clear that contrast agents are appropriately regulated as drugs under the FD&C Act, in contrast to the medical imaging devices intended to be used with such contrast agents." September 2018 Letter at 2. However, the amendments FDA references are not relevant to the classification of barium sulfate. Indeed, while section 520(p)(4) does define a contrast agent as a drug, the definitions are limited: the definitions are exclusively and explicitly for the "purposes of this *subsection*." 21 U.S.C. § 360j(p)(4) (emphasis added). Specifically, this definition is relevant only to device controls for diagnostic imaging devices intended for use with contrast agents. If Congress intended that this definition should control the entirety of contrast agents, it would have added the definition to the definitions articulated "for purposes of this *chapter*" in 21 U.S.C. § 321 (emphasis added).

Further, even if the definition of contrast agent in section 520(p)(4) applied to the entire FDC Act, the definition can be interpreted as a *limit* on the applicability of device controls to only those contrast agents approved as drugs. Section 520(p)(4) states that "the term 'contrast agent' means a drug that is approved under section 355 of this title or licensed under section 262 of title 42 . . . ." This provision could more logically be read (contrary to FDA's desperate and unconvincing interpretation) to mean that the term contrast agent, in this subsection, applies only to those contrast agents approved under section 505 of the FDC Act. The companion section at section 505(y) also refers to "a contrast agent for which an application has been approved under this section . . . ." If "contrast agent," by definition, referred to only a product approved as a drug, specification that a contrast agent in this subsection must be a drug would be superfluous.

## V.     FDA has significant financial incentives to regulate a given product as a drug, rather than a device, because of user fees and program fees.

It should be noted that there is significant financial incentive for FDA to classify medical products as drugs rather than a device. For a single ANDA from a small company, FDA can expect at least $300,000 in filing and program fees in the first year. Conversely, for a 510(k) notification for the same product from a small company when regulated as a device, FDA can expect only $7,600, inclusive of Annual Establishment Registration fees. With such a discrepancy in user fees, FDA has an incentive for categorizing products as drugs. If FDA is free to decide that any medical device can be regulated as a drug based on the premise that any device meets the definition of drug, the opportunity and incentive for abuse are considerable. Leaving the classification of medical products to FDA's discretion rather than complying with the statute and the clear-cut policies the agency has detailed could cast suspicion on the user fee scheme that has been carefully negotiated and thus far widely supported by industry.



**Genus Medical Technologies, LLC**
**207 Chesterfield Towne Center**
**Chesterfield, MO 63005**

*Ed Powers*
*President*

## VI.    Conclusion

In summary, Genus believes that barium sulfate can only be lawfully regulated as a device rather than a drug. FDA's position departs from the plain text of the FDC Act and FDA's longstanding policies as detailed in guidance. FDA's refusal to apply the existing statutory and regulatory scheme to barium sulfate and categorization of all contrast agents as drugs without public comment is arbitrary and capricious in violation of the APA.

Our May 2017 letter noted that Genus would welcome the opportunity to meet with FDA to discuss the possibility of submitting a 510(k) submission for its barium sulfate products, or to further discuss the regulatory status of the products. This request was repeated shortly thereafter in a phone call between Genus's attorneys and the FDA Office of Chief Counsel. Genus is disappointed that it took about 16 months for FDA to reject its arguments that barium sulfate contrast agents must be regulated as medical devices, especially when, in the interim, Genus's position was corroborated and reinforced by the Classification Guidance. But Genus will not withdraw its offer for further conversation about the future treatment of its barium sulfate contrast agents.[1]

Genus is preparing a Request for Designation for submission to the Office of Combination Products. Of course, Genus cannot stand for further disruption of the ability to sell the products while it pursues formal classification given the strength of Genus's legal position that the products are not unapproved drugs. Accordingly, Genus requests at FDA's earliest opportunity a conversation with FDA about potential enforcement discretion during the pendency of Genus's Request for Designation.

Please feel free to contact our lawyer, Douglas B. Farquhar of Hyman, Phelps & McNamara, P.C., with any questions or concerns.

Respectfully submitted,

Ed Powers
Chief Executive Officer

cc:  Eleanor E. Mayer, FDA Office of Chief Counsel (by email)

---

[1]    Should there be any confusion, Genus incorporates by reference all arguments presented in its May 2017 letter.



U.S. Food and Drug Administration
Division of Pharmaceutical Quality Operations III
300 River Place, Suite 5900
Detroit, MI  48207
Telephone: (313) 393-8100
Fax: (313) 393-8139
www.fda.gov

September 6, 2018

**UPS NEXT DAY**

John E. Powers, Chief Executive Officer
Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, Missouri 63005

Dear Mr. Powers:

This is in response to your May 19, 2017, response to the Warning Letter issued to your Chesterfield, MO, facility by FDA's Kansas City District Office on May 2, 2017 regarding your products Vanilla SilQ Barium Sulfate Liquid Suspension and Vanilla SilQ MD Barium Sulfate Powder for Suspension.  This letter will first address the unapproved new drug violations in the Warning Letter, followed by the misbranding violations.

**Unapproved New Drug Violations**

In FDA's Warning Letter, we informed you that your firm causes the introduction or delivery for introduction into interstate commerce of unapproved new drugs—Vanilla SilQ Barium Sulfate Liquid Suspension and Vanilla SilQ MD Barium Sulfate Powder for Suspension, both for use as contrast agents for radiographic studies—in violation of Sections 301(d) and 505(a) of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act" or "the Act").

In your response, you argue that your products are devices rather than drugs under the FD&C Act. For the reasons discussed below, we confirm that your products meet the statutory definition of "drug" and are regulated as drugs, consistent with the recently enacted statutory provisions regarding contrast agents (discussed below). For the reasons discussed in our May 2017 Warning letter, your products are unapproved new drugs that require new drug applications.

<u>Statutory Basis for Decision</u>
Citing the definitions of "drug"[1] and "device"[2] in the FD&C Act, you argue that your products meet the definition of a device found in the Act because they do not achieve their primary

---

[1] Under section 201(g)(1) of the FD&C Act, the term drug means "(A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C)."
[2] Section 201(h) of the FD&C Act defines a device, in relevant part, as, "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is:

FDA000032

intended purposes through chemical action within or on the body of man or other animals and are not dependent on being metabolized for the achievement of their primary intended purposes. You also assert that your products do not fall within the statutory definition of "drug" under section 201(g) of the Act.

Although your products appear to meet the definition of "device" at section 201(h) of the FD&C Act, they also meet the definition of "drug" at section 201(g) because they are articles intended for use in the diagnosis of disease. This is because the definitions of drug and device are overlapping, rather than mutually exclusive, as discussed further below. While FDA generally regulates products that meet the definition of a device under the device authorities, there are certain exceptions. Because not all contrast agents meet the definition of a device, but all of them do meet the definition of a drug, the Agency has for many years regulated these products as drugs in order to regulate them consistently under the same authority, as discussed further below.

This regulatory approach to contrast agents is consistent with the new contrast imaging-related statutory provisions recently enacted as part of the FDA Reauthorization Act of 2017 (FDARA). Section 706 of FDARA, which added sections 505(y) and 520(p) to the FD&C Act, permits FDA to approve, clear, or classify a medical imaging device intended to be used with an approved contrast agent for certain uses different from those for which the contrast agent is approved, provided certain criteria are met. New section 520(p)(4)(B) defines "contrast agent" to mean "a *drug* that is approved under section 505 of the FD&C Act or licensed under section 351 of the Public Health Service Act" (emphasis added), where the drug is intended for use in conjunction with an applicable medical imaging device, and

>   (i) is a diagnostic radiopharmaceutical, as defined in section 315.2 and 601.31 of title 21, Code of Federal Regulations (or any successor regulations); or

>   (ii) is a diagnostic agent that improves the visualization of structure or function within the body by increasing the relative difference in signal intensity within the target tissue, structure, or fluid.

These new provisions therefore make clear that contrast agents are appropriately regulated as drugs under the FD&C Act, in contrast to the medical imaging devices intended to be used with such contrast agents.

Current Regulation of Barium Sulfate and Other Contrast Agents

You refer to a pre-FDARA rulemaking to argue that FDA violated the Administrative Procedure

---

(1) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,

(2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

(3) intended to affect the structure or any function of the body of man or other animals, and

which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes."

Act (APA) by failing to go through rulemaking to implement its policy of regulating barium sulfate as a drug. In support of this argument you point to a 1982 preamble to a proposed device classification regulation for various types of radiology devices, in which FDA stated, "The agency has determined that all radiologic contrast media, including barium enema kits, are to be regulated by FDA as drugs under section 201(g) of the act [citation omitted] and not as devices."[3] You assert that this policy was not included in a final regulation and assert that FDA did not permit public feedback on it. You argue that, as a result, this policy is not binding on FDA or industry and does not limit the agency's discretion to make case-specific judgments about the appropriate regulation of a given product.

This argument now appears to be moot with respect to FDA's current regulation of barium sulfate, given that Congress has made it explicit that contrast agents are appropriately regulated as drugs under the FD&C Act. Even assuming otherwise, we do not agree that FDA violated the APA in regulating barium sulfate as a drug. The device classification rule to which you refer was intended to classify certain radiology devices into class I, II, or III under section 513 of the FD&C Act. The sentence you quoted from the 1982 preamble to the proposed rule explained why barium sulfate and other radiologic contrast media were not within the scope of this proposed device classification rule. This statement from the preamble was not intended to establish a new legislative rule with respect to barium sulfate or other radiologic contrast media, nor to limit the agency's discretion to make case-by-case judgments about these products.

We also note that FDA's regulation of contrast agents over the past two decades has been informed in part by *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997). In *Bracco*, several manufacturers of injectable contrast imaging agents for use with diagnostic ultrasound equipment challenged FDA's decision to treat their contrast imaging agents as new drugs while treating a competitor's similar product as a device.

In granting plaintiffs' motion for preliminary injunction, the court held that plaintiffs had substantial likelihood of success on the merits of their claim that FDA acted arbitrarily and capriciously, in violation of the Administrative Procedure Act (APA), by failing to treat these similarly situated products in the same fashion and enjoined FDA from continuing any approval or review procedures with respect to the products at issue in the case, pending a decision by the FDA as to how to treat ultrasound contrast agents. *Id.* at 31. The court acknowledged that the Federal Food, Drug, and Cosmetic Act's (FD&C Act) definitions of "drug"[4] and "device" are not mutually exclusive, stating that the products at issue "all likely meet both the definition of a drug and the definition of a device under the [FD&C Act], and the FDA therefore has discretion in determining how to treat them." *Id*. at 28. However, in exercising such discretion, the court found that FDA must either treat all the products at issue in *Bracco* in the same way or provide a rational basis for treating them differently. *See id.* at 27 ("An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."); *id.* at 28 ("The disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious.").

Consistent with that ruling, FDA determined that the contrast agents at issue in that case (microbubble and microsphere-based ultrasound contrast agents) should be regulated as drugs by

---

[3] 47 FR 4406, 4412.

CDER. The agency determined that consolidating the review of these products in one agency center, under one statutory scheme, would promote administrative efficiency and regulatory consistency, make better use of agency resources, and minimize the burden on industry and practitioners that a dual regulatory scheme might impose.[5] (FDA response to Citizen Petitions filed by Bracco Diagnostics Inc., DuPont Merck Pharmaceutical Company, ImaRx Pharmaceutical Corp., and Sonus Pharmaceuticals, Inc. (issued July 28, 1997, Docket 96P-0511) ("1997 Petition Response") at 58, 62).

Since then, the Agency has regulated all contrast imaging agents, including barium sulfate, as drugs for similar reasons. [6,7] Finally, as discussed above, section 520(p) of the FD&C Act, as added by FDARA, now makes it clear that contrast agents are properly regulated as drugs under the FD&C Act.[8]

**Misbranding Violations**

---

[5] Though your May 2017 response argues that your product should be regulated as a device for similar reasons as those cited by the Agency in the 1997 Petition response regarding the classification of Albunex, it neglected to mention a key point: following the issuance of the 1997 Petition Response, the PMA for Albunex was transferred to CDER and given an NDA. Accordingly, regardless of the Agency's initial classification of Albunex, regulating barium sulfate as a drug would not be inconsistent with the current regulation of Albunex.

[6] Guidance for Industry, New Contrast Imaging Indication Considerations for Devices and Approved Drug and Biological Products, December 2009, available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM195951.pdf; Guidance for Industry: Developing Medical Imaging Drug and Biological Products, Part 1: Conducting Safety Assessments, June 2004, available at https://www.fda.gov/downloads/Drugs/Guidances/ucm071600.pdf; Guidance for Industry, Developing Medical Imaging Drug and Biological Products, Part 2: Clinical Indications, June 2004, available at https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM071603.pdf; Guidance for Industry, Developing Medical Imaging Drug and Biological Products, Part 3: Design, Analysis, and Interpretation of Clinical Studies, June 2004, available at https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM071604.pdf.

[7] While barium enema kits are regulated as devices, those kits are distinguishable from your products. FDA's understanding is that such kits are marketed without barium sulfate—they contain only the various devices used for rectal administration of the barium. To the extent that these kits contain the barium sulfate itself, FDA's guidance on these convenience kits states that "FDA does not intend to propose regulatory changes relating to drug requirements for convenience kits. For convenience kits that contain components subject to regulation as drugs, the assembler/manufacturer should contact the Center for Drug Evaluation and Research." Convenience Kits Interim Regulatory Guidance, May 20, 1997, p.4, available at https://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080217.pdf. Whether the Agency determines that regulatory action may be warranted with respect to other products that may contain barium sulfate has no bearing on the regulatory status on your products as drugs under the FD&C Act.

[8] We note that your response cites *Prevor v. FDA*, 895 F. Supp. 2d 90 (D.D.C. 2012), in support of your argument that your products should be regulated as devices. Regardless of the merits of your argument, the new contrast imaging-related provisions in the statute, which were enacted several years after the *Prevor* decision, make clear that contrast agents are appropriately regulated as drugs.

In FDA's Warning Letter, we also stated that Vanilla SilQ Barium Sulfate Liquid Suspension and Vanilla SilQ MD Barium Sulfate Powder for Suspension are misbranded drugs under section 502 of the FD&C Act, and that by causing the introduction or delivery for introduction of these products into interstate commerce, you violated section 301(a) of the FD&C Act.

In your response, you proposed several changes to the labeling and inserts for your Vanilla SilQ Barium Sulfate Liquid Suspension and Vanilla SilQ MD Barium Sulfate Powder for Suspension in an effort to remedy the misbranding violations cited in FDA's Warning Letter. However, as stated in FDA's Warning Letter, the labeling for these prescription drugs fails to bear adequate directions for their intended uses, as required by section 502(f)(1) of the FD&C Act. Furthermore, these drugs are not exempt from the requirements of section 502(f)(1) under regulations issued by FDA.[9]  Until the misbranding violations in the Warning Letter under section 502(f)(1) of the FD&C Act pertaining to adequate directions for use are resolved (e.g., by submitting new drug applications for your unapproved new drugs, including labeling), FDA does not intend to review your proposed labeling changes to address the other misbranding violations.

**Conclusion**

Accordingly, we confirm that your products are appropriately regulated as drugs, and we reiterate that you should take prompt action to correct the violations cited in this letter by discontinuing the manufacturing and distribution of all of your unapproved and misbranded drugs immediately, if you have not done so already.

Please respond in writing to this letter within fifteen (15) working days of receipt. Please send your electronic reply to: ORAPHARM3_RESPONSES@fda.hhs.gov, attention Eric Mueller, Compliance Officer. Refer to the Unique Identification Number (Case# 506486) when replying.

Sincerely,

# Russell K. Riley -S

Digitally signed by Russell K. Riley -S
DN: c=US, o=U.S. Government,
ou=HHS, ou=FDA, ou=People,
0.9.2342.19200300.100.1.1=130018
7611, cn=Russell K. Riley -S
Date: 2018.09.06 10:11:40 -05'00'

Russell K. Riley
Acting Director of Compliance
Division of Pharmaceutical Quality Operations III

---

[9] For example, the exemption from section 502(f)(1) at 21 CFR 201.100 does not apply to your drugs because this exemption requires drugs to bear "the labeling authorized by [an] approved new drug application."  Similarly, the exemption from section 502(f)(1) at 21 CFR 201.115 does not apply to your drugs because this exemption requires an approved new drug application or an active investigational new drug application to be in effect.

FDA000036



*Ed Powers*
*President*

May 19, 2017

By E-Mail/Confirmation Copy By Mail

Miguel Hernandez
Compliance Branch Director
U.S. Food and Drug Administration
Kansas City District Office
8050 Marshall Drive, Suite 205
Lenexa, Kansas 66214
*Miguel.Hernandez@fda.hhs.gov*

Re:  Warning Letter dated May 2, 2017, relating to Genus Medical Technologies
     facility located in Chesterfield, Missouri 63005 (FEI number 3011028213)

Dear Mr. Hernandez:

Genus Medical Technologies, LLC (Genus Medical), provides the following

response to the Warning Letter issued by FDA on May 2, 2017, regarding our Vanilla

SilQ Barium Sulfate Liquid Suspension and Vanilla SilQ MD Barium Sulfate Powder for

Suspension products.

**Approval Status of Products**

In FDA's Warning Letter to Genus Medical of May 2, 2017, the agency alleges

that Genus Medical's Vanilla SilQ Barium Sulfate Liquid Suspension (Vanilla SilQ) and

Vanilla SilQ MD Barium Sulfate Powder for Suspension (Vanilla SilQ MD)

(collectively, the "products") are unapproved new drugs being distributed in violation of

1

FDA000037



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

sections 301(d) and 505(a) of the Federal Food, Drug, and Cosmetic Act (FDC Act)

(21 U.S.C. §§ 331(d), 355(a)). The letter states that Vanilla SilQ and Vanilla SilQ MD,

"which are intended for use as contrast agents in radiographic studies, are drugs within

the meaning of section 201(g)(1) of the Act [21 U.S.C. 321(g)(1)] because they are

intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in

humans."[1]

Genus Medical strongly disagrees that the products are drugs, as defined in the

FDC Act, the governing statute for characterization of medical products. Rather, Vanilla

SilQ and Vanilla SilQ MD are medical devices under the FDC Act, for the reasons

described below.

The definition of "drug," found in section 201(g)(1) of the FDC Act (21 U.S.C

§ 321(g)(1)), is:

> (A) articles recognized in the official United States
> Pharmacopeia, official Homoeopathic Pharmacopeia of the
> United States, or official National Formulary, or any
> supplement to any of them; and
> (B) articles intended for use in the diagnosis, cure, mitigation,
> treatment, or prevention of disease in man or other animals;
> and
> (C) articles (other than food) intended to affect the structure
> or any function of the body of man or other animals; and
> (D) articles intended for use as a component of any articles
> specified in clause (A), (B), or (C).

---

[1]    FDA, Warning Letter to Genus Medical, 2 (May 2, 2017).

2

FDA000038



The definition of "device," found in section 201(h) of the FDC Act (21 U.S.C § 321(h)),

follows:

> [A]n instrument, apparatus, implement, machine, contrivance,
> implant, in vitro reagent, or other similar or related article,
> including any component, part, or accessory, which is—
> (1) recognized in the official National Formulary, or the United
> States Pharmacopeia, or any supplement to them,
> (2) intended for use in the diagnosis of disease or other conditions,
> or in the cure, mitigation, treatment, or prevention of disease, in
> man or other animals, or
> (3) intended to affect the structure or any function of the body of
> man or other animals, and
> *which does not achieve its primary intended purposes through*
> *chemical action within or on the body of man or other animals and*
> *which is not dependent upon being metabolized for the*
> *achievement of its primary intended purposes* (emphasis added).

The definitions of both drug and device cover products that are intended for use in

the diagnosis, cure, mitigation, treatment, or prevention of a disease. Both definitions

also apply to products intended to affect the structure or any function of the body of man

or other animals. But the Genus Medical products fit neatly and exclusively only within

the statutory definition of devices. Unlike a drug, each of the products – as with devices

as defined in section 201(h)(3) – "does not achieve its primary intended purposes through

chemical action within or on the body of man or other animals" and "is not dependent

upon being metabolized for the achievement of its primary intended purposes."[2]

---

[2]        21 U.S.C § 321(h)(3).

3

FDA000039



**Genus Medical Technologies, LLC**
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

Vanilla SilQ and Vanilla SilQ MD do not achieve their primary intended purposes through chemical action within or on the body of man or other animals. Both of these barium sulfate products – as with other barium sulfate products – are contrast agents which are ingested for diagnostic purposes. The opacity of the barium sulfate enables radiologists to better visualize the gastrointestinal tract when performing X-ray or other radiological procedures. Indeed, the utility of contrast agents for X-ray procedures has been recognized since 1896.[3] Barium sulfate was commercially marketed as an x-ray contrast agent as early as 1913.[4] Unlike some other contrast agents, barium sulfate suspension does not chemically interact with human cells or tissue to serve its purpose. For further information about the characteristics of barium sulfate in the products, please see the attached Statement of Daniel Didier (**Attachment A**) and his curriculum vitae (**Attachment B**) showing that he is eminently qualified to provide scientific information and expert opinions on the characteristics of and mode of action of barium sulfate. He categorically states that barium sulfate is not metabolized after being ingested by humans (and, even if it were, that the metabolization would be inimical to the products' primary purposes) and that it is inert, so it has no chemical action inside or on the human body. Attachment A at ¶¶1, 2.

---

[3]     Dennis D. Patton, *Insight on the Radiologic Centennial: A Historical Perspective. Part 4. Of Gastrointestinal Radiology, Bread and Butter; or, the Flowering of Barium Sulfate*, 29(4) Investigative Radiology 472 (1994).

[4]     V.H. Wallingford, *The Development of Organic Iodine Compounds as X-ray Contrast Media*, 42(12) J. of Pharm. Sci. 721, 721 (1953).

FDA000040

**Genus Medical Technologies, LLC**
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

The products therefore meet the statutory definition of a device because there is no "chemical action within or on the body of man" for the products to achieve their "primary intended purposes."

In addition, FDA further elaborated on the meaning of the term "chemical action" in a draft guidance ("Interpretation of the Term 'Chemical Action' in the Definition of Device under Section 201(h) of the Federal Food, Drug, and Cosmetic Act").[5] Barium sulfate does not meet the standards set forth in that draft guidance, either. The draft guidance defines chemical action and provides four categories of chemical action. These four categories are:

1. Chemical reaction through which the product mediates a bodily response at the cellular or molecular level.
2. Intermolecular forces through which the product mediates a bodily response at the cellular or molecular level.
3. Chemical reaction through which the product combines with or modifies an entity so as to alter that entity's interaction with the body of man or other animals.
4. Intermolecular forces through which the product combines with or modifies an entity so as to alter that entity's interaction with the body of man or other animals.

With reference to categories 1 and 3, barium sulfate does not cause chemical reactions in the body. There is no chemical reaction that occurs within the GI tract as is evident from the fact that "Barium sulfate . . . is not absorbed or metabolized and is eliminated intact

---

[5]    FDA, Draft Guidance for Industry and FDA Staff: Interpretation of the Term "Chemical Action" in the Definition of Device under Section 201(h) of the Federal Food, Drug, and Cosmetic Act (June 2011).

5



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

from the body in a manner similar to other non-absorbed inorganic materials . . . ." [6]
With reference to categories 2 and 4, barium sulfate has no effect on intermolecular
forces. Dan Didier's statement provides the scientific definition of intermolecular forces
(at ¶3) and then explains why barium sulfate is incapable of exerting intermolecular
forces: "As an inert material barium sulfate cannot mediate a body response at the
cellular or molecular level. Further, as an inert material barium sulfate cannot combine
with or modify an entity so as to alter that entity's interaction with the body of man or
other animals." Thus, the products do not achieve their primary intended purposes
through chemical action within or on the body.

Likewise, Vanilla SilQ and Vanilla SilQ MD are not dependent upon being
metabolized for the achievement of their primary intended purposes. By virtue of its
inert nature, barium sulfate is it not absorbed or metabolized following oral or rectal
administration. "Barium sulfate is an inert radiopaque material which is not absorbed or
metabolized and is eliminated intact from the body in a manner similar to other
non-absorbed inorganic materials." Additionally, all of the non-barium sulfate
ingredients in Vanilla SilQ and Vanilla SilQ MD are inactive food ingredients as
evidenced by the fact that they are on the food GRAS ("Generally Recognized as Safe")

---

[6]     Barosperse (barium sulfate) Package Insert (rev'd Feb. 2009),
https://www.drugs.com/pro/barosperse.html.

6

FDA000042

listing.[7]  The mere fact that some of these inactive ingredients may be metabolized by the humans who ingest them does not make the products drugs:  achievement of the "primary intended purposes" of the products is not accomplished through metabolization of the inactive ingredients.  Because the accomplishment of intended purposes is achieved only by the barium sulfate's opacity, the statute requires Vanilla SilQ and Vanilla SilQ MD to be regulated as devices, rather than drugs.

FDA has acknowledged that, historically, the critical distinction between drugs and devices was whether the product achieves its primary intended purposes through chemical action within or on the body, or through metabolization.  In a 1997 decision on a Citizen Petition relating to ultrasound contrast agents (as opposed to radiological contrast agents at issue here), FDA stated that a 1987 decision to regulate a particular ultrasound contrast agent (Albunex) as a device was correct.  A copy of the Citizen Petition decision ("the 1997 CP decision") is attached as **Attachment C**, because it is not available online.  The decision said that the regulation of Albunex as a device was supported by three factors:

---

[7]     Excipients for Vanilla SilQ are: Water, Sorbitol, Xanthan Gum, Simethicone, Benzoic Acid, Sodium Citrate, Potassium Sorbate, Sodium Benzoate, Sodium Saccharin, Vanilla Flavor, Citric Acid.  Excipients for Vanilla SilQ MD are: Sodium Citrate, Sorbitol, Sodium Saccharin, Simethicone, Xanthan Gum, Bentonite, Tragacanth Gum, Lambda Carrageenan, Vanilla Flavoring.

FDA000043

Ed Powers
President

- the contrast agent was used as an accessory to a medical device, rather than independently (the same as the Genus products),

- the contrast agent was similar to other approved devices, and

- the contrast agent "did not appear to depend on chemical action in the body, or on being metabolized, to achieve its principal intended purposes," again, just like the Genus products.

(1997 CP Decision at 10, 52 n. 35.) And Dan Didier's Statement points out that barium sulfate is even less likely to meet the mode of action of a drug than the ultrasound contrast agents described in the 1997 CP Decision (Attachment A at ¶4).

The analysis above about Vanilla SilQ and Vanilla SilQ MD was the same analysis that led FDA to correctly characterize other barium sulfate products as devices until 1982.[8] Indeed, between the beginning of 1976 and the end of 1980, FDA issued at least eight 510(k) clearances for barium sulfate suspensions and barium sulfate powders for suspension: K760736, K800459, K800839, K800840, K800841, K800842, K800843, and K800844. Of course, 510(k) clearance is available only for devices. FDA characterized and cleared these products as devices at that time, consistent with the statutory definition. The fact that FDA had regulated similar products as devices for years rendered FDA's about-face in 1982 even more suspect: "An agency interpretation

---

[8]    The 1997 CP Decision acknowledged (at 29-30) that contrast agents were regulated as devices until 1982.

8



of a relevant provision which conflicts with the agency's earlier interpretation is entitled

to considerably less deference than a consistently held agency view." *INS v. Cardoza-*

*Fonesca*, 480 U.S. 421, 446 n.30 (1987) (internal quotation marks and citation omitted);

*see also Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency

of an agency's position is a factor in assessing the weight that position is due."). *See also*

*Republic Airline Inc. v. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) ("One of

the core tenets of reasoned decision-making is that an agency [when] changing its course

. . . is obligated to supply a reasoned analysis for the change") (internal quotation marks

and citations omitted). "Where the agency has failed to provide a reasoned explanation,

or where the record belies the agency's conclusion, [the court] must undo its action."

*Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (internal quotation

marks and citation omitted).

Then, beginning in 1982, FDA began to classify all radiological contrast agent

products, including barium sulfate, as drugs, rather than devices.  While some

radiological contrast agents could be characterized as drugs, barium sulfate, which does

not interact chemically in the human body and is not metabolized, should not have been.

Characterizing the barium sulfate products as drugs is inconsistent with the statute, and,

inasmuch as the statute is unambiguous, courts will not defer to an agency interpretation

of the statutory provisions. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467

U.S. 837, 842-44 (1984) (establishing a two-part test for reviewing an agency's

9

**Genus Medical Technologies, LLC**
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

interpretation of a statute); *Royal Foods Co. v. RJR Holdings Inc.*, 252 F.3d 1102, 1106 (9th Cir. 2000) (noting under the two-part Chevron analysis that deference is due the agency's interpretation of a statute unless the plain language is unambiguous with regard to the precise matter at issue); *Mylan Pharms., Inc. v. FDA,* 454 F.3d 270 (4th Cir. 2006).

In the 1997 CP Decision, FDA decided that it would lump all ultrasound contrast agents into classification as drugs as a matter of administrative convenience (1997 CP Decision at 4, 58). But administrative convenience (FDA may want to treat all contrast agents the same, even though some are drugs, and some are devices) cannot justify violation of the statute. Agency action will be set aside if the agency has relied on factors which Congress has not intended it to consider. Here, Congress did not state that all contrast agents would be drugs (or devices). Rather, it set forth a definition of drugs and devices, and the agency has adopted an informal adjudication approach to product classification. The FDA's informal adjudication must be based on statutory and regulatory definitions regarding what is a drug or a device. That informal adjudication approach to product classification also requires the agency to consider the relevant facts regarding each contrast agent on a case-by-case basis, and to explain its rationale regarding each product. Here, FDA did not do so.

The importance of distinguishing between a device mode of action (not dependent on chemical reaction or metabolization to achieve primary intended purposes) and a drug mode of action (dependent on chemical reaction or metabolization) survived and was

10



Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

strengthened in the Safe Medical Devices Amendments of 1990 (("SMDA")(Pub. L. 101-629)).  As noted in the 1997 CP Decision (at 53), the SMDA removed a portion of the FDC Act definition of drugs that excluded any items considered to be a device.  FDA has argued (*id.*) that the removal of that provision meant that devices could be regulated as drugs.  However, the legislative history makes clear that nothing of the sort was contemplated.  Rather, the provision was removed to enable combination drug/device products to be regulated as drugs.  S. Rept. 101-513, 101st Cong. 2d Sess. (1990) at 38 ("Section 19 alters the drug and device definitions in section 201 of the Act. Language is removed from the drug definition that will permit an approval of a drug/device combination.").  Further, the Senate Report re-emphasized that the critical distinction between drugs and devices remained, except in the case of combination products. *Id.* at 28 (revisions to the FDC Act "will provide the Secretary with firm ground rules to direct products promptly to that part of the FDA responsible for reviewing the article that provides the primary mode of action of the combination product;" "[b]y deleting this language, a product whose primary mode of action is attributable to a drug, but has a device component, may be reviewed under this Acts drug authority").

Not only is the FDA's redefinition of barium sulfate as a drug an illegal construction of unambiguous statutory language, if FDA wanted in 1982 to change longstanding FDA policy, it needed to do so through the rulemaking process, governed

11

FDA000047

**Genus Medical Technologies, LLC**
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

by the Administrative Procedure Act (APA).[9]  As required under the APA, in order to make new regulations an agency must develop and typically publish a proposed rule in the *Federal Register* and solicit comments from the public on the regulatory proposal.[10] After the agency considers the public feedback and makes appropriate changes, it then publishes the final rule in the *Federal Register.* [11]

Here, FDA did not follow the required rulemaking procedure to alter the classification of contrast agents from devices to drugs.  Instead, FDA attempted to simply announce a reversal of years of policy and adjudication by fiat, contradicting the governing statute.  First, on January 29, 1982, FDA published in a proposed rule a determination "that all radiologic contrast media, including barium enema kits, are to be regulated by FDA as drugs under section 201(g) of the act (21 U.S.C. § 321(g)(1)) and not as devices."[12]  This determination was discussed as a determination that had already been made, and did not solicit – or even permit – public feedback.  Second, on July 28, 1997, FDA released the 1997 CP Decision, which was the consolidated response to Citizen Petitions filed by Bracco Diagnostics Inc., Sonus Pharmaceutical Inc., Dupont Merck Pharmaceutical Company, and ImaRx Pharmaceutical Corp. with a determination

---

[9]      5 U.S.C. Chapter 5.

[10]     *Id.* § 553.

[11]     *Id.* § 552.

[12]     Radiology Devices; Development of General Provisions and Classification of 73 Devices, 47 Fed. Reg. 4406, 4412 (Jan. 29, 1982).

12

FDA000048



that ultrasound contrast agents would be regulated as drugs rather than devices.[13]  This

response is also insufficient to change the classification of barium sulfate.  Lastly, in

December 2009, FDA released a "Guidance for Industry:  New Contrast Imaging

Indication Considerations for Devices and Approved Drug Biological Products."[14]  The

guidance assumes, without discussion, that all contrast agents are drugs.  However, the

agency's guidance documents "do not establish legally enforceable rights or

responsibilities.  They do not legally bind the public or FDA."[15]  FDA improperly

attempted to rewrite statutory language by altering the classification for contrast agents

from device to drug by the methods mentioned above rather than through the prescribed

rulemaking process provided in the APA.

The 1982 Federal Register notice simply does not require that the Genus products

be regulated as drugs.  First, as FDA has acknowledged (1997 CP Decision at 30), "The

agency never finalized this statement regarding contrast agents [being regulated as drugs]

in a regulation."  Further, FDA Dockets Management has confirmed that the proposed

---

[13]    FDA, Consolidated Response to Pending Citizen Petitions on the Regulation of Ultrasound
Contrast Agents, Docket No. 96P-0511 (July 28, 1997).  In the 1997 decision on the Citizen
Petitions, FDA decided that the ultrasound contrast agents that were the subject of the decision in
*Bracco Diagnostics v Shalala* (discussed further below), would be regulated as a drug, and
Bracco's device clearance application would be immediately converted to a drug approval
application.  FDA's determination was not challenged, and the *Bracco Diagnostics* court lifted
the preliminary injunction on August 5, 1997.  *Id.*

[14]    FDA, Guidance for Industry:  New Contrast Imaging Indication Considerations for Devices and
Approved Drug and Biological Products (Dec. 2009).

[15]    *See* 21 C.F.R. § 10.115(d).

13

FDA000049



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

rule was never finalized.  So, the announcement of this policy was not binding on FDA or

on industry.  Second, as FDA also stated in the 1997 CP Decision (*id.*), "the 1982 Federal

Register statement does not and cannot limit FDA's discretion to make case specific

judgments about the appropriate regulation of a given product."  The 1997 CP Decision

based this conclusion on, among other things, FDA's own regulation stating that "a

statement in a preamble to a proposed FDA rule cannot bind the agency."  The 1997 CP

Decision then went to great lengths to look at the ultrasound products, ultimately

determining that all of the products, except Albunex, did have a chemical reaction in the

body, and that Albunex, based on more recent evidence, also would have some chemical

reactions that militated in the direction of classification as a drug.  Further, although the

1982 Federal Register notice specifically stated that "barium enema kits" would be

classified and regulated as drugs along with "radiological contrast agents," FDA has

removed barium enema kits from the drug classification and now regulates them as

devices.[16]  This is hardly surprising, since the kits are not dependent on chemical action

to achieve their intended purposes, so they, like barium sulfate itself, are characterized by

a device mode of action, not a drug mode of action.  And the fact that FDA pulled the kits

from classification as drugs, when the kits were explicitly named as being included,

demonstrates beyond a doubt that the 1982 announcement is meant to be applied on a

---

[16] FDA, Product Classification for Barium Enema Kit,
https://www.accessdata.fda.gov/SCRIPTS/cdrh/cfdocs/cfpcd/classification.cfm?ID=5033.

14

FDA000050



case-by-case basis in view of the specific characteristics of the product, just as FDA was

– and is – required to do with the barium sulfate products.

The fact that FDA's wrongful determination that all contrast agents for

radiological purposes must be characterized as drugs is longstanding (now 35 years old)

cannot excuse FDA's contravention of statutory language. An agency cannot "switch

from one consistently long followed permissible interpretation to a new one without

providing an opportunity for notice and comment." *Shell Offshore, Inc. v. Babbitt*, 238

F.3d 622, 629 (5th Cir. 2001). Here, FDA's consistently classified contrast agents as

devices. The switch to classifying contrast agents as drugs was impermissible without

notice and comment. If FDA proceeds to seek enforcement action against Genus Medical

for marketing an unapproved drug (FDA rebuffed the company's attempts to seek a

510(k) clearance many years ago), that will present the first opportunity for affected

industry to bring the matter to a court's attention. While the defense of laches bars a

dilatory claim, *AMTRAK v. Morgan*, 536 U.S. 101, 121-22 (2002), the doctrine only

applies when a party "sleep[s] on his or her rights for a decade." *Id.* at 152. The chain of

events here demonstrates that Genus did not "sleep upon its rights," at all. Genus tried

the approach of seeking a medical device clearance from FDA, and was rebuffed because

FDA informed Genus that the products were drugs. Genus then filed information

attempting to establish that the drug is GRAS and therefore grandfathered. FDA has only

recently rejected Genus' arguments on that point. Even the Warning Letter itself could

15



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

not form the basis of a ripe case or controversy to present to a court, in all likelihood. Genus can only seek judicial correction of FDA's improper treatment of its barium sulfate products if FDA initiates enforcement action against Genus.

Genus's position on this matter is also supported by the 2012 decision in *Prevor v. FDA*, 895 F. Supp. 2d 90 (D.D.C. 2012). The *Prevor* court recognized that the "critical distinguishing element" between drug and device is that "a product that 'achieve[s] its primary intended purposes through chemical action within or on the body' is excluded from the definition of a device." 895 F. Supp. at 93. The court further held that, in determining whether the relevant product – in that matter, a combination drug/device product – should be primarily regulated as a drug or device, FDA regulations looked to whether the product had a "drug mode of action" or a "device mode of action" ("'A constituent part has a device mode of action if it meets the [FFDCA] definition of device . . . and it does not achieve is primary intended purposes through chemical action within or on the body of man or other animals . . . .' 21 C.F.R. § 3.2(k)(2). 'A constituent part has a drug mode of action if it meets the [FFDCA] definition of drug . . . and it does not have a . . . device mode of action.' 21 C.F.R. § 3.2(k)(3)."). 895 F. Supp. at 92. The court held that FDA's decision that the product there had primarily a drug mode of action (a chemical action) was arbitrary and capricious, and reversed the decision.

Nor can FDA take refuge in the decision issued in *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997). In that decision, the court held that it was

16



arbitrary and capricious to treat similar injectable ultrasound contrast imaging agents in a dissimilar fashion, regulating one as a device and the others (with more difficult approval requirements) as drugs. It is noteworthy that the decision dealt with ultrasound contrast agents as opposed to radiologic contrast media at issue here, and Dan Didier's statement notes that ultrasound contrast agents are more drug-like than the Genus products. The court granted a preliminary injunction prohibiting FDA from issuing an approval of an intervening defendant's product as a device until FDA ruled on a Citizen Petition filed by plaintiffs claiming that the defendant's product was required to be regulated as a drug, not a device. 963 F. Supp. at 32. The court also gave FDA the opportunity to explain why the products should be treated differently. *Id.* (the defendant contended that its product was not dependent on metabolization, while the other products did depend on metabolization, to some extent. *Id.* at 24). Although the court mentioned, in passing, that the relevant products "all likely meet both the definition of a drug and the definition of a device" under the FDC Act, and that "FDA therefore has discretion in determining how to treat them" (*Id.* at 28), that finding was not discussed further, nor was it important to the court's decision. Indeed, when FDA issued its response to the Citizen Petition after the decision was issued, it stated that all contrast agents would be treated as drugs. See **Attachment C.**

And here, although one company's barium sulfate product has been approved by FDA as a drug, that does not mean that all barium sulfate products should be approved as

17

FDA000053



drugs.  As noted in the recent decision in *Ranbaxy Labs., LTD v. Burwell*, 82 F. Supp. 3d

159, 194 (D.D.C. 2015), "federal agencies' inherent authority to reconsider and correct

their own mistakes" was affirmed the previous year by the D.C. Circuit in *Ivy Sports*

*Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014).  The *Ranbaxy Labs* decision

quoted *Ivy Sports* (citing to 767 F.3d at 86) as follows:

> [A]s FDA notes, administrative agencies are assumed to
> possess at least some inherent authority to revisit their prior
> decisions, at least if done in a timely fashion. *See, e.g.*,
> *American Methyl Corp. v. EPA*, 749 F.2d 826, 835, 242 U.S.
> App. D.C. 148 (D.C. Cir. 1984) ("We have held that agencies
> have an inherent power to correct their mistakes by
> reconsidering their decisions within the period available for
> taking an appeal."); *Mazaleski v. Treusdell*, 562 F.2d 701,
> 720, 183 U.S. App. D.C. 182 (D.C. Cir. 1977) ("We have
> many times held that an agency has the inherent power to
> reconsider and change a decision if it does so within a
> reasonable [***13] period of time.") (quoting *Gratehouse v.*
> *United States*, 512 F.2d 1104, 1109, 206 Ct. Cl. 288 (Ct. Cl.
> 1975)); *Albertson v. FCC*, 182 F.2d 397, 399, 87 U.S. App.
> D.C. 39 (D.C. Cir. 1950) ("in the absence of any specific
> limitation," reconsideration available "within the period for
> taking an appeal"); *see generally* Daniel Bress, Note,
> Administrative Reconsideration, 91 Va. L. Rev. 1737 (2005).
> As this Court explained in an oft-repeated framing of the
> principle, inherent authority for timely administrative
> reconsideration is premised on the notion that the "power to
> reconsider is inherent in the power to decide." *Albertson*, 182
> F.2d at 399.

FDA's decision to treat a competitive barium sulfate product as a drug does not bind the

agency to make the same mistake a second time.

FDA000054

Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

While some other contrast agents may be eligible for classification as drugs because they do react chemically in the body, or are metabolized, barium sulfate does not fit either of these characteristics, and, therefore, cannot properly be characterized as a drug.

Given these circumstances, Genus has sought to pursue FDA clearance to distribute its barium sulfate products as devices. But it has been thwarted at every turn, including: (a) multiple calls to FDA in 2013 to research the reason that the 1976 and 1980 510(k)s were cancelled – with no additional information provided to Genus as to the reason for cancellation; (b) a FOIA request to FDA in 2013 asking for copies of the 1980 510(k) #K800839 to determine the reason for cancellation – to which FDA provided no information, stating that "the document could not be located and produced for the request;" (c) multiple calls to FDA in 2013 in which Genus was informed by FDA that a 510(k) submission was not possible because the products were considered drugs – and without further explanation as to why the products were considered drugs instead of devices; and (d) multiple calls to the FDA Small Business Office and Division of Medical Imaging Products in 2015 and 2016, receiving no response to requests for specific discussion on the correct filing pathway. The appropriate remedy is not to wrongly vilify Genus for distribution of an unapproved drug, but to reopen a pathway for Genus to seek clearance for the products using the 510(k) process.

19

FDA000055

*Ed Powers*
*President*

## Misbranding

The FDA Warning Letter asserts that Vanilla SilQ and Vanilla SilQ MD are misbranded under section 502 of the FDC Act (21 U.S.C. § 352). As will be detailed below, Genus has amended its labeling in response to FDA's suggestions.

Specifically, FDA contends that the labeling for the products fails to bear adequate directions for their intended uses, causing them to be misbranded under section 502(f)(1) of the FDC Act.[17] Additionally, FDA contends that the failure of Vanilla SilQ and Vanilla SilQ MD to include adequate warnings renders them misbranded under section 502(f)(2) of the FDC Act (21 U.S.C. § 352(f)(2)). Lastly, FDA claims that the labeling for Vanilla SilQ and Vanilla SilQ MD is false or misleading.[18]

Genus Medical has agreed to alter labeling and inserts for Vanilla SilQ and Vanilla SilQ MD to comply with FDC Act requirements. Genus Medical has made the following labeling and insert changes:

Product Label Changes:

- Remove "Rectal Administration;"

- Remove "2.0 w/w" in order not to confuse the clinician;

---

[17]    FDA, Warning Letter to Genus Medical at 3.

[18]    *Id.*

20



*Genus Medical Technologies, LLC*
*207 Chesterfield Towne Center*
*Chesterfield, MO 63005*

*Ed Powers*
*President*

- Change "Manufactured by" to "Manufactured for" Genus Medical.

Package Insert Changes:

- Remove "Rectal Administration;"
- Add sections to address concerns of "Hypersensitivity Reactions," "Intra-abdominal Barium Leakage," "Delayed Gastrointestinal Transit and Obstruction," "Aspiration Pneumonitis," "Systemic Embolization," and "Risk with Hereditary Fructose Intolerance."

These changes address FDA's concerns regarding misbranding violations. Genus Medical is open to considering additional changes if required. Copies of the revised labeling and packaging are included as **Attachments D and E**.

## Conclusion

In summary, Genus Medical believes that Vanilla SilQ and Vanilla SilQ MD fall within the statutory definition of device, not drug.

Regarding Genus Medical's plans to mitigate the misbranding concerns, the company is willing to make appropriate labeling changes. As a result, going forward Genus Medical is confident that Vanilla SilQ and Vanilla SilQ MD will meet the requirements under Section 502 of the FDC Act (21 U.S.C. § 352(f)(1)).

FDA000057

Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, MO 63005

Ed Powers
President

That said, we would welcome the opportunity to meet to discuss the matter

further.  Due to the fact that Vanilla SilQ and Vanilla SilQ MD clearly fit the statutory

definition of devices, and because of FDA's improper policy changing the classification,

Genus did not originally submit a 510(k).  Instead Genus Medical opted to register the

products with unapproved-other marketing designation and document the grandfather

status of the products.  However, Genus Medical welcomes the opportunity to meet with

FDA to discuss the possibility of submitting a 510(k) submission for Vanilla SilQ and

Vanilla SilQ MD.  If preferred by FDA, please directly contact our lawyer, Douglas B.

Farquhar of Hyman, Phelps & McNamara, P.C., if you believe that there are satisfactory

explanations for designating all radiographic contrast agents as drugs, despite the clear

statutory language to the contrary.

                    Respectfully submitted,

                    Ed Powers
                    Chief Executive Officer

22

FDA000058

ATTACHMENT A

**Statement of Daniel Didier Relating to Barium Sulfate**

**Q1  Is barium sulfate, when administered to humans as a radiological contrast agent, metabolized after ingestion [and, if so, is it metabolized for the achievement of its primary intended purposes]?**

ANSWER

No.  Barium sulfate passes through the human digestive tract intact, and is not metabolized. Even if it were to be metabolized, the result of metabolization would hinder the product's role in achievement of its primary intended purpose.  It is certainly would not assist in the achievement of the product's primary purposes for the product to be metabolized.

**Q2  Does barium sulfate depend upon chemical reaction to achieve its primary intended purpose?**

ANSWER

No.  By virtue of its inert nature, barium sulfate does not cause a chemical reaction in the body of humans or animals.

**Q3  Does barium sulfate depend upon intermolecular forces to achieve its primary intended purpose?**

ANSWER:

Intermolecular forces are the forces which mediate interaction between molecules, including forces of attraction or repulsion which act between molecules and other types of neighboring particles.  Barium sulfate is an inert compound which cannot exert dipole-dipole interactions, ion-dipole and ion-induced dipole forces, or van der Waals forces.  Barium sulfate is an inert radiopaque material which is not absorbed or metabolized, and is eliminated intact from the body in a manner similar to other non-absorbed inorganic materials.  As an inert material barium sulfate cannot mediate a body response at the cellular or molecular level.  Further, as an inert material barium sulfate cannot combine with or modify an entity so as to alter that entity's interaction with the body of man or other animals.

FDA000059

**Q4  Are there characteristics of barium sulfate that separate it from the drug-nature of ultrasound contrast as represented in FDA's 1997 summary response to the Citizen's Petitions?**

ANSWER:

Yes.  It is clear that there are three distinct features of ultrasound contrast material which FDA appears to reference as reasons the product was classified as a drug, and which do not apply to barium sulfate:

1. Barium sulfate is not absorbed (not bioavailable), so it does not enter the bloodstream and is therefore not dependent upon systemic circulation to achieve its primary intended effect.
2. Barium sulfate does not cross tissue barriers in the body like ultrasound contrast does — i.e. when it passes through capillaries
3. While there may be a propensity for cellular uptake to occur with ultrasound contrast, there is no cellular uptake that occurs with the administration of barium sulfate, particularly since barium sulfate is not absorbed through the gastrointestinal tract.

Respectfully submitted,

Daniel Didier
May 18, 2017

## ATTACHMENT B

## DANIEL K. DIDIER
**13030 Ray Trog Ct**
**St Louis, Missouri 63146**
**314-780-6806**
**dandidier7@aol.com**

## EXPERIENCE

| | |
|---|---|
| **THERMOFISHER SCIENTIFIC** | **2003-2016** |
| Public Health Director – ThermoFisher/Life Technologies | 2009-2016 |
| Head of Strategic Global Accounts – Life Technologies/Applied Biosystems | 2005-2009 |
| Director of Informatics – Applied Biosystems | 2003-2005 |
| | |
| **CYTOGENOMICS Inc.** | **2001-2003** |
| President and CEO | 2003 |
| Board of Directors | 2001-2003 |
| | |
| **INCYTE GENOMICS** | **1999-2003** |
| President of Operations, Incyte Genomics Asia | 2001-2003 |
| Senior Director Global Sales | 1999-2003 |
| | |
| **COGENT NEUROSCIENCE** | **1998-2002** |
| Scientific and Business Advisor | |
| | |
| **PROMEGA CORPORATION** | **1995-1999** |
| Drug Discovery Manager | 1997-1999 |
| Field Application Specialist | 1995-1997 |
| | |
| **MONSANTO COMPANY** | **1989-1995** |
| Molecular Biologist and Director of High Throughput Screening | |
| | |
| **HOWARD HUGHES MEDICAL INSTITUTE** | **1981-1989** |
| Research Associate | |

## EDUCATION

M.S., in Molecular Biology, University of Missouri

B.S., in Biology and Chemistry, Illinois State University

FDA000061

Attachment C



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the General Counsel

Office of the Chief Counsel
Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD  20857

July 28, 1997

**BY FACSIMILE**

Nancy L. Buc          2 9 1 4  '97  JUL 28  P 3 :26          Richard Morey
Buc & Beardsley                                             Kleinfeld, Kaplan and Becker
for Sonus Pharmaceuticals, Inc.                             for Bracco Diagnostics Inc.

Andrew M. Federhar                                          Robert Shaughnessy
Fennemore Craig                                             Williams & Connolly
for ImaRx Pharmaceutical Corp.                              for Molecular Biosystems, Inc.

Ellen J. Flannery                                           William Vodra
Covington & Burling                                         Arnold & Porter
for Mallinckrodt Inc.                                       for DuPont Merck Pharmaceutical Company

              Re:    96P-0511\CP1, Sup 1, and Sup 2 (Bracco), CP2 (Sonus),
                     CP3 and PSA3 (DuPont Merck), and PSA4 (ImaRx)

Dear Addressees:

        I am writing to inform you that the agency has completed its consolidated response to the
above-referenced citizen petitions and petitions for stay of action.  The agency's response will be
filed in the docket for this proceeding (Docket No. 96P-0511) at the close of business today.  A
copy of the response will be set aside for each of you at the agency's Dockets Management
Branch for pick-up beginning tomorrow, July 29, between the hours of 9:00 am and 4:00 pm.

        If you have any questions or concerns, please feel free to call me.

                                        Sincerely,

                                        David M. Fox
                                        Associate Chief Counsel

cc:     The Honorable Paul Friedman, United States District Court
        FDA Docket No. 96P-0511

96P-0511                                                                              PDN 3

FDA000062

**FDA's Consolidated Response to Pending
Citizen Petitions on the Regulation of
Ultrasound Contrast Agents
(Docket No. 96P-0511)**

FDA000063

# CONTENTS

**I.     INTRODUCTION**

**II.     BACKGROUND**

    **A.     Contrast Enhanced Ultrasound Imaging**

    **B.     Overview of FDA's Regulation of Ultrasound Contrast Agents**

        1.     Albunex

        2.     SonoRx and EchoGen

            a.     The SonoRx request for designation

            b.     The EchoGen request for designation

        3.     BR-1

        4.     FS069

        5.     DMP 115

**III.     SUMMARY OF THE CITIZEN PETITIONS**

**IV.     RESPONSE TO THE CITIZEN PETITIONS**

    **A.     The Products at Issue Were Not "Similarly Situated"**

    **B.     The Agency Did Not Establish a "Binding Policy" of Regulating Ultrasound Contrast Agents as Drugs**

    **C.     CDER and CDRH Have Not Imposed Materially Different Requirements**

        1.     Background regarding agency "requirements"

        2.     Analysis of alleged differences

            a.     Sonus

FDA000064

b.    Bracco

c.    DMP 115

V.    MBI'S PRODUCTS MAY BE REGULATED AS DRUGS

A.    The Drug and Device Categories Are Not Mutually Exclusive

B.    Section 503(g) Does Not Direct the Outcome of this Proceeding

VI.    FDA'S BASIS FOR PROSPECTIVELY REGULATING ULTRASOUND
CONTRAST AGENTS AS DRUGS

VII.    IMPLEMENTATION OF FDA'S DECISION TO REGULATE ULTRASOUND
CONTRAST AGENTS AS DRUGS

VIII.    CONCLUSION

FDA000065

# I.  INTRODUCTION

This document is a consolidated response to three citizen petitions filed with the Food and Drug Administration ("FDA") under 21 CFR 10.30 relating to the agency's regulation of products referred to as "ultrasound contrast agents."

On December 27, 1996, the law firm of Kleinfeld, Kaplan and Becker submitted a citizen petition on behalf of Bracco Diagnostics Inc. ("Bracco") asking that FDA "issue a determination concerning the appropriate method to regulate ultrasound contrast agents."  The agency filed the petition on December 30, 1996, and assigned the petition to Docket No. 96P-0511/CP1 (the "Bracco Petition").  Bracco supplemented its petition, with new information and new arguments, on January 30, 1997 (the "First Supp. Bracco Petition") and again on March 19, 1997 (the "Second Supp. Bracco Petition").  Bracco also submitted on January 30, 1997, a petition for stay of agency action under 21 CFR 10.35 (Docket No. 96P-0511/PSA1).  The agency denied the petition for stay in a written response dated February 28, 1997.

On February 3, 1997, the law firm of Buc & Beardsley submitted a citizen petition on behalf of Sonus Pharmaceuticals, Inc. ("Sonus") asking FDA to regulate "all ultrasound contrast media as new drugs requiring approval by the Center for Drug Evaluation and Research . . . ."  The agency filed the petition on February 4, 1997, and assigned it as a second citizen petition to the docket opened for the Bracco Petition, Docket No. 96P-0511/CP2 (the "Sonus Petition").  Also on February 3, 1997, Sonus submitted a petition for stay of agency action (Docket No. 96P-0511/PSA2), which the agency denied in a written response dated February 20, 1997.

On March 13, 1997, the law firm of Arnold & Porter submitted a citizen petition on behalf of The DuPont Merck Pharmaceutical Company ("DuPont Merck") asking FDA "to

FDA000066

eliminate a glaring and inequitable disparity in the regulation of ultrasound contrast agents." The agency initially assigned the petition to a new docket, Docket No. 97P-1014. On May 21, 1997, FDA notified DuPont Merck that its citizen petition had been reassigned as a third petition to the existing docket on this matter, Docket No. 96P-0511/CP3. Both DuPont Merck and DuPont Merck's marketing partner, ImaRx Pharmaceutical Corp. ("ImaRx"), also submitted petitions for stay of agency action under 21 CFR 10.35 (PSA3 on March 13, 1997, and PSA4 on April 14, 1997, respectively). These petitions for stay of action asked that FDA stay "active consideration" of a pending premarket approval application for a product known as "FS069" sponsored by Molecular Biosystems, Inc. ("MBI") until the agency determines that all ultrasound contrast agents will be regulated under the same standards. As discussed below, both of these petitions for stay of action were rendered moot by an injunction entered by the United States District Court for the District of Columbia on April 21, 1997.

Bracco, Sonus, DuPont Merck and ImaRx, each filed complaints in federal district court on April 14, 1997, seeking declaratory and injunctive relief against FDA on the same issues raised in the pending citizen petitions and seeking essentially the same injunctive relief requested in the pending petitions for stay of action. Those suits have been consolidated into the matter titled *Bracco Diagnostics, Inc. v. Shalala, et al.*, No. 97-0739, 97-0740, and 97-042 (PLF) ("*Bracco Diagnostics*"). On April 21, 1997, the district court in *Bracco Diagnostics* enjoined the agency from "continuing any approval and review procedures" for four specific ultrasound contrast agents (including FS069) until the agency issues a substantive response to the pending citizen petitions (and ten days thereafter). The injunctive relief entered by the district court includes the relief sought by DuPont Merck and ImaRx and, therefore, rendered their petitions

2

for stay moot.

Several firms have filed substantive comments to the pending petitions in Docket No. 96P-0511 (the "ultrasound docket"). Specifically, on May 8 and May 16, 1997, the law firm of Williams & Connolly filed comments on behalf of MBI, in response to the Sonus and DuPont Merck petitions. On May 16 and May 22, 1997, the law firm of Covington & Burling filed comments on behalf of Mallinckrodt Inc., MBI's marketing partner, in response to the Sonus and DuPont Merck petitions. On June 9, 1997, Williams & Connolly submitted additional comments outlining MBI's concerns, should the agency decide to regulate FS069 as a drug. On June 16 and July 15, 1997, Arnold & Porter submitted rebuttal comments to the ultrasound docket, as did Buc & Beardsley on June 22, 1997. In addition, the agency has received comments from a number of interested persons, including several medical practitioners and a manufacturing firm.

The agency has carefully considered the arguments in the pending citizen petitions, the comments submitted to the ultrasound docket, and all other relevant and available information, and has made the following determinations:

(1)    The agency is denying the petitions to the extent they argue that the agency has a longstanding "binding policy" that requires that all ultrasound contrast agents must be regulated as drugs.

(2)    The agency is denying the petitions to the extent they argue that the agency acted "arbitrarily and capriciously" in regulating some ultrasound contrast agents as drugs and others as devices. Each of the agency's prior determinations regarding the regulation of ultrasound contrast agents was rational, was based upon consideration of the relevant factors, and was within the agency's authority at the time the agency made each of those decisions.

(3)    The agency is denying the petitions to the extent they argue that the agency has caused petitioners to suffer significant prejudice or irreparable harm. The agency has applied reasonably consistent product development and review standards to microbubble and microsphere based ultrasound contrast agents.

3

FDA000068

(4)     Nevertheless, the agency is granting the petitions to the extent they request that the ultrasound contrast agents at issue in this proceeding should be brought within the same regulatory scheme, under the jurisdiction of a single agency Center. The agency has determined that, for reasons of administrative efficiency, and to ensure that the agency continues to apply similar standards to the products within this emerging class, the agency will regulate these products as "drugs" and "new drugs" and will assign primary oversight responsibility to the Center for Drug Evaluation and Research ("CDER").

The basis for the agency's decision is set forth below. Specifically, in Section II of this document the agency provides a brief overview of contrast enhanced ultrasound imaging and a brief overview of the agency's regulation of ultrasound contrast agents to date. Sections III and IV summarize, and then respond to, each of the arguments made by petitioners that the agency acted "arbitrarily and capriciously" by allowing some agents to be regulated as drugs and others as devices. Section V responds to the arguments made by MBI in its comments that the agency is required by statute to regulate its albumin-based ultrasound contrast agents as medical "devices." Section VI provides the agency's basis for deciding that microbubble and microsphere-based ultrasound contrast agents will, prospectively, be regulated by CDER as drugs, and Section VII provides the agency's plan for implementing this decision.

## II.    BACKGROUND

### A.    Contrast Enhanced Ultrasound Imaging

Ultrasound imaging is a widely used, non-invasive technique for producing pictorial images of structures inside the body. It employs low-power, high-frequency sound waves that, when directed into the body through a transducer, echo or reflect off surfaces in the body (such as organs or tissues) in a manner that allows a real-time electronic image of the targeted area. Ultrasound is suited in particular for examining soft tissues, internal organs such as the heart, blood flow in the body, and fetal development.

4

FDA000069

Although ultrasound may be performed without the use of contrast agents, clinical studies have shown that certain ultrasound images, particularly those of the heart, can be enhanced through the *in vivo* use of contrast agents. In 1994 the agency approved Albunex (albumin microspheres), the first (and to date the only) contrast agent labeled for use in ultrasound imaging. A number of other agents are now under development for use in improving the quality of ultrasound images as well as extending the possible uses of ultrasound imaging.

Ultrasound contrast agents generally consist of millions of injectable or instillable microscopic bubbles or spheres. The bubbles or spheres are capable of resonating acoustic energy when struck by ultrasound waves, to create a reflective effect. Each bubble or sphere encapsulates a gas, such as air or fluorocarbon gas, that helps maintain the structure of the bubble or sphere and define its acoustic impedance. The differential acoustic impedance of the contrast agent, relative to the impedance of blood and adjacent tissues and organs, causes areas where a contrast agent is present to appear brighter than areas where the agent is not present.

Once injected intravenously, the agent is distributed indiscriminately throughout the body according to blood flow. Generally, the gas in the microbubbles or spheres, over time, diffuses out of the agent, dissolves in the bloodstream, and is exhaled. The remaining ingredients are believed to be taken up by the liver and metabolized.

The effectiveness of an ultrasound contrast agent is based not only upon its "echogenicity" (*i.e.*, its ability to resonate in response to ultrasound waves), but also on the product's ability to cross certain barriers and participate in physiologic functions within the body. In particular, the individual bubbles or spheres must be large enough to resonate at ultrasound frequencies but small enough (as small as or smaller than a red blood cell) to move

5

FDA000070

throughout the body's circulatory system and within certain major organs. Bubbles or spheres that are too large or that coalesce too easily may block capillaries and could possibly lead to an embolic event.

The effectiveness of an ultrasound contrast agent also depends upon its duration — *i.e.*, it ability to remain echogenic within the body. Albunex is reported to remain echogenic for only 35 to 40 seconds after administration. Several of the agents under development — such as those being developed by each of the petitioners — encapsulate gases that may allow the agent to remain intact and echogenic for a substantially longer period of time (several minutes or longer according to published reports).

Albunex, because of its short duration, is approved for only a limited number of uses. Albunex has been shown to be effective in enhancing visualization of the structure and wall motion of the heart, particularly in patients with "suboptimal echoes" (*i.e.*, patients for whom standard ultrasound fails to yield a clinically useful image). Albunex has been approved for use following intrauterine injection in diagnosing fallopian tube patency *(i.e.,* determining whether there is blockage within the fallopian tubes). These clinical effects depend primarily on the agent entering a *cavity* within the body, an event that can be accomplished within the short time that Albunex remains echogenic.

The longer duration agents have the potential to enter into more systems within the body, and in some cases to be taken up intracellularly, while still remaining echogenic. For example, studies suggest that some ultrasound contrast agents may remain echogenic after perfusing (entering the capillaries within) major organs, including the heart muscle itself (as opposed to the chambers of the heart), the kidneys, liver, ovaries, prostate, testes, and the peripheral intracranial

6

FDA000071

vessels. If the agent can remain echogenic after it perfuses an organ, a clinician may be able to use ultrasound to distinguish between healthy and unhealthy tissue within the organ and make disease-specific diagnoses (*see generally* Sonus SEC Form 10-K, for fiscal year ended Dec. 31, 1996, at 3-8). This could allow ultrasound imaging to be used in place of other, more invasive modalities. Unlike Albunex's uses, which are directed primarily at visualizing structure and structural abnormalities, these uses would provide a clinician with the ability to make direct functional assessments by being able to "see" inside the tissue itself.

One of the most widely reported, potential uses of these agents is in assessing myocardial perfusion (*see, e.g.,* Comments of Dr. Sanjiv Kaul dated May 12, 1997, at 1-2).[1] Myocardial perfusion is the process by which oxygenated blood is brought to the heart muscle (*i.e.,* the myocardium). As one manufacturer has explained, "[i]f [the contrast agent] is not detected in a portion of the heart muscle, or not detected with the expected level of intensity, it means that a portion of the muscle is not receiving enough blood ('ischemia'). This finding may be diagnostic of several conditions, including coronary arterial stenosis and myocardial infarction" (MBI SEC Form 10-K405, for fiscal year ended Mar. 31, 1997, at 7; *accord* Sonus SEC Form 10-K, for fiscal year ended Dec. 31, 1996, at 4 (discussing the myocardial perfusion indication)).

Finally, some of the longer duration products are being developed for uses that depend upon "uptake" of the contrast agent by disease-fighting cells within the body. Pathologies such as tumors or lesions in the liver may be detectable, and visualizable, based on the idea that more

---

[1] Additional literature on this use of ultrasound contrast agents will be included in the administrative record of this proceeding. Also, the WorldWideWeb site sponsored by petitioner Sonus lists over a dozen scientific abstracts regarding the study of ultrasound contrast agents for assessing myocardial perfusion (also referred to as "myocardial opacification") (*see* www.sonuspharma.com).

7

FDA000072

macrophage (disease fighting) cells are present in healthy tissue, and thus will engulf and absorb

the contrast agent, than are present in diseased tissue. That is, after systemic distribution

throughout the vasculature, the contrast agent is taken up by the cells of the reticuloendothelial

system ("RES"), such as the Kupffer cells in the liver. The RES helps to clear foreign matter

from circulation, and its ability to clear the contrast agent may be used to achieve a clinical

effect. In the liver, for example, areas with high uptake of the agent (*via* active phagocytosis by

Kupffer cells) may appear enhanced upon ultrasound examination, while areas that are low in, or

devoid of, Kupffer cells, such as focal tumors of the liver, may not be enhanced.[2]

     In short, microbubble and microsphere ultrasound contrast agents are designed to

circulate throughout the body, much like a systemically absorbed drug product. Some of these

products are also intended to perfuse organs or be taken up intracellularly, much like a number of

drug products. Yet, these products are intended to work by resonating and reflecting ultrasound

waves through primarily physical phenomena.

    **B.**    **Overview of FDA's Regulation of Ultrasound Contrast Agents**

        1.    <u>Albunex</u>

Albunex, manufactured by MBI, is a suspension of stable, air-filled albumin

microspheres with a mean diameter of 3.0 - 5.0 micrometers ($\mu$m) (compared to red blood cells,

which have a mean diameter of approximately 7$\mu$m). It is produced from a 5% solution of FDA

licensed human plasma albumin, to which the stabilizers sodium acetyl tryptophanate and

sodium caprylate have been added. *See* Albunex, Summary of Safety and Effectiveness. The

---

    [2]*See, e.g.,* Leon, E. and McArdle, C., "Ultrasound Contrast Agents in Liver Imaging," 51 Clinical Radiology (Supp.) 1, 35 (1996); Mattrey, R., "The Potential Role of Perfluorochemicals in Diagnostic Imaging," 22 Artif. Cells, Blood Subs., and Immob. Biotech 295 (1994).

FDA000073

finished product is an amber liquid with a top layer of air-filled microspheres. Upon re-suspension (by shaking the container), the liquid turns milky. Albunex is supplied in vials for injection.

FDA began to regulate Albunex as a medical device in 1987 following an exchange of correspondence between FDA's Center for Devices and Radiological Health ("CDRH") and MBI. In particular, on February 23, 1987, MBI wrote to the Director of CDRH describing an albumin based "contrast microsphere" that MBI was developing "for enhancing the image produced from echocardiography." MBI proposed that the product should be regulated as a device given that similar products, known as trace microspheres,[3] are regulated as devices (*see* 21 CFR 870.1360) and given that ultrasonic echocardiographic instruments themselves are also regulated as devices (*see* 21 CFR 870.2330). MBI also proposed that the product, to be sold under the name Albunex, should be regulated as a Class III device (like trace microspheres) subject to premarket review and approval (21 USC 360e(a)).

On October 13, 1987, after consultation with agency officials responsible for regulating drugs and biological products, CDRH confirmed in a letter from CDRH's Office of Compliance that Albunex would in fact be regulated as a device. CDRH also confirmed that the product would be regulated as a Class III device and, therefore, would require a device premarket approval application ("PMA").

---

[3]Trace microspheres are radioactively tagged solid glass or plastic beads that are injected into an artery or vein for use in studying blood flow. The agency's Cardiovascular Device Classification Panel recommended that the product be regulated as a Class III medical device (*see* 44 FR 13312-13, March 9, 1979). The Commissioner agreed, noting that the product appears to be a type of implant (*id.*), and on February 5, 1980, the agency finalized the device classification of this product (*see* 45 FR 7916, Feb. 5, 1980).

FDA000074

The decision to regulate Albunex as a new device was consistent with the idea that Albunex would be used as an "accessory" to a device (*see* 21 USC 321(h)) and that the product bore similarities to an already-classified device, trace microspheres. Moreover, Albunex — as presented to the agency at that time — did not appear to depend on chemical action in the body, or on being metabolized, to achieve its principal intended purposes (enhancing anatomical images of the chambers of the heart). *See* 21 USC 321(h) (1987).[4]

Nevertheless, because the product used human albumin in the manufacturing process,[5] CDRH consulted with the biologics staff of the agency's Center for Drugs and Biologics[6] before making a jurisdictional decision to determine whether the product should be regulated as a biological product. The biologics staff agreed that if a licensed source of albumin were used in the manufacturing process, CDRH should oversee regulation of the product. Under a standing "Working Relationships Agreement" used at the time in deciding lead responsibility as between

---

[4] According to Bracco, Albunex was "presented to FDA in a unique posture because while Albunex was under investigation, end-users were directed to sonicate (apply ultrasound waves to) the albumin just prior to patient injection" (Bracco Pet. at 2). Bracco suggests, then, that FDA focused on the instrumentation associated with the sonication of the albumin and, on that basis, decided to regulate Albunex as a device. In fact, Albunex, as MBI presented it to FDA in 1987, consisted of stable air-filled microspheres in a 10 cc solution. In a "Usage Guide" for clinical investigators that MBI attached to its February 23, 1987, letter to FDA, there is no indication that the product must be "sonicated" by end-users in order to form the microspheres (*see also* MBI Comments, May 16, 1997, 14).

[5] Albumin generally is regulated by FDA as a biological product under section 351 of the Public Health Service Act (42 USC 262(a)).

[6] On October 15, 1987, the Center for Drugs and Biologics separated into two organizations, the Center for Drug Evaluation and Research and the Center for Biologics Evaluation and Research. *See* 52 FR 38275.

FDA000075

biologicals and devices, CDRH had responsibility for a product such as Albunex.[7]

MBI therefore filed an investigational device exemption ("IDE") with CDRH to allow

MBI to conduct clinical studies of Albunex on human test subjects. CDRH approved the IDE on

January 14, 1988, and on September 14, 1990, after completing more than two years of clinical

studies, MBI submitted a PMA for Albunex.

MBI supported the PMA for Albunex with one Phase 1 study (60 patients), one Phase 2

study (75 patients), and two Phase 3 studies (175 patients and 60 patients), for a total of 370

patients under four separate protocols. *See* Albunex, Summary of Safety and Effectiveness. On

July 14, 1992, the agency's Radiological Devices Advisory Panel evaluated the product in an

open, public proceeding.

CDRH approved the product for marketing on August 5, 1994, for use as an aid in

helping clinicians visualize the right and left ventricular chambers. CDRH also concluded that

the clinical studies in support of the PMA demonstrated that Albunex can improve visualization

of endocardial borders in 75% of those patients in which normal, non-contrast echocardiography

---

[7]As of 1987, when Albunex was presented to the agency, several agency programs maintained a "Working Relationships Agreement" governing products that potentially could be regulated as biologicals and/or devices. That Agreement, drafted in April 1982, put lead responsibility for ultrasound equipment, and accessories used exclusively with ultrasound equipment, in the agency's Bureau of Radiological Health (which later merged with the Bureau of Medical Devices to form the Center for Devices and Radiological Health). In addition, the agreement provided that products not specifically assigned to the Bureau of Biologics (which later merged with the Bureau of Drugs), or the Bureau of Radiological Health, would be assigned to the Bureau of Medical Devices. Because the Agreement did not give lead responsibility for a product such as Albunex to the Bureau of Biologics, it was again consistent with the Working Relationships Agreement for CDRH to accept lead responsibility for Albunex.

FDA000076

is ineffective.[8]  *See* Albunex, Summary of Safety and Effectiveness at 27.  Albunex therefore was

approved "as an aid for ultrasound contrast enhancement of ventricular chambers, and improved

endocardial border definition in patients with suboptimal echoes undergoing ventricular function

and regional wall motion studies."  *See* FDA approved labeling ("indications and usage"),

Albunex.

On February 17, 1995, the agency published notice of the approval of the Albunex device

PMA in the Federal Register and notice of public availability of a summary of the data on which

CDRH based its approval (60 FR 9334, Feb. 17, 1995).  The notice also advised that interested

persons may petition the agency, under section 515(d)(3) of the Federal Food, Drug, and

Cosmetic Act (the "Act") (21 USC 360e(d)(3)), to seek administrative review of the decision.  No

one petitioned the agency or otherwise asked the agency to reconsider CDRH's approval of

Albunex.  Recently, the agency approved a supplemental PMA for Albunex for use in diagnosing

fallopian tube patency.

2.    SonoRx and EchoGen

In November 1991 FDA promulgated regulations to facilitate the process for determining

the agency component with primary jurisdiction over a product for which jurisdiction is unclear

or in dispute.  *See* 56 FR 58756 (Nov. 21, 1991) (final regulations establishing 21 CFR Part 3)

(the "Part 3 regulations").  The Part 3 regulations established that FDA's Ombudsman would

serve as the agency's "product jurisdiction officer," thereby establishing a centralized process for

---

[8]An estimated 10% to 20% of the patient population has endocardial border "dropout" during
non-contrast echocardiographic examination.

FDA000077

designating jurisdiction for products that are difficult to categorize. *See* 21 CFR 3.2(m) and 3.6.[9]

Prior to the Part 3 regulations, jurisdictional issues often were resolved by and among the Offices

of Compliance of the various agency components.

In the first year of the Part 3 program, two companies filed requests for jurisdictional

designations for agents to be used in conjunction with ultrasound imaging. The first request,

submitted by ImaRx on March 31, 1992, sought a designation for "an orally administered gastro

intestinal ultrasound product" known as SonoRx. As discussed below, SonoRx is not a "contrast

agent" in the same respects as the other products at issue in this proceeding. The second request,

submitted by Sonus on October 14, 1992, sought a designation for an injectable "emulsion of

perfluoropentane in water for injection" for use in ultrasound imaging.

      a.     *The SonoRx request for designation*

SonoRx is an unapproved product that consists of simethicone-coated cellulose strands.

*See* Carpenter Decl. ¶ 7, DuPont Merck Pet. Simethicone is the active ingredient in a number of

antacid and antiflatulent drug products (*e.g.*, MaaloxTM and MylantaTM). It helps change the

surface tension of gas bubbles in the stomach and intestines, enabling the bubbles to coalesce,

thereby dispersing and freeing the gas by belching or passing flatus. Thus, SonoRx appears to be

intended to enhance images of the abdomen, stomach lining, and structures adjoining the

stomach by reducing excess "noise." *See* 19 *The Gray Sheet*, Issue 11 (Mar 15, 1993)

_____

[9]Under the Part 3 regulations, the agency also developed a series of guidance documents,
known as Intercenter Agreements, to provide guidance in deciding how to allocate jurisdictional
responsibility for combination products and products for which jurisdiction may be unclear. *See* 21
CFR 3.5; 56 FR 58760 (Nov. 21, 1991). The Intercenter Agreements do not specifically address
ultrasound contrast agents. They do, however, provide some information regarding the standards
the agency may apply in allocating jurisdictional responsibility.

13

FDA000078

(According to ImaRx's licensing partner, "SonoRx may allow physicians to see . . . internal organs more easily by eliminating the gas artifacts that can prevent clear delineation of structures during abdominal ultrasound procedures.").

ImaRx recommended in its request for designation (without discussion) that SonoRx should be regulated as a device. SonoRx, however, is closely related to, and contains the same active ingredient as, a number of over-the-counter antacid and antiflatulent drug products. It is intended to be used solely in gastrointestinal imaging, and its efficacy is based primarily on its gas relieving properties, which are achieved by chemical action within the body. The agency therefore designated the product a drug.[10] On May 28, 1992, the Ombudsman's office issued a letter of designation advising that SonoRx would be subject to regulation as a drug, with CDER having primary jurisdiction over the product. ImaRx did not request reconsideration of the designation decision. *See* 21 CFR 3.8(c).

b.    *The EchoGen request for designation*

EchoGen (perflenapent emulsion) is an emulsion of dodecafluoropentane (hereafter "perfluoropentane") and U.S.P. water for injection, with sucrose added to enhance viscosity and PEG Telomer B added as a stabilizer (Sonus Pet. at 5). The PEG Telomer B forms the microbubble that surrounds the perfluoropentane. The product also contains a number of other excipients. EchoGen is currently undergoing premarket review in CDER for use in echocardiography and radiology (*i.e.*, visualization of organs and tissues other than the heart).

---

[10]*See* Intercenter Agreement Between CDER and CDRH (Oct. 31, 1991) at section VIII.1 (liquids, powders, tablets or other similar formulations, that achieve their primary intended purpose through chemical action within the body, will be regulated as drugs, unless the product falls within one of the specified device categories).

14

FDA000079

As presented in the 1992 request for designation, EchoGen (then known as QW3512), consisted of a liquid-in-liquid emulsion (perfluoropentane and water), to be administered intravenously for possible use in, among other things, echocardiography. FDA's product jurisdiction officer, upon filing the request for designation, sought advice from CDER and CDRH on an appropriate jurisdictional designation.

In analyzing EchoGen, CDRH consulted with Sonus and learned that the perfluoropentane in the product is a liquid with a boiling point of 29.5 degrees Celsius, or only 7.5 degrees below normal human body temperature of 37.0 degrees Celsius. At body temperature, the liquid perfluoropentane becomes a gas. The overall goal of the product is to cause millions of small bubbles (less than the size of a red blood cell) to diffuse throughout the ventricular chamber and thereby create an echogenic substrate. *See generally* Quay, S.C. (Sonus), "Ultrasound Contrast Agent Development: Phase Shift Colloids," 13 J. Ultrasound Med. at 1 (Mar. 1994).

CDRH officials also learned, in researching the scientific literature, that while perfluoropentane had been shown to be effective in causing ultrasound backscatter, its effects inside the body were essentially unknown and potentially volatile. Thus, CDRH concluded that the dominant regulatory issues for this product would be its safety, and that much of the review work for such a product would have to be performed by CDER because of the way the product interacted with the body. CDRH therefore recommended to the Ombudsman that the product be regulated by CDER as a drug. CDER made the same recommendation.

The Ombudsman adopted these recommendations (as well as Sonus' own request that its

15

FDA000080

product be regulated as a drug)[11] and, on December 17, 1992, issued a designation letter assigning primary review authority for EchoGen to CDER.

As with the two previous decisions (for Albunex and SonoRx), the decision to regulate EchoGen as a drug was based upon the specific characteristics of the product as presented at the time of the request for designation. Although EchoGen was intended for some of the same uses as Albunex, its formulation was entirely different, as were several aspects of its mode of action inside the body.[12]

Following the decision of the product jurisdiction officer, Sonus filed an investigational new drug application ("IND") with CDER in September 1993, for the clinical study of EchoGen. In August 1996, Sonus filed a new drug application ("NDA") for EchoGen. That application is pending in CDER.

        3.    BR-1

BR-1, manufactured by Bracco, is an unapproved product that consists of sulfur hexafluoride gas suspended in microbubbles within a phospholipid blend. The product must be reconstituted prior to administration.

According to Bracco, BR-1 is being developed for intravenous injection as an ultrasound contrast agent in the diagnosis of "cardiac dysfunction" (Bracco Complt. ¶ 2, *Bracco Diagnostics*

---

[11]Under the Part 3 regulations, if the agency does not act on a request for designation within 60 days, the sponsor's recommendation of the center with primary jurisdiction "shall become the designated agency component" to review the product. 21 CFR 3.8(c).

[12]In April 1995, Sonus changed the manner in which EchoGen is activated (*i.e.*, the manner in which the microbubbles are formed). An administration technique based on a hypobaric syringe is now used to help activate EchoGen prior to injection (Sonus SEC Form 10K for fiscal year ended December 31, 1996, at 15-16).

FDA000081

litigation). In its second supplemental petition, filed in March 1997, Bracco stated that BR-1 "is intended to be used in conjunction with diagnostic ultrasound to provide opacification of cardiac chambers, improve delineation of endocardial borders, enhance Doppler signal, and visualize wall motion of the heart" (Second Supp. Pet. at 2; *accord* Bracco Complt., ¶ 11). This list of proposed indications is identical to the indications sought by MBI for FS069 (as disclosed at a February 24, 1997, FDA advisory panel meeting).

Bracco's list, however, is inconsistent with several pre-IND and IND submissions Bracco made to CDER for the study of BR-1. Bracco on its own initiative appears to have undertaken to develop BR-1 for a broader set of indications than that listed in its petition (and a broader set than what MBI is seeking in the pending PMA for FS069). Bracco also appears to have proposed to the agency the idea of comparing BR-1 against certain sophisticated comparators, including comparators about which they complain in their petition. *See* discussion, section IV.C.2., *infra.*

Bracco filed an IND for BR-1 in December 1994 and began clinical trials in April 1996 (Bracco Complt.¶ 18). At the time Bracco filed its IND, the fact that Albunex was being regulated as a device was known to the public.[13] Nevertheless, Bracco filed the IND for BR-1, and commenced clinical trials, without seeking a jurisdictional designation from the agency's product jurisdiction officer.[14] BR-1 is still being developed as a drug under an IND.

        4.      FS069

---

[13]*See, e.g.,* Mallinckrodt Comments dated May 16, 1997, at 12-13 (citing trade press articles starting in February 1988 regarding the regulation of Albunex by FDA as a device).

[14]The Intercenter Agreement Between CDER and CDRH (Oct. 31, 1991) does not clearly address ultrasound contrast agents such as BR-1. The Agreement, however, specifically recommends that product sponsors use the Part 3 product jurisdiction regulations if the product is not covered by the Agreement. *See* Intercenter Agreement at section VI.

FDA000082

FS069, manufactured by MBI, consists of albumin-based microspheres encapsulating perfluoropropane gas. The product is manufactured from a 1% solution of licensed human plasma albumin. No water is added to the product and it contains no stabilizers or surfactants.

Shortly after the approval of Albunex in August 1994, MBI presented FS069 to the agency as a "second-generation" version of Albunex. *See* Exh. B, Dittrich Decl., *Bracco Diagnostics* litigation. Albunex is limited as a diagnostic tool because it remains echogenic for only a short time. The air within the spheres diffuses rapidly and readily dissolves into the blood stream. MBI proposed to replace the air with perfluoropropane, an inert gas with a low diffusion constant that is insoluble in blood.

MBI initially sought to develop FS069 under a supplemental application to the already approved Albunex PMA (MBI Comments, May 8, 1997, at 13). However, upon filing an IDE for FS069 in December 1994, a CDRH official notified MBI that review of FS069 would be transferred to CDER. The official stated that under the provisions of the Intercenter Agreement Between CDER and CDRH (Oct. 31, 1991), responsibility for regulating ultrasound contrast agents rested with CDER (Letter from L. Yin, CDRH, to Doyle Smith, MBI, dated Dec. 30, 1994). Shortly after this communication, CDRH informed MBI that oversight for Albunex would also be transferred to CDER.

In early January 1995, MBI asked the agency's Ombudsman to intervene in the process for deciding how FS069 (and Albunex) should be regulated. *See* Exh. B, Dittrich Decl. In several communications with FDA, MBI argued that:

(1)    FDA had already determined that Albunex would be regulated as a device.

(2)    Albunex spent nearly four years under review in CDRH, with significant delay caused in part by the PMA being moved from one division in CDRH to another.

18

FDA000083

(3)   In pre-IDE meetings for FS069 with CDRH, no mention was made of the possible move of FS069 to CDER.

(4)   The CDRH review division that approved Albunex was familiar with the underlying technology, the labeling, MBI's methodological approach to product testing, and with MBI's regulatory and scientific personnel.

(5)   Albunex and FS069 both met the definition of a device under the Act and, as such, FS069 must be regulated as a device. Neither Albunex nor FS069 relies upon a biotransformation or phase shift *in vivo* to achieve its primary intended purpose.

(6)   The Intercenter Agreement does not direct MBI's products to CDER. Instead, Albunex and FS069, because they are manufactured from albumin, are "combination products" that must be regulated in CDRH pursuant to section 503(g) of the Act.

Having been presented with these arguments, the agency in May 1995 made an interim decision and agreed to allow MBI to continue with an IDE for FS069 in CDRH. The intent of this decision was to maintain the *status quo* for MBI, and not stop or impede the development of this new product, while the agency considered the jurisdictional issues raised by MBI.

This decision was also consistent with the fact that CDRH was familiar with MBI's albumin-based technology (after having evaluated Albunex under an IDE and a PMA from 1988 to 1994), and that the mechanism of action for FS069 appeared to be similar to that for Albunex. In addition, the Intercenter Agreement Between CDER and CDRH in fact did *not* appear to specifically address MBI's contrast agents. Rather, it appeared as if several of the general criteria identified in the Agreement for making drug/device determinations arguably could favor the regulation of FS069 as a device. *See* Intercenter Agreement at VIII.1 and VIII.2.

Finally, FS069 seemed at the time to have more in common with Albunex than with EchoGen, the closest other product to have gone through the agency's Part 3 designation process. Like Albunex, FS069 consisted of well-defined albumin microspheres (as opposed to the gaseous

19

FDA000084

bubbles in EchoGen).  And unlike EchoGen, FS069 used a fluorinated carbon molecule that exists in a gaseous state in the product, rather than a fluorinated molecule that undergoes a phase shift at or about the time of administration.

In March 1996, MBI informally requested from the product jurisdiction officer a written statement as to how FS069 would continue to be regulated.  *See* Exh. B, Dittrich Decl.  The agency had not reached a final decision on whether all ultrasound contrast agents should, or could, be regulated under a single statutory scheme within a single agency center.  Consistent with the idea of maintaining the *status quo*, the deputy for the product jurisdiction officer issued to MBI a letter dated March 29, 1996, stating that CDRH "should continue to assume administrative lead for MBI's contrast agents (*i.e.*, Albunex and FS069)," and that "[t]hese products will remain subject to review and regulation as medical devices . . . ."

On October 17, 1996, MBI submitted a device PMA for FS069.  The PMA, which remains pending in CDRH, seeks FDA approval for the use of FS069 in providing opacification of cardiac chambers, improvement in delineation of endocardial borders with concomitant improvement in visualization of wall motion, enhanced Doppler signal,[15] and conversion of non-diagnostic studies to diagnostic studies (in patients with suboptimal echoes) (*see* Transcript, Feb. 24, 1997, Radiological Devices Advisory Panel Meeting (the "Ad. Com. Tr."), at 135).  These proposed indications are essentially the same as those for which Albunex is approved.

CDRH review proceeded in accordance with the 180 day review period for PMAs (*see* 21 USC 360e(d)(1)(A)).  As with Albunex, and in light of the jurisdictional questions about contrast

---

[15]The "enhanced Doppler signal" indication is for improved visualization of the directional flow of blood.

FDA000085

agents that had been raised, CDRH consulted with CDER on significant parts of the review. On February 24, 1997, the agency's Radiological Devices Advisory Panel evaluated FS069 and concluded that the information in the PMA supported a finding that the product is safe and effective for the proposed indications. The application is still pending.

### 5.   DMP 115

DMP 115 is an unapproved product being developed jointly by DuPont Merck and ImaRx. It is described by DuPont Merck as "perfluoropropane gas in microsphere-encapsulated microbubbles" (Carpenter Decl. ¶ 12) and "perfluoropropane gas bubbles encapsulated within a microsphere membrane." (DuPont Merck Pet. at 3). In rebuttal comments filed by DuPont Merck, the firm acknowledges that the microsphere membrane is lipid based (DuPont Merck Rebuttal Comments at 3).[16]

DuPont Merck, like Bracco, maintains that "the same indications are being sought for DMP 115 and FS069" (DuPont Merck Rebuttal Comments at 4), and that "the proposed cardiology indications for DMP 115 are essentially the same as those proposed for FS069" (Carpenter Decl. II at ¶ 18). Namely, DuPont Merck states that the firm "will seek an indication for left ventricular opacification, endocardial border delineation, and left ventricular functional assessment, in patients undergoing echocardiography" (DuPont Merck Pet. at 3). The first two indications track the indications sought in the PMA for FS069. The third (for left ventricular

---

[16]According to MBI, "DMP 115 is an aqueous suspension of phospholipids such as phosphatidylcholine in a sealed vessel filled with a headspace of perfluoropropane gas" (MBI Comments, May 16, 1997, at 5). Also, "[a]lthough [DuPont Merck] has described DMP 115 as gas-filled microspheres (implying gas microbubbles surrounded by a stable, solid shell), the product is more correctly identified as a gas in a liquid emulsion. There is no true shell encapsulating the microbubble. The phospholipid component serves as an emulsifier, which coats the gas phase and slows the rate of spontaneous coalescence." (*Id.*). DuPont Merck has not disputed this description.

FDA000086

functional assessment), according to DuPont Merck, is equivalent to FS069's indication for "concomitant improvement in visualization of wall motion." Carpenter Decl. II, ¶ 18.

The indications DuPont Merck listed in its petition are inconsistent with the indications listed in the IND for DMP 115 and with a number of other documents submitted to the agency by DuPont Merck and ImaRx.[17]  As is the case with Bracco, these materials show that DMP 115 is being developed for indications that MBI is not seeking in the pending PMA.  For example, according to published reports, DMP 115 is being developed for use in assessing myocardial perfusion and kidney and liver imaging (*see The NDA Pipeline 1996* (15th ed. 1997, FDC Reports Inc.) at I-276 and I-412; *The NDA Pipeline 1995* (14th ed. 1996, FDC Reports Inc.) at I-374).  These indications — particularly the indication for myocardial perfusion — and other undisclosed indications invite the need for comparison against certain sophisticated comparators before the product could be approved for such uses.  These are the very comparators about which DuPont Merck appears to be complaining in its petition.  *See* discussion, section IV.C., *infra.*[18]

---

[17]The same indications are listed in ¶28 of the complaint filed by DuPont Merck in the *Bracco Diagnostics* litigation.  In the litigation, DuPont Merck has argued that the agency imposed "profoundly" different requirements on FS069 and DMP 115 "for the same core set of diagnostic uses in echocardiography." (DuPont Merck Complt. ¶¶ 28, 47, and 52).

[18]Some of the information needed to respond specifically to the petitions, particularly the arguments alleging that unequal requirements were imposed by the agency during the product development stage, is contained within petitioners' IND submissions and therefore is generally protected from disclosure under 21 CFR 314.430.  Petitioners, however, have themselves chosen to disclose (selectively) and put into issue information from their INDs.  In addition, a certain amount of IND information is publicly available.  The agency has attempted to respond publicly to the petitions by relying primarily on information petitioners themselves have disclosed and on other publicly available sources.  In addition, the agency has attempted to discuss certain issues at an appropriate level of generality to minimize potential disclosure of petitioners' information.

In one instance, the agency consulted with petitioner DuPont Merck to learn whether it would permit discussion in this document *of all* of the indications listed in the IND for DMP 115.  DuPont Merck, through counsel, insisted that the agency not disclose this information because DuPont

22

FDA000087

Finally, neither ImaRx nor DuPont Merck sought a jurisdictional designation under Part 3 for DMP 115 (known as MRX 115 when originally submitted to the agency by ImaRx in 1995). A marketing application for DMP 115 has not been filed with the agency.

## III.    SUMMARY OF THE CITIZEN PETITIONS

Three firms (DuPont Merck, Bracco, and Sonus) have submitted citizen petitions under 21 CFR 10.30 on the subject of the regulation of ultrasound contrast agents. The three petitions make essentially the same request: that all ultrasound contrast agents should be regulated under the same set of statutory authorities by a single agency Center. Petitioners Sonus and Bracco argue that all ultrasound contrast agents must be regulated as "new drugs" requiring approval by CDER (Sonus Pet. at 1; Bracco Pet. at 1). Petitioner DuPont Merck also argues that FDA must regulate all ultrasound contrast agents under the same standards and procedures (DuPont Merck Pet. at 1). DuPont Merck, however, allows for the possibility that all ultrasound contrast agents may be regulated as devices by CDRH (DuPont Merck Pet. at 2).

Petitioners' core argument for regulating all ultrasound contrast agents under the same statutory standards is that the products in this class are "essentially identical" (DuPont Merck Pet. at 4; *accord* Sonus Pet. at 3-4, 5; Bracco Second Supp. Pet. at 2). In particular, petitioners maintain that the ultrasound contrast agent currently undergoing review as a device (FS069) is "indistinguishable"from petitioners' products, all of which are in the new drug development and approval processes. All of these products, they argue, contain fluorinated gases encapsulated

Merck had chosen not to disclose it in the litigation (*see* Letter from Arnold & Porter to FDA dated July 18, 1997). *Subsequently*, the agency learned that information regarding an additional indication in the original IND for DMP 115, as well as other indications for which DMP 115 is under development, has in fact been widely published for some time. *See, e.g., The NDA Pipeline*, available on-line and in hard copy from F-D-C Reports, Inc.

FDA000088

within a microsphere "membrane," are administered by intravenous injection, and are intended

for the same uses (DuPont Merck Pet. at 4; Sonus Pet. at 2, 4-5; Bracco Second Supp. Pet. at 2).

Petitioners therefore insist that all of these products raise the same safety and efficacy questions

and, *perforce*, all must be subject to regulation under the same statutory standards applied by the

same set of agency officials (Sonus Pet. at 5; Bracco Pet. at 2, 4-5).

　　　Petitioners claim FDA is applying "significantly different standards" in assessing the

safety and effectiveness of ultrasound contrast agents, depending upon whether the agent is

undergoing review as a device or as a new drug.  The clinical data in support of the PMA for

FS069, they insist, is not nearly as extensive as the data that CDER has required for petitioners'

products, DMP 115 (sponsored by DuPont Merck), BR-1 (sponsored by Bracco), and EchoGen

(sponsored by Sonus) (DuPont Merck Pet. at 5; Sonus Pet. at 6; Bracco Second Supp. at 2).

They also speculate that there is a substantial disparity between the pharmacokinetic and toxicity

data that CDER has required as compared to what CDRH may have required for the PMA for

FS069 (Sonus Pet. at 6; *see* Bracco Second Supp. at 3).  As a result, petitioners maintain, MBI

has been able to proceed through product development and marketing review at a much faster

pace than petitioners, even though a new drug applicant must pay a substantial "user fee" to

ensure timely review of its application.

　　　Petitioners also argue that FDA has a "longstanding policy" of regulating most contrast

agents under the same standards, namely, under the drug provisions of the Act.  This policy,

petitioners argue, is evidenced by (1) a 1982 Federal Register notice in which FDA stated that all

radiologic contrast media would be regulated as drugs, (2) several jurisdictional designations

made by the FDA Ombudsman, and (3) a recent statement made by an FDA official at a medical

24

conference (DuPont Merck Pet. at 3, 19; Sonus Pet. at 2-4). Two petitioners also note that FDA has approved at least 40 contrast agents as drugs, albeit for uses other than in ultrasound imaging (Sonus Pet. at 3; Bracco Pet. at 4).

Finally, Sonus and Bracco urge that ultrasound contrast agents, as a class, should be regulated as drugs because CDER (rather than CDRH) is best equipped to analyze the safety and effectiveness of these products, which are administered intravenously and travel indiscriminately throughout the vasculature. (Sonus Pet. at 5; Bracco Pet. at 3, 4). CDER, they contend, also has substantially greater expertise in the area of contrast agents than does CDRH (Sonus Pet. at 8; Bracco Pet. at 2, 3, 4-5) and has more resources already dedicated to the analysis of contrast agents.

While these petitions were pending, and before the agency had the opportunity to consider fully the arguments presented, petitioners each filed suit in federal district court against the agency (i.e., the *Bracco Diagnostics* litigation). There, petitioners complained that the agency had acted "arbitrarily and capriciously" by regulating some ultrasound contrast agents as drugs and others as devices. They complained that as a result of this "disparate" treatment, and the application of "profoundly" different standards by CDER and CDRH, they each suffered and would continue to suffer irreparable harm. Finally, each argued that, as a matter of law, the agency must regulate all ultrasound contrast agents alike.

As discussed below, petitioners' claims of arbitrary and capricious conduct, disparate treatment, and irreparable harm, are factually and legally ill conceived. There is, however, merit in petitioners' argument that it would be administratively prudent for the agency to regulate all of these products as "drugs" in CDER. Given that the Act permits such a result — an issue that

FDA000090

was largely ignored by petitioners but which the agency takes up in detail below — the agency

has decided to grant that portion of the pending petitions.

## IV.    RESPONSE TO THE CITIZEN PETITIONS

### A.    The Products at Issue Were Not "Similarly Situated"

Petitioners argue that the agency acted "arbitrarily and capriciously" by failing to regulate

all ultrasound contrast agents under the same statutory standard, within the same agency Center.

The premise of the argument is that the products are "essentially identical" and "similarly

situated" and, therefore, the agency was legally obligated to regulate them in a like manner

(DuPont Merck Pet. at 4; Sonus Pet. at 3-4, 5; Bracco Second Supp. Pet. at 2).

The agency agrees that the microbubble and microsphere products at issue in this

proceeding are similar in several respects.  All are designed around the same principle:  to

resonate or reflect in a manner that allows them to stand out from the surrounding medium (*e.g.*,

surrounding blood and tissues in the body).  All use, in one form or another, compressible,

expandable, and flexible spheres or bubbles.  And, as petitioners emphasize, all are administered

by intravenous injection and are designed to travel systemically (although some, like Albunex,

may be administered locally rather than by intravenous injection).  Finally, these products are

designed for some of the same intended uses, although petitioners have not disclosed all relevant

information regarding the uses for which their products are being developed.  *See* discussion in

section IV.C.2, *infra*.

These common characteristics, while important, do not demonstrate that the agency's past

decisions to allow some agents to proceed as drugs, and others as devices, were "arbitrary and

capricious" under 5 USC 706(2)(A) and a "clear error" of law.  *See* DuPont Merck Pet. at 20;

26

FDA000091

Sonus Pet. at 7. Agency decisions must be analyzed based on the information before the agency

at the time it made the decision, and an agency is not "arbitrary and capricious" if the decision

was rational, was based on consideration of relevant factors, and did not represent a "clear error

of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Moreover, even if two inconsistent conclusions might be drawn from the evidence before the

agency at the time, an agency decision is not "arbitrary and capricious" simply because one could

have reached a different, rational conclusion. *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298,

304 (1977); *Motor Vehicle Mfrs. Ass'n of the United States, Inc., v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 42 (1983); *see also Formula v. Heckler*, 779 F.2d 743 (D.C. Cir. 1985).

The core rationale for the regulatory status of each of these products (in the order in

which each was presented to the agency) is as follows:

1. *Albunex (Feb. 1987)*, the first ultrasound contrast agent regulated by FDA, consists essentially of air-filled albumin spheres. The simple composition of the product, its similarity to trace microspheres, and its use as an accessory to ultrasound instruments, led the agency to regulate it as a device. *See* discussion in section II.B.1, *supra*.

2. *SonoRx (Mar. 1992)*, the first enhancement agent to receive a letter of jurisdictional designation, consists primarily of simethicone and cellulose. Its formulations bore no resemblance to Albunex. Rather, its similarity to a number of antiflatulent drug products led the agency to direct its sponsor to the drug review process. *See* discussion in section II.B.2, *supra*.

3. *EchoGen (Oct. 1992)*, the second ultrasound contrast agent to receive a letter of jurisdictional designation, consists primarily of an emulsion of liquid perfluoropentane and water for injection. Its formulation likewise bore no resemblance to Albunex or SonoRx. Instead, the use of unencapsulated perfluoropentane in the product, the safety concerns associated with the manner in which the product forms echogenic bubbles within the body, and the manner in which the gas is expelled from the body, led the agency to regulate the product as a drug. In addition, Sonus requested that the agency allow EchoGen to be regulated as a drug, even though Sonus acknowledged in its request for designation that a related product, Albunex, was being regulated as a device. *See*

27

FDA000092

discussion in section II.B.2, *supra*.

4.    *BR-1 (Dec. 1994)* consists primarily of sulfur hexafluoride gas suspended in microbubbles within a phospholipid. It too has a wholly unique formulation. Bracco chose not to seek a jurisdictional designation under Part 3. Instead, based on the agency's determinations with respect to SonoRx and EchoGen, and on a 1982 statement in the preamble to a proposed FDA regulation, Bracco claims it had no choice but to file an IND (Bracco Complt. ¶ 18, *Bracco Diagnostics* litigation). As discussed, *infra*, the 1982 Federal Register statement was superseded by the agency's Part 3 process as well as by the decision to regulate Albunex as a device. The SonoRx and EchoGen decisions were based on factors unique to each of those products. *See* discussion in section II.B.3, *supra*.

5.    *FS069 (Dec. 1994)* was presented as a second generation version of Albunex, with perfluoropropane gas used in place of air to fill the albumin microspheres. The product appeared to have more in common with Albunex than with any of the previous products that were the subject of jurisdictional determinations. Therefore, the agency's product jurisdiction officer, after consultation with officials in CDER and CDRH, decided that FS069 could follow in the same path as Albunex and commence review as a device, pending a decision on whether this emerging class of products should (and could) be regulated under the same statutory authorities in the same Center. *See* discussion in section II.B.4, *supra*.

6.    *DMP 115 (Aug. 1995)* consists of an aqueous suspension of phospholipids in a sealed vial filled with a headspace of perfluoropropane gas. It uses the same gas as FS069 but does not use an albumin sphere. Instead, like BR-1, it uses a blend of phospholipids as an emulsifier to surround the perfluoropropane gas. Like Bracco, DuPont Merck elected not to seek a jurisdictional designation before it filed an IND with CDER (even though the agency's Intercenter Agreement advised sponsors to do so) (*see* DuPont Merck Pet. at 18; Complt. ¶ 35). *See* discussion in section II.B.5, *supra*.

In short, all six products presented different formulations with potentially different safety and effectiveness profiles. The divergence that eventually arose — between regulating some products as devices (*e.g.*, Albunex) and others as drugs (*e.g.*, SonoRx and EchoGen) — was based on apparent differences in formulation, mode of action, and intended use. As for FS069, Albunex had been regulated as a device without objection for almost seven years when FS069 was presented to the agency, and FS069 appeared to be only incrementally different than Albunex.

FDA000093

Finally, several sponsors *sought* to be regulated as drugs, with one sponsor (Sonus) asking the agency's product jurisdiction officer for a CDER designation,[19] and two others (Bracco and DuPont Merck/ImaRx) submitting INDs on their own initiative. The current alignment, therefore, is rational when one takes into account the differences noted above and the interest that several sponsors showed in having their products regulated by CDER.

### B.   The Agency Did Not Establish a "Binding Policy" of Regulating Ultrasound Contrast Agents as Drugs

Petitioners argue that FDA has a "longstanding policy" of regulating contrast agents as "new drugs" (although at least one petitioner concedes that several contrast agents are regulated as biologicals, Sonus Pet. at 2). As a result, petitioners claim that FDA violated that policy and the Administrative Procedure Act ("APA"), by regulating Albunex and FS069 as a devices.

Petitioners focus primarily on a statement the agency made in the preamble to a 1982 proposed rule. The Medical Device Amendments of 1976 (Pub. L. 94-295) established a comprehensive system for providing reasonable assurance of the safety and effectiveness of medical devices. That system included placing all devices marketed prior to may 28, 1976, into one of three classes (Class I, Class II, or Class III), with each class requiring a different level of control. The 1982 Federal Register document is one of many in which the agency proposed classifications for categories of products then in commercial distribution. In that proposed rulemaking document, the agency stated that "radiologic contrast media," as a class, would be

---

[19]Following the agency's designation of EchoGen as a drug, Sonus' CEO Steven Quay announced that "Sonus met with FDA in 1992 'to get EchoGen's development program *and to get their agreement that this will be treated as a drug.* It was our strategy to do that, and we went through the ombudsman process at FDA to . . . have that established,' Quay said." The Gray Sheet, Sept. 14, 1994, vol. 20 issue 38 (emphasis added).

29

FDA000094

regulated as drugs.  47 Fed. Reg. 4406, 4412 (Jan. 28, 1982).  The agency never finalized this

statement regarding contrast agents in a regulation.  Nevertheless, petitioners insist that the

agency is obligated to follow this statement until it has been amended or revoked (*see* Sonus Pet.

at 3 citing 21 CFR 10.85(d) and (e)).

The intent of the 1982 statement was to address products then in existence, such as

barium sulfate enema kits and iodinated contrast media used in x-ray radiology.  At the time the

agency made that statement, however, contrast agents for use in ultrasound imaging had not been

the subject of investigational or marketing applications with FDA.  Thus, it cannot be said, as

petitioners insist, that the statement was intended to cover ultrasound contrast agents.[20]

Even more, the 1982 Federal Register statement does not and cannot limit FDA's

discretion to make case specific judgments about the appropriate regulation of a given product.

*See* 57 FR 47314 (Oct. 15, 1992) (FDA proposed rule amending 21 CFR Part 10 to, among other

things, make clear that under current legal precedents, a statement in a preamble to a proposed

FDA rule cannot bind the agency); 62 FR 8961, 8963 (Feb. 27, 1997) (explaining that the

principle that an advisory opinion might in some way be binding on FDA is inconsistent with the

decision in *Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987)).

---

[20]Petitioners nevertheless point to a statement made in May 1996 at a medical conference by Dr. Lillian Yin (Director, Division of Reproductive, Abdominal, Ear, Nose, and Throat, and Radiology Devices, Office of Drug Evaluation, CDRH) to show that the 1982 Federal Register notice was intended to cover, or has been interpreted by the agency as covering, ultrasound contrast agents (*see* Sonus Pet. at 4).  Dr. Yin's statement may have represented her best judgment at the time, but it did not represent the formal position of the agency.  *See* 21 CFR 10.85(k).  Indeed, Dr. Yin made this statement in May 1996, at a time when the agency was still considering the issue of whether ultrasound contrast agents — as a class — could and should be regulated as drugs or as devices.  The portion of her statement on which petitioners focus also is not consistent with the agency's 1994 decision approving Albunex as a device.

30

FDA000095

In any event, the agency's publication in February 1995 of notice of the approval of

Albunex as a device (60 FR 9334, Feb. 17, 1995) provided adequate notice that the 1982

statement could not be relied upon as agency policy regarding ultrasound contrast agents (*see*

MBI Comments, May 8, 1997, at 15-17 (repudiation of agency advisory opinions and

statements)).

Finally, the 1982 Federal Register notice pre-dated the agency's new process for

determining jurisdiction over difficult to classify products. *See* 21 CFR Part 3. Product-specific

decisions made under the agency's Part 3 procedures would supersede a prior, general statement

such as that made in the 1982 Federal Register notice. As the discussion in section IV.A.2

shows, the agency's product jurisdiction officer has made three jurisdictional designations for

ultrasound products (SonoRx, EchoGen, and FS069), with each decision based on the particular

formulation and intended use of the product.

### C.    CDER and CDRH Have Not Imposed Materially Different Review Requirements

Petitioners argue that CDER has imposed significantly different requirements on their

products than CDRH has imposed on FS069. They claim that their products have been made to

go through a longer, more expensive, and more complex process than FS069, and that the

"disparate" treatment of their products will allow FS069 to have an unfair advantage in the

marketplace. Thus, even if the agency issues the determination urged by petitioners, the agency

reasonably can anticipate that petitioners will continue to argue that MBI has had the benefit of a

less costly and less complex product development process. By starting out as a device, they

would argue, MBI was able to file a marketing application sooner than its competitors, at a much

lower cost. Thus, the agency expects petitioners, or at least some of them, to argue that MBI

FDA000096

must "begin again" and undertake the same testing that petitioners allegedly have been required to conduct. There would be no merit in such an argument.

The agency acknowledges that the statutory and regulatory provisions applicable to drugs differ from those applicable to devices. In this instance, however, petitioners have not demonstrated that — as a result of such differences — CDER and CDRH gave materially different guidance, or that product development for FS069 has been materially different from that of EchoGen, DMP 115, and BR-1. Instead, the differences that petitioners have identified are either: (1) untrue; (2) reasonably related to differences in product formulation; (3) reasonably related to each sponsor's own approach to product development; or (4) immaterial.

     1.    Background Regarding Agency "Requirements"

The alleged differences between the clinical development of petitioners' products and FS069 are each based on the idea that *prior to the filing of a marketing application,* CDER "required" petitioners to do more work than CDRH "required" of FS069.

During the product development phase (prior to the submission of a marketing application), CDER and CDRH frequently provide sponsors with advice and comments regarding issues such as study design and safety monitoring. This advice and guidance is intended to be informative, to assist the sponsor in developing safely the scientific and medical data to support a marketing application, but it is not intended to set forth requirements. *See* 21 CFR 312.41 (advice and comment provided throughout the product development phase does not bind the sponsor or the agency).

FDA fully anticipates that sponsors and investigators may develop alternative methods and procedures for studying a new product and that at the review stage (following the submission

FDA000097

of a marketing application), FDA may find those alternative methods and procedures acceptable. *See, e.g.,* 62 FR 8961 (Feb. 27, 1997) (agency guidance represents the agency's current thinking on a subject but agency guidance does not establish enforceable rights or responsibilities and are not legally binding on the agency or on the public).[21] Thus, even assuming that CDER and CDRH gave different guidance to firms seeking to develop ultrasound contrast agents (an allegation the agency addresses below), petitioners have not established that the agency imposed different binding requirements.

Nor is it the case, as a general matter, that sponsors of similar products within the same center will necessarily receive identical advice and guidance. Differences in formulation, in the indications being sought, and in the agency's current thinking at the time (which is often based on its experience with other products in the class), may cause sponsors to be guided in different ways. Indeed, it is because of these variables that the discussions that take place at the product development stage are expressly designated as non-binding. *See* 21 CFR 312.41.

Finally, it is important to note throughout the discussion that follows that the agency took steps to help ensure that products within this class are treated as consistently as possible, regardless of whether they are being reviewed as "new drugs" or as "devices." For example, CDER's medical imaging review staff participated in the review of the Albunex PMA, including the presentations made to the advisory panel that evaluated Albunex in July 1992. In addition, a member of the CDER medical imaging advisory committee participated (albeit as a non-voting

---

[21]During the review of a marketing application (*e.g.*, an NDA or PMA), the agency may also find that the methods used by the sponsor were not acceptable. For example, as CDRH advises all IDE applicants, FDA approval of an IDE does not imply that the investigation will develop sufficient safety and effectiveness data to assure FDA approval of a PMA.

FDA000098

member) on the February 24, 1997, CDRH device review panel that evaluated a PMA

supplement for Albunex and the PMA for FS069. And, with respect to the PMA for FS069,

CDRH consulted with CDER's medical imaging staff during the IDE stage of FS069 and the

non-clinical review components of the PMA for FS069.

      2.   Analysis of Alleged Differences

Each petitioner has identified alleged differences between what CDRH has required of

MBI and what CDER has required of petitioners. These differences, petitioners insist, cost them

time and money and, in turn, have allowed MBI to obtain a significant competitive advantage.

      a.   *Sonus*

Sonus argues that in preparing to file an NDA for EchoGen, it was required to: (1)

undertake "expensive and time-consuming genotoxicity, reproductive toxicity, and

pharmacokinetic studies" not required of FS069; (2) conduct two adequate and well-controlled

clinical studies compared to a single study for FS069; and (3) conduct studies of a possible "off-

label" use of EchoGen for use outside of echocardiography in "radiological ultrasound," thereby

doubling the number of clinical trials and delaying the filing of the NDA by six months (Sonus

Pet. at 6). Sonus also asserts that the "approval of a contrast agent as a device rather than a drug

appears to be a much faster process" (Sonus Pet. at 6), allowing MBI to gain an unfair advantage

in the race to the market.[22]

      *(1) Pharm/Tox data*

Sonus's assumption that the PMA for FS069 does not contain "genotoxicity, reproductive

---

[22]The agency's plan for implementing its decision, discussed in section VII, *infra*, addresses the "user fee" issue raised by Sonus and other petitioners.

34

FDA000099

toxicity, and pharmacokinetic studies" (Sonus Pet. at 6) is incorrect. As MBI disclosed in its

comments, it too has completed genotoxicity, reproductive toxicity, pharmacokinetic, and

immunology testing for FS069 (MBI Comments, May 8, 1997, at 21; *see* section b(3), *infra*, for

a discussion of the immunologic testing done by MBI). Indeed, while Sonus complains that it

spent more than $700,000 on such testing, MBI apparently spent at least $1,100,000 (MBI

Comments, May 8, 1997, at 21).

More to the point, it would be difficult for the agency to compare the specific

"pharm/tox" data submitted by Sonus for EchoGen with the pharm/tox data submitted in support

of the PMA for FS069, given that there are differences between the products based on

formulation and toxicity profiles. For purposes of responding to this argument, however, the

agency notes that CDER pharmacologists have reviewed the pharm/tox data provided in support

of FS069 and have determined that the data are adequate for review under the standards

applicable to "new drugs."

### (2) Two clinical studies

Sonus states that NDA sponsors are generally required to conduct two adequate and well

controlled clinical studies to support the effectiveness of the product, while PMA sponsors

"historically have been allowed to provide less rigorous proof of effectiveness." (Sonus Pet. at

6). Thus, Sonus claims, it has had to conduct two clinical studies to every one conducted by

MBI, and has had to enroll twice as many patients as MBI (*id.*).

In fact, the PMA for FS069 is supported by two Phase 3 studies of FS069 (one with 101

patients and one with 102 patients for a total of 203 patients) for the indications of endocardial

border delineation, left ventricular opacification and improved Doppler signal. *See* Ad Com Tr.

FDA000100

at 140.  With respect to the number of subjects enrolled, on a per study basis, Sonus and MBI enrolled similar numbers of subjects.  Sonus conducted four separate clinical studies of EchoGen (two for echocardiography and two for "radiological ultrasound"), enrolling a total of 410 subjects (Sonus Pet. at 6), or an average of approximately 102 per study, compared to 101 and 102 subjects in MBI's two pivotal studies.

It should also be noted that neither CDRH nor CDER "requires" a certain number of patients to be enrolled in a clinical study.  While a study must be "adequate and well controlled" for purposes of demonstrating that which it purports to demonstrate, it is the applicant's responsibility to determine the appropriate number of subjects to enroll in a study.  The agency will not make a final determination on whether the sample size was adequate, as a statistical matter, until after the study has been submitted as part of a marketing application.

In short, MBI and Sonus each conducted two pivotal studies for use of the product in echocardiography, and each enrolled similar numbers of patients in those studies.  Whether each applicant's studies will be determined to be "adequate and well controlled," for purposes of supporting marketing approval, is a review issue that the agency has not decided and need not decide for purposes of this petition response.

### (3) The "radiological ultrasound" indication

Sonus also argues that it was required to conduct two additional clinical studies of EchoGen because CDER officials were concerned about the possible "off label" use of EchoGen for radiological ultrasound (Sonus Pet. at 6).  CDRH did not impose such a requirement on FS069, Sonus contends.

Sonus provided the agency with no documentation to support its claim that the agency

36

required the company to pursue a non-cardiac "radiology indication" for EchoGen. The agency

has reviewed minutes of its meetings with Sonus, as well as Sonus' IND submission, and was not

able to confirm Sonus' assertion. Finally, while Sonus' counsel claims that the radiology studies

significantly slowed the filing of an NDA (Sonus Pet. at 6), Sonus has stated publicly that the

NDA for EchoGen was filed "well ahead of our strategic plan target date . . ." (Sonus Press

Release, Sept. 5, 1996).

### (4) Review Period

Sonus claims that "approval of a contrast agent as a device rather than a drug appears to

be a much faster process" (Sonus Pet. at 6). As Sonus well knows, the review of Albunex *as a

device* lasted nearly four years (including time taken by the sponsor to respond to deficiencies

noted during the review by FDA). *See* 60 FR 11671 (Mar. 2, 1995) (FDA determination of

regulatory review period for Albunex, stating that the PMA was submitted on September 14,

1990, and was approved on August 5, 1994). In fact, Sonus sought in October 1992 to have

EchoGen regulated by FDA as drug, knowing that Albunex had already been under review in

CDRH for more than two years.[23]  Sonus cannot now complain before the agency that it has

been prejudiced by the alleged pace of product reviews in CDRH versus the alleged pace in

CDER.[24]

---

[23]By September 1990 MBI had publicized the fact that it had filed a PMA for Albunex (*see* May 16, 1997, Mallinckrodt Comments, Exh. L). Albunex went before a public advisory committee meeting in July 1992, just prior to Sonus filing its request for designation. Sonus itself noted in its request for designation that Albunex was being regulated as a device.

[24]Both drugs and devices are subject to the same statutory review periods. *See* 21 USC 360e(d)(1)(A) (providing that FDA complete its review of a PMA "[a]s promptly as possible, but no later than one hundred and eighty days after the receipt of [an application for premarket approval of a class III device] . . ."; 21 USC 355(c) (review period applicable to "new drugs"). In

FDA000102

    b.    *Bracco*

Bracco cites five "requirements" allegedly imposed by CDER during the clinical study of

BR-1 to show that FDA has required "significantly different data, both in terms of amount and

character, to support approval of [BR-1] than the agency has required from MBI . . ." (Bracco

Second Supp. Pet. at 2).[25]   To the contrary, none of these alleged "requirements" supports an

argument that MBI had an unfair advantage in the product development process.

    *(1)    Use of a gold standard*

According to Bracco, CDER required the verification of diagnoses made with BR-1

against an accepted reference standard, such as "cardioangiographt (*sic*) or radionuclide

ventriculography," while CDRH allowed FS069 to be tested only against Albunex  (Bracco

Second Supp. Pet. at 2-3).  One premise of this argument is that Bracco is developing its product

for the same indications for use that MBI is seeking in the pending PMA for FS069.   The agency

disagrees.

---

implementing the Prescription Drug User Fee Act of 1992 ("PDUFA")  (21 USC 379g *et seq.*),
CDER generally sets a "goal date" in which to take action on a drug marketing application of one
year from the date of submission for a "standard review" and six months for a "priority review."
CDRH has also been making strides toward improving review times for PMAs.  It cannot, however
be said that review of a PMA in CDRH will necessarily be faster than review of an NDA in CDER.
Many factors affect the pace of review, including the quality of the application, the number and
kind of indications sought, the particular review team's familiarity with the underlying formulation, and
the sponsor's ability to respond quickly and thoroughly to inquiries from agency reviewers.

    [25]At an April 8, 1997, meeting with agency officials, Bracco submitted a packet of materials,
marked "confidential," to show that it has been unfairly prejudiced and irreparably harmed by the
unequal treatment of BR-1 versus FS069.  Although Bracco did not submit this material to the
ultrasound docket, *see* 21 CFR § 10.20(c) and 21 CFR 10.20(c)(6) (setting forth procedures for
making confidential submissions in support of a citizen petition), the agency has considered this
material here, and has incorporated it into the record of this proceeding, as Bracco's best evidence
in support of its unequal treatment claim.

38

FDA000103

MBI is seeking FDA approval for the use of FS069 in providing opacification of cardiac chambers, improved delineation of endocardial borders with concomitant improvement in visualization of wall motion, and conversion of nondiagnostic images to diagnostic images, and enhanced Doppler signal (*see* Ad. Com. Tr. at 135). These indications are variations on the same theme. In an echocardiogram, the distinction between the edge of the blood pool in the heart and the endocardial border may appear blurry in an unenhanced image. Introduction of a contrast agent "lights up" the blood pool, allowing clearer delineation between the edge of the blood and the heart muscle (*i.e.*, improved endocardial border delineation, conversion of non-diagnostic to diagnostic). Because the contrast agent allows for clearer delineation between the blood and the muscle, it is easier to observe the movement of the heart muscle (*i.e.*, regional wall motion), as well as the filling of the left ventricle with blood (*i.e.*, opacification of the left ventricle) and the directional flow of the blood (*i.e.*, enhanced Doppler).

To demonstrate efficacy for such uses, the primary issue is whether the ultrasound image taken with the benefit of the contrast agent yields a better (more useful) image than that taken without the benefit of an agent. Accepted textbook knowledge of anatomy may well be sufficient to confirm whether the enhanced image is an improvement over the unenhanced image.

There are, however, a number of potential uses for ultrasound contrast agents that would require much more sophisticated confirmation in order to demonstrate the efficacy of the product for such uses. Two examples are measurement of ejection fraction and assessment of myocardial perfusion. The ejection fraction is the ratio of blood that leaves the heart with each beat. A healthy heart will eject about seventy percent of its contents with each beat, leaving behind about thirty percent of the blood in the chambers; an unhealthy heart may leave behind even more (50

FDA000104

percent or more). This ratio or ejection fraction is based on a *quantitative* measurement, not just visual assessment. Thus, a firm seeking to label its contrast agent as an aid in measuring ejection fraction would need to test its product against an accepted "gold standard" for measuring ejection fraction. An example of such a standard is radionuclide ventriculography, which involves injection of a traceable radionuclide such as native red blood cells tagged with Technetium into the blood pool that can be tracked and recorded using Multiple Uptake Gated Acquisition ("MUGA").

Assessment of myocardial perfusion is a disease-specific claim that is directed at providing direct (as opposed to inferential) evidence that the blood supply to specific tissue in the heart is compromised. Myocardial perfusion is the process by which oxygenated blood is brought to the heart muscle. A number of published reports suggest that ultrasound contrast agents of sufficient duration — which can enter the capillaries within the heart muscle itself — can be used directly to assess myocardial perfusion and thereby assist in the diagnosis of conditions such as coronary arterial stenosis (abnormal narrowing of the vessels) and myocardial infarction (death of a segment of the heart muscle). An example of an accepted modality for assessing myocardial perfusion involves the use of Thallium or Sestamibi with Single Photon Emission Computed Tomography ("SPECT"). Thallium and Sestamibi are radiocharged isotopes that are taken up by the heart muscle and can be read using SPECT.[26]

---

[26]In addition to myocardial perfusion and ejection fraction, some ultrasound contrast agents are being developed for "patient management" indications, in which the agent would be used to provide additional information for establishing a diagnosis, managing the overall course of treatment, to signal the need for certain further diagnostic examination, or to eliminate the need for certain tests. A proposed "patient management" indication relating to issues such as assessment of myocardial perfusion or ejection fraction would, likewise, invite the need for comparison — at a minimum — against the types of modalities discussed in the text.

40

FDA000105

The idea that Bracco has used cardioangiography, radionuclide ventriculography, or any of the other types of modalities described above in the study of BR-1, or that Bracco was advised to do so, is consistent with the IND and development plan Bracco presented to the agency. Bracco's IND did not limit the development of BR-1 to the indications listed in its petition, or to the indications MBI is seeking in the pending PMA. Bracco also did not limit itself in its IND and development plan to comparing BR-1 only against Albunex. Indeed, these documents show that Bracco stated it would compare BR-1 against the very modalities about which it now complains.

Finally, MBI has publicly reported that it has initiated studies of FS069 for myocardial perfusion and that FS069 is being compared against "stress nuclear imaging," a relevant gold standard comparator (MBI SEC Form 10-K405, fiscal year ended March 31, 1997, at 2). This disclosure, as well as a host of confidential materials reviewed by the agency in this proceeding, show that both CDER and CDRH expect sponsors to conduct clinical studies using relevant gold standard comparators.[27]

### (2)    Safety assessment

Bracco complains that CDER required the firm to collect safety data from patients at 24, 48, and 72 hours post-administration, while MBI collected safety data at a single point in time, 48 hours after administration (Bracco Second Supp. Pet. at 3).

MBI recorded safety data "at baseline" (just prior to administration), 30 minutes after

---

[27]Sonus likewise has reported that in January of this year, it initiated Phase 3 studies "which will compare the discriminatory power of contrast echocardiography with EchoGen and nuclear medicine scans in diagnosing myocardial infarction by assessing perfusion deficits in the myocardium. The success of this trial may foster new options for the non-invasive diagnosis of coronary artery disease . . . ." (Sonus SEC Form 10-K, for fiscal year ended Dec. 31, 1996, at 7).

FDA000106

administration, and between 48 hours and 10 days after administration (Ad Com. Tr. at 145).

The level of monitoring and data collection is based on factors such as the adverse events that

were noted during Phase 1 and 2 trials, the particular formulation, and the agency's

understanding of the product's uptake, metabolism, and elimination. The agency's current

database of knowledge regarding the product, and similar products, at the time that it provides

guidance is also a relevant factor. It is not unreasonable, then, for two products, presented at

different times, with different formulations, to receive different guidance on an issue such as

safety monitoring.

### (3)    *Testing for immunologic factors*

Bracco claims that CDER "required" Bracco to test at least 40 patients for immunologic

parameters, while MBI was permitted to test only 10 patients for such parameters (Bracco

Second Supp. Pet. at 3). In fact, as shown in the presentation made to the advisory panel, MBI

conducted immunologic testing on 16 of 40 subjects in study FS1000, re-tested five of those

subjects 1 year later in the re-challenge study FS1250, and conducted immunologic testing on 25

of 50 subjects in study FS6000, with a total of 41 subjects receiving FS069 for testing of key

reaction indicators (*see* Ad. Com. Tr. at 141-44).

In addition, the documentation submitted by Bracco at the April 8 meeting suggests that

in a Phase 1 trial of BR-1, certain adverse events were reported that suggested an immune

response of some kind to BR-1. *See* Bracco April 8, 1997, submission, Tab 5. Aside from the

fact that Bracco and MBI appear to have conducted a comparable quantity of immunology

studies (and that Bracco's documentation does not show that CDER required Bracco to study

42

FDA000107

immunologic parameters on 40 subjects),[28] such adverse event reports would certainly support the need for careful testing of BR-1 for immunologic parameters.

### (4)    Blinding procedures

Bracco claims that CDER required "sophisticated blinding procedures to blind both the sponsor and patient to the contrast agent administered," while CDRH permitted MBI to study FS069 in "an open label fashion" (Bracco Second Supp. Pet. at 3; Didato Decl. at ¶7).

The documentation submitted by Bracco does not show that the agency required Bracco to employ extraordinary or "sophisticated" blinding procedures during the administration of the test agent (*see* Bracco's April 8 Submission, Tab 2). Moreover, other documentation reviewed by the agency show that Bracco itself proposed early in the development process to use a "double-blind" study design. Bracco also has not shown that MBI conducted its studies "in an open label fashion," let alone that CDRH "permitted" an open label study during the development of FS069.

CDRH (like CDER) will consider the adequacy of the procedures used in a clinical study as part of its overall review of the adequacy of the study data submitted in the marketing application. Even if patients and investigators were not adequately blinded to the test agent, as Bracco claims, that is a review issue that would be considered in the context of looking at all of the data submitted in the application.

### (5)    Off-site assessments

According to Bracco, CDER required the firm to use an independent, "blinded"

---

[28] *See* Bracco's "Synopsis of Clinical and Statistical Comments Received from the FDA" and documentation submitted under Tab 3.

43

FDA000108

radiologist, maintained "off-site," to evaluate all test images, while MBI was permitted to have

the principal on-site investigator conduct all assessments of efficacy (Bracco Second Supp. Pet.

at 3). In fact, pursuant to a recommendation made by CDRH,[29] MBI used an off-site independent

"core laboratory" at Georgetown University, with a "masked reviewer" blinded to the test agent,

dose volume, and patient history, to make efficacy assessments in the two pivotal Phase 3 studies

(see Ad. Com. Tr. at 141, 146, 148, and 167).

### c.    *DuPont Merck*

DuPont Merck, like Bracco, argues that as a result of CDER's directions to the firm,

DuPont Merck now stands at a significant competitive disadvantage *vis a vis* MBI.  Closer

analysis of DuPont Merck's list of alleged differences — between CDER's guidance and the

PMA for FS069 — shows otherwise.[30]

### (1)    *Selection of a comparator*

DuPont Merck argues that it was required to use expensive gold standard comparators

"such as MRI" (magnetic resonance imaging) to demonstrate the effectiveness of DMP 115 in

assessing cardiac function, while FS069 was permitted to use Albunex as a comparator (DuPont

Merck Pet. at 6-7, and 13; DuPont Merck Rebuttal Comments at 9).  As a result, DuPont Merck

complains, it incurred more than $1,500,000 in additional expenses and lost nearly 6 months in

development time.

---

[29]Letter from CDRH to MBI dated Aug. 23, 1995.

[30]DuPont Merck also attended the meeting on April 8, 1997, with agency officials (see footnote 25, *supra*) and, like Bracco, provided a packet of materials in support of its unequal treatment claim. Though DuPont Merck did not submit this material to the ultrasound docket, the agency has considered the material presented at the meeting as DuPont Merck's best documentary support for its argument, and has incorporated this material into the record of this proceeding.

FDA000109

DuPont Merck insists that CDER imposed different testing standards than CDRH, even though "the record demonstrates that the same indications are being sought for DMP 115 and FS069." (DuPont Merck Rebuttal Comments at 4).[31]  As with Bracco, DuPont Merck has not discussed in its petition all of the indications for which DMP 115 is being developed.  DMP 115, like BR-1, is being developed for certain uses that by necessity invite the use of sophisticated gold standard comparators.

DuPont Merck is relying primarily on a set of minutes prepared by the firm from a November 1996 meeting with CDER.  It was at this meeting, according to the firm, that CDER rejected DuPont Merck's proposal to study DMP 115 against Albunex and *required* the firm to use a gold standard comparator "such as MRI" (DuPont Merck Pet. at 13).[32]  The minutes show, instead, that CDER requested clarification from DuPont Merck of the indications it was seeking to study and informed DuPont Merck that *if* the firm were seeking a cardiac function claim, *then* a reference standard other than Albunex would be required  (DMP 115 Presentation, April 8, 1997, at Tab 2).   Prior to this meeting, DuPont Merck and ImaRx indicated to CDER, in several different filings with the agency, that they intended to study DMP 115 for a number of sophisticated "function" indications, including several for which Albunex is not approved. Documents reviewed by the agency also show that the sponsors intended to study DMP 115

_____

[31]DuPont Merck believes the burden is on MBI to demonstrate that DMP 115 is being developed for different indications than MBI is seeking in the pending PMA (DuPont Merck Rebuttal Comments at 4).  DuPont Merck, however, controls this information and, as discussed, did not reveal in its petition, to interested persons such as MBI, that DMP 115 is being developed for certain more sophisticated uses. *See* Letter from Arnold & Porter to FDA dated July 18, 1997.

[32]Nowhere in the documentation submitted by DuPont Merck does it show that the agency suggested using MRI as a comparator in the study of DMP 115.

FDA000110

against several sophisticated gold standard comparators — the same types of comparators about which they now seem to be complaining.[33] The idea that DuPont Merck may be using sophisticated gold standard comparators in the study of DMP 115, and may have been advised accordingly, is consistent with the overall development plan form DMP 115 that was presented to the agency.[34]

It should also be noted that the documentation offered by DuPont Merck makes it especially clear that the agency was providing advice and guidance to the firm, and that the firm at all times retained primary control over its own product development program (*see generally* DMP 115 Presentation, April 8, 1997, at Tab 2 (minutes of November meeting prepared by DuPont Merck showing that FDA raised questions about certain aspects of the firm's

---

[33]DuPont Merck also claims to have been told by CDER at the November 1996 meeting to consider using "objective measures" of the clinical endpoint, rather than purely subjective measures (DuPont Merck April 8 Presentation, Slide 1 and Tab 2). DuPont Merck insists that this was another way in which the firm was "required" to use more sophisticated nuclear comparators, rather than Albunex. In fact, this advice does not relate to the selection of a comparator. It refers, instead, to the criteria that the investigator/reviewer will use when measuring or scoring images generated during the study. *I.e.*, the technical attributes of the image that the reviewer will focus on in order to make a determination as to whether the contrast enhanced image is superior to the unenhanced image (*see, e.g.,* the extensive discussion of "scoring" in CDER's October 1995 draft comments to ImaRx, under Tab 5 of DuPont Merck's April 8 Presentation). CDER was recommending that DuPont Merck work on developing such "objective" criteria, and not rely on the reviewer's overall subjective "impression" — as had been suggested in a protocol submission made by DuPont Merck just before the November meeting.

[34]In its rebuttal comments, DuPont Merck tries to reinforce its argument that CDER and CDRH have imposed materially different requirements by referring to a study of EchoGen in which MRI was used as a comparator. First, this appears to be an academic study. The document supplied by DuPont Merck does not show that FDA required the use of MRI in the study. In any case, the abstract submitted by DuPont Merck shows that the EchoGen study in which MRI was used involved assessment not just of "wall motion," but of systemic arterial pressure and *"ejection fraction."* See DuPont Merck Rebuttal Comments at 8, attachment 2). Again, assessment of ejection fraction is a categorically different indication than that for which Albunex is approved and invites comparison against more sophisticated comparators.

46

FDA000111

development program, and "indicated" certain concerns, but that DuPont Merck took the agency's comments "under consideration" and regarded the agency's questions and concerns as "input and guidance on the development of DMP 115").

Finally, as discussed above, MBI is using one of the "expensive" nuclear-based gold standard comparators in ongoing studies of FS069 for a myocardial perfusion indication. Thus, the idea that only CDER requires firms to use comparators other than Albunex is wrong.

### (2)    *Accuracy of cardiac function*

DuPont Merck claims that it was required to demonstrate the effectiveness of DMP 115 in assessing cardiac function using diagnostic tests in humans, while MBI was allowed to use a study performed in five dogs (DuPont Merck Pet. at 7). The "dog study" identified by DuPont Merck was a pre-clinical study performed with Albunex, not FS069. Indeed, there should be no question that MBI has studied FS069 on substantial numbers of human subjects for each of the indications sought in the PMA.

In support of its argument DuPont Merck provided the agency with a highlighted copy of the transcript of the February 24, 1997, advisory panel meeting (DMP 115 Presentation, April 8, 1997, Slide No. 6). The highlighted excerpt focuses on a study done during the development of Albunex, *not* FS069, to confirm whether an agent such as Albunex could in fact be useful in helping to locate the endocardial border. As the transcript shows, Mallinckrodt Medical sought to do a study in which stainless steel helices were implanted by catheterization into five dogs. The location of the helices was measured using Albunex enhanced ultrasound images, and then again on *postmortem* gross examination following dissection of each dog (Transcript at 198-99). The test obviously could not be done on human subjects and, as the FDA reviewer noted during

47

FDA000112

the advisory panel meeting, there was no need to repeat the test for FS069.

It is remarkable, given the obvious purpose of this study and the description in the transcript, that DuPont Merck would argue — both before the agency and in court in *Bracco Diagnostics* — that MBI used only a study on just five dogs to establish efficacy. Indeed, as if this portion of the transcript submitted by DuPont Merck were not clear enough, the balance of the transcript makes it perfectly clear that MBI studied FS069 for endocardial border delineation and regional wall motion in over 200 human subjects.

### (3)  *Number of clinical trials*

DuPont Merck claims it was required to conduct two studies "for both echocardiographic and structural image enhancement, as well as functional measurement assessments of DMP 115, for a total of four well-controlled trials." (DuPont Merck Pet. at 7). FS069, according to DuPont Merck, conducted only "[t]wo well-controlled clinical trials to demonstrate structure."

DuPont Merck has not shown that it was *required* to study its product for "functional measurement assessments." The documentation it supplied the agency certainly does not show this (*see* DuPont Merck" April 8, 1997, presentation). However, *if* DuPont Merck chose to study DMP 115 for myocardial perfusion or for assessment of ejection fraction, then it is reasonable to expect that the firm would need to conduct additional studies and would need to use in its studies reference standards other than (or in addition to) Albunex.

### (4)  *Statistical power*

Petitioners have argued that the statutory standard for approval of a medical device has been interpreted by FDA as requiring, in certain circumstances, only one pivotal trial. Here, however, MBI conducted two Phase 3 pivotal trials of FS069. DuPont Merck nevertheless

FDA000113

claims that MBI's two Phase 3 trials likely do not have the statistical power to stand on their own because the data from the two trials were pooled at the February 24, 1997, advisory panel.

Because the protocols for the two Phase 3 studies were identical, the data from the two studies were pooled for presentation purposes. They were also presented to the advisory committee as separate studies. In any event, whether each study is adequate and well-controlled is a review issue, not a product development issue. The statistical power (or lack thereof) of the studies MBI submitted in support of its PMA should have no bearing on DuPont Merck's design of its pivotal studies.

### (5)    *Multiple blinded image readings*

DuPont Merck states that CDER advised the firm to use "multiple blinded readers," while MBI does not appear to have used multiple blinding (DuPont Merck Pet. at 8).

With respect to efficacy, the focus of the FS069 pivotal studies was to demonstrate superiority to Albunex for the same uses. The core difference between Albunex and FS069 is that Albunex remains echogenic for 30 to 45 seconds, while FS069 remains echogenic in excess of 4 minutes. This is not a subtle distinction to discern, and the need for multiple blinded readers may well prove not to be crucial, when all of the data are reviewed.

### (6)    *Total number of subjects*

DuPont Merck complains that 500 patients will have been exposed to DMP 115, while only 300 will have been exposed to FS069, for purposes of establishing the safety of the agents (DuPont Merck Pet. at 8-9). As discussed above, in the response to Sonus, the agency does not require in advance that a specific number of patients be administered a test article. Moreover, the idea that DMP 115 will have been studied on more patients than FS069 is a function primarily of

49

FDA000114

the kind and quantity of the indications for which DuPont Merck is seeking to develop DMP 115, versus the indications that MBI is pursuing in the pending PMA, as well as each firm's own trial design.

It is also a function of each firm's own development program. Each is developing its product for different indications at different times, making it near impossible to evaluate DuPont Merck's assertion.

### (7)    *Safety monitoring*

DuPont Merck raises the same claim as Bracco regarding follow-up safety monitoring at 24, 48, and 72 hour intervals (DuPont Merck Pet. at 9). *See* response, *supra*, to Bracco.

### (8)    *Weight-based dosing*

DuPont Merck claims it was required to use weight-based dosing in the study of DMP 115, while MBI was not required to do so in Phase 3 trials of FS069 (DuPont Merck Pet. at 9). Again, the documentation submitted by DuPont Merck shows only that the agency suggested doing a subset analysis of weight-based dosing for efficacy, and that DuPont Merck "would take this under consideration" (DuPont Merck April 8 Presentation, Tab 2).

In any event, existing knowledge about the dosing of Albunex helped to establish early on that weight-based dosing was not an issue for FS069. MBI used weight-based dosing in the study of Albunex in order to arrive at a safe and effective dosage level. (The dose of a contrast agent must be large enough to fill the heart with bubbles, but not so large as to cause adverse events.) Early in the development of FS069, it became apparent that FS069 showed efficacy in improving border delineation at doses that were orders of magnitude lower than Albunex. Because FS069 could be dosed at levels far below the safety threshold established by Albunex,

50

FDA000115

the agency did not focus on the need to study weight-based dosing of FS069.

There was, however, much less familiarity with DMP 115 (particularly the manner in which the active gas is contained as a bubble) and, therefore, it was not unreasonable for the agency to suggest that additional data be gathered on appropriate dosing of DMP 115.

Finally, as with several other differences cited by DuPont Merck, it is not apparent from the petition that gathering data on weight-based dosing imposed materially higher costs on the development of DMP 115, or materially slowed the study of the product.  Even DuPont Merck concedes that some differences in clinical development should be expected and do not give rise to claims of "disparate" treatment (*see* DuPont Merck Rebuttal Comments at 5).

*          *          *

In short, none of the petitioners has shown that as a result of its product being regulated as a drug, and FS069 undergoing review as a device, the clinical development program for the products were markedly different.  It is true that one could expect, based on the different statutory schemes governing drugs and devices, that drug and device product development would be different. In this case, however, the "differences" cited by petitioners tend instead to show that the products have been developed using quite similar investigatory approaches (especially if one corrects for the different indications that several of the petitioners appear to be pursuing, versus the indications sought by MBI in the pending application).  Finally, several of the differences cited by petitioners Bracco and DuPont Merck are premised on incomplete or incorrect descriptions of the underlying factual record.

## V.    MBI'S PRODUCTS MAY BE REGULATED AS DRUGS

In comments filed to the ultrasound docket, and in papers filed in the *Bracco Diagnostic*

51

FDA000116

litigation, MBI argues that the Act directs the agency to regulate FS069 and Albunex as devices. The agency disagrees.  Although FDA has regulated Albunex as a device, and has allowed FS069 to proceed through the device review process, the agency has ample discretion to regulate these ultrasound contrast agents as "drugs."

### A.    The Drug and Device Categories Are Not Mutually Exclusive

MBI argues that if Albunex and FS069 meet the statutory definition of a device,[35] then the agency has no discretion: it must regulate those products as devices (MBI Comments, May 8, 1997,  at 7-8 n. 3).  MBI's assertion that the "drug" and "device" categories are in all instances "mutually exclusive" is simply not true.

The district court in *Bracco Diagnostics* has already rejected this argument twice. *See* Opinion and Order dated April 21, 1997, at 14 (finding that the products at issue likely meet both the definition of a drug and the definition of a device and, as such, FDA has discretion in determining how to regulate them); Order dated May 29, 1997 (rejecting defendant MBI's motion for reconsideration, in which MBI extensively briefed the issue of whether the terms

---

[35]Only one petitioner offered a direct argument as to why FS069 might not meet the definition of a device.  Focusing on the introductory language in section 201(h) of the Act, Sonus asserted in a footnote that "[c]ontrast media are not instruments, apparatuses, implements, machines, contrivances, implants or reagents, nor are they similar or related to any of those things," and "[t]hey therefore appear to fall outside the device classification" (Sonus Pet. at 3 n.4.)  In *Bracco Diagnostics*, Sonus elaborated slightly, referring to a 1982 FDA Federal Register notice reclassifying a product (artificial tears) from "device" to "drug" because the product did not appear to fall within the categories listed in the introduction to section 201(h) (Sonus Opp. to MBI's Motion for Reconsideration, May 5, 1997, at 3-4, citing 47 Fed. Reg. 46139 (1982)).  The term "device" it should be noted also includes an "accessory" to an instrument, apparatus, implement, *etc.*, and ultrasound contrast agents, unlike the stand-alone product noted by Sonus, is used as an accessory to various diagnostic equipment. *See also* Intercenter Agreement Between CDER and CDRH (Oct. 31, 1991) section VII.C (showing that dyes, fluids, and gases, among other things, may be regulated as devices).

52

FDA000117

"drug" and "device" are mutually exclusive).  Moreover, the United States District Court for the Middle District of North Carolina recently rejected this argument in *Coyne Beahm, Inc., et al. v. FDA, et al.*, 958 F. Supp. 1060, 1081 and n.18 (M.D.N.C. 1997) (*Appeal pending*) (finding that reports accompanying the Medical Device Amendments of 1976 "suggest that Congress amended the definition [of the term device] to draw a clearer line between the 'drug' and 'device' definitions," but that these reports do not show that Congress intended to limit FDA's discretion to choose regulatory authorities).

Prior to 1990, section 201(g) of the Act stated that a drug "does not include devices or their components, parts, or accessories."  This language suggested an absolute distinction between drugs and devices.  However, as part of the Safe Medical Devices Amendments of 1990 ("SMDA") (Pub. L. 101-629), Congress deleted this language from the definition of the term "drug."  The intent of the modification, as MBI argued in *Bracco Diagnostics* (*see* MBI Reply Mem. in Support of Motion for Reconsideration, dated May 12, 1997, at 5), may well have been to accommodate the regulation of combination products that consist of drug components and device components (*see* S. Rept. 101-513, 101st Cong. 2d Sess., at 30 (1990)).  The effect, however, was to eliminate the notion that the terms "drug" and "device" are mutually exclusive. *See* 61 FR 44396, 44400 (Aug. 28, 1996) (FDA final rule on the regulation of cigarettes and smokeless tobacco); Memorandum of DuPont Merck in Response to MBI's Motion for Reconsideration dated May 5, 1997, at 5-6 filed in *Bracco Diagnostics.*

Nor is it the case, as MBI insists, that there is an absolute distinction between "drugs" and "devices" that is based on whether the primary intended purpose of the product is "physical" (*i.e.*, a device) or chemical or metabolic (*i.e.*, a drug).  While Congress has excluded from the

53

FDA000118

definition of the term "device" articles that rely on chemical action or on being metabolized, there is no counterpart provision in the definition of the term "drug." As a result, the agency regulates a number of products as drugs that rely on "physical" mechanisms to achieve their primary intended effects. *See, e.g*, Intercenter Agreement Between CDER and CDRH at section VII.D.

Finally, a product such as FS069, which consists of injectable, flexible, systemically distributed microspheres, each comparable to the size of a red blood cell, is well suited for regulation under either the drug provisions or the device provisions of the Act. That is, the product at issue is not one for which the operational provisions of the Act governing devices are uniquely or exclusively suited (*see* MBI Reply Mem. in Support of Motion for Reconsideration, dated May 12, 1997). The agency thus has substantial discretion in this instance to choose whether to regulate FS069 as a "drug" or as a "device."

**B.      Section 503(g)(1) Does Not Direct the Outcome of this Proceeding**

MBI argues that FS069 (and Albunex) are combination "device/biological" products whose "primary mode of action" is that of a device.[36] As such, MBI insists that regulation of FS069 is governed by section 503(g)(1) of the Act (21 USC 353(g)(1)). Section 503(g), according to MBI, leaves the agency with no discretion but to assign regulation of FS069 to CDRH and to regulate FS069 under the device provisions of the Act. The agency disagrees.

---

[36]According to MBI, the albumin used in the manufacturing of FS069 is a licensed biological product, and the perfluoropropane gas that fills the microsphere is an approved device. (*See, e.g.*, MBI's May 19, 1995, letter to FDA). That approved device product (ISPAN perfluoropropane ($C_3F_8$) gas), however, is intended for an entirely different use than the gas that is contained within FS069. ISPAN is intended for use as a surgical aid in treatment of retinal detachment by phematic retinopexy. 58 FR 19463 (April 14, 1993). It is administered in the form of a local intravitreal injection, in the chamber behind the lens of the eye, for selected retinal breaks and to aid in the resorption of subretinal fluid.

FDA000119

A combination product combines a drug and a device, a drug and a biological product, or a device and a biological product (21 USC 353(g)(1); *see* 21 CFR 3.2(e)). Examples of combination products, as listed in the legislative history supporting section 503(g), include "devices impregnated with biologically-active materials, medicated devices, implantable drug pumps, and biological sensors."[37]  In these examples, each article within the product contributes a distinct function *(e.g.*, a device function and a drug function, or a device function and a biological function), with one component providing the product's "primary mode of action." Indeed, as Congress stated in enacting section 503(g), the combination product provision is intended to provide "firm ground rules to direct products promptly to that part of the FDA responsible for reviewing *the article that provides the primary mode of action* of the combination product." S. Rep. No. 513, 101st Cong., 2d Sess., 30 (1990) (emphasis added).

In this instance, the components that make up FS069 are intended to provide the same effect. The efficacy of FS069 is a function of the diameter, sphericity, flexibility, and compressibility of each microsphere, with the resonance of ultrasound energy occurring as a result of the interaction between the outer shell and the encapsulated gas *(see* Ad. Comm. Tr. at 154-55; MBI Comments, May 8, 1997, at 4). In resonating, the spheres compress and expand as a unit in response to ultrasound energy. Neither the shell nor the gas itself is responsible for the product's intended effect. The gas in FS069 supports the outer shell, while the shell helps to contain the gas. Unlike, for example, a preloaded syringe or an implantable drug pump, in which one component is contributing a definable delivery function and the other a definable drug effect,

---

[37]Examples of other types of combination products with a biological component include: an artificial hip swabbed with a biological growth factor, allergen patches, and pre-filled immunoglobulin syringes.

FDA000120

the components in FS069 do not contribute separately definable effects for purposes of applying section 503(g) of the Act.

The agency also disagrees with MBI's argument that section 503(g) limits the agency's discretion as to the statutory provisions under which a combination product may be regulated. Section 503(g) directs FDA only as to the agency component that will have regulatory responsibility for a combination product. Section 503(g) does not control which set or sets of statutory authorities the agency must apply in reviewing the safety and effectiveness of such a product.[38] *See Coyne Beam, Inc., et al. v. FDA, et al.*, 958 F. Supp. 1060 (M.D.N.C. 1997) (*appeal pending*) (deferring to FDA's interpretation of section 503(g)).

In sum, section 503(g) does not determine the outcome of this proceeding. Even if section 503(g) were applicable, MBI has not demonstrated that FS069 must be regulated in CDRH as a device.

## VI.    FDA'S BASIS FOR PROSPECTIVELY REGULATING ULTRASOUND CONTRAST AGENTS AS DRUGS

The Act defines the term "drug" as:

> (A) articles recognized in the official United States Pharmacopeia, official Homeopathic Pharmacopeia of the United States, or official National Formulary,

---

[38]*See* H.R. Rep. No.101-959, at 29 (1990) (Conference Report), *reprinted in* 1990 U.S.C.C.A.N. 6327, 6334 (the combination product provision "describe[s] the general procedures for determining the appropriate *component of the FDA* to review" a combination product) (emphasis added); *see also* 61 Fed. Reg. 44400-03. An earlier version of the Safe Medical Devices Act arguably would *not* have allowed FDA discretion with respect to which statutory authorities to apply. *See* 136 Cong. Rec. S. 12493, 101st Cong., 2d Sess., Aug. 4, 1990 (proposing, in S. 3006, that if the primary mode of action of a combination product is that of a drug "neither the combination article nor any part of the article shall be treated as a device or as a biological product for market clearance purposes"). However, Congress chose *not* to enact that limitation. *See also* Memorandum of Law filed by DuPont Merck and ImaRx in opposition to MBI's motion for reconsideration, dated May 5, 1997, in *Bracco Diagnostics* at 8-9, describing the limited purpose of section 503(g).

FDA000121

> or any supplement to any of them; and (B) *articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals;* and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C).

21 USC 321 (g)(1) (emphasis added). All of the microbubble and microsphere ultrasound contrast agents at issue in this proceeding are "articles" that, at a minimum, are "intended for use in the diagnosis . . . of disease." 21 USC 321(g)(1)(B). All, therefore, fit within the definition of a "drug" and, as such, may be regulated as drugs by CDER. *See generally United States v. An Article of Drug . . . Bacto-Unidisk,* 394 U.S. 784 (1969).

The same cannot be said when these products are held up to the definition of a "device" in section 201(h) of the Act. As discussed above, Congress excluded from the definition of a "device" those articles that rely on chemical action within or on the body, or that rely on being metabolized, to achieve their principal intended purposes. Also, as discussed in section II.A, *supra*, ultrasound contrast agents are being developed for a number of uses that require biochemical action inside the body as a necessary step to the product achieving its primary intended purpose. Such uses — which are made possible by the longer duration of products such as FS069 and EchoGen — may exclude these products from being regulated as devices.[39]

All of the products in this class meet the definition of a "drug." For most uses, all are distributed systemically, a characteristic far more endemic to drug products than to devices. These products also raise many of the same safety and effectiveness considerations (although that

---

[39]*See, e.g.,* FDA petition response dated November 27, 1995 (Docket No. 92P-0206/CP1) finding that radiopharmaceuticals used in positron emission tomography (PET) cannot be regulated as devices because PET radioisotopes depend upon biochemical processes (phosphorylation of a glucose ligand attached to the isotope) to position the radioisotope in the body in areas of high glucose uptake.

FDA000122

did not always appear to be the case). Moreover, as petitioners have noted, CDER has traditionally regulated other radiologic contrast agents and has developed substantial expertise in evaluating the safety and effectiveness of such products. Finally, a number of products within this class, because of their extended duration, are being developed for uses that may preclude them from being regulated as devices.

With these factors in mind, the agency has decided that it is appropriate to begin regulating these products — as a class — as drug products in CDER. Concentrating the review of these products in one agency Center, under one statutory scheme, will promote administrative efficiency, make better use of agency resources, and minimize the burden on industry and practitioners that a dual regulatory scheme may impose.

## VII.    IMPLEMENTATION OF THE DECISION TO REGULATE ULTRASOUND CONTRAST AGENTS AS DRUGS

A number of times in the past the agency has administratively moved products from one regulatory category to another. *See, e.g.,* 47 FR 46139 (Oct. 15, 1982) (redesignation of liquid tear ophthalmic product from device to drug); 51 FR 37976 (Oct. 27, 1986) (determination that human Thrombin product would be "more appropriately and efficiently" regulated as a device rather than as a biological). In some instances, the agency has moved products from one category to another *(e.g.,* from biologics to drugs) in order to bring regulatory uniformity to a class of products which, for historical reasons, was subject to regulation by more than one agency component. *See, e.g.,* 40 FR 31311 (July 25, 1975) (reassignment of radioactive biological products "to provide uniformity in processing and a focal point for action within FDA for this category of products"). In other instances, the transfer of certain products from one category to another was based on the recognition that clinical use of the  product had changed.

58

FDA000123

*See, e.g.,* 55 FR 5892 (Feb. 20, 1990) (notice stating that FDA would begin regulating *in vitro* diagnostic test kits for use in detecting total antibody to hepatitis B core antigen as licensed biologicals, rather than as devices for which PMAs had been required, "because the major use of these products has changed from clinical diagnostic use to that of screening licensed blood and blood products intended for transfusion"). In each case the agency has worked to ensure that the transition from one jurisdictional category to another would take place with minimal disruption to the marketplace and minimal prejudice to the firms subject to the move. Consistent with prior product redesignations, the agency intends to implement the decision to regulate all injectable microbubble and microsphere ultrasound contrast agents as drugs as follows.

A.   FS069

The agency has determined that primary review authority for the pending PMA for FS069 will be transferred to CDER, and that the PMA will immediately be deemed a submitted and filed NDA under section 505(b) of the Act. *Compare* 21 USC 355(b)(1) (setting forth required contents of an NDA) with 21 USC 360e(c)(1) (setting forth similar requirements for the contents of a PMA). The submission date of the NDA for FS069, for purposes of setting a PDUFA "goal date" within CDER for completion of the review (*see* footnote 24, *supra*), will be October 17, 1996, the date on which FDA received the PMA for FS069.[40]

CDER will review the application under the statutory and regulatory standards applicable to new drug products, *see* 21 USC 505(d) and 21 CFR 314.125(d). CDER will not, however, repeat the review of those portions of the PMA on which CDER officials have already completed

---

[40]The filing date of the application, for purposes of beginning the 180 day review period described in section 505(c) of the Act, would be 60 days after the submission date, or December 17, 1996. 21 CFR 314.101(a)(2).

FDA000124

substantial work. Moreover, CDER will be able to rely, as appropriate, on the extensive analyses already done by CDRH, the comments and recommendations of the February 24, 1997, advisory panel, and any conclusions already reached by CDRH officials regarding the data and information in the PMA.

In order to meet the statutory requirements for the marketing of a new drug, MBI will be expected to amend its NDA with appropriate patent information (*see* 21 USC 355(b)(1) and 21 CFR 314.125(b)(18)), proposed drug labeling, and any other information needed to support the approval of an NDA. In addition, because FS069 will be undergoing review as a new drug under an application that will be deemed to have been submitted as an NDA, the terms of section 735 *et. seq.* of the Act (21 USC 379g *et seq.*) governing payment of "user fees" will apply to the review, subject to any exceptions or waivers that may be applicable.

In comments submitted to the ultrasound docket, MBI requested that if FS069 were categorized as a drug, (1) CDRH should continue to have primary responsibility for the product; (2) FS069 should be approved for echocardiography based on the data in the PMA; (3) post-approval requirements applicable to new drugs, such as compliance with drug good manufacturing practice ("GMP") regulations, should be phased in over a one-year period; and (4) MBI's perfluoropropane supplier should be given one year within which to bring itself into compliance with drug GMP regulations (MBI Comments, June 9, 1997).

For the reasons discussed above, the agency has determined that it will regulate FS069 as a drug in CDER. The agency expects, however, that the redesignation of FS069 can be accomplished without a significant interruption in the pre-market review process. This is based on two important aspects of the FS069 PMA. First, the PMA contains sufficient data and

60

information for CDER to accept it for filing as an NDA. Second, CDER staff have consulted closely on, and in some instances have already reviewed, significant portions of the FS069 PMA. To minimize the burden on MBI, CDER will review FS069 based on the data and information in the already-filed PMA, and build on the review that has been completed in CDRH (as well as the review work completed by CDER officials). With respect to MBI's concerns regarding drug GMP requirements, given the decision to require approval of FS069 as a new drug, it would be inappropriate to allow the product to be marketed if it did not comply with drug GMP requirements by the time of final marketing approval. MBI's other product, Albunex, has been found to meet drug GMP requirements. Moreover, because perfluoropropane has been approved for intraocular use, it is likely that MBI will be able to locate a gas supplier for FS069 capable of meeting GMP requirements.

Finally, with respect to any and all IDEs that may have been filed in CDRH for the study of FS069, those IDEs will be transferred to CDER and assigned IND numbers. It is expected that ongoing studies will continue without interruption. However, CDER officials will meet promptly with the sponsor(s) of such IDEs to discuss the status of ongoing studies and to determine whether additional information must be submitted to bring the IDEs into conformity with IND requirements.

### B.    Albunex

Albunex is an approved and marketed product. Moreover, because of its limited biological half-life, Albunex has not and is not likely to be developed for several of the uses discussed in sections II.A and VI., *supra*. It would be contrary to the public health if the agency's efforts to bring regulatory uniformity to this class of products resulted in safe and effective

FDA000126

products, such as Albunex, being withdrawn from the market. For these reasons, the agency has determined that Albunex, and the approved supplement for Albunex, will continue to be marketed under the existing PMA.

However, to help achieve the agency's goal of regulatory consistency for this class of products, the PMA for Albunex, as well as all pending and approved supplements and IDEs, will be transferred to CDER. As with FS069, the IDEs will be assigned IND numbers, with the expectation that the studies will continue without interruption. The PMA for Albunex, and the recently approved supplement, will be transferred to CDER, which will work with the sponsor to convert the approved device applications to approved "new drug" applications in a timely fashion. Marketing of Albunex, however, will continue under the existing applications and under device standards until the applications have been converted. Payment of a "user fee" will is not required in order to accomplish the transfer of Albunex. Any new applications for new uses of Albunex will be submitted and reviewed under the new drug review standards.

C.    All Other Products and Future Applications

Finally, all future investigational applications and applications for premarket approval of microbubble and microsphere-based ultrasound contrast agents must be filed in CDER pursuant to section 505 of the Act. Pending IDEs will be transferred to CDER and will be assigned IND numbers, with the expectation that there will be no interruption in ongoing studies.

FDA000127

## VIII.  CONCLUSION

For the foregoing reasons, the agency is granting the petitions filed by Bracco, Sonus, and DuPont Merck, to the extent that each requests that microbubble and microsphere ultrasound contrast agents should be regulated under the same statutory standards.  The agency is also granting the Bracco and Sonus petitions to the extent that each requests that the agency regulate these products as "drugs" and "new drugs."  The agency, however, is denying the Bracco, Sonus, and DuPont Merck petitions to the extent that each argues that the agency was "arbitrary and capricious" in determining in the past that certain products within this class should be regulated as devices while others should be regulated as drugs.  Finally, the agency has outlined a reasonable and appropriate plan for implementing its decision.

Michael Friedman, M.D.
Deputy Commissioner
for Operations

Dated:

JUL 25 1997

63

FDA000128

Attachment D1

NDC 69307-1024-2
SILQ™
BARIUM SULFATE SUSPENSION
(2.1% w/v)

**DESCRIPTION: SILQ™** is a barium sulfate suspension 2.1% w/v, 2.0% w/w for oral administration. Each 100 mL contains 2.1 g barium sulfate. Barium sulfate, due to its high molecular density is opaque to x-rays and therefore, acts as a positive contrast agent for radiographic studies. The active ingredient is barium sulfate and its structural formula is $BaSO_4$. Barium sulfate occurs as a fine, white, odorless, tasteless, bulky powder which is free from grittiness. Its aqueous suspensions are neutral to litmus. It is practically insoluble in water solutions of acids and alkalies, and organic solvents.

**Inactive Ingredients:** citric acid, natural and artificial flavors, benzoic acid, suspending agent, potassium sorbate, purified water, sodium saccharin, sodium citrate, simethicone, sodium benzoate, sorbitol

**CLINICAL PHARMACOLOGY:** Barium sulfate, due to its high molecular density is opaque to x-rays and, therefore, acts as a positive contrast agent for radiographic studies. Barium sulfate is biologically inert and, therefore, is not absorbed or metabolized by the body, and is eliminated from the GI tract unchanged. Excretion rate is a function of gastrointestinal transit time.

**INDICATIONS AND USAGE:** For use as a contrast agent in radiographic studies.

**CONTRAINDICATIONS:** This product should not be used in patients with known or suspected gastric or intestinal perforation, or hypersensitivity to barium sulfate or any component of this barium sulfate formulation; in patients with known or suspected obstruction of the colon; suspected tracheoesophageal fistula; obstructing lesions of the small intestine; pyloric stenosis; inflammation or neoplastic lesions of the rectum; or in patients who have had a recent rectal biopsy.
Barium sulfate suspensions should not be used for infants with swallowing disorders or for newborns with complete duodenal or jejunal obstruction or when distal small bowel or colon obstruction is suspected. Barium sulfate suspension is not recommended for very small preterm infants and young babies requiring small volumes of contrast media or for infants and young children when there is a possibility of leakage from the gastrointestinal tract, such as nectrotizing enterocolitis, unexplained pneumoperitoneum, gasless abdomen, other bowel perforation, esophageal perforation or post operative anastomosis.

**WARNINGS:** Serious adverse reactions, including death, have been reported with the administration of barium sulfate formulations and are usually associated with the technique of administration, the underlying pathological condition and/or patient hypersensitivities.

**PRECAUTIONS: General:** Procedures which involve the use of radiopaque contrast agents should be carried out under the direction of personnel with the requisite training and with a thorough knowledge of the particular procedure to be performed. A history of bronchial asthma, atopy, as evidenced by hay fever and eczema, or a previous reaction to a contrast agent, warrant special attention. Caution should be exercised with the use of radiopaque media in severely debilitated patients and in those with marked hypertension or advanced cardiac disease. Ingestion of barium is not recommended in patients with a history of food aspiration or in patients in whom the integrity of the swallowing mechanism is unknown. If barium is aspirated into the larynx, further administration should be immediately discontinued. After any barium study of the GI tract, it may be important to rehydrate the patient as quickly as possible to prevent impaction of the barium. To prevent barium impaction in the colon, the use of mild laxatives such as milk of magnesia or lactulose following completion of the examination may also be required. These mild laxatives are recommended on a routine basis and in patients with a history of constipation unless clinically contraindicated.

**Hypersensitivity Reactions:** Barium sulfate preparations contain a number of excipients, including natural and artificial flavors and may induce serious hypersensitivity reactions. The manifestations include hypotension, bronchospasm, and other respiratory impairments, dermal reactions including rashes, urticarial, and itching. A history of bronchial asthma, atopy, or a previous reaction to a contrast agent may increase the risk for hypersensitivity reactions. Emergency equipment and trained personnel should be immediately available for treatment of a hypersensitivity reaction.

**Intra-abdominal Barium Leakage:** The use of Vanilla SilQ products is contraindicated in patients at high risk of perforation of the GI tract. Administration of Vanilla SilQ products may result in leakage of barium for the GI tract in the presence of conditions such as carcinomas, GI fistula, inflammatory bowel disease, gastric or duodenal ulcer, appendicitis, or diverticulitis, and in patients with a sever stenosis at any level of the GI tract, especially if it is distal to the stomach. The barium leakage has been associated with peritonitis and granuloma formation.

**Delayed Gastrointestinal Transit and Obstruction:** Orally administered barium sulfate may accumulate proximal to a constricting lesion of the colon, causing obstruction or impaction with development of baroliths (inspissated barium associated with feces) and may lead to abdominal pain, appendicitis, bowel obstruction, or rarely perforation. Patients with the following conditions are at higher risk for developing obstruction or baroliths: severe stenosis at any level of the GI tract, impaired GI motility, electrolyte imbalance, dehydration, on a low residue diet, taking medications that delay GI motility, and constipation, pediatric patients with cystic fibrosis or Hirschsprung disease, and the elderly. To reduce the risk of delayed GI transit and obstruction, patients should maintain adequate hydration following a barium sulfate procedure.

**Aspiration Pneumonitis:** The use of Vanilla SilQ products is contraindicated in patients at high risk of aspiration. Oral administration of barium is associated with aspiration pneumonitis, especially in patients with a history of food aspiration or with compromised swallowing mechanism. Vomiting following oral administration of barium sulfate may lead to aspiration pneumonitis. In patients at risk for aspiration, begin the procedure with a small ingested volume of Vanilla SilQ products. Discontinue administration of Vanilla SilQ products immediately if aspiration is suspected.

**Systemic Embolization:** Barium sulfate products may occasionally intravasate into the venous drainage of the large bowel and enter the circulation as a "barium embolus" leading to the potentially fatal complications which include systemic and pulmonary embolism, disseminated intravascular coagulation, septicemia and prolonged severe hypotension. Although this complication is exceedingly uncommon after oral administration of barium sulfate suspension, monitor patients for potential intravasation when administering barium sulfate.

**Risk with Hereditary Fructose Intolerance:** Vanilla SilQ contains sorbitol which may cause sever reactions if ingested by patients with hereditary fructose intolerance such as vomiting, hypoglycemia, jaundice, hemorrhage, hepatomegaly, hyperuricemia, and kidney failure. Before administration of Vanilla SilQ assess patients for a history of hereditary fructose intolerance and avoid use in these patients.

**Information for Patients:** Before using this product patients should be instructed to tell the physician ordering the procedure and the imaging technologist:
1. If they are pregnant.
2. If they are allergic to any foods or medication, or if they have had any prior reactions to barium sulfate products or other x-ray contrast agents.
3. If they are currently taking any medications, have any serious medical condition for which they are being treated or followed, or had any recent surgery.
4. Seek immediate medical attention if they experience an allergic or other adverse reaction during or after use of this product.

**Drug Interactions:** The presence of barium sulfate formulations in the GI tract may alter the absorption of therapeutic agents taken concomitantly. In order to minimize any potential change in absorption, the separate administration of barium sulfate from that of other agents should be considered.

**Usage in Pregnancy:** Radiation is known to cause harm to the unborn fetus exposed *in utero*. Therefore, radiographic procedures should only be used when, in the judgment of the physician, its use is deemed essential to the welfare of the pregnant patient.

**ADVERSE REACTIONS:** Adverse reactions accompanying the use of barium sulfate formulations are infrequent and usually mild, though severe reactions (approximately 1 in 500,000) and fatalities (approximately 1 in 2,000,000) have occurred. Procedural complications are rare, but may include aspiration pneumonitis, barium sulfate impaction, granuloma formation, intravasation, embolization and peritonitis following intestinal perforation, vasovagal and syncopal episodes, and fatalities. EKG changes have been shown to occur following or during barium sulfate suspension enemas. It is of the utmost importance to be completely prepared to treat any such occurrence.

Due to the increased likelihood of allergic reactions in atopic patients, a complete history of known and suspected allergies as well as allergic-like symptoms, e.g. rhinitis, bronchial asthma, eczema and urticaria, must be obtained prior to any medical procedure.

Aspiration of large amounts of barium sulfate suspension may cause pneumonitis or nodular granulomas of interstitial lung tissues and lymph nodes; asphyxiation and death have been reported.

Transient bacteremia, beginning almost immediately and lasting up to 15 minutes, may also occur during rectal administration of barium sulfate suspension, and rarely septicemia has been reported.

A rare mild allergic reaction would most likely be generalized pruritis, erythema or urticaria (approximately 1 in 100,000 reactions). Such reactions will often respond to an antihistamine. More serious reactions (approximately 1 in 500,000) may result in laryngeal edema, bronchospasm or hypotension.

Severe reactions which may require emergency measures are often characterized by peripheral vasodilation, hypotension, reflex tachycardia, dyspnea, bronchospasm, agitation, confusion and cyanosis, progressing to unconsciousness. Treatment should be initiated immediately according to established standard of care.

Apprehensive patients may develop weakness, pallor, tinnitus, diaphoresis and bradycardia following the administration of any diagnostic agent. Such reactions are usually non-allergic in nature.

Allergic reactions to the enema accessories, in particular to retention catheters (tips) with latex cuffs, can occur. Such reactions could occur immediately and result in the previously mentioned acute allergic-like responses or might be delayed in appearance and result in a contact dermatitis. Known atopic patients, particularly those with a history of asthma or eczema, should be evaluated for alternative methods of administration in order to avoid these adverse reactions. These plastic/rubber accessories are disposable, single-use devices that must not be reused or left in the body cavity for an extended period of time.

**OVERDOSAGE:** On rare occasions following repeated administration, severe stomach cramps, nausea, vomiting, diarrhea or constipation may occur. These are transitory in nature and are not considered serious. Symptoms may be treated according to currently accepted standards of medical care.

**DOSAGE AND ADMINISTRATION:** Barium sulfate volume and method of administration are determined by individual technique, and may vary with differing patient and procedure characteristics.

**STORAGE:** Store product to protect from freezing and excessive heat (above 40°C).

℞ only (USA)          SHAKE WELL PRIOR TO USE

**Genus Medical Technologies, LLC**
**Chesterfield, MO  63005**
**Tel.  314 899 2930**

FDA000130

NDC 69307-4096-2
**VANILLA SILQ MD™**
BARIUM SULFATE FOR SUSPENSION
(96% w/w)

**DESCRIPTION: VANILLA SILQ MD™** is a barium sulfate for suspension 96% w/w for oral administration. Each 100 g contains 96 g barium sulfate. Barium sulfate, due to its high molecular density is opaque to x-rays and therefore, acts as a positive contrast agent for radiographic studies. The active ingredient is barium sulfate and its structural formula is BaSO₄. Barium sulfate occurs as a fine, white, odorless, tasteless, bulky powder which is free from grittiness. Its aqueous suspensions are neutral to litmus. It is practically insoluble in water, solutions of acids and alkalies, and organic solvents.

**Inactive Ingredients:** simethicone, sorbitol, saccharin sodium, natural and artificial vanilla flavor, emulsifiers, and thickening agents.

**CLINICAL PHARMACOLOGY:** Barium sulfate, due to its high molecular density is opaque to x-rays and, therefore, acts as a positive contrast agent for radiographic studies. Barium sulfate is biologically inert and, therefore, is not absorbed or metabolized by the body, and is eliminated from the GI tract unchanged. Excretion rate is a function of gastrointestinal transit time.

**INDICATIONS AND USAGE:** For use as a contrast agent in radiographic studies.

**CONTRAINDICATIONS:** This product should not be used in patients with known or suspected gastric or intestinal perforation, patients with conditions that may increase the risk of perforation; hypersensitivity to barium sulfate products; suspected tracheoesophageal fistula; obstructing lesions of the small intestine; pyloric stenosis; inflammation or neoplastic lesions of the rectum; or in patients who have had a recent rectal biopsy.

Barium sulfate suspensions should not be used for infants with swallowing disorders or for newborns with complete duodenal or jejunal obstruction or when distal small bowel or colon obstruction is suspected. Barium sulfate suspension is not recommended for very small preterm infants and young babies requiring small volumes of contrast media or for infants and young children when there is a possibility of leakage from the gastrointestinal tract, such as necrotizing enterocolitis, unexplained pneumoperitoneum, gasless abdomen, other bowel perforation, esophageal perforation or post operative anastomosis.

**WARNINGS:** Serious adverse reactions, including death, have been reported with the administration of barium sulfate formulations and are usually associated with the technique of administration, the underlying pathological condition and/or patient hypersensitivities.

**PRECAUTIONS:  General:** Procedures which involve the use of radiopaque contrast agents should be carried out under the direction of personnel with the requisite training and with a thorough knowledge of the particular procedure to be performed. A history of bronchial asthma, atopy, as evidenced by hay fever and eczema, or a previous reaction to a contrast agent, warrant special attention. Caution should be exercised with the use of radiopaque media in severely debilitated patients and in those with marked hypertension or advanced cardiac disease. Ingestion of barium is not recommended in patients with a history of food aspiration. Use caution if administering this product to patients in whom the integrity of the swallowing mechanism is unknown. If barium is aspirated into the larynx, further administration should be immediately discontinued. After any barium study of the GI tract, it may be important to rehydrate the patient as quickly as possible to prevent impaction of the barium. To prevent barium impaction in the colon, the use of mild laxatives such as milk of magnesia or lactulose following completion of the examination may also be required. These mild laxatives are recommended on a routine basis and in patients with a history of constipation unless clinically contraindicated.

**Administration:** Give careful consideration to the risks and benefits of the administration of a barium sulfate suspension to patients with possible gastrointestinal blockage. Take care to minimize the amount of barium allowed to flow proximal to the tissue affected with blockage or lesion. When administering this product with an enema tip, use caution to avoid insertion in a manner that is too forceful or deep, as this may cause tearing or perforation of the colorectal tissues.

**Hypersensitivity Reactions:** Barium sulfate preparations contain a number of excipients, including natural and artificial flavors and may induce serious hypersensitivity reactions. The manifestations include hypotension, bronchospasm, and other respiratory impairments, dermal reactions including rashes, urticarial, and itching. A history of bronchial asthma, atopy, or a previous reaction to a contrast agent may increase the risk for hypersensitivity reactions. Emergency equipment and trained personnel should be immediately available for treatment of a hypersensitivity reaction.

**Intra-abdominal Barium Leakage:** The use of Vanilla SilQ products is contraindicated in patients at high risk of perforation of the GI tract. Administration of Vanilla SilQ products may result in leakage of barium for the GI tract in the presence of conditions such as carcinomas, GI fistula, inflammatory bowel disease, gastric or duodenal ulcer, appendicitis, or diverticulitis, and in patients with a sever stenosis at any level of the GI tract, especially if it is distal to the stomach. The barium leakage has been associated with peritonitis and granuloma formation.

**Delayed Gastrointestinal Transit and Obstruction:** Orally administered barium sulfate may accumulate proximal to a constricting lesion of the colon, causing obstruction or impaction with development of baroliths (inspissated barium associated with feces) and may lead to abdominal pain, appendicitis, bowel obstruction, or rarely perforation. Patients with the following conditions are at higher risk for developing obstruction or baroliths:  severe stenosis at any level of the GI tract, impaired GI motility, electrolyte imbalance, dehydration, on a low residue diet, taking medications that delay GI motility, and constipation, pediatric patients with cystic fibrosis or Hirschsprung disease, and the elderly. To reduce the risk of delayed GI transit and obstruction, patients should maintain adequate hydration following a barium sulfate procedure.

**Aspiration Pneumonitis:** The use of Vanilla SilQ products is contraindicated in patients at high risk of aspiration. Oral administration of barium is associated with aspiration pneumonitis, especially in patients with a history of food aspiration or with compromised swallowing mechanism. Vomiting following oral administration of barium sulfate may lead to aspiration pneumonitis. In patients at risk for aspiration, begin the procedure with a small ingested volume of Vanilla SilQ products. Discontinue administration of Vanilla SilQ products immediately if aspiration is suspected.

**Systemic Embolization:** Barium sulfate products may occasionally intravasate into the venous drainage of the large bowel and enter the circulation as a "barium embolus" leading to the potentially fatal complications which include systemic and pulmonary embolism, disseminated intravascular coagulation, septicemia and prolonged severe hypotension. Although this complication is exceedingly uncommon after oral administration of barium sulfate suspension, monitor patients for potential intravasation when administering barium sulfate.

**Risk with Hereditary Fructose Intolerance:** Vanilla SilQ contains sorbitol which may cause sever reactions if ingested by patients with hereditary fructose intolerance such as vomiting, hypoglycemia, jaundice, hemorrhage, hepatomegaly, hyperuricemia, and kidney failure. Before administration of Vanilla SilQ assess patients for a history of hereditary fructose intolerance and avoid use in these patients.

**Information for Patients:** Before using this product patients should be instructed to tell the physician ordering the procedure and the imaging technologist:
1. If they are pregnant.
2. If they are allergic to any foods or medication, or if they have had any prior reactions to barium sulfate products or other x-ray contrast agents.
3. If they are currently taking any medications, have any serious medical condition for which they are being treated or followed, or had any recent surgery.

Patients should seek immediate medical attention if they experience an allergic or other adverse reaction during or after use of this product.

**Drug Interactions:** The presence of barium sulfate formulations in the GI tract may alter the absorption of therapeutic agents taken concomitantly. In order to minimize any potential change in absorption, the separate administration of barium sulfate from that of other agents should be considered.

**Usage in Pregnancy:** Radiation is known to cause harm to the unborn fetus exposed *in utero*. Therefore, radiographic procedures should only be used when, in the judgment of the physician, its use is deemed essential to the welfare of the pregnant patient.

**ADVERSE REACTIONS:** Adverse reactions accompanying the use of barium sulfate formulations are infrequent and usually mild, though severe reactions (approximately 1 in 500,000) and fatalities (approximately 1 in 2,000,000) have occurred. Procedural complications are rare, but may include aspiration pneumonitis, barium sulfate impaction, granuloma formation, intravasation, embolization and peritonitis following intestinal perforation, vasovagal and syncopal episodes, and fatalities. EKG changes have been shown to occur following or during barium sulfate suspension enemas. It is of the utmost importance to be completely prepared to treat any such occurrence.

Due to the increased likelihood of allergic reactions in atopic patients, a complete history of known and suspected allergies as well as allergic-like symptoms, e.g. rhinitis, bronchial asthma, eczema and urticaria, must be obtained prior to any medical procedure.

Aspiration of large amounts of barium sulfate suspension may cause pneumonitis or nodular granulomas of interstitial lung tissues and lymph nodes; asphyxiation and death have been reported.

Transient bacteremia may occur during rectal administration of barium sulfate suspension, and septicemia has been reported.

A rare mild allergic reaction would most likely be generalized pruritis, erythema or urticaria (approximately 1 in 100,000 reactions). Such reactions will often respond to an antihistamine. More serious reactions (approximately 1 in 500,000) may result in laryngeal edema, bronchospasm or hypotension.

Severe reactions which may require emergency measures are often characterized by peripheral vasodilation, hypotension, reflex tachycardia, dyspnea, bronchospasm, agitation, confusion and cyanosis, progressing to unconsciousness. Treatment should be initiated immediately according to established standard of care.

Apprehensive patients may develop weakness, pallor, tinnitus, diaphoresis and bradycardia following the administration of any diagnostic agent. Such reactions are usually non-allergic in nature.

**OVERDOSAGE:** On rare occasions following repeated administration, stomach cramps, nausea, vomiting, diarrhea or constipation may occur. . Symptoms may be treated according to currently accepted standards of medical care.

**DOSAGE AND ADMINISTRATION:** Barium sulfate volume and method of administration are determined by individual technique, and may vary with differing patient and procedure characteristics. Add water to the desired % w/w fill line on bottle. Replace lid. Invert bottle, tap bottom to loosen barium, and shake vigorously for 30 seconds. Let stand at least 5 minutes. Add additional water as necessary to achieve the desired % mixture. Replace lid, and again shake vigorously for 30 seconds.

**STORAGE:** Store product to protect from excessive heat (above 40°C).

℞ only (USA)

**Genus Medical Technologies, LLC**
**St. Louis, MO**

**Tel. 866-468-5157**

FDA000132

**Attachment E**

Catalog #: 256-1024

Manufactured for
Genus Medical Technologies
St. Louis, MO
866-468-5157

Made In USA



℞ only



NDC 69307-1024-2

VANILLA
SILQ®

(BARIUM SULFATE, USP)
LIQUID SUSPENSION
2.1% w/v
Each 100ml contains 2.1g barium sulfate

**450mL**

For oral administration.
See package insert
for full prescribing
information.

**Storage**
Store product to protect from
freezing and excessive heat
(above 40°C).

---

Catalog #: 256-4096

Manufactured for
Genus Medical Technologies
St. Louis, MO
866-468-5157

Made In USA



℞ only



NDC 69307-4096-2

VANILLA
SILQ®

**MD** MEDIUM
DENSITY

**BARIUM SULFATE FOR
SUSPENSION**
(96% w/w)
Net contents 176g



Barium sulfate for suspension for oral
administration. See package insert for full
prescribing information.
**Storage:** Store product to protect from
excessive heat (above 40°C).
Use immediately upon reconstitution.
Discard any unused suspension.
**Mixing Instructions:** Add water to the desired
% fill line on the bottle.  Replace the lid.  Invert
bottle, tap bottom to loosen barium and shake
vigorously for 30 seconds.  Wait five minutes,
then add more water as necessary to achieve
the desired % mixture.  Replace the lid and
shake vigorously for 30 seconds.
**Yield:** After reconstitution with 163 mL of
water, yields 210 mL of suspension, 50% w/w,
83% w/v. The varying volume and concentra-
tion of Vanilla SILQ MD to be administered will
depend on the area under examination and
should be determined by the radiologist. Refer
to the package insert for additional information
on the varied concentration levels after
reconstitution and mixing.

| | |
|---|---|
| 40% w/w | 59% w/v |
| 45% w/w | 70% w/v |
| 50% w/w | 83% w/v |
| 55% w/w | 97% w/v |
| 60% w/w | 114% w/v |

FDA000133



U.S. Food and Drug Administration
Kansas City District Office
8050 Marshall Drive – Suite 205
Lenexa, KS 66214
(913) 495-5100

May 2, 2017

## WARNING LETTER

**DELIVERY VIA UPS**
REF: CMS Case 506486

Mr. John E. Powers
President and Chief Executive Officer
Genus Medical Technologies, LLC
207 Chesterfield Towne Center
Chesterfield, Missouri 63005

Dear Mr. Powers:

From June 6 through June 8, 2016, investigators from the U.S. Food and Drug Administration (the FDA or the Agency) conducted an inspection of your own-label distribution facility, Genus Medical Technologies, LLC ("Genus" or "your firm"), located at 207 Chesterfield Towne Center, Chesterfield, Missouri 63005.

The inspection revealed that your firm causes the introduction or delivery for introduction into interstate commerce of unapproved new drugs—Vanilla SilQ Barium Sulfate Liquid Suspension, and Vanilla SilQ MD Barium Sulfate Powder for Suspension, both for use as contrast agents for radiographic studies—in violation of Sections 301(d) and 505(a) of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act" or "the Act") [21 U.S.C. §§ 331(d) and 355(a)]. Other sponsors have obtained FDA approval for their barium sulfate oral suspension products for use as contrast agents in radiographic studies. Marketing unapproved barium sulfate products for such use, particularly in direct competition with the approved products, undermines the drug approval system, which is designed to prevent patients from being exposed to the risks associated with potentially unsafe, ineffective, and fraudulent drugs.

Furthermore, these drugs are misbranded under section 502 of the FD&C Act [21 U.S.C. § 352], and by causing the introduction or delivery for introduction of these products into interstate commerce, you are in violation of section 301(a) of the FD&C Act [21 U.S.C. §§ 331(a)]. This violation is concerning from a public health perspective because the labeling of the drugs you

introduced into interstate commerce provides neither adequate directions for safe and effective use nor adequate warnings for such use.

## Unapproved New Drug Violations

Based on labeling and other information collected during the inspection, you market the following prescription drugs, including but not limited to:

- Vanilla SilQ Barium Sulfate Liquid Suspension 2.1% w/v 2.0% w/w (NDC 69307-1024), for use as a contrast agent in radiographic studies for oral and rectal administration; and
- Vanilla SilQ MD Barium Sulfate Powder for Suspension 96 % w/w (NDC 69307-4096), for use as a contrast agent for radiographic studies for oral and rectal administration.

Both Vanilla SilQ and Vanilla SilQ MD, which are intended for use as contrast agents in radiographic studies, are drugs within the meaning of section 201(g)(1) of the Act [21 U.S.C. 321(g)(1)], because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans. Further, both products are "new drugs" within the meaning of section 201(p) of the Act [21 U.S.C. § 321(p)], because they are not generally recognized as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling. Moreover, consistent with our letter to you dated January 5, 2016, we remain unpersuaded by the documentation submitted by your firm on September 25, 2015 purporting to establish that your products are "grandfathered" under section 201(p)(1). FDA's criteria for determining "grandfather" status of a drug product includes establishing whether the specific product at issue being marketed today has the same formulation, strength, dosage form, routes of administration, indication, intended patient populations, and other conditions of use as a drug product marketed between January 1, 1907 and June 25, 1938. As stated in FDA's January 5, 2016 letter, for FDA to determine "grandfather" status, a firm must provide copies of the product labeling that is shown to be from the period from January 1, 1907 and June 25, 1938, and this labeling must be the same as the labeling used today. You have not provided historic labeling for your product, leaving FDA unable to determine if your barium sulfate drug products qualify for the grandfather exemption. Accordingly, FDA does not consider your products "grandfathered" under section 201(p)(1), and as such, FDA does not consider your products exempt from "new drug" status.

Under section 505(a) of the Act [21 U.S.C. § 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an application filed with FDA under section 505(b) or (j) of the Act [21 U.S.C. § 355(b) and (j)] is effective with respect to such drug. Based on our information, there are no FDA-approved applications on file for either of these drugs. The introduction or delivery for introduction (or the causing thereof) into interstate commerce of a new drug in violation of section 505 is prohibited under 301(d) of the Act [21 U.S.C. § 331(d)].

## Misbranding Violations

Section 301(a) of the Act [21 U.S.C. § 331(a)] prohibits the introduction or delivery for introduction (or the causing thereof) into interstate commerce of a misbranded drug.

FDA000135

A drug is deemed to be misbranded under section 502(f)(1) of the Act [21 U.S.C. § 352(f)(1)] if its labeling fails to bear adequate directions for use. Under 21 CFR 201.5, "adequate directions for use" means directions under which a layman can use the drug safely and for the purposes for which it is intended. "Prescription drugs," as defined in section 503(b)(1)(A) of the Act [21 U.S.C. § 353(b)(1)(A)], are drugs that, because of their toxicity or potential for harmful effect, method of use, or collateral measures necessary to their use, are not safe for use except under the supervision of a practitioner licensed by law to administer them. Accordingly, adequate directions cannot be written for prescription drugs so that a layman can use them safely for their intended uses.

Due to the toxicity and other potential for harmful effect and the collateral measures necessary to their use, Vanilla SilQ and Vanilla SilQ MD are not safe for use except under the supervision of a licensed practitioner. In addition, Vanilla SilQ and Vanilla SilQ MD are intended for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners. For these reasons, they are prescription drugs as defined in section 503(b)(1)(A) of the Act [21 U.S.C. § 353(b)(1)(A)], and adequate directions cannot be written so that a layman can use them safely for their intended uses. Consequently, the labeling of these drugs fails to bear adequate directions for their intended uses, causing them to be misbranded under section 502(f)(l) of the Act [21 U.S.C. § 352(f)(1)].

Additionally, a drug is deemed to be misbranded under section 502(f)(2) of the Act [21 U.S.C. § 352(f)(2)] if its labeling fails to bear "adequate warnings against use in those pathological conditions . . . or application, in such manner and form, as are necessary for the protection of users . . . ." We note that FDA has reviewed and approved barium sulfate oral suspension drug products (NDA 208036 and NDA 208143) and determined that such products require warning information pursuant to 21 C.F.R. 201.57. This warning information includes the need to have emergency equipment and personnel immediately available and that intra-abdominal leakage may occur in certain conditions, such as GI fistula, ulcer, inflammatory bowel disease, appendicitis or diverticulitis, severe stenosis or obstructing lesions of the GI tract. Further, given these serious risks, it is especially concerning that the labeling of these products describe an additional rectal route of administration and similarly fails to provide adequate warnings for such use. The failure of Vanilla SilQ and Vanilla SilQ MD to include adequate warnings renders them misbranded under section 502(f)(2) of the FD&C Act [21 U.S.C. 352(f)(2)].

Further, a drug is deemed to be misbranded under section 502(a) of the Act [21 U.S.C. 352(a)] if its labeling is false or misleading in any particular. Section 201(n) of the Act [21 U.S.C. § 321(n)], provides that, in determining whether an article's labeling "is misleading, there shall be taken into account . . . not only representations made or suggested . . . but also the extent to which the labeling or advertising . . . fails to reveal facts materials in light of such representations." The labels collected by the FDA investigators for both Vanilla SilQ and Vanilla SilQ MD misleadingly state that the products are manufactured **by** Genus Medical Technologies, when in fact the products are manufactured by Relion Manufacturing, Inc., dba G3. Further, Vanilla SilQ and Vanilla SilQ MD are also misbranded because their labeling misleadingly fails to reveal material facts with respect to consequences that may result from the use of these products. As described above, barium sulfate oral suspension products may pose serious health

FDA000136

risks to consumers. Furthermore, the expression of the net contents in two distinct measurements (w/v and w/w) in Vanilla SilQ's label as described above may confuse practitioners about the strength of the product, rendering the labeling misleading.

## Conclusion

The violations cited in this letter are not intended to be an all-inclusive statement of violations that exist in connection with your products. You are responsible for investigating and determining the causes of the violations identified above and for preventing their recurrence or the occurrence of other violations. It is your responsibility to ensure that your firm complies with all requirements of federal law and FDA regulations.

You should take prompt action to correct the violations cited in this letter by discontinuing the manufacturing and distribution of all of your unapproved drugs immediately, if you have not done so already. Failure to promptly correct these violations may result in legal action without further notice, including, without limitation seizure and injunction. Other federal agencies may take this Warning Letter into account when considering the award of contracts. Additionally, FDA may withhold approval of requests for export certificates or approval of pending new drug applications until the above violations are corrected. A re-inspection may be necessary to verify corrective actions have been completed.

FDA requests that you contact CDER's Drug Shortages Staff immediately at drugshortages@fda.hhs.gov so that we can work with you to meet any obligations you may have to report discontinuances or interruptions in your drug manufacture, as required under 21 U.S.C. § 356c(a), and to allow FDA to consider, as soon as possible, what actions, if any, may be needed to avoid shortages and protect the health of patients who depend on your products.

Within fifteen (15) working days of receipt of this letter, please notify this office in writing of the specific steps that you have taken to correct the violations. Your response should include an explanation of each step that has been taken or will be taken to correct the violations and prevent their recurrence. If you cannot complete corrective action within fifteen (15) working days, state the reason for the delay and the time within which you will complete the correction. Please include copies of any documentation demonstrating that corrections have been made. If you no longer distribute barium sulfate products, your response should indicate that, including the reasons that and the date on which you ceased production.

All firms are required to electronically update the listing of their products under section 510(j) of the FD&C Act to reflect discontinuation of the manufacture, repacking, relabeling, or salvaging for commercial distribution of a listed drug [21 CFR 207.57(b)]. Questions about electronic drug listing updates should be sent to eDRLS@fda.hhs.gov. In addition to the required update, firms can also notify the FDA of product discontinuation by sending a letter, signed by the firm's chief executive officer and fully identifying the discontinued products, including the product NDC number, and stating that the manufacturing and/or distribution of the products have been discontinued. FDA plans to rely on its existing records, including its drug listing records, the results of any future inspections, or other available information when considering enforcement action.

FDA000137

**Genus Medical Technologies LLC Warning Letter**                    **FEI: 3011028213**
**Chesterfield, MO**                                                 **CMS Case: 506486**

Send your electronic reply to Miguel.Hernandez@fda.hhs.gov or mail your reply to:

     Miguel Hernandez
     Compliance Branch Director
     U.S. Food and Drug Administration
     Kansas City District Office
     8050 Marshall Drive, Suite 205
     Lenexa, Kansas 66214

Please identify your response with FEI: 3011028213

Sincerely,

Cheryl A. Bigham -S

Cheryl A. Bigham
District Director
Kansas City District

5

bcc:

      KAN-DO DD & DDD (chrono): CB & AD
      KAN-DO DIB: GB
      KAN-DO SCSOs: ORAKANIBSupervisors@fda.hhs.gov
      KAN-DO Program Monitor (if is not a SCSO) VAH, CH
      KAN-DO CSO(s): VF, RJH
      KAN-DO State Liaisons: KANSTATELIAISONS@fda.hhs.gov
      KAN-DO ERC: ED

      KAN-DO Factory File FEI: 3011028213
      CMS Case: 506486
      HFR-SW340: ORASWRKANCOPS@fda.hhs.gov

      FACTS Assignment #11623800, OP ID #18731
      Firm's Telephone # 314-899-2921
      Firm's website: http://www.genusmedical.com/

      Drafted by: EMM/  Date: 08/18/2016
      Reviewed by: DSH/ Date: 08/22/2016
      KAN-DO revised date: 08/22/2016

      Revised by RAH 8/29/2016, 10/6/2016, 10/20/2016, 2/27/2017
      Edits: JSchipper, 10/20/16
      Edits RHurwitz 10/25/2016
      Edits/recleared: JSchipper 10/31/16
      Cleared: J. Flahive 11/21/2016, 1/18/17
      Revised: RHurwitz 12/1/2016, 1/19/17, 3/22/2017
      Edits: G. Bormel 12/5/2016, 12/27/16, 1/19/17
      Cleared: C. Becker 1/20/2017, 3/3/2017
      OUDLC final clearance 4/20/2017

FDA000139



DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the General Counsel

Office of the Chief Counsel
Food and Drug Administration
5600 Fishers Lane, GCF-1
Rockville, MD  20857

July 28, 1997

**BY FACSIMILE**

Nancy L. Buc    2 9 1 4   '97   JUL 28   P 3 :26    Richard Morey
Buc & Beardsley                                Kleinfeld, Kaplan and Becker
for Sonus Pharmaceuticals, Inc.          for Bracco Diagnostics Inc.

Andrew M. Federhar                         Robert Shaughnessy
Fennemore Craig                           Williams & Connolly
for ImaRx Pharmaceutical Corp.          for Molecular Biosystems, Inc.

Ellen J. Flannery                              William Vodra
Covington & Burling                        Arnold & Porter
for Mallinckrodt Inc.                         for DuPont Merck Pharmaceutical Company

        Re:    96P-0511\CP1, Sup 1, and Sup 2 (Bracco), CP2 (Sonus),
                CP3 and PSA3 (DuPont Merck), and PSA4 (ImaRx)

Dear Addressees:

     I am writing to inform you that the agency has completed its consolidated response to the above-referenced citizen petitions and petitions for stay of action. The agency's response will be filed in the docket for this proceeding (Docket No. 96P-0511) at the close of business today. A copy of the response will be set aside for each of you at the agency's Dockets Management Branch for pick-up beginning tomorrow, July 29, between the hours of 9:00 am and 4:00 pm.

     If you have any questions or concerns, please feel free to call me.

                        Sincerely,

                        David M. Fox
                        Associate Chief Counsel

cc:    The Honorable Paul Friedman, United States District Court
       FDA Docket No. 96P-0511

96P-0511                                        PDN 3

FDA000140

**FDA's Consolidated Response to Pending
Citizen Petitions on the Regulation of
Ultrasound Contrast Agents
(Docket No. 96P-0511)**

FDA000141

# CONTENTS

I.     INTRODUCTION

II.    BACKGROUND

      A.     Contrast Enhanced Ultrasound Imaging

      B.     Overview of FDA's Regulation of Ultrasound Contrast Agents

           1.     Albunex

           2.     SonoRx and EchoGen

                 a.     The SonoRx request for designation

                 b.     The EchoGen request for designation

           3.     BR-1

           4.     FS069

           5.     DMP 115

III.   SUMMARY OF THE CITIZEN PETITIONS

IV.    RESPONSE TO THE CITIZEN PETITIONS

      A.     The Products at Issue Were Not "Similarly Situated"

      B.     The Agency Did Not Establish a "Binding Policy" of Regulating Ultrasound Contrast Agents as Drugs

      C.     CDER and CDRH Have Not Imposed Materially Different Requirements

           1.     Background regarding agency "requirements"

           2.     Analysis of alleged differences

                 a.     Sonus

FDA000142

b.    Bracco

c.    DMP 115

V.    **MBI'S PRODUCTS MAY BE REGULATED AS DRUGS**

A.    **The Drug and Device Categories Are Not Mutually Exclusive**

B.    **Section 503(g) Does Not Direct the Outcome of this Proceeding**

VI.    **FDA'S BASIS FOR PROSPECTIVELY REGULATING ULTRASOUND CONTRAST AGENTS AS DRUGS**

VII.    **IMPLEMENTATION OF FDA'S DECISION TO REGULATE ULTRASOUND CONTRAST AGENTS AS DRUGS**

VIII.    **CONCLUSION**

FDA000143

I.` **INTRODUCTION**

This document is a consolidated response to three citizen petitions filed with the Food

and Drug Administration ("FDA") under 21 CFR 10.30 relating to the agency's regulation of

products referred to as "ultrasound contrast agents."

On December 27, 1996, the law firm of Kleinfeld, Kaplan and Becker submitted a citizen

petition on behalf of Bracco Diagnostics Inc. ("Bracco") asking that FDA "issue a determination

concerning the appropriate method to regulate ultrasound contrast agents." The agency filed the

petition on December 30, 1996, and assigned the petition to Docket No. 96P-0511/CP1 (the

"Bracco Petition"). Bracco supplemented its petition, with new information and new arguments,

on January 30, 1997 (the "First Supp. Bracco Petition") and again on March 19, 1997 (the

"Second Supp. Bracco Petition"). Bracco also submitted on January 30, 1997, a petition for stay

of agency action under 21 CFR 10.35 (Docket No. 96P-0511/PSA1). The agency denied the

petition for stay in a written response dated February 28, 1997.

On February 3, 1997, the law firm of Buc & Beardsley submitted a citizen petition on

behalf of Sonus Pharmaceuticals, Inc. ("Sonus") asking FDA to regulate "all ultrasound contrast

media as new drugs requiring approval by the Center for Drug Evaluation and Research . . . ."

The agency filed the petition on February 4, 1997, and assigned it as a second citizen petition to

the docket opened for the Bracco Petition, Docket No. 96P-0511/CP2 (the "Sonus Petition").

Also on February 3, 1997, Sonus submitted a petition for stay of agency action (Docket No. 96P-

0511/PSA2), which the agency denied in a written response dated February 20, 1997.

On March 13, 1997, the law firm of Arnold & Porter submitted a citizen petition on

behalf of The DuPont Merck Pharmaceutical Company ("DuPont Merck") asking FDA "to

1

eliminate a glaring and inequitable disparity in the regulation of ultrasound contrast agents." The agency initially assigned the petition to a new docket, Docket No. 97P-1014. On May 21, 1997, FDA notified DuPont Merck that its citizen petition had been reassigned as a third petition to the existing docket on this matter, Docket No. 96P-0511/CP3. Both DuPont Merck and DuPont Merck's marketing partner, ImaRx Pharmaceutical Corp. ("ImaRx"), also submitted petitions for stay of agency action under 21 CFR 10.35 (PSA3 on March 13, 1997, and PSA4 on April 14, 1997, respectively). These petitions for stay of action asked that FDA stay "active consideration" of a pending premarket approval application for a product known as "FS069" sponsored by Molecular Biosystems, Inc. ("MBI") until the agency determines that all ultrasound contrast agents will be regulated under the same standards. As discussed below, both of these petitions for stay of action were rendered moot by an injunction entered by the United States District Court for the District of Columbia on April 21, 1997.

Bracco, Sonus, DuPont Merck and ImaRx, each filed complaints in federal district court on April 14, 1997, seeking declaratory and injunctive relief against FDA on the same issues raised in the pending citizen petitions and seeking essentially the same injunctive relief requested in the pending petitions for stay of action. Those suits have been consolidated into the matter titled *Bracco Diagnostics, Inc. v. Shalala, et al.*, No. 97-0739, 97-0740, and 97-042 (PLF) ("*Bracco Diagnostics*"). On April 21, 1997, the district court in *Bracco Diagnostics* enjoined the agency from "continuing any approval and review procedures" for four specific ultrasound contrast agents (including FS069) until the agency issues a substantive response to the pending citizen petitions (and ten days thereafter). The injunctive relief entered by the district court includes the relief sought by DuPont Merck and ImaRx and, therefore, rendered their petitions

2

for stay moot.

Several firms have filed substantive comments to the pending petitions in Docket No. 96P-0511 (the "ultrasound docket"). Specifically, on May 8 and May 16, 1997, the law firm of Williams & Connolly filed comments on behalf of MBI, in response to the Sonus and DuPont Merck petitions. On May 16 and May 22, 1997, the law firm of Covington & Burling filed comments on behalf of Mallinckrodt Inc., MBI's marketing partner, in response to the Sonus and DuPont Merck petitions. On June 9, 1997, Williams & Connolly submitted additional comments outlining MBI's concerns, should the agency decide to regulate FS069 as a drug. On June 16 and July 15, 1997, Arnold & Porter submitted rebuttal comments to the ultrasound docket, as did Buc & Beardsley on June 22, 1997. In addition, the agency has received comments from a number of interested persons, including several medical practitioners and a manufacturing firm.

The agency has carefully considered the arguments in the pending citizen petitions, the comments submitted to the ultrasound docket, and all other relevant and available information, and has made the following determinations:

(1)     The agency is denying the petitions to the extent they argue that the agency has a longstanding "binding policy" that requires that all ultrasound contrast agents must be regulated as drugs.

(2)     The agency is denying the petitions to the extent they argue that the agency acted "arbitrarily and capriciously" in regulating some ultrasound contrast agents as drugs and others as devices. Each of the agency's prior determinations regarding the regulation of ultrasound contrast agents was rational, was based upon consideration of the relevant factors, and was within the agency's authority at the time the agency made each of those decisions.

(3)     The agency is denying the petitions to the extent they argue that the agency has caused petitioners to suffer significant prejudice or irreparable harm. The agency has applied reasonably consistent product development and review standards to microbubble and microsphere based ultrasound contrast agents.

3

(4)  Nevertheless, the agency is granting the petitions to the extent they request that the ultrasound contrast agents at issue in this proceeding should be brought within the same regulatory scheme, under the jurisdiction of a single agency Center. The agency has determined that, for reasons of administrative efficiency, and to ensure that the agency continues to apply similar standards to the products within this emerging class, the agency will regulate these products as "drugs" and "new drugs" and will assign primary oversight responsibility to the Center for Drug Evaluation and Research ("CDER").

The basis for the agency's decision is set forth below. Specifically, in Section II of this document the agency provides a brief overview of contrast enhanced ultrasound imaging and a brief overview of the agency's regulation of ultrasound contrast agents to date. Sections III and IV summarize, and then respond to, each of the arguments made by petitioners that the agency acted "arbitrarily and capriciously" by allowing some agents to be regulated as drugs and others as devices. Section V responds to the arguments made by MBI in its comments that the agency is required by statute to regulate its albumin-based ultrasound contrast agents as medical "devices." Section VI provides the agency's basis for deciding that microbubble and microsphere-based ultrasound contrast agents will, prospectively, be regulated by CDER as drugs, and Section VII provides the agency's plan for implementing this decision.

## II.    BACKGROUND

### A.    Contrast Enhanced Ultrasound Imaging

Ultrasound imaging is a widely used, non-invasive technique for producing pictorial images of structures inside the body. It employs low-power, high-frequency sound waves that, when directed into the body through a transducer, echo or reflect off surfaces in the body (such as organs or tissues) in a manner that allows a real-time electronic image of the targeted area. Ultrasound is suited in particular for examining soft tissues, internal organs such as the heart, blood flow in the body, and fetal development.

4

FDA000147

Although ultrasound may be performed without the use of contrast agents, clinical studies have shown that certain ultrasound images, particularly those of the heart, can be enhanced through the *in vivo* use of contrast agents. In 1994 the agency approved Albunex (albumin microspheres), the first (and to date the only) contrast agent labeled for use in ultrasound imaging. A number of other agents are now under development for use in improving the quality of ultrasound images as well as extending the possible uses of ultrasound imaging.

Ultrasound contrast agents generally consist of millions of injectable or instillable microscopic bubbles or spheres. The bubbles or spheres are capable of resonating acoustic energy when struck by ultrasound waves, to create a reflective effect. Each bubble or sphere encapsulates a gas, such as air or fluorocarbon gas, that helps maintain the structure of the bubble or sphere and define its acoustic impedance. The differential acoustic impedance of the contrast agent, relative to the impedance of blood and adjacent tissues and organs, causes areas where a contrast agent is present to appear brighter than areas where the agent is not present.

Once injected intravenously, the agent is distributed indiscriminately throughout the body according to blood flow. Generally, the gas in the microbubbles or spheres, over time, diffuses out of the agent, dissolves in the bloodstream, and is exhaled. The remaining ingredients are believed to be taken up by the liver and metabolized.

The effectiveness of an ultrasound contrast agent is based not only upon its "echogenicity" (*i.e.*, its ability to resonate in response to ultrasound waves), but also on the product's ability to cross certain barriers and participate in physiologic functions within the body. In particular, the individual bubbles or spheres must be large enough to resonate at ultrasound frequencies but small enough (as small as or smaller than a red blood cell) to move

5

FDA000148

throughout the body's circulatory system and within certain major organs. Bubbles or spheres that are too large or that coalesce too easily may block capillaries and could possibly lead to an embolic event.

The effectiveness of an ultrasound contrast agent also depends upon its duration — *i.e.,* it ability to remain echogenic within the body. Albunex is reported to remain echogenic for only 35 to 40 seconds after administration. Several of the agents under development — such as those being developed by each of the petitioners — encapsulate gases that may allow the agent to remain intact and echogenic for a substantially longer period of time (several minutes or longer according to published reports).

Albunex, because of its short duration, is approved for only a limited number of uses. Albunex has been shown to be effective in enhancing visualization of the structure and wall motion of the heart, particularly in patients with "suboptimal echoes" (*i.e.*, patients for whom standard ultrasound fails to yield a clinically useful image). Albunex has been approved for use following intrauterine injection in diagnosing fallopian tube patency *(i.e.,* determining whether there is blockage within the fallopian tubes). These clinical effects depend primarily on the agent entering a *cavity* within the body, an event that can be accomplished within the short time that Albunex remains echogenic.

The longer duration agents have the potential to enter into more systems within the body, and in some cases to be taken up intracellularly, while still remaining echogenic. For example, studies suggest that some ultrasound contrast agents may remain echogenic after perfusing (entering the capillaries within) major organs, including the heart muscle itself (as opposed to the chambers of the heart), the kidneys, liver, ovaries, prostate, testes, and the peripheral intracranial

FDA000149

vessels. If the agent can remain echogenic after it perfuses an organ, a clinician may be able to use ultrasound to distinguish between healthy and unhealthy tissue within the organ and make disease-specific diagnoses (*see generally* Sonus SEC Form 10-K, for fiscal year ended Dec. 31, 1996, at 3-8). This could allow ultrasound imaging to be used in place of other, more invasive modalities. Unlike Albunex's uses, which are directed primarily at visualizing structure and structural abnormalities, these uses would provide a clinician with the ability to make direct functional assessments by being able to "see" inside the tissue itself.

One of the most widely reported, potential uses of these agents is in assessing myocardial perfusion (*see, e.g.,* Comments of Dr. Sanjiv Kaul dated May 12, 1997, at 1-2).[1] Myocardial perfusion is the process by which oxygenated blood is brought to the heart muscle (*i.e.*, the myocardium). As one manufacturer has explained, "[i]f [the contrast agent] is not detected in a portion of the heart muscle, or not detected with the expected level of intensity, it means that a portion of the muscle is not receiving enough blood ('ischemia'). This finding may be diagnostic of several conditions, including coronary arterial stenosis and myocardial infarction" (MBI SEC Form 10-K405, for fiscal year ended Mar. 31, 1997, at 7; *accord* Sonus SEC Form 10-K, for fiscal year ended Dec. 31, 1996, at 4 (discussing the myocardial perfusion indication)).

Finally, some of the longer duration products are being developed for uses that depend upon "uptake" of the contrast agent by disease-fighting cells within the body. Pathologies such as tumors or lesions in the liver may be detectable, and visualizable, based on the idea that more

---

[1]Additional literature on this use of ultrasound contrast agents will be included in the administrative record of this proceeding. Also, the WorldWideWeb site sponsored by petitioner Sonus lists over a dozen scientific abstracts regarding the study of ultrasound contrast agents for assessing myocardial perfusion (also referred to as "myocardial opacification") (*see* www.sonuspharma.com).

7

FDA000150

macrophage (disease fighting) cells are present in healthy tissue, and thus will engulf and absorb the contrast agent, than are present in diseased tissue. That is, after systemic distribution throughout the vasculature, the contrast agent is taken up by the cells of the reticuloendothelial system ("RES"), such as the Kupffer cells in the liver. The RES helps to clear foreign matter from circulation, and its ability to clear the contrast agent may be used to achieve a clinical effect. In the liver, for example, areas with high uptake of the agent (*via* active phagocytosis by Kupffer cells) may appear enhanced upon ultrasound examination, while areas that are low in, or devoid of, Kupffer cells, such as focal tumors of the liver, may not be enhanced.[2]

In short, microbubble and microsphere ultrasound contrast agents are designed to circulate throughout the body, much like a systemically absorbed drug product. Some of these products are also intended to perfuse organs or be taken up intracellularly, much like a number of drug products. Yet, these products are intended to work by resonating and reflecting ultrasound waves through primarily physical phenomena.

**B.    Overview of FDA's Regulation of Ultrasound Contrast Agents**

1.    <u>Albunex</u>

Albunex, manufactured by MBI, is a suspension of stable, air-filled albumin microspheres with a mean diameter of 3.0 - 5.0 micrometers ($\mu$m) (compared to red blood cells, which have a mean diameter of approximately 7$\mu$m). It is produced from a 5% solution of FDA licensed human plasma albumin, to which the stabilizers sodium acetyl tryptophanate and sodium caprylate have been added. *See* Albunex, Summary of Safety and Effectiveness. The

---

[2]*See, e.g.,* Leon, E. and McArdle, C., "Ultrasound Contrast Agents in Liver Imaging," 51 Clinical Radiology (Supp.) 1, 35 (1996); Mattrey, R., "The Potential Role of Perfluorochemicals in Diagnostic Imaging," 22 Artif. Cells, Blood Subs., and Immob. Biotech 295 (1994).

FDA000151

finished product is an amber liquid with a top layer of air-filled microspheres. Upon re-suspension (by shaking the container), the liquid turns milky. Albunex is supplied in vials for injection.

FDA began to regulate Albunex as a medical device in 1987 following an exchange of correspondence between FDA's Center for Devices and Radiological Health ("CDRH") and MBI. In particular, on February 23, 1987, MBI wrote to the Director of CDRH describing an albumin based "contrast microsphere" that MBI was developing "for enhancing the image produced from echocardiography." MBI proposed that the product should be regulated as a device given that similar products, known as trace microspheres,[3] are regulated as devices (*see* 21 CFR 870.1360) and given that ultrasonic echocardiographic instruments themselves are also regulated as devices (*see* 21 CFR 870.2330). MBI also proposed that the product, to be sold under the name Albunex, should be regulated as a Class III device (like trace microspheres) subject to premarket review and approval (21 USC 360e(a)).

On October 13, 1987, after consultation with agency officials responsible for regulating drugs and biological products, CDRH confirmed in a letter from CDRH's Office of Compliance that Albunex would in fact be regulated as a device. CDRH also confirmed that the product would be regulated as a Class III device and, therefore, would require a device premarket approval application ("PMA").

---

[3]Trace microspheres are radioactively tagged solid glass or plastic beads that are injected into an artery or vein for use in studying blood flow. The agency's Cardiovascular Device Classification Panel recommended that the product be regulated as a Class III medical device (*see* 44 FR 13312-13, March 9, 1979). The Commissioner agreed, noting that the product appears to be a type of implant (*id.*), and on February 5, 1980, the agency finalized the device classification of this product (*see* 45 FR 7916, Feb. 5, 1980).

9

FDA000152

The decision to regulate Albunex as a new device was consistent with the idea that Albunex would be used as an "accessory" to a device (*see* 21 USC 321(h)) and that the product bore similarities to an already-classified device, trace microspheres. Moreover, Albunex — as presented to the agency at that time — did not appear to depend on chemical action in the body, or on being metabolized, to achieve its principal intended purposes (enhancing anatomical images of the chambers of the heart). *See* 21 USC 321(h) (1987).[4]

Nevertheless, because the product used human albumin in the manufacturing process,[5] CDRH consulted with the biologics staff of the agency's Center for Drugs and Biologics[6] before making a jurisdictional decision to determine whether the product should be regulated as a biological product. The biologics staff agreed that if a licensed source of albumin were used in the manufacturing process, CDRH should oversee regulation of the product. Under a standing "Working Relationships Agreement" used at the time in deciding lead responsibility as between

---

[4]According to Bracco, Albunex was "presented to FDA in a unique posture because while Albunex was under investigation, end-users were directed to sonicate (apply ultrasound waves to) the albumin just prior to patient injection" (Bracco Pet. at 2). Bracco suggests, then, that FDA focused on the instrumentation associated with the sonication of the albumin and, on that basis, decided to regulate Albunex as a device. In fact, Albunex, as MBI presented it to FDA in 1987, consisted of stable air-filled microspheres in a 10 cc solution. In a "Usage Guide" for clinical investigators that MBI attached to its February 23, 1987, letter to FDA, there is no indication that the product must be "sonicated" by end-users in order to form the microspheres (*see also* MBI Comments, May 16, 1997, 14).

[5]Albumin generally is regulated by FDA as a biological product under section 351 of the Public Health Service Act (42 USC 262(a)).

[6]On October 15, 1987, the Center for Drugs and Biologics separated into two organizations, the Center for Drug Evaluation and Research and the Center for Biologics Evaluation and Research. *See* 52 FR 38275.

FDA000153

biologicals and devices, CDRH had responsibility for a product such as Albunex.[7]

MBI therefore filed an investigational device exemption ("IDE") with CDRH to allow MBI to conduct clinical studies of Albunex on human test subjects. CDRH approved the IDE on January 14, 1988, and on September 14, 1990, after completing more than two years of clinical studies, MBI submitted a PMA for Albunex.

MBI supported the PMA for Albunex with one Phase 1 study (60 patients), one Phase 2 study (75 patients), and two Phase 3 studies (175 patients and 60 patients), for a total of 370 patients under four separate protocols. *See* Albunex, Summary of Safety and Effectiveness. On July 14, 1992, the agency's Radiological Devices Advisory Panel evaluated the product in an open, public proceeding.

CDRH approved the product for marketing on August 5, 1994, for use as an aid in helping clinicians visualize the right and left ventricular chambers. CDRH also concluded that the clinical studies in support of the PMA demonstrated that Albunex can improve visualization of endocardial borders in 75% of those patients in which normal, non-contrast echocardiography

---

[7]As of 1987, when Albunex was presented to the agency, several agency programs maintained a "Working Relationships Agreement" governing products that potentially could be regulated as biologicals and/or devices. That Agreement, drafted in April 1982, put lead responsibility for ultrasound equipment, and accessories used exclusively with ultrasound equipment, in the agency's Bureau of Radiological Health (which later merged with the Bureau of Medical Devices to form the Center for Devices and Radiological Health). In addition, the agreement provided that products not specifically assigned to the Bureau of Biologics (which later merged with the Bureau of Drugs), or the Bureau of Radiological Health, would be assigned to the Bureau of Medical Devices. Because the Agreement did not give lead responsibility for a product such as Albunex to the Bureau of Biologics, it was again consistent with the Working Relationships Agreement for CDRH to accept lead responsibility for Albunex.

11

FDA000154

is ineffective.[8]  *See* Albunex, Summary of Safety and Effectiveness at 27.  Albunex therefore was

approved "as an aid for ultrasound contrast enhancement of ventricular chambers, and improved

endocardial border definition in patients with suboptimal echoes undergoing ventricular function

and regional wall motion studies."  *See* FDA approved labeling ("indications and usage"),

Albunex.

On February 17, 1995, the agency published notice of the approval of the Albunex device

PMA in the Federal Register and notice of public availability of a summary of the data on which

CDRH based its approval (60 FR 9334, Feb. 17, 1995).  The notice also advised that interested

persons may petition the agency, under section 515(d)(3) of the Federal Food, Drug, and

Cosmetic Act (the "Act") (21 USC 360e(d)(3)), to seek administrative review of the decision.  No

one petitioned the agency or otherwise asked the agency to reconsider CDRH's approval of

Albunex.  Recently, the agency approved a supplemental PMA for Albunex for use in diagnosing

fallopian tube patency.

## 2.    SonoRx and EchoGen

In November 1991 FDA promulgated regulations to facilitate the process for determining

the agency component with primary jurisdiction over a product for which jurisdiction is unclear

or in dispute.  *See* 56 FR 58756 (Nov. 21, 1991) (final regulations establishing 21 CFR Part 3)

(the "Part 3 regulations").  The Part 3 regulations established that FDA's Ombudsman would

serve as the agency's "product jurisdiction officer," thereby establishing a centralized process for

---

[8]An estimated 10% to 20% of the patient population has endocardial border "dropout" during
non-contrast echocardiographic examination.

12

FDA000155

designating jurisdiction for products that are difficult to categorize. *See* 21 CFR 3.2(m) and 3.6.[9]

Prior to the Part 3 regulations, jurisdictional issues often were resolved by and among the Offices

of Compliance of the various agency components.

In the first year of the Part 3 program, two companies filed requests for jurisdictional

designations for agents to be used in conjunction with ultrasound imaging. The first request,

submitted by ImaRx on March 31, 1992, sought a designation for "an orally administered gastro

intestinal ultrasound product" known as SonoRx. As discussed below, SonoRx is not a "contrast

agent" in the same respects as the other products at issue in this proceeding. The second request,

submitted by Sonus on October 14, 1992, sought a designation for an injectable "emulsion of

perfluoropentane in water for injection" for use in ultrasound imaging.

            a.      *The SonoRx request for designation*

SonoRx is an unapproved product that consists of simethicone-coated cellulose strands.

*See* Carpenter Decl. ¶ 7, DuPont Merck Pet. Simethicone is the active ingredient in a number of

antacid and antiflatulent drug products (*e.g.*, MaaloxTM and MylantaTM). It helps change the

surface tension of gas bubbles in the stomach and intestines, enabling the bubbles to coalesce,

thereby dispersing and freeing the gas by belching or passing flatus. Thus, SonoRx appears to be

intended to enhance images of the abdomen, stomach lining, and structures adjoining the

stomach by reducing excess "noise." *See* 19 *The Gray Sheet*, Issue 11 (Mar 15, 1993)

_____

[9]Under the Part 3 regulations, the agency also developed a series of guidance documents,
known as Intercenter Agreements, to provide guidance in deciding how to allocate jurisdictional
responsibility for combination products and products for which jurisdiction may be unclear. *See* 21
CFR 3.5; 56 FR 58760 (Nov. 21, 1991). The Intercenter Agreements do not specifically address
ultrasound contrast agents. They do, however, provide some information regarding the standards
the agency may apply in allocating jurisdictional responsibility.

13

FDA000156

(According to ImaRx's licensing partner, "SonoRx may allow physicians to see . . . internal organs more easily by eliminating the gas artifacts that can prevent clear delineation of structures during abdominal ultrasound procedures.").

ImaRx recommended in its request for designation (without discussion) that SonoRx should be regulated as a device. SonoRx, however, is closely related to, and contains the same active ingredient as, a number of over-the-counter antacid and antiflatulent drug products. It is intended to be used solely in gastrointestinal imaging, and its efficacy is based primarily on its gas relieving properties, which are achieved by chemical action within the body. The agency therefore designated the product a drug.[10] On May 28, 1992, the Ombudsman's office issued a letter of designation advising that SonoRx would be subject to regulation as a drug, with CDER having primary jurisdiction over the product. ImaRx did not request reconsideration of the designation decision. *See* 21 CFR 3.8(c).

b.  *The EchoGen request for designation*

EchoGen (perflenapent emulsion) is an emulsion of dodecafluoropentane (hereafter "perfluoropentane") and U.S.P. water for injection, with sucrose added to enhance viscosity and PEG Telomer B added as a stabilizer (Sonus Pet. at 5). The PEG Telomer B forms the microbubble that surrounds the perfluoropentane. The product also contains a number of other excipients. EchoGen is currently undergoing premarket review in CDER for use in echocardiography and radiology (*i.e.*, visualization of organs and tissues other than the heart).

---

[10]*See* Intercenter Agreement Between CDER and CDRH (Oct. 31, 1991) at section VIII.1 (liquids, powders, tablets or other similar formulations, that achieve their primary intended purpose through chemical action within the body, will be regulated as drugs, unless the product falls within one of the specified device categories).

14

As presented in the 1992 request for designation, EchoGen (then known as QW3512), consisted of a liquid-in-liquid emulsion (perfluoropentane and water), to be administered intravenously for possible use in, among other things, echocardiography. FDA's product jurisdiction officer, upon filing the request for designation, sought advice from CDER and CDRH on an appropriate jurisdictional designation.

In analyzing EchoGen, CDRH consulted with Sonus and learned that the perfluoropentane in the product is a liquid with a boiling point of 29.5 degrees Celsius, or only 7.5 degrees below normal human body temperature of 37.0 degrees Celsius. At body temperature, the liquid perfluoropentane becomes a gas. The overall goal of the product is to cause millions of small bubbles (less than the size of a red blood cell) to diffuse throughout the ventricular chamber and thereby create an echogenic substrate. *See generally* Quay, S.C. (Sonus), "Ultrasound Contrast Agent Development: Phase Shift Colloids," 13 J. Ultrasound Med. at 1 (Mar. 1994).

CDRH officials also learned, in researching the scientific literature, that while perfluoropentane had been shown to be effective in causing ultrasound backscatter, its effects inside the body were essentially unknown and potentially volatile. Thus, CDRH concluded that the dominant regulatory issues for this product would be its safety, and that much of the review work for such a product would have to be performed by CDER because of the way the product interacted with the body. CDRH therefore recommended to the Ombudsman that the product be regulated by CDER as a drug. CDER made the same recommendation.

The Ombudsman adopted these recommendations (as well as Sonus' own request that its

15

FDA000158

product be regulated as a drug)[11] and, on December 17, 1992, issued a designation letter assigning primary review authority for EchoGen to CDER.

As with the two previous decisions (for Albunex and SonoRx), the decision to regulate EchoGen as a drug was based upon the specific characteristics of the product as presented at the time of the request for designation. Although EchoGen was intended for some of the same uses as Albunex, its formulation was entirely different, as were several aspects of its mode of action inside the body.[12]

Following the decision of the product jurisdiction officer, Sonus filed an investigational new drug application ("IND") with CDER in September 1993, for the clinical study of EchoGen. In August 1996, Sonus filed a new drug application ("NDA") for EchoGen. That application is pending in CDER.

3.    BR-1

BR-1, manufactured by Bracco, is an unapproved product that consists of sulfur hexafluoride gas suspended in microbubbles within a phospholipid blend. The product must be reconstituted prior to administration.

According to Bracco, BR-1 is being developed for intravenous injection as an ultrasound contrast agent in the diagnosis of "cardiac dysfunction" (Bracco Complt. ¶ 2, *Bracco Diagnostics*

---

[11]Under the Part 3 regulations, if the agency does not act on a request for designation within 60 days, the sponsor's recommendation of the center with primary jurisdiction "shall become the designated agency component" to review the product. 21 CFR 3.8(c).

[12]In April 1995, Sonus changed the manner in which EchoGen is activated (*i.e.*, the manner in which the microbubbles are formed). An administration technique based on a hypobaric syringe is now used to help activate EchoGen prior to injection (Sonus SEC Form 10K for fiscal year ended December 31, 1996, at 15-16).

16

FDA000159

litigation).  In its second supplemental petition, filed in March 1997, Bracco stated that BR-1 "is

intended to be used in conjunction with diagnostic ultrasound to provide opacification of cardiac

chambers, improve delineation of endocardial borders, enhance Doppler signal, and visualize

wall motion of the heart" (Second Supp. Pet. at 2; *accord* Bracco Complt., ¶ 11).  This list of

proposed indications is identical to the indications sought by MBI for FS069 (as disclosed at a

February 24, 1997, FDA advisory panel meeting).

Bracco's list, however, is inconsistent with several pre-IND and IND submissions Bracco

made to CDER for the study of BR-1.  Bracco on its own initiative appears to have undertaken to

develop BR-1 for a broader set of indications than that listed in its petition (and a broader set

than what MBI is seeking in the pending PMA for FS069).  Bracco also appears to have proposed

to the agency the idea of comparing BR-1 against certain sophisticated comparators, including

comparators about which they complain in their petition.  *See* discussion, section IV.C.2., *infra.*

Bracco filed an IND for BR-1 in December 1994 and began clinical trials in April 1996

(Bracco Complt.¶ 18).  At the time Bracco filed its IND, the fact that Albunex was being

regulated as a device was known to the public.[13]  Nevertheless, Bracco filed the IND for BR-1,

and commenced clinical trials, without seeking a jurisdictional designation from the agency's

product jurisdiction officer.[14]  BR-1 is still being developed as a drug under an IND.

4.    FS069

---

[13]*See, e.g.,* Mallinckrodt Comments dated May 16, 1997, at 12-13 (citing trade press articles
starting in February 1988 regarding the regulation of Albunex by FDA as a device).

[14]The Intercenter Agreement Between CDER and CDRH (Oct. 31, 1991) does not clearly
address ultrasound contrast agents such as BR-1.  The Agreement, however, specifically recommends
that product sponsors use the Part 3 product jurisdiction regulations if the product is not covered by
the Agreement.  *See* Intercenter Agreement at section VI.

17

FDA000160

FS069, manufactured by MBI, consists of albumin-based microspheres encapsulating perfluoropropane gas. The product is manufactured from a 1% solution of licensed human plasma albumin. No water is added to the product and it contains no stabilizers or surfactants.

Shortly after the approval of Albunex in August 1994, MBI presented FS069 to the agency as a "second-generation" version of Albunex. *See* Exh. B, Dittrich Decl., *Bracco Diagnostics* litigation. Albunex is limited as a diagnostic tool because it remains echogenic for only a short time. The air within the spheres diffuses rapidly and readily dissolves into the blood stream. MBI proposed to replace the air with perfluoropropane, an inert gas with a low diffusion constant that is insoluble in blood.

MBI initially sought to develop FS069 under a supplemental application to the already approved Albunex PMA (MBI Comments, May 8, 1997, at 13). However, upon filing an IDE for FS069 in December 1994, a CDRH official notified MBI that review of FS069 would be transferred to CDER. The official stated that under the provisions of the Intercenter Agreement Between CDER and CDRH (Oct. 31, 1991), responsibility for regulating ultrasound contrast agents rested with CDER (Letter from L. Yin, CDRH, to Doyle Smith, MBI, dated Dec. 30, 1994). Shortly after this communication, CDRH informed MBI that oversight for Albunex would also be transferred to CDER.

In early January 1995, MBI asked the agency's Ombudsman to intervene in the process for deciding how FS069 (and Albunex) should be regulated. *See* Exh. B, Dittrich Decl. In several communications with FDA, MBI argued that:

(1)     FDA had already determined that Albunex would be regulated as a device.

(2)     Albunex spent nearly four years under review in CDRH, with significant delay caused in part by the PMA being moved from one division in CDRH to another.

18

FDA000161

(3)   In pre-IDE meetings for FS069 with CDRH, no mention was made of the possible move of FS069 to CDER.

(4)   The CDRH review division that approved Albunex was familiar with the underlying technology, the labeling, MBI's methodological approach to product testing, and with MBI's regulatory and scientific personnel.

(5)   Albunex and FS069 both met the definition of a device under the Act and, as such, FS069 must be regulated as a device. Neither Albunex nor FS069 relies upon a biotransformation or phase shift *in vivo* to achieve its primary intended purpose.

(6)   The Intercenter Agreement does not direct MBI's products to CDER. Instead, Albunex and FS069, because they are manufactured from albumin, are "combination products" that must be regulated in CDRH pursuant to section 503(g) of the Act.

Having been presented with these arguments, the agency in May 1995 made an interim decision and agreed to allow MBI to continue with an IDE for FS069 in CDRH. The intent of this decision was to maintain the *status quo* for MBI, and not stop or impede the development of this new product, while the agency considered the jurisdictional issues raised by MBI.

This decision was also consistent with the fact that CDRH was familiar with MBI's albumin-based technology (after having evaluated Albunex under an IDE and a PMA from 1988 to 1994), and that the mechanism of action for FS069 appeared to be similar to that for Albunex. In addition, the Intercenter Agreement Between CDER and CDRH in fact did *not* appear to specifically address MBI's contrast agents. Rather, it appeared as if several of the general criteria identified in the Agreement for making drug/device determinations arguably could favor the regulation of FS069 as a device. *See* Intercenter Agreement at VIII.1 and VIII.2.

Finally, FS069 seemed at the time to have more in common with Albunex than with EchoGen, the closest other product to have gone through the agency's Part 3 designation process. Like Albunex, FS069 consisted of well-defined albumin microspheres (as opposed to the gaseous

19

bubbles in EchoGen). And unlike EchoGen, FS069 used a fluorinated carbon molecule that exists in a gaseous state in the product, rather than a fluorinated molecule that undergoes a phase shift at or about the time of administration.

In March 1996, MBI informally requested from the product jurisdiction officer a written statement as to how FS069 would continue to be regulated. *See* Exh. B, Dittrich Decl. The agency had not reached a final decision on whether all ultrasound contrast agents should, or could, be regulated under a single statutory scheme within a single agency center. Consistent with the idea of maintaining the *status quo*, the deputy for the product jurisdiction officer issued to MBI a letter dated March 29, 1996, stating that CDRH "should continue to assume administrative lead for MBI's contrast agents (*i.e.*, Albunex and FS069)," and that "[t]hese products will remain subject to review and regulation as medical devices . . . ."

On October 17, 1996, MBI submitted a device PMA for FS069. The PMA, which remains pending in CDRH, seeks FDA approval for the use of FS069 in providing opacification of cardiac chambers, improvement in delineation of endocardial borders with concomitant improvement in visualization of wall motion, enhanced Doppler signal,[15] and conversion of non-diagnostic studies to diagnostic studies (in patients with suboptimal echoes) (*see* Transcript, Feb. 24, 1997, Radiological Devices Advisory Panel Meeting (the "Ad. Com. Tr."), at 135). These proposed indications are essentially the same as those for which Albunex is approved.

CDRH review proceeded in accordance with the 180 day review period for PMAs (*see* 21 USC 360e(d)(1)(A)). As with Albunex, and in light of the jurisdictional questions about contrast

---

[15]The "enhanced Doppler signal" indication is for improved visualization of the directional flow of blood.

FDA000163

agents that had been raised, CDRH consulted with CDER on significant parts of the review. On February 24, 1997, the agency's Radiological Devices Advisory Panel evaluated FS069 and concluded that the information in the PMA supported a finding that the product is safe and effective for the proposed indications. The application is still pending.

## 5.    DMP 115

DMP 115 is an unapproved product being developed jointly by DuPont Merck and ImaRx. It is described by DuPont Merck as "perfluoropropane gas in microsphere-encapsulated microbubbles" (Carpenter Decl. ¶ 12) and "perfluoropropane gas bubbles encapsulated within a microsphere membrane." (DuPont Merck Pet. at 3). In rebuttal comments filed by DuPont Merck, the firm acknowledges that the microsphere membrane is lipid based (DuPont Merck Rebuttal Comments at 3).[16]

DuPont Merck, like Bracco, maintains that "the same indications are being sought for DMP 115 and FS069" (DuPont Merck Rebuttal Comments at 4), and that "the proposed cardiology indications for DMP 115 are essentially the same as those proposed for FS069" (Carpenter Decl. II at ¶ 18). Namely, DuPont Merck states that the firm "will seek an indication for left ventricular opacification, endocardial border delineation, and left ventricular functional assessment, in patients undergoing echocardiography" (DuPont Merck Pet. at 3). The first two indications track the indications sought in the PMA for FS069. The third (for left ventricular

---

[16]According to MBI, "DMP 115 is an aqueous suspension of phospholipids such as phosphatidylcholine in a sealed vessel filled with a headspace of perfluoropropane gas" (MBI Comments, May 16, 1997, at 5). Also, "[a]lthough [DuPont Merck] has described DMP 115 as gas-filled microspheres (implying gas microbubbles surrounded by a stable, solid shell), the product is more correctly identified as a gas in a liquid emulsion. There is no true shell encapsulating the microbubble. The phospholipid component serves as an emulsifier, which coats the gas phase and slows the rate of spontaneous coalescence." (*Id*.). DuPont Merck has not disputed this description.

21

functional assessment), according to DuPont Merck, is equivalent to FS069's indication for "concomitant improvement in visualization of wall motion." Carpenter Decl. II, ¶ 18.

The indications DuPont Merck listed in its petition are inconsistent with the indications listed in the IND for DMP 115 and with a number of other documents submitted to the agency by DuPont Merck and ImaRx.[17]  As is the case with Bracco, these materials show that DMP 115 is being developed for indications that MBI is not seeking in the pending PMA. For example, according to published reports, DMP 115 is being developed for use in assessing myocardial perfusion and kidney and liver imaging (*see The NDA Pipeline 1996* (15th ed. 1997, FDC Reports Inc.) at I-276 and I-412; *The NDA Pipeline 1995* (14th ed. 1996, FDC Reports Inc.) at I-374). These indications — particularly the indication for myocardial perfusion — and other undisclosed indications invite the need for comparison against certain sophisticated comparators before the product could be approved for such uses. These are the very comparators about which DuPont Merck appears to be complaining in its petition. *See* discussion, section IV.C., *infra*.[18]

_____

[17]The same indications are listed in ¶28 of the complaint filed by DuPont Merck in the *Bracco Diagnostics* litigation. In the litigation, DuPont Merck has argued that the agency imposed "profoundly" different requirements on FS069 and DMP 115 "for the same core set of diagnostic uses in echocardiography." (DuPont Merck Complt. ¶¶ 28, 47, and 52).

[18]Some of the information needed to respond specifically to the petitions, particularly the arguments alleging that unequal requirements were imposed by the agency during the product development stage, is contained within petitioners' IND submissions and therefore is generally protected from disclosure under 21 CFR 314.430. Petitioners, however, have themselves chosen to disclose (selectively) and put into issue information from their INDs. In addition, a certain amount of IND information is publicly available. The agency has attempted to respond publicly to the petitions by relying primarily on information petitioners themselves have disclosed and on other publicly available sources. In addition, the agency has attempted to discuss certain issues at an appropriate level of generality to minimize potential disclosure of petitioners' information.

In one instance, the agency consulted with petitioner DuPont Merck to learn whether it would permit discussion in this document *of all* of the indications listed in the IND for DMP 115. DuPont Merck, through counsel, insisted that the agency not disclose this information because DuPont

FDA000165

Finally, neither ImaRx nor DuPont Merck sought a jurisdictional designation under Part 3 for DMP 115 (known as MRX 115 when originally submitted to the agency by ImaRx in 1995). A marketing application for DMP 115 has not been filed with the agency.

## III.    SUMMARY OF THE CITIZEN PETITIONS

Three firms (DuPont Merck, Bracco, and Sonus) have submitted citizen petitions under 21 CFR 10.30 on the subject of the regulation of ultrasound contrast agents. The three petitions make essentially the same request: that all ultrasound contrast agents should be regulated under the same set of statutory authorities by a single agency Center. Petitioners Sonus and Bracco argue that all ultrasound contrast agents must be regulated as "new drugs" requiring approval by CDER (Sonus Pet. at 1; Bracco Pet. at 1). Petitioner DuPont Merck also argues that FDA must regulate all ultrasound contrast agents under the same standards and procedures (DuPont Merck Pet. at 1). DuPont Merck, however, allows for the possibility that all ultrasound contrast agents may be regulated as devices by CDRH (DuPont Merck Pet. at 2).

Petitioners' core argument for regulating all ultrasound contrast agents under the same statutory standards is that the products in this class are "essentially identical" (DuPont Merck Pet. at 4; *accord* Sonus Pet. at 3-4, 5; Bracco Second Supp. Pet. at 2). In particular, petitioners maintain that the ultrasound contrast agent currently undergoing review as a device (FS069) is "indistinguishable"from petitioners' products, all of which are in the new drug development and approval processes. All of these products, they argue, contain fluorinated gases encapsulated

---

Merck had chosen not to disclose it in the litigation (*see* Letter from Arnold & Porter to FDA dated July 18, 1997). *Subsequently*, the agency learned that information regarding an additional indication in the original IND for DMP 115, as well as other indications for which DMP 115 is under development, has in fact been widely published for some time. *See, e.g., The NDA Pipeline*, available on-line and in hard copy from F-D-C Reports, Inc.

23

FDA000166

within a microsphere "membrane," are administered by intravenous injection, and are intended

for the same uses (DuPont Merck Pet. at 4; Sonus Pet. at 2, 4-5; Bracco Second Supp. Pet. at 2).

Petitioners therefore insist that all of these products raise the same safety and efficacy questions

and, *perforce*, all must be subject to regulation under the same statutory standards applied by the

same set of agency officials (Sonus Pet. at 5; Bracco Pet. at 2, 4-5).

Petitioners claim FDA is applying "significantly different standards" in assessing the

safety and effectiveness of ultrasound contrast agents, depending upon whether the agent is

undergoing review as a device or as a new drug. The clinical data in support of the PMA for

FS069, they insist, is not nearly as extensive as the data that CDER has required for petitioners'

products, DMP 115 (sponsored by DuPont Merck), BR-1 (sponsored by Bracco), and EchoGen

(sponsored by Sonus) (DuPont Merck Pet. at 5; Sonus Pet. at 6; Bracco Second Supp. at 2).

They also speculate that there is a substantial disparity between the pharmacokinetic and toxicity

data that CDER has required as compared to what CDRH may have required for the PMA for

FS069 (Sonus Pet. at 6; *see* Bracco Second Supp. at 3). As a result, petitioners maintain, MBI

has been able to proceed through product development and marketing review at a much faster

pace than petitioners, even though a new drug applicant must pay a substantial "user fee" to

ensure timely review of its application.

Petitioners also argue that FDA has a "longstanding policy" of regulating most contrast

agents under the same standards, namely, under the drug provisions of the Act. This policy,

petitioners argue, is evidenced by (1) a 1982 Federal Register notice in which FDA stated that all

radiologic contrast media would be regulated as drugs, (2) several jurisdictional designations

made by the FDA Ombudsman, and (3) a recent statement made by an FDA official at a medical

24

FDA000167

conference (DuPont Merck Pet. at 3, 19; Sonus Pet. at 2-4). Two petitioners also note that FDA has approved at least 40 contrast agents as drugs, albeit for uses other than in ultrasound imaging (Sonus Pet. at 3; Bracco Pet. at 4).

Finally, Sonus and Bracco urge that ultrasound contrast agents, as a class, should be regulated as drugs because CDER (rather than CDRH) is best equipped to analyze the safety and effectiveness of these products, which are administered intravenously and travel indiscriminately throughout the vasculature. (Sonus Pet. at 5; Bracco Pet. at 3, 4). CDER, they contend, also has substantially greater expertise in the area of contrast agents than does CDRH (Sonus Pet. at 8; Bracco Pet. at 2, 3, 4-5) and has more resources already dedicated to the analysis of contrast agents.

While these petitions were pending, and before the agency had the opportunity to consider fully the arguments presented, petitioners each filed suit in federal district court against the agency (*i.e.,* the *Bracco Diagnostics* litigation). There, petitioners complained that the agency had acted "arbitrarily and capriciously" by regulating some ultrasound contrast agents as drugs and others as devices. They complained that as a result of this "disparate" treatment, and the application of "profoundly" different standards by CDER and CDRH, they each suffered and would continue to suffer irreparable harm. Finally, each argued that, as a matter of law, the agency must regulate all ultrasound contrast agents alike.

As discussed below, petitioners' claims of arbitrary and capricious conduct, disparate treatment, and irreparable harm, are factually and legally ill conceived. There is, however, merit in petitioners' argument that it would be administratively prudent for the agency to regulate all of these products as "drugs" in CDER. Given that the Act permits such a result — an issue that

25

FDA000168

was largely ignored by petitioners but which the agency takes up in detail below — the agency

has decided to grant that portion of the pending petitions.

## IV.    RESPONSE TO THE CITIZEN PETITIONS

### A.    The Products at Issue Were Not "Similarly Situated"

Petitioners argue that the agency acted "arbitrarily and capriciously" by failing to regulate

all ultrasound contrast agents under the same statutory standard, within the same agency Center.

The premise of the argument is that the products are "essentially identical" and "similarly

situated" and, therefore, the agency was legally obligated to regulate them in a like manner

(DuPont Merck Pet. at 4; Sonus Pet. at 3-4, 5; Bracco Second Supp. Pet. at 2).

The agency agrees that the microbubble and microsphere products at issue in this

proceeding are similar in several respects.  All are designed around the same principle:  to

resonate or reflect in a manner that allows them to stand out from the surrounding medium (*e.g.*,

surrounding blood and tissues in the body).  All use, in one form or another, compressible,

expandable, and flexible spheres or bubbles.  And, as petitioners emphasize, all are administered

by intravenous injection and are designed to travel systemically (although some, like Albunex,

may be administered locally rather than by intravenous injection).  Finally, these products are

designed for some of the same intended uses, although petitioners have not disclosed all relevant

information regarding the uses for which their products are being developed.  *See* discussion in

section IV.C.2, *infra*.

These common characteristics, while important, do not demonstrate that the agency's past

decisions to allow some agents to proceed as drugs, and others as devices, were "arbitrary and

capricious" under 5 USC 706(2)(A) and a "clear error" of law.  *See* DuPont Merck Pet. at 20;

FDA000169

Sonus Pet. at 7. Agency decisions must be analyzed based on the information before the agency at the time it made the decision, and an agency is not "arbitrary and capricious" if the decision was rational, was based on consideration of relevant factors, and did not represent a "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Moreover, even if two inconsistent conclusions might be drawn from the evidence before the agency at the time, an agency decision is not "arbitrary and capricious" simply because one could have reached a different, rational conclusion. *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 304 (1977); *Motor Vehicle Mfrs. Ass'n of the United States, Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also Formula v. Heckler*, 779 F.2d 743 (D.C. Cir. 1985).

The core rationale for the regulatory status of each of these products (in the order in which each was presented to the agency) is as follows:

1. *Albunex (Feb. 1987)*, the first ultrasound contrast agent regulated by FDA, consists essentially of air-filled albumin spheres. The simple composition of the product, its similarity to trace microspheres, and its use as an accessory to ultrasound instruments, led the agency to regulate it as a device. *See* discussion in section II.B.1, *supra*.

2. *SonoRx (Mar. 1992)*, the first enhancement agent to receive a letter of jurisdictional designation, consists primarily of simethicone and cellulose. Its formulations bore no resemblance to Albunex. Rather, its similarity to a number of antiflatulent drug products led the agency to direct its sponsor to the drug review process. *See* discussion in section II.B.2, *supra*.

3. *EchoGen (Oct. 1992)*, the second ultrasound contrast agent to receive a letter of jurisdictional designation, consists primarily of an emulsion of liquid perfluoropentane and water for injection. Its formulation likewise bore no resemblance to Albunex or SonoRx. Instead, the use of unencapsulated perfluoropentane in the product, the safety concerns associated with the manner in which the product forms echogenic bubbles within the body, and the manner in which the gas is expelled from the body, led the agency to regulate the product as a drug. In addition, Sonus requested that the agency allow EchoGen to be regulated as a drug, even though Sonus acknowledged in its request for designation that a related product, Albunex, was being regulated as a device. *See*

27

FDA000170

discussion in section II.B.2, *supra*.

4.  **BR-1 (Dec. 1994)** consists primarily of sulfur hexafluoride gas suspended in microbubbles within a phospholipid. It too has a wholly unique formulation. Bracco chose not to seek a jurisdictional designation under Part 3. Instead, based on the agency's determinations with respect to SonoRx and EchoGen, and on a 1982 statement in the preamble to a proposed FDA regulation, Bracco claims it had no choice but to file an IND (Bracco Complt. ¶ 18, *Bracco Diagnostics* litigation). As discussed, *infra*, the 1982 Federal Register statement was superseded by the agency's Part 3 process as well as by the decision to regulate Albunex as a device. The SonoRx and EchoGen decisions were based on factors unique to each of those products. *See* discussion in section II.B.3, *supra*.

5.  **FS069 (Dec. 1994)** was presented as a second generation version of Albunex, with perfluoropropane gas used in place of air to fill the albumin microspheres. The product appeared to have more in common with Albunex than with any of the previous products that were the subject of jurisdictional determinations. Therefore, the agency's product jurisdiction officer, after consultation with officials in CDER and CDRH, decided that FS069 could follow in the same path as Albunex and commence review as a device, pending a decision on whether this emerging class of products should (and could) be regulated under the same statutory authorities in the same Center. *See* discussion in section II.B.4, *supra*.

6.  **DMP 115 (Aug. 1995)** consists of an aqueous suspension of phospholipids in a sealed vial filled with a headspace of perfluoropropane gas. It uses the same gas as FS069 but does not use an albumin sphere. Instead, like BR-1, it uses a blend of phospholipids as an emulsifier to surround the perfluoropropane gas. Like Bracco, DuPont Merck elected not to seek a jurisdictional designation before it filed an IND with CDER (even though the agency's Intercenter Agreement advised sponsors to do so) (*see* DuPont Merck Pet. at 18; Complt. ¶ 35). *See* discussion in section II.B.5, *supra*.

In short, all six products presented different formulations with potentially different safety and effectiveness profiles. The divergence that eventually arose — between regulating some products as devices (*e.g.*, Albunex) and others as drugs (*e.g.*, SonoRx and EchoGen) — was based on apparent differences in formulation, mode of action, and intended use. As for FS069, Albunex had been regulated as a device without objection for almost seven years when FS069 was presented to the agency, and FS069 appeared to be only incrementally different than Albunex.

28

Finally, several sponsors *sought* to be regulated as drugs, with one sponsor (Sonus) asking the agency's product jurisdiction officer for a CDER designation,[19] and two others (Bracco and DuPont Merck/ImaRx) submitting INDs on their own initiative. The current alignment, therefore, is rational when one takes into account the differences noted above and the interest that several sponsors showed in having their products regulated by CDER.

### B.    The Agency Did Not Establish a "Binding Policy" of Regulating Ultrasound Contrast Agents as Drugs

Petitioners argue that FDA has a "longstanding policy" of regulating contrast agents as "new drugs" (although at least one petitioner concedes that several contrast agents are regulated as biologicals, Sonus Pet. at 2). As a result, petitioners claim that FDA violated that policy and the Administrative Procedure Act ("APA"), by regulating Albunex and FS069 as a devices.

Petitioners focus primarily on a statement the agency made in the preamble to a 1982 proposed rule. The Medical Device Amendments of 1976 (Pub. L. 94-295) established a comprehensive system for providing reasonable assurance of the safety and effectiveness of medical devices. That system included placing all devices marketed prior to may 28, 1976, into one of three classes (Class I, Class II, or Class III), with each class requiring a different level of control. The 1982 Federal Register document is one of many in which the agency proposed classifications for categories of products then in commercial distribution. In that proposed rulemaking document, the agency stated that "radiologic contrast media," as a class, would be

---

[19]Following the agency's designation of EchoGen as a drug, Sonus' CEO Steven Quay announced that "Sonus met with FDA in 1992 'to get EchoGen's development program *and to get their agreement that this will be treated as a drug.* It was our strategy to do that, and we went through the ombudsman process at FDA to . . . have that established,' Quay said." The Gray Sheet, Sept. 14, 1994, vol. 20 issue 38 (emphasis added).

FDA000172

regulated as drugs. 47 Fed. Reg. 4406, 4412 (Jan. 28, 1982). The agency never finalized this statement regarding contrast agents in a regulation. Nevertheless, petitioners insist that the agency is obligated to follow this statement until it has been amended or revoked (*see* Sonus Pet. at 3 citing 21 CFR 10.85(d) and (e)).

The intent of the 1982 statement was to address products then in existence, such as barium sulfate enema kits and iodinated contrast media used in x-ray radiology. At the time the agency made that statement, however, contrast agents for use in ultrasound imaging had not been the subject of investigational or marketing applications with FDA. Thus, it cannot be said, as petitioners insist, that the statement was intended to cover ultrasound contrast agents.[20]

Even more, the 1982 Federal Register statement does not and cannot limit FDA's discretion to make case specific judgments about the appropriate regulation of a given product. *See* 57 FR 47314 (Oct. 15, 1992) (FDA proposed rule amending 21 CFR Part 10 to, among other things, make clear that under current legal precedents, a statement in a preamble to a proposed FDA rule cannot bind the agency); 62 FR 8961, 8963 (Feb. 27, 1997) (explaining that the principle that an advisory opinion might in some way be binding on FDA is inconsistent with the decision in *Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987)).

---

[20]Petitioners nevertheless point to a statement made in May 1996 at a medical conference by Dr. Lillian Yin (Director, Division of Reproductive, Abdominal, Ear, Nose, and Throat, and Radiology Devices, Office of Drug Evaluation, CDRH) to show that the 1982 Federal Register notice was intended to cover, or has been interpreted by the agency as covering, ultrasound contrast agents (*see* Sonus Pet. at 4). Dr. Yin's statement may have represented her best judgment at the time, but it did not represent the formal position of the agency. *See* 21 CFR 10.85(k). Indeed, Dr. Yin made this statement in May 1996, at a time when the agency was still considering the issue of whether ultrasound contrast agents — as a class — could and should be regulated as drugs or as devices. The portion of her statement on which petitioners focus also is not consistent with the agency's 1994 decision approving Albunex as a device.

FDA000173

In any event, the agency's publication in February 1995 of notice of the approval of Albunex as a device (60 FR 9334, Feb. 17, 1995) provided adequate notice that the 1982 statement could not be relied upon as agency policy regarding ultrasound contrast agents (*see* MBI Comments, May 8, 1997, at 15-17 (repudiation of agency advisory opinions and statements)).

Finally, the 1982 Federal Register notice pre-dated the agency's new process for determining jurisdiction over difficult to classify products. *See* 21 CFR Part 3. Product-specific decisions made under the agency's Part 3 procedures would supersede a prior, general statement such as that made in the 1982 Federal Register notice. As the discussion in section IV.A.2 shows, the agency's product jurisdiction officer has made three jurisdictional designations for ultrasound products (SonoRx, EchoGen, and FS069), with each decision based on the particular formulation and intended use of the product.

## C.    CDER and CDRH Have Not Imposed Materially Different Review Requirements

Petitioners argue that CDER has imposed significantly different requirements on their products than CDRH has imposed on FS069. They claim that their products have been made to go through a longer, more expensive, and more complex process than FS069, and that the "disparate" treatment of their products will allow FS069 to have an unfair advantage in the marketplace. Thus, even if the agency issues the determination urged by petitioners, the agency reasonably can anticipate that petitioners will continue to argue that MBI has had the benefit of a less costly and less complex product development process. By starting out as a device, they would argue, MBI was able to file a marketing application sooner than its competitors, at a much lower cost. Thus, the agency expects petitioners, or at least some of them, to argue that MBI

31

FDA000174

must "begin again" and undertake the same testing that petitioners allegedly have been required to conduct. There would be no merit in such an argument.

The agency acknowledges that the statutory and regulatory provisions applicable to drugs differ from those applicable to devices. In this instance, however, petitioners have not demonstrated that — as a result of such differences — CDER and CDRH gave materially different guidance, or that product development for FS069 has been materially different from that of EchoGen, DMP 115, and BR-1. Instead, the differences that petitioners have identified are either: (1) untrue; (2) reasonably related to differences in product formulation; (3) reasonably related to each sponsor's own approach to product development; or (4) immaterial.

      1.    Background Regarding Agency "Requirements"

The alleged differences between the clinical development of petitioners' products and FS069 are each based on the idea that *prior to the filing of a marketing application,* CDER "required" petitioners to do more work than CDRH "required" of FS069.

During the product development phase (prior to the submission of a marketing application), CDER and CDRH frequently provide sponsors with advice and comments regarding issues such as study design and safety monitoring. This advice and guidance is intended to be informative, to assist the sponsor in developing safely the scientific and medical data to support a marketing application, but it is not intended to set forth requirements. *See* 21 CFR 312.41 (advice and comment provided throughout the product development phase does not bind the sponsor or the agency).

FDA fully anticipates that sponsors and investigators may develop alternative methods and procedures for studying a new product and that at the review stage (following the submission

32

of a marketing application), FDA may find those alternative methods and procedures acceptable. *See, e.g.,* 62 FR 8961 (Feb. 27, 1997) (agency guidance represents the agency's current thinking on a subject but agency guidance does not establish enforceable rights or responsibilities and are not legally binding on the agency or on the public).[21] Thus, even assuming that CDER and CDRH gave different guidance to firms seeking to develop ultrasound contrast agents (an allegation the agency addresses below), petitioners have not established that the agency imposed different binding requirements.

Nor is it the case, as a general matter, that sponsors of similar products within the same center will necessarily receive identical advice and guidance. Differences in formulation, in the indications being sought, and in the agency's current thinking at the time (which is often based on its experience with other products in the class), may cause sponsors to be guided in different ways. Indeed, it is because of these variables that the discussions that take place at the product development stage are expressly designated as non-binding. *See* 21 CFR 312.41.

Finally, it is important to note throughout the discussion that follows that the agency took steps to help ensure that products within this class are treated as consistently as possible, regardless of whether they are being reviewed as "new drugs" or as "devices." For example, CDER's medical imaging review staff participated in the review of the Albunex PMA, including the presentations made to the advisory panel that evaluated Albunex in July 1992. In addition, a member of the CDER medical imaging advisory committee participated (albeit as a non-voting

---

[21]During the review of a marketing application (*e.g.,* an NDA or PMA), the agency may also find that the methods used by the sponsor were not acceptable. For example, as CDRH advises all IDE applicants, FDA approval of an IDE does not imply that the investigation will develop sufficient safety and effectiveness data to assure FDA approval of a PMA.

FDA000176

member) on the February 24, 1997, CDRH device review panel that evaluated a PMA supplement for Albunex and the PMA for FS069. And, with respect to the PMA for FS069, CDRH consulted with CDER's medical imaging staff during the IDE stage of FS069 and the non-clinical review components of the PMA for FS069.

### 2.    Analysis of Alleged Differences

Each petitioner has identified alleged differences between what CDRH has required of MBI and what CDER has required of petitioners. These differences, petitioners insist, cost them time and money and, in turn, have allowed MBI to obtain a significant competitive advantage.

### a.    *Sonus*

Sonus argues that in preparing to file an NDA for EchoGen, it was required to: (1) undertake "expensive and time-consuming genotoxicity, reproductive toxicity, and pharmacokinetic studies" not required of FS069; (2) conduct two adequate and well-controlled clinical studies compared to a single study for FS069; and (3) conduct studies of a possible "off-label" use of EchoGen for use outside of echocardiography in "radiological ultrasound," thereby doubling the number of clinical trials and delaying the filing of the NDA by six months (Sonus Pet. at 6). Sonus also asserts that the "approval of a contrast agent as a device rather than a drug appears to be a much faster process" (Sonus Pet. at 6), allowing MBI to gain an unfair advantage in the race to the market.[22]

### *(1) Pharm/Tox data*

Sonus's assumption that the PMA for FS069 does not contain "genotoxicity, reproductive

---

[22]The agency's plan for implementing its decision, discussed in section VII, *infra*, addresses the "user fee" issue raised by Sonus and other petitioners.

34

FDA000177

toxicity, and pharmacokinetic studies" (Sonus Pet. at 6) is incorrect. As MBI disclosed in its

comments, it too has completed genotoxicity, reproductive toxicity, pharmacokinetic, and

immunology testing for FS069 (MBI Comments, May 8, 1997, at 21; *see* section b(3), *infra*, for

a discussion of the immunologic testing done by MBI). Indeed, while Sonus complains that it

spent more than $700,000 on such testing, MBI apparently spent at least $1,100,000 (MBI

Comments, May 8, 1997, at 21).

More to the point, it would be difficult for the agency to compare the specific

"pharm/tox" data submitted by Sonus for EchoGen with the pharm/tox data submitted in support

of the PMA for FS069, given that there are differences between the products based on

formulation and toxicity profiles. For purposes of responding to this argument, however, the

agency notes that CDER pharmacologists have reviewed the pharm/tox data provided in support

of FS069 and have determined that the data are adequate for review under the standards

applicable to "new drugs."

### *(2) Two clinical studies*

Sonus states that NDA sponsors are generally required to conduct two adequate and well

controlled clinical studies to support the effectiveness of the product, while PMA sponsors

"historically have been allowed to provide less rigorous proof of effectiveness." (Sonus Pet. at

6). Thus, Sonus claims, it has had to conduct two clinical studies to every one conducted by

MBI, and has had to enroll twice as many patients as MBI (*id.*).

In fact, the PMA for FS069 is supported by two Phase 3 studies of FS069 (one with 101

patients and one with 102 patients for a total of 203 patients) for the indications of endocardial

border delineation, left ventricular opacification and improved Doppler signal. *See* Ad Com Tr.

35

FDA000178

at 140. With respect to the number of subjects enrolled, on a per study basis, Sonus and MBI enrolled similar numbers of subjects. Sonus conducted four separate clinical studies of EchoGen (two for echocardiography and two for "radiological ultrasound"), enrolling a total of 410 subjects (Sonus Pet. at 6), or an average of approximately 102 per study, compared to 101 and 102 subjects in MBI's two pivotal studies.

It should also be noted that neither CDRH nor CDER "requires" a certain number of patients to be enrolled in a clinical study. While a study must be "adequate and well controlled" for purposes of demonstrating that which it purports to demonstrate, it is the applicant's responsibility to determine the appropriate number of subjects to enroll in a study. The agency will not make a final determination on whether the sample size was adequate, as a statistical matter, until after the study has been submitted as part of a marketing application.

In short, MBI and Sonus each conducted two pivotal studies for use of the product in echocardiography, and each enrolled similar numbers of patients in those studies. Whether each applicant's studies will be determined to be "adequate and well controlled," for purposes of supporting marketing approval, is a review issue that the agency has not decided and need not decide for purposes of this petition response.

### (3) The "radiological ultrasound" indication

Sonus also argues that it was required to conduct two additional clinical studies of EchoGen because CDER officials were concerned about the possible "off label" use of EchoGen for radiological ultrasound (Sonus Pet. at 6). CDRH did not impose such a requirement on FS069, Sonus contends.

Sonus provided the agency with no documentation to support its claim that the agency

36

FDA000179

required the company to pursue a non-cardiac "radiology indication" for EchoGen. The agency

has reviewed minutes of its meetings with Sonus, as well as Sonus' IND submission, and was not

able to confirm Sonus' assertion. Finally, while Sonus' counsel claims that the radiology studies

significantly slowed the filing of an NDA (Sonus Pet. at 6), Sonus has stated publicly that the

NDA for EchoGen was filed "well ahead of our strategic plan target date . . ." (Sonus Press

Release, Sept. 5, 1996).

### (4) Review Period

Sonus claims that "approval of a contrast agent as a device rather than a drug appears to

be a much faster process" (Sonus Pet. at 6). As Sonus well knows, the review of Albunex *as a*

*device* lasted nearly four years (including time taken by the sponsor to respond to deficiencies

noted during the review by FDA). *See* 60 FR 11671 (Mar. 2, 1995) (FDA determination of

regulatory review period for Albunex, stating that the PMA was submitted on September 14,

1990, and was approved on August 5, 1994). In fact, Sonus sought in October 1992 to have

EchoGen regulated by FDA as drug, knowing that Albunex had already been under review in

CDRH for more than two years.[23]   Sonus cannot now complain before the agency that it has

been prejudiced by the alleged pace of product reviews in CDRH versus the alleged pace in

CDER.[24]

---

[23]By September 1990 MBI had publicized the fact that it had filed a PMA for Albunex (*see* May 16, 1997, Mallinckrodt Comments, Exh. L). Albunex went before a public advisory committee meeting in July 1992, just prior to Sonus filing its request for designation. Sonus itself noted in its request for designation that Albunex was being regulated as a device.

[24]Both drugs and devices are subject to the same statutory review periods. *See* 21 USC 360e(d)(1)(A) (providing that FDA complete its review of a PMA "[a]s promptly as possible, but no later than one hundred and eighty days after the receipt of [an application for premarket approval of a class III device] . . ."; 21 USC 355(c) (review period applicable to "new drugs"). In

37

b.   *Bracco*

Bracco cites five "requirements" allegedly imposed by CDER during the clinical study of

BR-1 to show that FDA has required "significantly different data, both in terms of amount and

character, to support approval of [BR-1] than the agency has required from MBI . . ." (Bracco

Second Supp. Pet. at 2).[25]   To the contrary, none of these alleged "requirements" supports an

argument that MBI had an unfair advantage in the product development process.

### (1)   *Use of a gold standard*

According to Bracco, CDER required the verification of diagnoses made with BR-1

against an accepted reference standard, such as "cardioangiograph (*sic*) or radionuclide

ventriculography," while CDRH allowed FS069 to be tested only against Albunex (Bracco

Second Supp. Pet. at 2-3).   One premise of this argument is that Bracco is developing its product

for the same indications for use that MBI is seeking in the pending PMA for FS069.   The agency

disagrees.

implementing the Prescription Drug User Fee Act of 1992 ("PDUFA")   (21 USC 379g *et seq.*),
CDER generally sets a "goal date" in which to take action on a drug marketing application of one
year from the date of submission for a "standard review" and six months for a "priority review."
CDRH has also been making strides toward improving review times for PMAs. It cannot, however
be said that review of a PMA in CDRH will necessarily be faster than review of an NDA in CDER.
Many factors affect the pace of review, including the quality of the application, the number and kind
of indications sought, the particular review team's familiarity with the underlying formulation, and
the sponsor's ability to respond quickly and thoroughly to inquiries from agency reviewers.

[25]At an April 8, 1997, meeting with agency officials, Bracco submitted a packet of materials,
marked "confidential," to show that it has been unfairly prejudiced and irreparably harmed by the
unequal treatment of BR-1 versus FS069.   Although Bracco did not submit this material to the
ultrasound docket, *see* 21 CFR § 10.20(c) and 21 CFR 10.20(c)(6) (setting forth procedures for
making confidential submissions in support of a citizen petition), the agency has considered this
material here, and has incorporated it into the record of this proceeding, as Bracco's best evidence
in support of its unequal treatment claim.

FDA000181

MBI is seeking FDA approval for the use of FS069 in providing opacification of cardiac chambers, improved delineation of endocardial borders with concomitant improvement in visualization of wall motion, and conversion of nondiagnostic images to diagnostic images, and enhanced Doppler signal (*see* Ad. Com. Tr. at 135). These indications are variations on the same theme. In an echocardiogram, the distinction between the edge of the blood pool in the heart and the endocardial border may appear blurry in an unenhanced image. Introduction of a contrast agent "lights up" the blood pool, allowing clearer delineation between the edge of the blood and the heart muscle (*i.e.*, improved endocardial border delineation, conversion of non-diagnostic to diagnostic). Because the contrast agent allows for clearer delineation between the blood and the muscle, it is easier to observe the movement of the heart muscle (*i.e.*, regional wall motion), as well as the filling of the left ventricle with blood (*i.e.*, opacification of the left ventricle) and the directional flow of the blood (*i.e.,* enhanced Doppler).

To demonstrate efficacy for such uses, the primary issue is whether the ultrasound image taken with the benefit of the contrast agent yields a better (more useful) image than that taken without the benefit of an agent. Accepted textbook knowledge of anatomy may well be sufficient to confirm whether the enhanced image is an improvement over the unenhanced image.

There are, however, a number of potential uses for ultrasound contrast agents that would require much more sophisticated confirmation in order to demonstrate the efficacy of the product for such uses. Two examples are measurement of ejection fraction and assessment of myocardial perfusion. The ejection fraction is the ratio of blood that leaves the heart with each beat. A healthy heart will eject about seventy percent of its contents with each beat, leaving behind about thirty percent of the blood in the chambers; an unhealthy heart may leave behind even more (50

39

FDA000182

percent or more). This ratio or ejection fraction is based on a *quantitative* measurement, not just visual assessment. Thus, a firm seeking to label its contrast agent as an aid in measuring ejection fraction would need to test its product against an accepted "gold standard" for measuring ejection fraction. An example of such a standard is radionuclide ventriculography, which involves injection of a traceable radionuclide such as native red blood cells tagged with Technetium into the blood pool that can be tracked and recorded using Multiple Uptake Gated Acquisition ("MUGA").

Assessment of myocardial perfusion is a disease-specific claim that is directed at providing direct (as opposed to inferential) evidence that the blood supply to specific tissue in the heart is compromised. Myocardial perfusion is the process by which oxygenated blood is brought to the heart muscle. A number of published reports suggest that ultrasound contrast agents of sufficient duration — which can enter the capillaries within the heart muscle itself — can be used directly to assess myocardial perfusion and thereby assist in the diagnosis of conditions such as coronary arterial stenosis (abnormal narrowing of the vessels) and myocardial infarction (death of a segment of the heart muscle). An example of an accepted modality for assessing myocardial perfusion involves the use of Thallium or Sestamibi with Single Photon Emission Computed Tomography ("SPECT"). Thallium and Sestamibi are radiocharged isotopes that are taken up by the heart muscle and can be read using SPECT.[26]

---

[26]In addition to myocardial perfusion and ejection fraction, some ultrasound contrast agents are being developed for "patient management" indications, in which the agent would be used to provide additional information for establishing a diagnosis, managing the overall course of treatment, to signal the need for certain further diagnostic examination, or to eliminate the need for certain tests. A proposed "patient management" indication relating to issues such as assessment of myocardial perfusion or ejection fraction would, likewise, invite the need for comparison — at a minimum — against the types of modalities discussed in the text.

40

FDA000183

The idea that Bracco has used cardioangiography, radionuclide ventriculography, or any of the other types of modalities described above in the study of BR-1, or that Bracco was advised to do so, is consistent with the IND and development plan Bracco presented to the agency. Bracco's IND did not limit the development of BR-1 to the indications listed in its petition, or to the indications MBI is seeking in the pending PMA. Bracco also did not limit itself in its IND and development plan to comparing BR-1 only against Albunex. Indeed, these documents show that Bracco stated it would compare BR-1 against the very modalities about which it now complains.

Finally, MBI has publicly reported that it has initiated studies of FS069 for myocardial perfusion and that FS069 is being compared against "stress nuclear imaging," a relevant gold standard comparator (MBI SEC Form 10-K405, fiscal year ended March 31, 1997, at 2). This disclosure, as well as a host of confidential materials reviewed by the agency in this proceeding, show that both CDER and CDRH expect sponsors to conduct clinical studies using relevant gold standard comparators.[27]

### *(2)    Safety assessment*

Bracco complains that CDER required the firm to collect safety data from patients at 24, 48, and 72 hours post-administration, while MBI collected safety data at a single point in time, 48 hours after administration (Bracco Second Supp. Pet. at 3).

MBI recorded safety data "at baseline" (just prior to administration), 30 minutes after

---

[27]Sonus likewise has reported that in January of this year, it initiated Phase 3 studies "which will compare the discriminatory power of contrast echocardiography with EchoGen and nuclear medicine scans in diagnosing myocardial infarction by assessing perfusion deficits in the myocardium. The success of this trial may foster new options for the non-invasive diagnosis of coronary artery disease . . . ." (Sonus SEC Form 10-K, for fiscal year ended Dec. 31, 1996, at 7).

41

FDA000184

administration, and between 48 hours and 10 days after administration (Ad Com. Tr. at 145).

The level of monitoring and data collection is based on factors such as the adverse events that

were noted during Phase 1 and 2 trials, the particular formulation, and the agency's

understanding of the product's uptake, metabolism, and elimination. The agency's current

database of knowledge regarding the product, and similar products, at the time that it provides

guidance is also a relevant factor. It is not unreasonable, then, for two products, presented at

different times, with different formulations, to receive different guidance on an issue such as

safety monitoring.

### *(3)    Testing for immunologic factors*

Bracco claims that CDER "required" Bracco to test at least 40 patients for immunologic

parameters, while MBI was permitted to test only 10 patients for such parameters (Bracco

Second Supp. Pet. at 3). In fact, as shown in the presentation made to the advisory panel, MBI

conducted immunologic testing on 16 of 40 subjects in study FS1000, re-tested five of those

subjects 1 year later in the re-challenge study FS1250, and conducted immunologic testing on 25

of 50 subjects in study FS6000, with a total of 41 subjects receiving FS069 for testing of key

reaction indicators (*see* Ad. Com. Tr. at 141-44).

In addition, the documentation submitted by Bracco at the April 8 meeting suggests that

in a Phase 1 trial of BR-1, certain adverse events were reported that suggested an immune

response of some kind to BR-1. *See* Bracco April 8, 1997, submission, Tab 5. Aside from the

fact that Bracco and MBI appear to have conducted a comparable quantity of immunology

studies (and that Bracco's documentation does not show that CDER required Bracco to study

42

FDA000185

immunologic parameters on 40 subjects),[28] such adverse event reports would certainly support the need for careful testing of BR-1 for immunologic parameters.

### (4)   *Blinding procedures*

Bracco claims that CDER required "sophisticated blinding procedures to blind both the sponsor and patient to the contrast agent administered," while CDRH permitted MBI to study FS069 in "an open label fashion" (Bracco Second Supp. Pet. at 3; Didato Decl. at ¶7).

The documentation submitted by Bracco does not show that the agency required Bracco to employ extraordinary or "sophisticated" blinding procedures during the administration of the test agent (*see* Bracco's April 8 Submission, Tab 2). Moreover, other documentation reviewed by the agency show that Bracco itself proposed early in the development process to use a "double-blind" study design. Bracco also has not shown that MBI conducted its studies "in an open label fashion," let alone that CDRH "permitted" an open label study during the development of FS069.

CDRH (like CDER) will consider the adequacy of the procedures used in a clinical study as part of its overall review of the adequacy of the study data submitted in the marketing application. Even if patients and investigators were not adequately blinded to the test agent, as Bracco claims, that is a review issue that would be considered in the context of looking at all of the data submitted in the application.

### (5)   *Off-site assessments*

According to Bracco, CDER required the firm to use an independent, "blinded"

---

[28] *See* Bracco's "Synopsis of Clinical and Statistical Comments Received from the FDA" and documentation submitted under Tab 3.

FDA000186

radiologist, maintained "off-site," to evaluate all test images, while MBI was permitted to have

the principal on-site investigator conduct all assessments of efficacy (Bracco Second Supp. Pet.

at 3). In fact, pursuant to a recommendation made by CDRH,[29] MBI used an off-site independent

"core laboratory" at Georgetown University, with a "masked reviewer" blinded to the test agent,

dose volume, and patient history, to make efficacy assessments in the two pivotal Phase 3 studies

(*see* Ad. Com. Tr. at 141, 146, 148, and 167).

### c.   *DuPont Merck*

DuPont Merck, like Bracco, argues that as a result of CDER's directions to the firm,

DuPont Merck now stands at a significant competitive disadvantage *vis a vis* MBI.  Closer

analysis of DuPont Merck's list of alleged differences — between CDER's guidance and the

PMA for FS069 — shows otherwise.[30]

### *(1)   Selection of a comparator*

DuPont Merck argues that it was required to use expensive gold standard comparators

"such as MRI" (magnetic resonance imaging) to demonstrate the effectiveness of DMP 115 in

assessing cardiac function, while FS069 was permitted to use Albunex as a comparator (DuPont

Merck Pet. at 6-7, and 13; DuPont Merck Rebuttal Comments at 9).  As a result, DuPont Merck

complains, it incurred more than $1,500,000 in additional expenses and lost nearly 6 months in

development time.

---

[29]Letter from CDRH to MBI dated Aug. 23, 1995.

[30]DuPont Merck also attended the meeting on April 8, 1997, with agency officials (*see* footnote 25, *supra*) and, like Bracco, provided a packet of materials in support of its unequal treatment claim. Though DuPont Merck did not submit this material to the ultrasound docket, the agency has considered the material presented at the meeting as DuPont Merck's best documentary support for its argument, and has incorporated this material into the record of this proceeding.

44

DuPont Merck insists that CDER imposed different testing standards than CDRH, even though "the record demonstrates that the same indications are being sought for DMP 115 and FS069." (DuPont Merck Rebuttal Comments at 4).[31]  As with Bracco, DuPont Merck has not discussed in its petition all of the indications for which DMP 115 is being developed.  DMP 115, like BR-1, is being developed for certain uses that by necessity invite the use of sophisticated gold standard comparators.

DuPont Merck is relying primarily on a set of minutes prepared by the firm from a November 1996 meeting with CDER.  It was at this meeting, according to the firm, that CDER rejected DuPont Merck's proposal to study DMP 115 against Albunex and *required* the firm to use a gold standard comparator "such as MRI" (DuPont Merck Pet. at 13).[32]  The minutes show, instead, that CDER requested clarification from DuPont Merck of the indications it was seeking to study and informed DuPont Merck that *if* the firm were seeking a cardiac function claim, *then* a reference standard other than Albunex would be required  (DMP 115 Presentation, April 8, 1997, at Tab 2).  Prior to this meeting, DuPont Merck and ImaRx indicated to CDER, in several different filings with the agency, that they intended to study DMP 115 for a number of sophisticated "function" indications, including several for which Albunex is not approved. Documents reviewed by the agency also show that the sponsors intended to study DMP 115

---

[31]DuPont Merck believes the burden is on MBI to demonstrate that DMP 115 is being developed for different indications than MBI is seeking in the pending PMA (DuPont Merck Rebuttal Comments at 4).  DuPont Merck, however, controls this information and, as discussed, did not reveal in its petition, to interested persons such as MBI, that DMP 115 is being developed for certain more sophisticated uses. *See* Letter from Arnold & Porter to FDA dated July 18, 1997.

[32]Nowhere in the documentation submitted by DuPont Merck does it show that the agency suggested using MRI as a comparator in the study of DMP 115.

45

FDA000188

against several sophisticated gold standard comparators — the same types of comparators about which they now seem to be complaining.[33] The idea that DuPont Merck may be using sophisticated gold standard comparators in the study of DMP 115, and may have been advised accordingly, is consistent with the overall development plan form DMP 115 that was presented to the agency. [34]

It should also be noted that the documentation offered by DuPont Merck makes it especially clear that the agency was providing advice and guidance to the firm, and that the firm at all times retained primary control over its own product development program (*see generally* DMP 115 Presentation, April 8, 1997, at Tab 2 (minutes of November meeting prepared by DuPont Merck showing that FDA raised questions about certain aspects of the firm's

---

[33]DuPont Merck also claims to have been told by CDER at the November 1996 meeting to consider using "objective measures" of the clinical endpoint, rather than purely subjective measures (DuPont Merck April 8 Presentation, Slide 1 and Tab 2). DuPont Merck insists that this was another way in which the firm was "required" to use more sophisticated nuclear comparators, rather than Albunex. In fact, this advice does not relate to the selection of a comparator. It refers, instead, to the criteria that the investigator/reviewer will use when measuring or scoring images generated during the study. *I.e.,* the technical attributes of the image that the reviewer will focus on in order to make a determination as to whether the contrast enhanced image is superior to the unenhanced image (*see, e.g.,* the extensive discussion of "scoring" in CDER's October 1995 draft comments to ImaRx, under Tab 5 of DuPont Merck's April 8 Presentation). CDER was recommending that DuPont Merck work on developing such "objective" criteria, and not rely on the reviewer's overall subjective "impression" — as had been suggested in a protocol submission made by DuPont Merck just before the November meeting.

[34]In its rebuttal comments, DuPont Merck tries to reinforce its argument that CDER and CDRH have imposed materially different requirements by referring to a study of EchoGen in which MRI was used as a comparator. First, this appears to be an academic study. The document supplied by DuPont Merck does not show that FDA required the use of MRI in the study. In any case, the abstract submitted by DuPont Merck shows that the EchoGen study in which MRI was used involved assessment not just of "wall motion," but of systemic arterial pressure and *"ejection fraction."* See DuPont Merck Rebuttal Comments at 8, attachment 2). Again, assessment of ejection fraction is a categorically different indication than that for which Albunex is approved and invites comparison against more sophisticated comparators.

46

FDA000189

development program, and "indicated" certain concerns, but that DuPont Merck took the agency's comments "under consideration" and regarded the agency's questions and concerns as "input and guidance on the development of DMP 115").

Finally, as discussed above, MBI is using one of the "expensive" nuclear-based gold standard comparators in ongoing studies of FS069 for a myocardial perfusion indication. Thus, the idea that only CDER requires firms to use comparators other than Albunex is wrong.

### (2)    Accuracy of cardiac function

DuPont Merck claims that it was required to demonstrate the effectiveness of DMP 115 in assessing cardiac function using diagnostic tests in humans, while MBI was allowed to use a study performed in five dogs (DuPont Merck Pet. at 7). The "dog study" identified by DuPont Merck was a pre-clinical study performed with Albunex, not FS069. Indeed, there should be no question that MBI has studied FS069 on substantial numbers of human subjects for each of the indications sought in the PMA.

In support of its argument DuPont Merck provided the agency with a highlighted copy of the transcript of the February 24, 1997, advisory panel meeting (DMP 115 Presentation, April 8, 1997, Slide No. 6). The highlighted excerpt focuses on a study done during the development of Albunex, *not* FS069, to confirm whether an agent such as Albunex could in fact be useful in helping to locate the endocardial border. As the transcript shows, Mallinckrodt Medical sought to do a study in which stainless steel helices were implanted by catheterization into five dogs. The location of the helices was measured using Albunex enhanced ultrasound images, and then again on *postmortem* gross examination following dissection of each dog (Transcript at 198-99). The test obviously could not be done on human subjects and, as the FDA reviewer noted during

47

FDA000190

the advisory panel meeting, there was no need to repeat the test for FS069.

It is remarkable, given the obvious purpose of this study and the description in the transcript, that DuPont Merck would argue — both before the agency and in court in *Bracco Diagnostics* — that MBI used only a study on just five dogs to establish efficacy. Indeed, as if this portion of the transcript submitted by DuPont Merck were not clear enough, the balance of the transcript makes it perfectly clear that MBI studied FS069 for endocardial border delineation and regional wall motion in over 200 human subjects.

### (3)    *Number of clinical trials*

DuPont Merck claims it was required to conduct two studies "for both echocardiographic and structural image enhancement, as well as functional measurement assessments of DMP 115, for a total of four well-controlled trials." (DuPont Merck Pet. at 7). FS069, according to DuPont Merck, conducted only "[t]wo well-controlled clinical trials to demonstrate structure."

DuPont Merck has not shown that it was *required* to study its product for "functional measurement assessments." The documentation it supplied the agency certainly does not show this (*see* DuPont Merck" April 8, 1997, presentation). However, *if* DuPont Merck chose to study DMP 115 for myocardial perfusion or for assessment of ejection fraction, then it is reasonable to expect that the firm would need to conduct additional studies and would need to use in its studies reference standards other than (or in addition to) Albunex.

### (4)    *Statistical power*

Petitioners have argued that the statutory standard for approval of a medical device has been interpreted by FDA as requiring, in certain circumstances, only one pivotal trial. Here, however, MBI conducted two Phase 3 pivotal trials of FS069. DuPont Merck nevertheless

48

claims that MBI's two Phase 3 trials likely do not have the statistical power to stand on their own because the data from the two trials were pooled at the February 24, 1997, advisory panel.

Because the protocols for the two Phase 3 studies were identical, the data from the two studies were pooled for presentation purposes. They were also presented to the advisory committee as separate studies. In any event, whether each study is adequate and well-controlled is a review issue, not a product development issue. The statistical power (or lack thereof) of the studies MBI submitted in support of its PMA should have no bearing on DuPont Merck's design of its pivotal studies.

### *(5)*     *Multiple blinded image readings*

DuPont Merck states that CDER advised the firm to use "multiple blinded readers," while MBI does not appear to have used multiple blinding (DuPont Merck Pet. at 8).

With respect to efficacy, the focus of the FS069 pivotal studies was to demonstrate superiority to Albunex for the same uses. The core difference between Albunex and FS069 is that Albunex remains echogenic for 30 to 45 seconds, while FS069 remains echogenic in excess of 4 minutes. This is not a subtle distinction to discern, and the need for multiple blinded readers may well prove not to be crucial, when all of the data are reviewed.

### *(6)*     *Total number of subjects*

DuPont Merck complains that 500 patients will have been exposed to DMP 115, while only 300 will have been exposed to FS069, for purposes of establishing the safety of the agents (DuPont Merck Pet. at 8-9). As discussed above, in the response to Sonus, the agency does not require in advance that a specific number of patients be administered a test article. Moreover, the idea that DMP 115 will have been studied on more patients than FS069 is a function primarily of

49

FDA000192

the kind and quantity of the indications for which DuPont Merck is seeking to develop DMP 115,
versus the indications that MBI is pursuing in the pending PMA, as well as each firm's own trial
design.

It is also a function of each firm's own development program. Each is developing its
product for different indications at different times, making it near impossible to evaluate DuPont
Merck's assertion.

### (7)   *Safety monitoring*

DuPont Merck raises the same claim as Bracco regarding follow-up safety monitoring at
24, 48, and 72 hour intervals (DuPont Merck Pet. at 9). *See* response, *supra*, to Bracco.

### (8)   *Weight-based dosing*

DuPont Merck claims it was required to use weight-based dosing in the study of DMP
115, while MBI was not required to do so in Phase 3 trials of FS069 (DuPont Merck Pet. at 9).
Again, the documentation submitted by DuPont Merck shows only that the agency suggested
doing a subset analysis of weight-based dosing for efficacy, and that DuPont Merck "would take
this under consideration" (DuPont Merck April 8 Presentation, Tab 2).

In any event, existing knowledge about the dosing of Albunex helped to establish early
on that weight-based dosing was not an issue for FS069. MBI used weight-based dosing in the
study of Albunex in order to arrive at a safe and effective dosage level. (The dose of a contrast
agent must be large enough to fill the heart with bubbles, but not so large as to cause adverse
events.) Early in the development of FS069, it became apparent that FS069 showed efficacy in
improving border delineation at doses that were orders of magnitude lower than Albunex.
Because FS069 could be dosed at levels far below the safety threshold established by Albunex,

50

FDA000193

the agency did not focus on the need to study weight-based dosing of FS069.

There was, however, much less familiarity with DMP 115 (particularly the manner in which the active gas is contained as a bubble) and, therefore, it was not unreasonable for the agency to suggest that additional data be gathered on appropriate dosing of DMP 115.

Finally, as with several other differences cited by DuPont Merck, it is not apparent from the petition that gathering data on weight-based dosing imposed materially higher costs on the development of DMP 115, or materially slowed the study of the product. Even DuPont Merck concedes that some differences in clinical development should be expected and do not give rise to claims of "disparate" treatment (*see* DuPont Merck Rebuttal Comments at 5).

*    *    *

In short, none of the petitioners has shown that as a result of its product being regulated as a drug, and FS069 undergoing review as a device, the clinical development program for the products were markedly different. It is true that one could expect, based on the different statutory schemes governing drugs and devices, that drug and device product development would be different. In this case, however, the "differences" cited by petitioners tend instead to show that the products have been developed using quite similar investigatory approaches (especially if one corrects for the different indications that several of the petitioners appear to be pursuing, versus the indications sought by MBI in the pending application). Finally, several of the differences cited by petitioners Bracco and DuPont Merck are premised on incomplete or incorrect descriptions of the underlying factual record.

## V.    MBI'S PRODUCTS MAY BE REGULATED AS DRUGS

In comments filed to the ultrasound docket, and in papers filed in the *Bracco Diagnostic*

51

FDA000194

litigation, MBI argues that the Act directs the agency to regulate FS069 and Albunex as devices.
The agency disagrees. Although FDA has regulated Albunex as a device, and has allowed
FS069 to proceed through the device review process, the agency has ample discretion to regulate
these ultrasound contrast agents as "drugs."

## A.   The Drug and Device Categories Are Not Mutually Exclusive

MBI argues that if Albunex and FS069 meet the statutory definition of a device,[35] then
the agency has no discretion: it must regulate those products as devices (MBI Comments, May 8,
1997, at 7-8 n. 3). MBI's assertion that the "drug" and "device" categories are in all instances
"mutually exclusive" is simply not true.

The district court in *Bracco Diagnostics* has already rejected this argument twice. *See*
Opinion and Order dated April 21, 1997, at 14 (finding that the products at issue likely meet both
the definition of a drug and the definition of a device and, as such, FDA has discretion in
determining how to regulate them); Order dated May 29, 1997 (rejecting defendant MBI's
motion for reconsideration, in which MBI extensively briefed the issue of whether the terms

---

[35]Only one petitioner offered a direct argument as to why FS069 might not meet the
definition of a device. Focusing on the introductory language in section 201(h) of the Act, Sonus
asserted in a footnote that "[c]ontrast media are not instruments, apparatuses, implements, machines,
contrivances, implants or reagents, nor are they similar or related to any of those things," and "[t]hey
therefore appear to fall outside the device classification" (Sonus Pet. at 3 n.4.) In *Bracco
Diagnostics*, Sonus elaborated slightly, referring to a 1982 FDA Federal Register notice reclassifying
a product (artificial tears) from "device" to "drug" because the product did not appear to fall within
the categories listed in the introduction to section 201(h) (Sonus Opp. to MBI's Motion for
Reconsideration, May 5, 1997, at 3-4, citing 47 Fed. Reg. 46139 (1982)). The term "device" it
should be noted also includes an "accessory" to an instrument, apparatus, implement, *etc.*, and
ultrasound contrast agents, unlike the stand-alone product noted by Sonus, is used as an accessory
to various diagnostic equipment. *See also* Intercenter Agreement Between CDER and CDRH (Oct.
31, 1991) section VII.C (showing that dyes, fluids, and gases, among other things, may be regulated
as devices).

FDA000195

"drug" and "device" are mutually exclusive). Moreover, the United States District Court for the Middle District of North Carolina recently rejected this argument in *Coyne Beahm, Inc., et al. v. FDA, et al.*, 958 F. Supp. 1060, 1081 and n.18 (M.D.N.C. 1997) (*Appeal pending*) (finding that reports accompanying the Medical Device Amendments of 1976 "suggest that Congress amended the definition [of the term device] to draw a clearer line between the 'drug' and 'device' definitions," but that these reports do not show that Congress intended to limit FDA's discretion to choose regulatory authorities).

Prior to 1990, section 201(g) of the Act stated that a drug "does not include devices or their components, parts, or accessories." This language suggested an absolute distinction between drugs and devices. However, as part of the Safe Medical Devices Amendments of 1990 ("SMDA") (Pub. L. 101-629), Congress deleted this language from the definition of the term "drug." The intent of the modification, as MBI argued in *Bracco Diagnostics* (*see* MBI Reply Mem. in Support of Motion for Reconsideration, dated May 12, 1997, at 5), may well have been to accommodate the regulation of combination products that consist of drug components and device components (*see* S. Rept. 101-513, 101st Cong. 2d Sess., at 30 (1990)). The effect, however, was to eliminate the notion that the terms "drug" and "device" are mutually exclusive. *See* 61 FR 44396, 44400 (Aug. 28, 1996) (FDA final rule on the regulation of cigarettes and smokeless tobacco); Memorandum of DuPont Merck in Response to MBI's Motion for Reconsideration dated May 5, 1997, at 5-6 filed in *Bracco Diagnostics*.

Nor is it the case, as MBI insists, that there is an absolute distinction between "drugs" and "devices" that is based on whether the primary intended purpose of the product is "physical" (*i.e.*, a device) or chemical or metabolic (*i.e.*, a drug). While Congress has excluded from the

53

FDA000196

definition of the term "device" articles that rely on chemical action or on being metabolized, there is no counterpart provision in the definition of the term "drug." As a result, the agency regulates a number of products as drugs that rely on "physical" mechanisms to achieve their primary intended effects. *See, e.g,* Intercenter Agreement Between CDER and CDRH at section VII.D.

Finally, a product such as FS069, which consists of injectable, flexible, systemically distributed microspheres, each comparable to the size of a red blood cell, is well suited for regulation under either the drug provisions or the device provisions of the Act. That is, the product at issue is not one for which the operational provisions of the Act governing devices are uniquely or exclusively suited (*see* MBI Reply Mem. in Support of Motion for Reconsideration, dated May 12, 1997). The agency thus has substantial discretion in this instance to choose whether to regulate FS069 as a "drug" or as a "device."

**B.    Section 503(g)(1) Does Not Direct the Outcome of this Proceeding**

MBI argues that FS069 (and Albunex) are combination "device/biological" products whose "primary mode of action" is that of a device.[36] As such, MBI insists that regulation of FS069 is governed by section 503(g)(1) of the Act (21 USC 353(g)(1)). Section 503(g), according to MBI, leaves the agency with no discretion but to assign regulation of FS069 to CDRH and to regulate FS069 under the device provisions of the Act. The agency disagrees.

---

[36]According to MBI, the albumin used in the manufacturing of FS069 is a licensed biological product, and the perfluoropropane gas that fills the microsphere is an approved device. (*See, e.g.,* MBI's May 19, 1995, letter to FDA). That approved device product (ISPAN perfluoropropane ($C_3F_8$) gas), however, is intended for an entirely different use than the gas that is contained within FS069. ISPAN is intended for use as a surgical aid in treatment of retinal detachment by phematic retinopexy. 58 FR 19463 (April 14, 1993). It is administered in the form of a local intravitreal injection, in the chamber behind the lens of the eye, for selected retinal breaks and to aid in the resorption of subretinal fluid.

FDA000197

A combination product combines a drug and a device, a drug and a biological product, or a device and a biological product (21 USC 353(g)(1); *see* 21 CFR 3.2(e)). Examples of combination products, as listed in the legislative history supporting section 503(g), include "devices impregnated with biologically-active materials, medicated devices, implantable drug pumps, and biological sensors."[37]  In these examples, each article within the product contributes a distinct function *(e.g.*, a device function and a drug function, or a device function and a biological function), with one component providing the product's "primary mode of action." Indeed, as Congress stated in enacting section 503(g), the combination product provision is intended to provide "firm ground rules to direct products promptly to that part of the FDA responsible for reviewing *the article that provides the primary mode of action* of the combination product." S. Rep. No. 513, 101st Cong., 2d Sess., 30 (1990) (emphasis added).

In this instance, the components that make up FS069 are intended to provide the same effect. The efficacy of FS069 is a function of the diameter, sphericity, flexibility, and compressibility of each microsphere, with the resonance of ultrasound energy occurring as a result of the interaction between the outer shell and the encapsulated gas *(see* Ad. Comm. Tr. at 154-55; MBI Comments, May 8, 1997, at 4). In resonating, the spheres compress and expand as a unit in response to ultrasound energy. Neither the shell nor the gas itself is responsible for the product's intended effect. The gas in FS069 supports the outer shell, while the shell helps to contain the gas. Unlike, for example, a preloaded syringe or an implantable drug pump, in which one component is contributing a definable delivery function and the other a definable drug effect,

---

[37]Examples of other types of combination products with a biological component include: an artificial hip swabbed with a biological growth factor, allergen patches, and pre-filled immunoglobulin syringes.

FDA000198

the components in FS069 do not contribute separately definable effects for purposes of applying section 503(g) of the Act.

The agency also disagrees with MBI's argument that section 503(g) limits the agency's discretion as to the statutory provisions under which a combination product may be regulated. Section 503(g) directs FDA only as to the agency component that will have regulatory responsibility for a combination product.  Section 503(g) does not control which set or sets of statutory authorities the agency must apply in reviewing the safety and effectiveness of such a product.[38]  *See Coyne Beam, Inc., et al. v. FDA, et al.*, 958 F. Supp. 1060 (M.D.N.C. 1997) (*appeal pending*) (deferring to FDA's interpretation of section 503(g)).

In sum, section 503(g) does not determine the outcome of this proceeding.  Even if section 503(g) were applicable, MBI has not demonstrated that FS069 must be regulated in CDRH as a device.

## VI.   FDA'S BASIS FOR PROSPECTIVELY REGULATING ULTRASOUND CONTRAST AGENTS AS DRUGS

The Act defines the term "drug" as:

> (A) articles recognized in the official United States Pharmacopeia, official Homeopathic Pharmacopeia of the United States, or official National Formulary,

---

[38]*See* H.R. Rep. No.101-959, at 29 (1990) (Conference Report), *reprinted in* 1990 U.S.C.C.A.N. 6327, 6334 (the combination product provision "describe[s] the general procedures for determining the appropriate *component of the FDA* to review" a combination product) (emphasis added); *see also* 61 Fed. Reg. 44400-03. An earlier version of the Safe Medical Devices Act arguably would *not* have allowed FDA discretion with respect to which statutory authorities to apply. *See* 136 Cong. Rec. S. 12493, 101st Cong., 2d Sess., Aug. 4, 1990 (proposing, in S. 3006, that if the primary mode of action of a combination product is that of a drug "neither the combination article nor any part of the article shall be treated as a device or as a biological product for market clearance purposes"). However, Congress chose *not* to enact that limitation. *See also* Memorandum of Law filed by DuPont Merck and ImaRx in opposition to MBI's motion for reconsideration, dated May 5, 1997, in *Bracco Diagnostics* at 8-9, describing the limited purpose of section 503(g).

FDA000199

or any supplement to any of them; and (B) *articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals;* and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C).

21 USC 321 (g)(1) (emphasis added).  All of the microbubble and microsphere ultrasound contrast agents at issue in this proceeding are "articles" that, at a minimum, are "intended for use in the diagnosis . . . of disease." 21 USC 321(g)(1)(B).  All, therefore, fit within the definition of a "drug" and, as such, may be regulated as drugs by CDER.  S*ee generally United States v. An Article of Drug . . . Bacto-Unidisk*, 394 U.S. 784 (1969).

The same cannot be said when these products are held up to the definition of a "device" in section 201(h) of the Act.  As discussed above, Congress excluded from the definition of a "device" those articles that rely on chemical action within or on the body, or that rely on being metabolized, to achieve their principal intended purposes.  Also, as discussed in section II.A, *supra,* ultrasound contrast agents are being developed for a number of uses that require biochemical action inside the body as a necessary step to the product achieving its primary intended purpose.  Such uses — which are made possible by the longer duration of products such as FS069 and EchoGen — may exclude these products from being regulated as devices.[39]

All of the products in this class meet the definition of a "drug."  For most uses, all are distributed systemically, a characteristic far more endemic to drug products than to devices.  These products also raise many of the same safety and effectiveness considerations (although that

---

[39]*See, e.g.,* FDA petition response dated November 27, 1995 (Docket No. 92P-0206/CP1) finding that radiopharmaceuticals used in positron emission tomography (PET) cannot be regulated as devices because PET radioisotopes depend upon biochemical processes (phosphorylation of a glucose ligand attached to the isotope) to position the radioisotope in the body in areas of high glucose uptake.

57

FDA000200

did not always appear to be the case). Moreover, as petitioners have noted, CDER has traditionally regulated other radiologic contrast agents and has developed substantial expertise in evaluating the safety and effectiveness of such products. Finally, a number of products within this class, because of their extended duration, are being developed for uses that may preclude them from being regulated as devices.

With these factors in mind, the agency has decided that it is appropriate to begin regulating these products — as a class — as drug products in CDER. Concentrating the review of these products in one agency Center, under one statutory scheme, will promote administrative efficiency, make better use of agency resources, and minimize the burden on industry and practitioners that a dual regulatory scheme may impose.

## VII.   IMPLEMENTATION OF THE DECISION TO REGULATE ULTRASOUND CONTRAST AGENTS AS DRUGS

A number of times in the past the agency has administratively moved products from one regulatory category to another. *See, e.g.,* 47 FR 46139 (Oct. 15, 1982) (redesignation of liquid tear ophthalmic product from device to drug); 51 FR 37976 (Oct. 27, 1986) (determination that human Thrombin product would be "more appropriately and efficiently" regulated as a device rather than as a biological). In some instances, the agency has moved products from one category to another *(e.g.,* from biologics to drugs) in order to bring regulatory uniformity to a class of products which, for historical reasons, was subject to regulation by more than one agency component. *See, e.g.,* 40 FR 31311 (July 25, 1975) (reassignment of radioactive biological products "to provide uniformity in processing and a focal point for action within FDA for this category of products"). In other instances, the transfer of certain products from one category to another was based on the recognition that clinical use of the product had changed.

FDA000201

*See, e.g.*, 55 FR 5892 (Feb. 20, 1990) (notice stating that FDA would begin regulating *in vitro* diagnostic test kits for use in detecting total antibody to hepatitis B core antigen as licensed biologicals, rather than as devices for which PMAs had been required, "because the major use of these products has changed from clinical diagnostic use to that of screening licensed blood and blood products intended for transfusion"). In each case the agency has worked to ensure that the transition from one jurisdictional category to another would take place with minimal disruption to the marketplace and minimal prejudice to the firms subject to the move. Consistent with prior product redesignations, the agency intends to implement the decision to regulate all injectable microbubble and microsphere ultrasound contrast agents as drugs as follows.

### A.    FS069

The agency has determined that primary review authority for the pending PMA for FS069 will be transferred to CDER, and that the PMA will immediately be deemed a submitted and filed NDA under section 505(b) of the Act. *Compare* 21 USC 355(b)(1) (setting forth required contents of an NDA) with 21 USC 360e(c)(1) (setting forth similar requirements for the contents of a PMA). The submission date of the NDA for FS069, for purposes of setting a PDUFA "goal date" within CDER for completion of the review (*see* footnote 24, *supra*), will be October 17, 1996, the date on which FDA received the PMA for FS069.[40]

CDER will review the application under the statutory and regulatory standards applicable to new drug products, *see* 21 USC 505(d) and 21 CFR 314.125(d). CDER will not, however, repeat the review of those portions of the PMA on which CDER officials have already completed

---

[40]The filing date of the application, for purposes of beginning the 180 day review period described in section 505(c) of the Act, would be 60 days after the submission date, or December 17, 1996. 21 CFR 314.101(a)(2).

FDA000202

substantial work.  Moreover, CDER will be able to rely, as appropriate, on the extensive analyses already done by CDRH, the comments and recommendations of the February 24, 1997, advisory panel, and any conclusions already reached by CDRH officials regarding the data and information in the PMA.

In order to meet the statutory requirements for the marketing of a new drug, MBI will be expected to amend its NDA with appropriate patent information (*see* 21 USC 355(b)(1) and 21 CFR 314.125(b)(18)), proposed drug labeling, and any other information needed to support the approval of an NDA.  In addition, because FS069 will be undergoing review as a new drug under an application that will be deemed to have been submitted as an NDA, the terms of section 735 *et. seq.* of the Act (21 USC 379g *et seq.*) governing payment of "user fees" will apply to the review, subject to any exceptions or waivers that may be applicable.

In comments submitted to the ultrasound docket, MBI requested that if FS069 were categorized as a drug, (1) CDRH should continue to have primary responsibility for the product; (2) FS069 should be approved for echocardiography based on the data in the PMA; (3) post-approval requirements applicable to new drugs, such as compliance with drug good manufacturing practice ("GMP") regulations, should be phased in over a one-year period; and (4) MBI's perfluoropropane supplier should be given one year within which to bring itself into compliance with drug GMP regulations (MBI Comments, June 9, 1997).

For the reasons discussed above, the agency has determined that it will regulate FS069 as a drug in CDER.  The agency expects, however, that the redesignation of FS069 can be accomplished without a significant interruption in the pre-market review process. This is based on two important aspects of the FS069 PMA.  First, the PMA contains sufficient data and

60

FDA000203

information for CDER to accept it for filing as an NDA. Second, CDER staff have consulted closely on, and in some instances have already reviewed, significant portions of the FS069 PMA. To minimize the burden on MBI, CDER will review FS069 based on the data and information in the already-filed PMA, and build on the review that has been completed in CDRH (as well as the review work completed by CDER officials). With respect to MBI's concerns regarding drug GMP requirements, given the decision to require approval of FS069 as a new drug, it would be inappropriate to allow the product to be marketed if it did not comply with drug GMP requirements by the time of final marketing approval. MBI's other product, Albunex, has been found to meet drug GMP requirements. Moreover, because perfluoropropane has been approved for intraocular use, it is likely that MBI will be able to locate a gas supplier for FS069 capable of meeting GMP requirements.

Finally, with respect to any and all IDEs that may have been filed in CDRH for the study of FS069, those IDEs will be transferred to CDER and assigned IND numbers. It is expected that ongoing studies will continue without interruption. However, CDER officials will meet promptly with the sponsor(s) of such IDEs to discuss the status of ongoing studies and to determine whether additional information must be submitted to bring the IDEs into conformity with IND requirements.

## B.    Albunex

Albunex is an approved and marketed product. Moreover, because of its limited biological half-life, Albunex has not and is not likely to be developed for several of the uses discussed in sections II.A and VI., *supra*. It would be contrary to the public health if the agency's efforts to bring regulatory uniformity to this class of products resulted in safe and effective

FDA000204

products, such as Albunex, being withdrawn from the market. For these reasons, the agency has determined that Albunex, and the approved supplement for Albunex, will continue to be marketed under the existing PMA.

However, to help achieve the agency's goal of regulatory consistency for this class of products, the PMA for Albunex, as well as all pending and approved supplements and IDEs, will be transferred to CDER. As with FS069, the IDEs will be assigned IND numbers, with the expectation that the studies will continue without interruption. The PMA for Albunex, and the recently approved supplement, will be transferred to CDER, which will work with the sponsor to convert the approved device applications to approved "new drug" applications in a timely fashion. Marketing of Albunex, however, will continue under the existing applications and under device standards until the applications have been converted. Payment of a "user fee" will is not required in order to accomplish the transfer of Albunex. Any new applications for new uses of Albunex will be submitted and reviewed under the new drug review standards.

**C.    All Other Products and Future Applications**

Finally, all future investigational applications and applications for premarket approval of microbubble and microsphere-based ultrasound contrast agents must be filed in CDER pursuant to section 505 of the Act. Pending IDEs will be transferred to CDER and will be assigned IND numbers, with the expectation that there will be no interruption in ongoing studies.

62

FDA000205

## VIII. CONCLUSION

For the foregoing reasons, the agency is granting the petitions filed by Bracco, Sonus, and DuPont Merck, to the extent that each requests that microbubble and microsphere ultrasound contrast agents should be regulated under the same statutory standards. The agency is also granting the Bracco and Sonus petitions to the extent that each requests that the agency regulate these products as "drugs" and "new drugs." The agency, however, is denying the Bracco, Sonus, and DuPont Merck petitions to the extent that each argues that the agency was "arbitrary and capricious" in determining in the past that certain products within this class should be regulated as devices while others should be regulated as drugs. Finally, the agency has outlined a reasonable and appropriate plan for implementing its decision.

Michael Friedman, M.D.
Deputy Commissioner
for Operations

Dated:    JUL 2 5 1997

63

FDA000206

# Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff

## *FINAL GUIDANCE*

*Additional copies are available from:*
*Office of Combination Products*
*Food and Drug Administration*
*WO32, Hub/Mail Room #5129*
*10903 New Hampshire Avenue*
*Silver Spring, MD 20993*
*(Tel) 301-796-8930*
*(Fax) 301-847-8619*
*http://www.fda.gov/CombinationProducts/default.htm.*

For questions regarding this document contact the Office of Combination Products at 301-796-8930 or combination@fda.gov.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Combination Products**
**Office of Special Medical Programs**
**Office of the Commissioner**

**September 2017**

FDA000207

*Contains Nonbinding Recommendations*

## Table of Contents

**I.    INTRODUCTION** ..................................................................................................2

**II.    WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT?** ............................................................3

**III.    WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE?** ..........................................................4

    A.    STATUTORY DEFINITIONS ....................................................................................5

        1.    *Drug* ..............................................................................................................5

        2.    *Device* ...........................................................................................................5

    B.    CERTAIN KEY PROVISIONS OF THE DEFINITION OF DEVICE ...................................5

        1.    *"Similar or related article" in the definition of device* ..............................6

        2.    *"Primary intended purposes" in the definition of device* ...........................6

        3.    *"Chemical action" in the definition of device* ...........................................7

        4.    *"Within or on the body" in the definition of device* ...................................7

        5.    *Illustrative Examples* ...................................................................................8

    C.    HOW IS A PRODUCT CLASSIFIED IF IT MEETS THE DEFINITION FOR DRUG (OR FOR BOTH DRUG AND DEVICE) AND ALSO MEETS THE DEFINITION FOR BIOLOGICAL PRODUCT? ....................................10

**IV.    ADDITIONAL INFORMATION** ...........................................................................11

**FREQUENTLY ASKED QUESTIONS** ............................................................................12

1

FDA000208

*Contains Nonbinding Recommendations*

# Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff[1]

This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page of this guidance.

## I.    INTRODUCTION[1]

FDA regularly receives questions from medical product sponsors concerning the classification of their products.[2] We believe that efficient, effective regulation is facilitated by providing guidance on issues frequently raised in relation to Requests for Designation (RFDs) and other classification activities. In addition, providing as much clarity and predictability as possible with respect to product classifications should enable informed planning for product development. Accordingly, we have prepared this guidance to make the Agency's current thinking concerning certain product classification issues more readily and widely available.

While issues have arisen relating to whether a product should be classified as a drug, device, biological product, or combination product, most of these issues have related to whether a product should be classified as either a drug or a device.[3] Accordingly, this guidance focuses particularly on cases in which a product[4] may be classified as a drug or device.[5] This guidance also addresses additional issues relating to product classification, including how to obtain classification determinations from FDA for medical products.

This guidance is organized into two substantive sections.

---

[1] This guidance has been prepared by the Office of Combination Products in consultation with the Center for Biologics Evaluation and Research, the Center for Devices and Radiological Health, and the Center for Drug Evaluation and Research.

[2] Please note that "classification" as used in this guidance refers to a product's designation as a drug, device, biological product, or combination product. This is distinct from the use of the term "classification" in reference to the class (Class I, II, or III) of a device as described in section 513(a) of the Federal Food, Drug, and Cosmetic Act (FD&C Act).

[3] This guidance addresses the definitions for the terms drug, device, and biological product in section III. The term "combination product" is defined in 21 CFR 3.2(e). For further information regarding the definition for the term combination product and the regulation of combination products, please visit the webpage for the Office of Combination Products at www.fda.gov/CombinationProducts/default.htm.

[4] The guidance's discussion of the classification of products is also relevant to classification of the constituent parts of a combination product.

[5] This guidance focuses on classification of products for human use. Distinct considerations may apply in determining how to classify a product intended for use in animals.

FDA000209

*Contains Nonbinding Recommendations*

Section II offers guidance on the RFD process for obtaining a formal determination of a product's classification.

Section III presents general concepts regarding FDA's decision-making process for classification determinations and addresses issues that may arise in determining whether products should be classified as drugs or devices.[6]

The Agency recommends that sponsors contact the Office of Combination Products (OCP) to confirm the classification of any products they may wish to market if the appropriate classification is unclear or in dispute.  Section IV provides contact information for OCP and responses to frequently asked questions.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word "should" in Agency guidances means that something is suggested or recommended, but not required.

## II.    WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT?

If the classification of a product as a drug, device, biological product, or combination product is unclear or in dispute, a sponsor can submit an RFD to OCP in accordance with Part 3 of Title 21 of the Code of Federal Regulations (21 CFR Part 3) to obtain a formal classification determination for the product, as provided for under section 563 of the FD&C Act (21 USC 360bbb-2).  Any RFD determined to be incomplete will be returned to the sponsor with a request for the missing information.[7]  21 CFR 3.8(a).  Once OCP determines the RFD is complete for filing, the Agency reviews the RFD.

The sponsor recommends a classification in the RFD, and should explain the basis for the recommendation.  While the sponsor should justify why it believes the product meets the recommended classification, we generally consider both the information provided in the RFD and other information available to the Agency at that time in making our designation.

Generally, OCP will respond to the sponsor in writing within sixty days of the RFD filing, identifying the classification of the product as a drug, device, biological product, or

---

[6] This section generally focuses on approaches for determining whether a product should be classified as a drug or a device, based on application of the statutory definitions for these terms under sections 201(g) and 201(h) of the FD&C Act (21 USC 321(g) and (h)), respectively.  Please note that this document does not focus on the classification of products as biological products regulated under section 351(i) of the Public Health Service Act (PHS Act) (42 USC 262(i)).  It also does not address under what circumstances certain human cells, tissues, or cellular or tissue-based products (HCT/Ps), as defined in 21 CFR Part 1271, are regulated solely under section 361 of the PHS Act.  For guidance concerning HCT/Ps, please visit http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Tissue/.

[7] See 21 CFR 3.7 for content requirements for RFDs.

3

FDA000210

*Contains Nonbinding Recommendations*

combination product.  If the Agency does not provide a written response within sixty days, the sponsor's recommendation respecting the classification of the product is considered to be the final determination.  21 USC 360bbb-2(b) and (c).

RFD determinations pertain only to the product as described in the designation letter, including its proposed use(s) or indication(s) for use.  The Agency may modify a determination made under section 563 regarding the classification of a product or the component of FDA that will regulate the product either with the written consent of the sponsor or for public health reasons based on scientific evidence.  21 USC 360bbb-2(b) and (c).[8]

A new determination may be appropriate if there is a change in, for example, a proposed indication for use or in a component of the product, or if the sponsor or Agency becomes aware of additional information that reveals that the means by which the product achieves its primary intended purposes differ from what was originally described in the RFD.  For example, if a sponsor wished to change the indication for a product and that new indication would be achieved through a different mechanism than the original indication, a different classification for the new indication might be appropriate.

Please contact OCP if you have questions regarding whether to submit an RFD, what information to provide, or issues to address in an RFD to ensure its completeness and clarity.[9]

## III.    WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE?

FDA's determination of whether to classify a product as a drug or device is based on statutory definitions, as set forth in sections 201(g) and 201(h) of the FD&C Act, respectively. We apply these definitions to products, relying on the scientific data that are available to FDA at the time of the classification determination concerning the product for its proposed use(s)/indication(s).[10]

---

[8] The sponsor may request reconsideration of the decision if its classification recommendation is not adopted by the Agency.  See 21 CFR 3.8, 10.75.  If the sponsor develops or becomes aware of new information that may affect the product's classification, the sponsor may also submit a new RFD seeking a new determination.

[9] More detailed information on the RFD process is provided in OCP's guidance *How to Write a Request for Designation (RFD), available at* http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm.  A pre-RFD process is available if a sponsor wishes to obtain a preliminary, non-binding classification determination or to engage in preliminary classification discussions with the Agency before filing a formal RFD.  The RFD and pre-RFD processes are also available to sponsors to clarify the Center assignment for medical products, though this issue is beyond the scope of this guidance.  More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf.

[10] If a product type has been classified by regulation, FDA would generally classify the product (including as a constituent part of a combination product) in accordance with the regulation, if the product (or constituent part) falls within the scope of that regulation.  If the Agency concludes that it may be appropriate to propose changing a classification established by regulation, FDA would initiate notice and comment rulemaking to do so.[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes."  This clause has not been at issue frequently in classification determinations.  Accordingly, we do not offer guidance on its construction here.  If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

4

*Contains Nonbinding Recommendations*

Medical product classification determinations often focus substantially on whether a product that meets the definition of drug also meets the statutory definition of device. This section presents the drug and device definitions and discusses how the Agency addresses certain issues that arise when determining whether a product should be classified as a drug or device.

### A.    Statutory Definitions

#### 1.    Drug

Section 201(g) of the FD&C Act (21 USC 321(g)) provides that the term "drug" means:

> (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C). . . .

#### 2.    Device

Section 201(h) of the FD&C Act (21 USC 321(h)) provides that the term "device" means:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--
> (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
> (3) intended to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

### B.    Certain key provisions of the definition of device

Conceptually, all FDA-regulated medical products meet the definition of "drug" under section 201(g) of the FD&C Act, due to the broader scope of the drug definition. For a medical product also to meet the more restrictive device definition under section 201(h) of the FD&C Act, it must (i) be "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article," and (ii) *not* achieve its primary intended purposes through *chemical action* within or on the body of man or other animals" and (iii) "*not* [be] dependent upon being *metabolized* for the achievement of its primary intended purposes" (emphasis added).

5

FDA000212

*Contains Nonbinding Recommendations*

The sponsor presumably has the most complete information relevant to how its proposed product achieves its primary intended purpose(s). Sponsors seeking a classification determination should present all available data and other information potentially relevant to that determination (without regard to whether the data or information supports the sponsor's preferred outcome). For example, for a sponsor seeking to classify its proposed product as a device, those data should demonstrate that its product meets the definition of a device.

At the classification stage, sponsors would not be expected to have gathered sufficient data to demonstrate that their proposed product meets the applicable marketing authorization standard (e.g., data demonstrating effectiveness). Therefore, the focus of FDA's classification analysis is on how the product would be expected to achieve its primary intended purposes, assuming it is capable of achieving its primary intended purposes at all. FDA will use its best scientific judgment to evaluate all available information relevant to the classification determination, including information submitted by the sponsor or available in the literature.

The following discussion presents the Agency's current thinking on certain issues that arise with respect to the statutory definition of device.

### 1.    "Similar or related article" in the definition of device

The first clause of the device definition provides that the term "means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or *other similar or related article* . . ." (emphasis added). The issue of whether a product may be considered a "similar or related article" under this clause can arise, for example, with regard to products in liquid, semi-liquid, gel, gas, or powder form. In some cases, such products are appropriately considered "similar or related articles," and may be classified as devices, so long as they also satisfy the remainder of the device definition under section 201(h) of the FD&C Act, including the chemical action exclusion discussed in section III.B.3 below. This could be the case, for example, for gels or powders put on the skin as a barrier, gases used as space fillers, or liquids used to clean either surgical instruments or contact lenses.

### 2.    "Primary intended purposes" in the definition of device

Most often, in determining whether a product meets the device definition, questions arise concerning the exclusionary clause of the definition, which provides that a device is a product "which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals . . . ."[11] A product that has chemical action could be a device if it does not achieve its primary intended purposes through that chemical action.

---

[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes." This clause has not been at issue frequently in classification determinations. Accordingly, we do not offer guidance on its construction here. If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

FDA000213

*Contains Nonbinding Recommendations*

For example, if the primary intended purpose of a hip joint replacement implant is to restore movement, and the implant also elicits a foreign body response through chemical action, that response would not be considered a primary intended purpose of the implant. Accordingly, such an implant could be classified as a device despite the chemical action, because such action does not achieve the product's primary intended purpose. Similarly, if the primary intended purpose of an absorbable suture is to rejoin tissue, and the suture is also designed to be resorbed by the body through a combination of chemical action and metabolic activities, such resorption would not be considered a primary intended purpose of the product. Accordingly, such an absorbable suture could be classified as a device despite the chemical action and metabolic activity, because such action or activity does not achieve the product's primary intended purpose.

### 3.    "Chemical action" in the definition of device

FDA frequently receives questions from product sponsors concerning the Agency's interpretation of the term "chemical action." This term must be read in the context of the statutory definition of "device" as a whole. The determination of whether a product meets the device definition does not depend solely on whether the product exhibits "chemical action." In particular, as explained in section III.B.2 and 4, a product that exhibits chemical action will still meet the device definition if the product "does not achieve its primary intended purposes through" that chemical action "within or on the body," and otherwise satisfies the device definition.

Under the Agency's interpretation of the device definition, a product exhibits "chemical action" if it interacts at the molecular level with bodily components (e.g., cells or tissues) to mediate (including promoting or inhibiting) a bodily response, or with foreign entities (e.g., organisms or chemicals) so as to alter that entity's interaction with the body.[12] We note that this type of interaction is consistent with the term "pharmacological action" as that term is generally understood in the medical field. Accordingly, we have used "pharmacological action" as a short-hand throughout the rest of this guidance for ease of explication and recognition. The examples presented in section III.B.5 offer illustration of FDA's interpretation of chemical action.

### 4.    "Within or on the body" in the definition of device

Because a device "does not achieve its primary intended purposes through chemical action *within or on the body* of man or other animals" (emphasis added), a product can be a device even if it achieves its primary intended purposes through chemical action, so long as the chemical action does not occur "within or on the body" (and the product meets the other elements of the definition of device under section 201(h)).

Whether chemical action is occurring "within or on the body" is generally a straightforward matter. If the chemical action is occurring inside the body or on the surface of the body, it is within or on the body. For example, the chemical action of an orally ingested pill

---

[12] For purposes of this interpretation, an interaction at the molecular level occurs through either chemical reaction (i.e., formation or breaking of covalent or ionic bonds), intermolecular forces (e.g., electrostatic interactions), or both. The mere exchange of non-chemical energy (e.g., electromagnetic or thermal energy) between a product and the body would not constitute "chemical action."

FDA000214

*Contains Nonbinding Recommendations*

or tablet of a decongestant would be "within the body," and the chemical action of a spray or cream for treatment of dermatitis when applied to the skin would be "on the body."  Similarly, it is generally a straightforward matter to determine that chemical action is not occurring within or on the body.  For example, the chemical action of an antimicrobial agent used to clean a surgical instrument before that instrument is used is not occurring within or on the body.

However, the Agency has on occasion considered some situations in which it may be less clear whether chemical action is occurring within or on the body.  For example, we have determined that chemical action occurring solely within an extracorporeal device, specifically a kidney hemodialysis machine, is not occurring within or on the body.  Similarly, we have determined that the chemical action of a transport solution to preserve a donor organ for transplantation while in an organ transport container is not occurring within or on the body.

## 5.    Illustrative Examples

The following examples further illustrate the application of some of the key provisions of the device definition discussed above.  Table 1 contains some examples of medical products that achieve their primary intended purposes through chemical action within or on the body.  Table 2 contains some examples of medical products that do not achieve their primary intended purposes through chemical action within or on the body.

**Table 1:   Examples of Medical Products that Achieve Their Primary Intended Purposes through Chemical Action within or on the Body**

| Product | Description |
|---|---|
| Aspirin | Aspirin is used for pain relief.  Acetylsalicyclic acid (aspirin) contains an acetyl group that has the ability to covalently bind to a serine residue of a cyclooxygenase enzyme (COX-1 or COX-2). This is considered pharmacological action because it inactivates the enzyme and thereby inhibits the synthesis of prostaglandin and thromboxanes, which suppresses the body's inflammatory response for pain relief. |
| Beta Blockers | Beta blockers are used to reduce blood pressure.  Cells contain beta receptors that can be stimulated by neurotransmitters such as adrenaline/epinephrine.  Beta blockers, like propranolol, bind beta receptors (b1 and b2) and exhibit pharmacological action by inhibiting the activation of the signaling cascade. This blockage causes cardiac cells to reduce the strength of cardiac contractions and heart rate. |
| Magnesium Sulfate | Magnesium sulfate is used as replacement therapy for magnesium deficiency. It acts as a catalyst in enzymatic reactions (a molecular-level interaction). While the chemical or atomic structure of magnesium sulfate is not altered, its participation in enzymatic reactions is considered a pharmacological action because it impacts various cellular and molecular processes. |

8

FDA000215

*Contains Nonbinding Recommendations*

| | |
|---|---|
| Polymyxin B Sulfate | Polymyxin B sulfate is an antibiotic that is used to treat bacterial infection. It is composed of a cationic protein surfactant that has fatty acid functional groups. Polymyxin B sulfate acts through intermolecular forces, by binding to components of the bacterial membrane (i.e., the membrane of the foreign entity) and by association/fusion of the fatty acid portion of the molecule with the lipid bilayer via hydrophobic interactions.  This binding is a pharmacological action because it disrupts the integrity of the bacterial membrane, which causes organism death, thereby treating the bacterial infection. |
| Hydroxocobalamin | Hydroxocobalamin is used as an antidote to cyanide poisoning. The cobalt moiety of hydroxocobalamin exhibits pharmacological action because it chemically reacts with cyanide, a toxic chemical agent, to form cyanocobalamin, a non-toxic compound, and the ability of hydroxocobalamin to interact with cyanide facilitates the removal of the toxic agent in order to inhibit the toxic effects of cyanide on the body. |

**Table 2:   Examples of Medical Products That Do Not Achieve Their Primary Intended Purposes through Chemical Action within or on the Body**

| Product | Description |
|---|---|
| Abdominal Adhesion Barrier | Inert, biodegradable synthetic polymers can be used to reduce post-operative adhesions with tissues and organs within the abdominal cavity. An implanted physical barrier sheet composed of such polymers would act to reduce adhesion through physical separation of tissue and not through pharmacological action on the surrounding tissue. |
| Polymethylmethacrylate (PMMA) | PMMA is an acrylate polymer that is used as a temporary bone spacer. PMMA is built from methyl methacrylate monomer units, which undergo free radical polymerization in the presence of an initiator compound. The molecules that are part of the polymerization process interact with each other to create a solid mass to fill a bone void physically. The process does not require an interaction between the PMMA and the bone at the molecular level and, therefore is not considered chemical action within or on the body. |
| Topical Surgical Adhesive | Cyanoacrylate is an acrylic resin that is used to approximate skin tissue as an adjunct to a wound closure product. The resin undergoes anionic polymerization in the presence of water. The chemical reaction that occurs between the resin and ions in the water allows it to form into long polymer chains. This type of adhesive can bond to a cut/incision, creating a physically-intact film to aid in keeping skin edges together.  While the product binds to tissue, it does not exhibit pharmacological action because that binding does not mediate a bodily response. |

9

FDA000216

*Contains Nonbinding Recommendations*

| Gold Nanoparticles | Nanoparticles composed of gold can be used to treat cancer. When gold nanoparticles are injected into a tumor site and exposed to electromagnetic energy, they absorb the electromagnetic energy and convert it to thermal energy, and this heat is transferred to the surrounding cells or tissue.  The heat transfer, as opposed to a binding interaction with the nanoparticle, causes the cancer cells to die. Therefore, this effect is not achieved through chemical action. |
|---|---|
| Cryosurgery for Wart Removal | Cryogen (liquid gas), such as nitrogen or dimethyl ether, is used to treat common and plantar warts. The liquid gas is extremely cold and freezes the wart, resulting in damage to the topmost layer of cells.  A physiological effect (i.e., cell death) results from heat transfer, not from a binding interaction with the gas.  Therefore, the freezing is not considered chemical action. |
| Dental Amalgam | A resin that fills a cavity in a tooth as part of the treatment of dental caries may bind to the tooth via covalent bonding, or rely in part on intermolecular forces to change from liquid or paste to solid form.  However, this binding and/or state change does not mediate a bodily response, but rather produces a solid mass, to fill the cavity. Therefore, it would not be considered chemical action. |
| Respirator Mask with Antimicrobial Filter | An antimicrobial product impregnated into a filter on a respirator mask to kill microbes that the user might otherwise inhale would exhibit pharmacological action.  However, while the mask is in contact with the user's face, the filter is not.  So, the chemical action occurring on the filter is not occurring within or on the body. |

### C.    How is a product classified if it meets the definition for drug (or for both drug and device) and also meets the definition for biological product?

As explained in section III.B, products that meet the device definition in 201(h) of the FD&C Act also meet the drug definition in 201(g) of the FD&C Act.  In addition, products that meet the drug definition, or both the drug and device definitions, may also meet the definition of biological product under section 351(i) of the PHS Act (42 USC 262(i)).

Section 351(i) provides that:

The term "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide),[13] or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

---

[13] For guidance on FDA's interpretation of the category "protein (except any chemically synthesized polypeptide)" see *Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009*, at Q.II.1 (April 2015), *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM444661.pdf.

FDA000217

*Contains Nonbinding Recommendations*

Products that meet the drug definition and that also meet the definition of biological product are classified as biological products, and are generally subject to licensure under the PHS Act.[14] Products that meet the definitions for drug, device, and biological product may also be classified as biological products. If you have questions regarding whether a product meets the definition of biological product or how this might affect its classification, please contact OCP.

## IV.    ADDITIONAL INFORMATION

For further information on the classification of products as devices, drugs, biological products, or combination products, please refer to the Frequently Asked Questions on the next page, OCP's webpage at https://www.fda.gov/CombinationProducts/default.htm or contact OCP at:

> Office of Combination Product
> Food and Drug Administration
> WO32, Hub/Mail Room #5129
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993
>
> (Tel) 301-796-8930
> (Fax) 301301-847-8619
> combination@fda.gov

---

[14] Certain biological products have been historically approved under the FD&C Act and may continue to be subject to approval under the FD&C Act until March 23, 2020. See Section 7002(e) of the Biological Price Competition and Innovation Act of 2009; see also FDA, *Implementation of the "Deemed to be a License" Provision of the Biologics Price Competition and Innovation Act of 2009, available at* https://www.fda.gov/ucm/groups/fdagov-public/@fdagov-drugs-gen/documents/document/ucm490264.pdf.

11

FDA000218

*Contains Nonbinding Recommendations*

## FREQUENTLY ASKED QUESTIONS

1. Can a product be classified as a device if it exhibits "chemical action"?

   Yes, if the product does not achieve its primary intended purposes through chemical action within or on the body and otherwise meets the definition of a device. However, products that meet the device definition may be regulated as drugs or biological products in some cases. See question 2.

2. If a product meets the definition for drug at 21 USC 321(g) and for device at 21 USC 321(h), how is it classified?

   Generally, the product would be classified as a device, unless it falls within a special category (for example, apparatuses used in the preparation of compounded positron emission tomography drugs are classified as drugs, see 21 USC 321(ii)).

3. Can the proposed use or indication of a product affect its classification?

   Yes. Two products with exactly the same composition can be classified differently based on their primary intended purposes. For example, if a vaginal product is intended solely to facilitate ease and comfort during sexual intercourse and it achieves this through lubrication that decreases friction (via mechanical/physical action) and not through chemical action, it is classified as a device. However, the same product can be classified as a drug if it is intended, for instance, to alter pH, control odor, or prevent infection, and does so through chemical action as discussed in III.B.3 above.

4. What should you do if, after reviewing this guidance, you are unsure of how your product is classified?

   You should contact the Office of Combination Products (Combination@FDA.GOV) for feedback. OCP will provide you feedback, including on whether a pre-RFD or an RFD may be appropriate and what information you should provide.

5. Where can you find additional information about product classification?

   Additional information on classification is posted on OCP's webpage at:(https://www.fda.gov/CombinationProducts/AboutCombinationProducts/ucm101496.htm)

   For additional information on how to submit an RFD, see *How to Write a Request for Designation (RFD)* (http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm).

   More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf .

12

FDA000219

# CENTER FOR DRUG EVALUATION AND RESEARCH

## Approval Package for:

## *APPLICATION NUMBER:*

## 208036Orig1s000

*Trade Name:*              E-Z-HD Powder for Oral Suspension, 98% (w/w)

*Generic or Proper Name:*  Barium sulfate

*Sponsor:*                 Bracco Diagnostics, Inc.

*Approval Date:*           January 11, 2016

*Indication:*              For use in double contrast radiographic examinations of the esophagus, stomach and duodenum to visualize the gastrointestinal tract in patients 12 years and older.

FDA000220

# CENTER FOR DRUG EVALUATION AND RESEARCH

# 208036Orig1s000

## CONTENTS

## Reviews / Information Included in this NDA Review.

| | |
|---|---|
| **Approval Letter** | **X** |
| **Other Action Letters** | |
| **Labeling** | **X** |
| **REMS** | |
| **Summary Review** | **X** |
| **Officer/Employee List** | **X** |
| **Office Director Memo** | **X** |
| **Cross Discipline Team Leader Review** | **X** |
| **Medical Review(s)** | **X** |
| **Chemistry Review(s)** | **X** |
| **Environmental Assessment** | |
| **Pharmacology Review(s)** | **X** |
| **Statistical Review(s)** | **X** |
| **Microbiology Review(s)** | **X** |
| **Clinical Pharmacology/Biopharmaceutics Review(s)** | **X** |
| **Other Reviews** | **X** |
| **Risk Assessment and Risk Mitigation Review(s)** | |
| **Proprietary Name Review(s)** | **X** |
| **Administrative/Correspondence Document(s)** | **X** |

FDA000221

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

## 208036Orig1s000

## <u>APPROVAL LETTER</u>



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

NDA 208036

**NDA APPROVAL**

Bracco Diagnostics Inc.
Attention:  Melanie Benson
Director, US Regulatory Operations
259 Prospect Plains Rd.
Building H
Monroe Township, NJ  08831

Dear Ms. Benson:

Please refer to your New Drug Application (NDA) dated December 11, 2014, received December 11, 2014, and your amendments, submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Act for E-Z-HD (barium sulfate) powder for oral suspension 98% (w/w).

We acknowledge receipt of your major amendment dated September 14, 2015, which extended the goal date by three months.

This new drug application provides for the use of E-Z-HD (barium sulfate) powder for oral suspension for use in double contrast  radiographic examinations of the esophagus, stomach and duodenum to visualize the gastrointestinal tract in patients 12 years and older.

We have completed our review of this application, as amended.  It is approved, effective on the date of this letter, for use as recommended in the enclosed agreed-upon labeling text.

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, submit the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using the FDA automated drug registration and listing system (eLIST), as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the enclosed labeling (text for the package insert).  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As*, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

FDA000223

## CARTON AND IMMEDIATE CONTAINER LABELS

Submit final printed carton and immediate container labels that are identical to the carton and immediate container labels submitted on January 6, 2016, as soon as they are available, but no more than 30 days after they are printed. Please submit these labels electronically according to the guidance for industry *Providing Regulatory Submissions in Electronic Format – Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications (June 2008)*. Alternatively, you may submit 12 paper copies, with 6 of the copies individually mounted on heavy-weight paper or similar material. For administrative purposes, designate this submission "**Final Printed Carton and Container Labels for approved NDA 208036.**" Approval of this submission by FDA is not required before the labeling is used.

Marketing the product with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.

## ADVISORY COMMITTEE

Your application for barium sulfate was not referred to an FDA advisory committee because outside expertise was not necessary; there were no controversial issues that would benefit from advisory committee discussion.

## REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We note that you have fulfilled the pediatric studies requirement for all relevant pediatric age groups for this application.

We are waiving the pediatric studies requirement for pediatric patients less than 12 years of age. Double contrast procedures require full patient cooperation and are therefore rarely performed in pediatric patients younger than age 12. Endoscopy is the standard procedure for visualization of mucosa in pediatric patients.

## POSTMARKETING COMMITMENTS NOT SUBJECT TO THE REPORTING REQUIREMENTS UNDER SECTION 506B

We remind you of your postmarketing commitment:

3021-1    Use the USP method to screen the starting material                                   (b) (4)

NDA 208036
Page 3

(b) (4)

The timetable you submitted on January 11, 2016, states that you will conduct this study according to the following schedule:

Final Report Submission:    January 2017

Submit nonclinical and chemistry, manufacturing, and controls protocols and all postmarketing final reports to this NDA.  In addition, under 21 CFR 314.81(b)(2)(vii) and 314.81(b)(2)(viii) you should include a status summary of each commitment in your annual report to this NDA. The status summary should include expected summary completion and final report submission dates, any changes in plans since the last annual report.  All submissions, including supplements, relating to these postmarketing commitments should be prominently labeled **"Postmarketing Commitment Protocol," "Postmarketing Commitment Final Report," or "Postmarketing Commitment Correspondence."**

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling.  To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert, Medication Guide, and patient PI (as applicable) to:

OPDP Regulatory Project Manager
Food and Drug Administration
Center for Drug Evaluation and Research
Office of Prescription Drug Promotion
5901-B Ammendale Road
Beltsville, MD 20705-1266

Alternatively, you may submit a request for advisory comments electronically in eCTD format. For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf ).

As required under 21 CFR 314.81(b)(3)(i), you must submit final promotional materials, and the package insert, at the time of initial dissemination or publication, accompanied by a Form FDA 2253. Form FDA 2253 is available at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf. Information and Instructions for completing the form can be found at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf. For more information about submission of promotional materials to the Office of Prescription Drug Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

FDA000225

NDA 208036
Page 4

## <u>REPORTING REQUIREMENTS</u>

We remind you that you must comply with reporting requirements for an approved NDA
(21 CFR 314.80 and 314.81).

If you have any questions, call Frank Lutterodt, Regulatory Project Manager, at (301) 796-4251.

Sincerely,

*{See appended electronic signature page}*

Charles Ganley, M.D.
Director
Office of Drug Evaluation IV
Center for Drug Evaluation and Research

Enclosures:
    Content of Labeling
    Carton and Container Labeling

FDA000226

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

----------------------------------------------------

CHARLES J GANLEY
01/11/2016

FDA000227

# CENTER FOR DRUG EVALUATION AND RESEARCH

## Approval Package for:

### *APPLICATION NUMBER:*

### 208143Orig1s000

*Trade Name:*  Readi-Cat 2 Smoothie Oral Suspension 2% (w/v)

*Generic or Proper Name:*  Barium sulfate

*Sponsor:*  Bracco Diagnostics Inc.

*Approval Date:*  January 15, 2016

*Indication:*  For use in computed tomography of the abdomen to delineate the gastrointestinal tract in adult and pediatric patients to opacity the gastrointestinal tract.

FDA000244

# CENTER FOR DRUG EVALUATION AND RESEARCH

# 208143Orig1s000

## CONTENTS

## Reviews / Information Included in this NDA Review.

| | |
|---|---|
| Approval Letter | X |
| Other Action Letters | |
| Labeling | X |
| REMS | |
| Summary Review | X |
| Officer/Employee List | X |
| Office Director Memo | X |
| Cross Discipline Team Leader Review | X |
| Medical Review(s) | X |
| Chemistry Review(s) | X |
| Environmental Assessment | |
| Pharmacology Review(s) | X |
| Statistical Review(s) | X |
| Microbiology Review(s) | X |
| Clinical Pharmacology/Biopharmaceutics Review(s) | X |
| Other Reviews | X |
| Risk Assessment and Risk Mitigation Review(s) | |
| Proprietary Name Review(s) | X |
| Administrative/Correspondence Document(s) | X |

FDA000245

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# 208143Orig1s000

# <u>APPROVAL LETTER</u>

FDA000246



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

NDA 208143

**NDA APPROVAL**

Bracco Diagnostics Inc.
Attention:  Melanie Benson
Director, US Regulatory Operations
259 Prospect Plains Rd.
Building H
Monroe Township, NJ  08831

Dear Ms. Benson:

Please refer to your New Drug Application (NDA) dated December 18, 2014, received December 18, 2014, and your amendments, submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Act for READI-CAT 2 (barium sulfate) oral suspension 2% (w/v) and READI-CAT 2 SMOOTHIE (barium sulfate) oral suspension 2% (w/v).

We acknowledge receipt of your major amendment dated September 1, 2015, which extended the goal date by three months.

This new drug application provides for the use of READI-CAT 2 (barium sulfate) oral suspension for use in computed tomography of the abdomen to delineate the gastrointestinal tract in adult and pediatric patients to opacify the gastrointestinal tract.

We have completed our review of this application, as amended.  It is approved, effective on the date of this letter, for use as recommended in the enclosed agreed-upon labeling text.

**CONTENT OF LABELING**
As soon as possible, but no later than 14 days from the date of this letter, submit the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using the FDA automated drug registration and listing system (eLIST), as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the enclosed labeling text for the package insert.  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As*, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

FDA000247

NDA 208143
Page 2

## CARTON AND IMMEDIATE CONTAINER LABELS

Submit final printed carton and immediate container labels that are identical to the carton and immediate container labels submitted on January 11, 2016, as soon as they are available, but no more than 30 days after they are printed. Please submit these labels electronically according to the guidance for industry *Providing Regulatory Submissions in Electronic Format – Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications (June 2008)*. Alternatively, you may submit 12 paper copies, with 6 of the copies individually mounted on heavy-weight paper or similar material. For administrative purposes, designate this submission "**Final Printed Carton and Container Labels for approved NDA 208143**." Approval of this submission by FDA is not required before the labeling is used.

Marketing the product with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.

## REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We note that you have fulfilled the pediatric studies requirement for all relevant pediatric age groups for this application.

## POSTMARKETING COMMITMENTS NOT SUBJECT TO THE REPORTING REQUIREMENTS UNDER SECTION 506B

We remind you of your postmarketing commitments:

3024-1    Use the USP method to screen the starting material.



(b) (4)

The timetable you submitted on January 15, 2016, states that you will conduct this study according to the following schedule:

> Final Report Submission:    January 2017

Submit nonclinical and chemistry, manufacturing, and controls protocols and all postmarketing final reports to this NDA. In addition, under 21 CFR 314.81(b)(2)(vii) and 314.81(b)(2)(viii) you should include a status summary of each commitment in your annual report to this NDA.

FDA000248

NDA 208143
Page 3

The status summary should include expected summary completion and final report submission dates, any changes in plans since the last annual report, and, for clinical studies/trials, number of patients entered into each study/trial.  All submissions, including supplements, relating to these postmarketing commitments should be prominently labeled **"Postmarketing Commitment Protocol," "Postmarketing Commitment Final Report," or "Postmarketing Commitment Correspondence."**

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling.  To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert, Medication Guide, and patient PI (as applicable) to:

> OPDP Regulatory Project Manager
> Food and Drug Administration
> Center for Drug Evaluation and Research
> Office of Prescription Drug Promotion
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

Alternatively, you may submit a request for advisory comments electronically in eCTD format.  For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf ).

As required under 21 CFR 314.81(b)(3)(i), you must submit final promotional materials, and the package insert, at the time of initial dissemination or publication, accompanied by a Form FDA 2253. Form FDA 2253 is available at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf. Information and Instructions for completing the form can be found at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf. For more information about submission of promotional materials to the Office of Prescription Drug Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

FDA000249

NDA 208143
Page 4

If you have any questions, call Frank Lutterodt, Regulatory Project Manager, at (301) 796-4251.

Sincerely,

*{See appended electronic signature page}*

Charles Ganley, M.D.
Director
Office of Drug Evaluation IV
Center for Drug Evaluation and Research

Enclosures:
    Content of Labeling
    Carton and Container Labeling

FDA000250

----------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

----------------------------------------------------------------------------------------

/s/

----------------------------------------------------

CHARLES J GANLEY
01/15/2016

FDA000251



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

NDA 208844

**NDA APPROVAL**

Bracco Diagnostics Inc.
Attention:  Melanie Benson
Director, US Regulatory Operations
259 Prospect Plains Rd.
Building H
Monroe Township, NJ  08831

Dear Ms. Benson:

Please refer to your New Drug Application (NDA) dated December 14, 2015, received December 14, 2015, submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Varibar Pudding (barium sulfate paste, 40% (w/v)).

This new drug application provides for the use of Varibar Pudding (barium sulfate paste) for use in modified barium swallow examinations to evaluate the oral and pharyngeal function and morphology in adult and pediatric patients 6 months of age and older.

We have completed our review of this application, as amended.  It is approved, effective on the date of this letter, for use as recommended in the enclosed agreed-upon labeling text.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, submit the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using the FDA automated drug registration and listing system (eLIST), as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the enclosed labeling text for the package insert.  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As*, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

**CARTON AND IMMEDIATE CONTAINER LABELS**

We acknowledge your September 14, 2016, submission containing final printed carton and container labels.

FDA000269

NDA 208844                                    Varibar Pudding (barium sulfate paste)
Page 2

## ADVISORY COMMITTEE

Your application for Varibar Pudding (barium sulfate paste) was not referred to an FDA advisory committee because this drug is not the first in its class.

## REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We note that you have fulfilled the pediatric studies requirement for all relevant pediatric age groups for this application.

We are waiving the pediatric studies requirement of Varibar Pudding oral paste for pediatric patients less than 6 months of age. Modified barium swallow procedures using Varibar formulations with more suitable viscosities are used in pediatric patients younger than 6 months of age because of the inability of patients in this population to take solid foods. Studies are therefore impossible or highly impracticable in this age group.

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling. To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert, Medication Guide, and patient PI (as applicable) to:

> OPDP Regulatory Project Manager
> Food and Drug Administration
> Center for Drug Evaluation and Research
> Office of Prescription Drug Promotion
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

Alternatively, you may submit a request for advisory comments electronically in eCTD format. For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf ).

As required under 21 CFR 314.81(b)(3)(i), you must submit final promotional materials, and the package insert, at the time of initial dissemination or publication, accompanied by a Form FDA

FDA000270

                                                    Varibar Pudding (barium sulfate paste)

2253. Form FDA 2253 is available at
http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf.
Information and Instructions for completing the form can be found at
http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf. For
more information about submission of promotional materials to the Office of Prescription Drug
Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA
(21 CFR 314.80 and 314.81).

If you have any questions, call Frank Lutterodt, Senior Regulatory Project Manager, at (301)
796-4251.

                                        Sincerely,

                                        *{See appended electronic signature page}*

                                        Libero Marzella, M.D., Ph.D.
                                        Director
                                        Division of Medical Imaging Products
                                        Office of Drug Evaluation IV
                                        Center for Drug Evaluation and Research

Enclosures:
    Content of Labeling
    Carton and Container Labeling

----------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

----------------------------------------------------------------------------------------------------

/s/

---------------------------------------------------

LIBERO L MARZELLA
10/14/2016

FDA000272

# Guidance for Industry

## Developing Medical Imaging Drug and Biological Products

## Part 1:  Conducting Safety Assessments

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**June 2004**
**Clinical Medical**

FDA000298

# Guidance for Industry

## Developing Medical Imaging Drug and Biological Products

## Part 1:  Conducting Safety Assessments

*Additional copies of this Guidance are available from:*

*Division of Drug Information HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane, Rockville, MD  20857*
*(Phone 301-827-4573)*
*Internet:  http://www.fda.gov/cder/guidance/index.htm.*

*or*

*Office of Communication, Training and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*Internet:  http://www.fda.gov/cber/guidelines.htm.*
*Mail: the Voice Information System at 800-835-4709 or 301-827-1800.*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**June 2004**
**Clinical Medical**

FDA000299

# Table of Contents

I.    INTRODUCTION ...................................................................................................... 1

II.   SCOPE — TYPES OF MEDICAL IMAGING AGENTS .................................... 2

   A.  Contrast Agents ..................................................................................................... 2

   B.  Diagnostic Radiopharmaceuticals ........................................................................ 2

III.  GENERAL CONSIDERATIONS FOR SAFETY ASSESSMENTS OF MEDICAL IMAGING AGENTS ........................................................................... 3

   A.  Medical Imaging Agent Characteristics Relevant to Safety ............................. 3

      1.  Mass Dose ......................................................................................................... 4
      2.  Route of Administration .................................................................................... 4
      3.  Frequency of Use .............................................................................................. 4
      4.  Biological, Physical, and Effective Half-Lives ................................................ 5

   B.  Performance of Nonclinical Safety Assessments ................................................ 5

      1.  Nonclinical Safety Assessments for Nonbiological Drug Products ................. 5
         a.  Timing of Nonclinical Studies Submitted to an IND Application .............. 5
         b.  Contrast Agents ......................................................................................... 6
         c.  Diagnostic Radiopharmaceuticals (Nonbiological Products) ................... 8
      2.  Nonclinical Safety Assessments for Biological Products ................................ 8

IV.   CLINICAL SAFETY ASSESSMENTS ................................................................. 9

   A.  Group 1 and 2 Medical Imaging Agents ............................................................. 9

      1.  Group 1 Medical Imaging Agents .................................................................... 9
      2.  Group 2 Medical Imaging Agents .................................................................. 10

   B.  Considerations For Groups 1 or 2 ...................................................................... 11

      1.  Safety-Margin Considerations ....................................................................... 11
         a.  Results of nonclinical studies .................................................................. 11
         b.  Results of initial human experience ......................................................... 13
      2.  Clinical Use Considerations .......................................................................... 14

   C.  Radiation Safety Assessment for All Diagnostic Radiopharmaceuticals ...... 14

      1.  General Considerations ................................................................................. 14
      2.  Calculation of Radiation Absorbed Dose to the Target Organs or Tissues ... 15
      3.  Maximum Radiation Absorbed Dose ............................................................. 16

FDA000300

# Guidance for Industry[1]
# Developing Medical Imaging Drug and Biological Products
# Part 1:  Conducting Safety Assessments

> This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations.  If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.  If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.    INTRODUCTION

This guidance is one of three guidances intended to assist developers of medical imaging drug and biological products (*medical imaging agents*) in planning and coordinating their clinical investigations and preparing and submitting investigational new drug applications (INDs), new drug applications (NDAs), biologics license applications (BLAs), abbreviated NDAs (ANDAs), and supplements to NDAs or BLAs.  The three guidances are*: Part 1: Conducting Safety Assessments*; *Part 2:  Clinical Indications*; and *Part 3: Design, Analysis, and Interpretation of Clinical Studies.*

Medical imaging agents generally are governed by the same regulations as other drug and biological products.  However, because medical imaging agents are used solely to diagnose and monitor diseases or conditions as opposed to treat them, development programs for medical imaging agents can be tailored to reflect these particular uses.  Specifically, this guidance discusses our recommendations on conducting safety assessments of medical imaging agents.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

---

[1] This guidance has been prepared by the Division of Medical Imaging and Radiopharmaceutical Drug Products and the Office of Therapeutics Research and Review in the Center for Drug Evaluation and Research (CDER) at the Food and Drug Administration.

FDA000301

*Contains Nonbinding Recommendations*

41  A glossary of common terms used in diagnostic medical imaging is provided at the end of this
42  document.
43
44
45  **II.    SCOPE — TYPES OF MEDICAL IMAGING AGENTS**
46
47  This guidance discusses medical imaging agents that are administered in vivo and are used for
48  diagnosis or monitoring with a variety of different modalities, such as radiography, computed
49  tomography (CT), ultrasonography, magnetic resonance imaging (MRI), and radionuclide
50  imaging.  The guidance is not intended to apply to the development of in vitro diagnostic or
51  therapeutic uses of these agents.[2]
52
53  Medical imaging agents can be classified into at least two general categories, contrast agents and
54  diagnostic radiopharmaceuticals.
55
56      **A.    Contrast Agents**
57
58  As used in this guidance, a *contrast agent* is a medical imaging agent used to improve the
59  visualization of tissues, organs, and physiologic processes by increasing the relative difference of
60  imaging signal intensities in adjacent regions of the body.  Types of contrast agents include, but
61  are not limited to, (1) iodinated compounds used in radiography and CT; (2) paramagnetic
62  metallic ions (such as ions of gadolinium, iron, and manganese) linked to a variety of molecules
63  and microparticles (such as superparamagnetic iron oxide) used in MRI; and (3) microbubbles,
64  microaerosomes, and related microparticles used in diagnostic ultrasonography.
65
66      **B.    Diagnostic Radiopharmaceuticals**
67
68  As used in this guidance, a *diagnostic radiopharmaceutical* is (1) an article that is intended for
69  use in the diagnosis or monitoring of a disease or a manifestation of a disease in humans and that
70  exhibits spontaneous disintegration of unstable nuclei with the emission of nuclear particles or
71  photons or (2) any nonradioactive reagent kit or nuclide generator that is intended to be used in

---

[2] The guidance is not intended to apply to the development of research drugs that do not provide direct patient
benefit with respect to diagnosis, therapy, prevention, or prognosis, or other clinically useful information.  These
include radioactive drugs for research that are used in accordance with 21 CFR 361.1.  Section 361.1(a) states that
radioactive drugs (defined in 21 CFR 310.3(n)) are generally recognized as safe and effective when administered
under specified conditions to human research subjects in the course of a project intended to obtain basic information
about the metabolism of a radioactively labeled drug or about human physiology, pathophysiology, or biochemistry.
However, if a radioactive drug is used for immediate therapeutic, diagnostic, or similar purposes or to determine the
safety and effectiveness of the drug in humans, or if the radioactive drug has a pharmacological effect in the human
body, an IND is required.  FDA is developing a guidance on determining when research with radioactive drugs may
be conducted under § 361.1.

The Agency recognizes the potential of imaging agents as research tools for aiding the development of therapeutic
drugs, and some of the principles of the guidance may be applicable to such research.  Sponsors of such imaging
research agents are urged to contact the Division of Medical Imaging and Radiopharmaceutical Drug Products for
advice on development of the imaging research agent.

FDA000302

*Contains Nonbinding Recommendations*

72  the preparation of such an article.[3]  As stated in the preamble to FDA's proposed rule on
73  Regulations for In Vivo Radiopharmaceuticals Used for Diagnosis and Monitoring, the Agency
74  interprets this definition to include articles that exhibit spontaneous disintegration leading to the
75  reconstruction of unstable nuclei and the subsequent emission of nuclear particles or photons
76  (63 FR 28301 at 28303; May 22, 1998).
77
78  Diagnostic radiopharmaceuticals are generally radioactive drug or biological products that
79  contain a radionuclide that typically is linked to a ligand or carrier.[4]  These products are used in
80  nuclear medicine procedures, including planar imaging, single photon emission computed
81  tomography (SPECT), positron emission tomography (PET), or in combination with other
82  radiation detection probes.
83
84  Diagnostic radiopharmaceuticals used for imaging typically have two distinct components.
85
86      • A radionuclide that can be detected in vivo (e.g., technetium-99m, iodine-123, indium-
87        111).
88
89        The radionuclide typically is a radioactive atom with a relatively short physical half-life
90        that emits radioactive decay photons having sufficient energy to penetrate the tissue mass
91        of the patient.  These photons can then be detected with imaging devices or other
92        detectors
93
94      • A nonradioactive component to which the radionuclide is bound that delivers the
95        radionuclide to specific areas within the body.
96
97        This nonradionuclidic portion of the diagnostic radiopharmaceutical often is an organic
98        molecule such as a carbohydrate, lipid, nucleic acid, peptide, small protein, or antibody.
99
100 As technology advances, new products may emerge that do not fit into these traditional
101 categories (e.g., agents for optical imaging, magnetic resonance spectroscopy, combined contrast
102 and functional imaging).  It is anticipated, however, that the general principles discussed here
103 could apply to these new diagnostic products.  Developers of these products should contact the
104 appropriate reviewing division for advice on product development.
105
106
107 **III.    GENERAL CONSIDERATIONS FOR SAFETY ASSESSMENTS OF MEDICAL**
108 **IMAGING AGENTS**
109
110     **A.    Medical Imaging Agent Characteristics Relevant to Safety**
111

---

[3] 21 CFR 315.2 and 601.31.

[4] In this guidance, the terms *ligand* and *carrier* refer to the entire nonradionuclidic portion of the diagnostic
radiopharmaceutical.

FDA000303

*Contains Nonbinding Recommendations*

112  The following sections discuss the special characteristics of a medical imaging agent that can
113  lead to a more focused safety evaluation.  Characteristics include its radiation absorbed dose,
114  mass dose, route of administration, frequency of use, biodistribution, and biological, physical,
115  and effective half-lives in the serum, the whole body, and critical organs.[5]
116
117          *1.     Mass Dose*
118
119  Some medical imaging agents can be administered at low mass doses.  For example, the mass
120  dose of a single administration of a diagnostic radiopharmaceutical can be small because device
121  technologies can typically detect relatively small amounts of a radionuclide (e.g.,
122  radiopharmaceuticals for myocardial perfusion imaging).   When a medical imaging agent is
123  administered at a mass dose that is at the low end of the dose-response curve, dose-related
124  adverse events are less likely to occur.
125
126          *2.     Route of Administration*
127
128  Some medical imaging agents are administered by routes that decrease the likelihood of systemic
129  adverse events.  For example, medical imaging agents that are administered as contrast media for
130  radiographic examination of the gastrointestinal tract (e.g., barium sulfate) can be administered
131  orally, through an oral tube, or rectally.  In patients with normal gastrointestinal tracts, many of
132  these products are not absorbed, so systemic adverse events are less likely to occur.  In general,
133  nonradiolabeled contrast agents pose safety issues similar to therapeutic drugs because of the
134  inherently large amounts needed for administration.  Therefore, nonradiolabeled drugs generally
135  should be treated like therapeutic agents for the purpose of conducting clinical safety
136  assessments.
137
138          *3.     Frequency of Use*
139
140  Many medical imaging agents, including both contrast agents and diagnostic
141  radiopharmaceuticals, are administered infrequently or as single doses.  Accordingly, adverse
142  events that are related to long-term use or to accumulation are less likely to occur with these
143  agents than with agents that are administered repeatedly to the same patient.  Therefore, the
144  nonclinical development programs for such single-use products usually can omit long-term (i.e.,
145  3 months' duration or longer), repeat-dose safety studies.  In clinical settings where it is possible
146  that the medical imaging agent will be administered to a single patient repeatedly (e.g., to
147  monitor disease progression), we recommend that repeat-dose studies (of 14 to 28 days'
148  duration) be performed to assess safety.
149
150  Biological medical imaging agents are frequently immunogenic, and the development of
151  antibodies after intermittent, repeated administration can alter the pharmacokinetics,
152  biodistribution, safety, and/or imaging properties of such agents and, potentially, of
153  immunologically related agents.  We recommend that studies in which repeat dosing of a
154  biological imaging agent is planned incorporate pharmacokinetic data, human anti-mouse

---

[5] See also 21 CFR 315.6 on evaluation of safety.  When a medical imaging agent does not possess any of these
special characteristics, as described in section III.A.1-4, complete standard safety assessments should be performed.

FDA000304

*Contains Nonbinding Recommendations*

155  antibody (HAMA), human anti-humanized antibody (HAHA), or human anti-chimeric antibody
156  (HACA) levels as well as whole body biodistribution imaging to assess for alterations in the
157  biodistribution of the imaging agent following repeat dosing.  Studies of immunogenicity in
158  animal models are generally of limited value.  Therefore, we recommend that human clinical
159  data assessing the repeat use of a biological imaging agent be obtained prior to application for
160  licensure of such an agent.
161
162      *4.      Biological, Physical, and Effective Half-Lives*
163
164  Diagnostic radiopharmaceuticals often use radionuclides with short physical half-lives or that are
165  excreted rapidly.  The biological, physical, and effective half-lives of diagnostic
166  radiopharmaceuticals are incorporated into radiation dosimetry evaluations[6] that require an
167  understanding of the kinetics of the distribution and excretion of the radionuclide and its mode of
168  decay.  We recommend that biological, physical, and effective half-lives be considered in
169  planning appropriate safety and dosimetry evaluations of diagnostic radiopharmaceuticals.
170
171  **B.      Performance of Nonclinical Safety Assessments**
172
173  We recommend that the nonclinical development strategy for an agent be based on sound
174  scientific principles, the agent's unique chemistry (including, for example, those of its
175  components, metabolites, and impurities), and the agent's intended use.  Because each product is
176  unique, we encourage sponsors to consult with us before submitting an IND application and
177  during product development.  The number and types of nonclinical studies recommended would
178  depend in part on the phase of development, what is known about the agent or its pharmacologic
179  class, its proposed use, and the indicated patient population.  If you determine that nonclinical
180  pharmacology or toxicology studies are not needed, we are prepared to grant a waiver under
181  21 CFR 312.10 if you provide adequate justification.
182
183  In the discussion that follows, a distinction is made between drug products and biological
184  products.  Existing specific guidance for biological products is referenced but not repeated here
185  (see section III.B.2).
186
187      *1.      Nonclinical Safety Assessments for Nonbiological Drug Products*
188
189          a.      Timing of Nonclinical Studies Submitted to an IND Application
190
191              We recommend that nonclinical studies be timed so that they help facilitate the
192              timely conduct of clinical trials (including appropriate safety monitoring based on
193              findings in nonclinical studies) and to reduce the unnecessary use of animals and

---

[6] *Biological half-life* is the time needed for a human or animal to remove, by biological elimination, half of the amount of a substance that has been administered.  *Effective half-life* is the time needed for a radionuclide in a human or animal to decrease its activity by half as a combined result of biological elimination and radioactive decay. *Physical half-life* is the time needed for half of the population of atoms of a particular radioactive substance to disintegrate to another nuclear form.

5

*Contains Nonbinding Recommendations*

194  other resources.[7]  The recommended timing of nonclinical studies for medical
195  imaging drugs is summarized in Table 1.
196
197       b.      Contrast Agents
198
199  Because of the characteristics of contrast drug products (e.g., variable biologic
200  half-life) and the way they are used, we recommend that nonclinical safety
201  evaluations of such drug products be made more efficient with the following
202  modifications:
203
204  •   Long-term (i.e., greater than 3 months), repeat-dose toxicity studies in animals
205       usually can be omitted.  (Exceptions are products with long residence time,
206       e.g., > 90 days.)
207
208  •   Long-term rodent carcinogenicity studies usually can be omitted.[8]
209
210  •   Reproductive toxicology studies required under § 312.23(a)(8)(ii)(*a*) often can
211       be limited to an evaluation of embryonic and fetal toxicities in rats and rabbits
212       and to evaluations of reproductive organs in other short-term toxicity studies.[9]
213       If you determine that such reproductive studies are not needed, we are
214       prepared to grant a waiver under § 312.10 if you provide adequate
215       justification.
216
217  We recommend that studies be conducted to address the effects of large mass
218  dose and volume (especially for iodinated contrast materials administered
219  intravenously); osmolality effects; potential transmetalation of complexes of
220  gadolinium, manganese, or iron (generally MRI drugs); potential effects of tissue
221  or cellular accumulation on organ function (particularly if the drug is intended to
222  image a diseased organ system); and the chemical, physiological, and physical
223  effects of ultrasound microbubble drugs (e.g., coalescence, aggregation,
224  margination, and cavitation).

---

[7] See the guidance *M3 Nonclinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals*.
This and all other guidances cited in this document are available at FDA's Web site at
http://www.fda.gov/cder/guidance/index.htm.

[8] Circumstances in which carcinogenicity testing may be recommended are summarized in the guidance *S1A The
Need for Long-Term Rodent Carcinogenicity Studies of Pharmaceuticals*.

[9] See the guidance *S5A Detection of Toxicity to Reproduction for Medicinal Products* and *S5B Detection of Toxicity
to Reproduction for Medicinal Products:  Addendum on Toxicity to Male Fertility*.

FDA000306

*Contains Nonbinding Recommendations*

225   **Table 1: Timing of Nonclinical Studies for Nonbiological Products Submitted to an IND**
226

| Study Type | Before Phase 1 | Before Phase 2 | Before Phase 3 | Before NDA |
|---|---|---|---|---|
| Safety pharmacology | Major organs,[a] and organ systems the drug is intended to visualize | | | |
| Toxicokinetic pharmacokinetic | See ICH guidances | | | |
| Expanded single-dose toxicity | Expanded acute single dose [b] | | | |
| Short-term (2 to 4 weeks) multiple dose toxicity | | Repeat-dose toxicity | | |
| Special toxicology | Conduct as necessary based on route-irritancy, blood compatibility, protein flocculation, misadministration, extravasation | | | |
| Radiation dosimetry | If applicable | | | |
| Genotoxicity | In vitro [d] | Complete standard battery | | |
| Immunotoxicity | | | May be needed based on molecular structure, biodistribution pattern, class concern, or clinical or nonclinical signal | |
| Reproductive and developmental toxicity | | | Needed or waiver obtained [d] | |
| Drug interaction | | | | As needed |
| Other based on data results | | | | As needed |

227  (a) See the guidances *S7A Safety Pharmacology Studies for Human Pharmaceutical* and *S7B Safety Pharmacology*
228  *Studies for Assessing the Potential for Delayed Ventricular Repolarization (QT Interval Prolongation) by Human*
229  *Pharmaceuticals* (note that *S7B* allows for phase evaluation of the required studies).
230  (b) See the guidance *Single Dose Acute Testing for Pharmaceuticals*.
231  (c) When repeat-dose toxicity studies have been performed, but single-dose toxicology studies have not, dose
232  selection for initial human studies will likely be based on the results of the no-adverse-effect level (NOAEL)
233  obtained in the repeat-dose study. The likely result will be a mass dose selection for initial human administration
234  that is lower than if the dose selection had been based on the results of acute, single-dose toxicity studies.
235  (d) See radiopharmaceutical discussion in section III.B.1.c of this document.
236

FDA000307

*Contains Nonbinding Recommendations*

237        c.        Diagnostic Radiopharmaceuticals (Nonbiological Products)
238
239        Because of the characteristics of diagnostic radiopharmaceuticals and the way
240        they are used, we recommend that nonclinical safety evaluations of these drugs be
241        made more efficient by the following modifications:
242
243        •   Long-term, repeat-dose toxicity studies in animals typically can be omitted.
244
245        •   Long-term rodent carcinogenicity studies typically can be omitted.
246
247        •   Reproductive toxicology studies can be waived when adequate scientific
248            justification is provided.[10]
249
250        •   Genotoxicity studies should be conducted on the nonradioactive component
251            because the genotoxicity of the nonradioactive component should be
252            identified separately from that of the radionuclide.  Genotoxicity studies can
253            be waived if adequate scientific justification is provided.[11]
254
255        We recommend that special safety considerations for diagnostic
256        radiopharmaceuticals include verification of the mass dose of the radiolabeled
257        and unlabeled moiety; assessment of the mass, toxic potency, and receptor
258        interactions for any unlabeled moiety; assessment of potential pharmacologic
259        or physiologic effects due to molecules that bind with receptors or enzymes;
260        and evaluation of all components in the final formulation for toxicity (e.g.,
261        excipients, reducing drugs, stabilizers, anti-oxidants, chelators, impurities, and
262        residual solvents).  We recommend that the special safety considerations
263        include an analysis of particle size (for products containing particles) and an
264        assessment of instability manifested by aggregation or precipitation.  We also
265        recommend that an individual component be tested if specific toxicological
266        concerns are identified or if toxicological data for that component are lacking.
267        However, if toxicological studies are performed on the combined components
268        of a radiopharmaceutical and no significant toxicity is found, toxicological
269        studies of individual components are seldom required.
270
271    *2.    Nonclinical Safety Assessments for Biological Products*
272
273    Many biological products raise relatively distinct nonclinical issues such as immunogenicity and
274    species specificity.  We recommend the following Agency documents be reviewed for guidance
275    on the preclinical evaluation of biological medical imaging agents:
276
277        •   *S6 Preclinical Safety Evaluation of Biotechnology-Derived Pharmaceuticals*

---

[10] See footnote 11.

[11] See guidances *S2A Specific Aspects of Regulatory Genotoxicity Tests for Pharmaceuticals* and *S2B Genotoxicity: A Standard Battery for Genotoxicity Testing of Pharmaceuticals*.

FDA000308

*Contains Nonbinding Recommendations*

278
279     • *Points to Consider in the Manufacture and Testing of Monoclonal Antibody Products*
280       *for Human Use*
281
282   Sponsors are encouraged to consult with the appropriate reviewing division for additional
283   information when needed.
284
285
286   **IV.    CLINICAL SAFETY ASSESSMENTS**
287
288   Under section 505(d) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 355(d)),
289   FDA cannot approve a new drug application (NDA) unless it contains adequate tests
290   demonstrating whether the proposed drug product is safe for use under the conditions prescribed,
291   recommended, or suggested in its proposed labeling.[12]  All drugs have risks, including risks
292   related to the intrinsic properties of the drug, the administration process, the reactions of the
293   patient, and incorrect diagnostic information.  Incorrect diagnostic information includes
294   inaccurate structural, functional, physiological, or biochemical information; false positive or
295   false negative diagnostic determinations; and information leading to inappropriate decisions in
296   diagnostic or therapeutic management.  Even if risks are found to be small, all drug development
297   programs must also obtain evidence of drug effectiveness under section 505 of the Act.
298   Although it has been suggested that a demonstration of effectiveness not be required for *safer*
299   drugs, this statutory requirement cannot be waived.  FDA weighs the benefits and risks of each
300   proposed drug product when making its decision about whether to approve a marketing
301   application (e.g., an NDA or BLA).
302
303       **A.    Group 1 and 2 Medical Imaging Agents**
304
305   The special characteristics of medical imaging agents may allow for a more efficient clinical
306   safety program.  This guidance describes two general categories for medical imaging agents:
307   Group 1 and Group 2.  The extent of clinical safety monitoring and evaluation that we
308   recommend differs for these two categories.  Generally, a less extensive clinical safety
309   evaluation is appropriate for Group 1 agents.  Conversely, we recommend that Group 2 agents
310   undergo standard clinical safety evaluations in clinical trials throughout their development.
311   These different groups have been conceived to help drug sponsors identify and differentiate
312   those characteristics that are of greatest interest to the Agency in assessing the potential safety of
313   a medical imaging agent.
314
315   FDA anticipates that it can assess which agents are Group 1 agents based on the safety-margin
316   criteria from animal studies and initial human trials completed at the end of Phase 1.
317
318       *1.    Group 1 Medical Imaging Agents*
319
320   For purposes of this guidance, a Group 1 medical imaging agent generally exhibits the following
321   three characteristics.

---

[12] For approval of a biological license application, the safety of the proposed product must be demonstrated under
section 351 of the Public Health Service Act (42 U.S.C. 262).

FDA000309

*Contains Nonbinding Recommendations*

322
323  • The medical imaging agent meets *either* the safety-margin considerations *or* the clinical-
324     use considerations described below (see sections B.1 and B.2, respectively).

325  • The medical imaging agent is not a biological product[13, 14]

326  • The medical imaging agent does not predominantly emit alpha or beta particles

327  Note that under the safety margin criteria (see section IV.B), medical imaging agents that are
328  administered in low mass doses to humans (e.g., diagnostic radiopharmaceuticals) usually are
329  more likely to be considered Group 1 than those administered in higher mass doses.[15] There
330  are important exceptions, including cases where the medical imaging agents are likely to be
331  immunogenic (e.g., biological products) when the pharmacologic response exists at a low
332  mass dose, or when the medical imaging agents cause adverse reactions that are not dose-
333  related (e.g., idiosyncratic drug reactions).

334  We recommend that standard clinical safety evaluations be performed in all clinical
335  investigations of medical imaging agents, but we suggest that, for Group 1 agents, reduced
336  human safety monitoring may be appropriate in subsequent human trials.
337
338  • For example, human safety monitoring may be limited to recording adverse events and
339     monitoring only particular organs or tissues of interest for toxicity (such as organs that
340     showed toxicity in the animal studies, or the organs and tissues in which the medical
341     imaging agent localizes, which usually would include the liver and kidneys).
342
343  Persons having questions about whether a medical imaging agent is a Group 1 agent are
344  encouraged to contact FDA to discuss. Whether a medical imaging agent should be considered a
345  Group 1 or Group 2 agent may change during the course of a product's development. For
346  example, even if an agent is initially thought to be Group 1, the subsequent identification of
347  safety concerns could be reason to treat that agent as a Group 2 agent for the remainder of the
348  product's development.
349
350     *2.    Group 2 Medical Imaging Agents*
351
352  For purposes of this guidance, Group 2 medical imaging agents are generally medical imaging
353  drugs or biological products that do not fall under the considerations for Group 1 medical
354  imaging agents. All biological products are assumed to be Group 2 agents unless the sponsor
355  demonstrates that its product lacks immunogenicity. Medical imaging agents that are

---

[13] Biological medical imaging products (e.g.., radiolabeled cells, monoclonal antibodies, monoclonal antibody fragments; see 21 CFR 600.3(h) for definition of a biological product) have the potential to elicit an immunogenic response. Because the development of antibodies following repeat or intermittent administration can alter the safety, pharmacokinetics, and biodistribution of such agents, we regard biological medical imaging products as Group 2 agents.

[14] See also the final regulation Adverse Experience Reporting Requirements for Licensed Biological Products (59 FR 54042; October 27, 1994).

[15] For example, the approved PET drug products meet the Group 1 criteria.

FDA000310

*Contains Nonbinding Recommendations*

356  biologically active in animal studies or in human studies when administered at dosages that are
357  similar to those intended for clinical use should also be considered Group 2 agents.[16]
358
359  For Group 2 medical imaging agents, *standard clinical safety evaluations* should include serial
360  assessments of patient symptoms, physical signs, clinical laboratory tests (e.g., blood chemistry,
361  hematology, coagulation profiles, urinalyses), other tests (e.g., electrocardiograms as
362  appropriate), and adverse events.  We recommend that additional specialized evaluations be
363  performed when appropriate (e.g., immunological evaluations, creatine kinase isoenzymes), or if
364  a particular toxicity is deemed possible based on animal studies or the known chemical or
365  pharmacological properties of the medical imaging agent.  Although the extent of clinical
366  monitoring cannot be predetermined, we recommend that it be of sufficient duration to identify
367  possible effects that may lag behind those predicted by pharmacokinetic analyses.  If some of
368  these standard clinical safety evaluations are felt to be unnecessary, this should be discussed with
369  the reviewing division.  We recommend that sponsors seek FDA comment on the clinical safety
370  monitoring plans in clinical studies before such studies are initiated.
371
372  **B.    Considerations For Groups 1 or 2**
373
374  *1.    Safety-Margin Considerations*
375
376  Under the safety-margin considerations, medical imaging agents can be considered Group 1 if
377  the results of nonclinical studies *and* initial human experience are consistent with the conditions
378  outlined below:
379
380  a.    Results of nonclinical studies
381
382  To be considered a Group 1 agent under the safety-margin considerations, we
383  recommend that a medical imaging agent have an adequately documented margin
384  of safety as assessed in the nonclinical studies outlined in the following list.[17]
385
386  • We recommend that the no-observed-adverse-effect level (NOAEL)[18] in
387    expanded-acute, single-dose toxicity studies in suitable animal species be at
388    least one hundred times (100x) greater than the maximal mass dose to be used
389    in human studies.  We further recommend that such expanded, acute, single-
390    dose toxicity studies be completed before the medical imaging agent is
391    introduced into humans (see section III.B.1).

---

[16] Group 2 diagnostic radiopharmaceuticals can also include radionuclides and carriers that are known to be biologically active.  This group includes radionuclides and carriers used at radiation doses or mass dosages that are higher than those used previously, including radionuclides and carriers that have been documented to produce adverse reactions.

[17] In addition, the medical imaging agent should meet the conditions described for the results of initial human experience (see section IV.B.1.b).

[18] For purposes of Groups 1 and 2 in this section of this guidance, the  term *no-observed-adverse-effect-level (NOAEL)* is defined as the highest mass dose tested in animals with no adverse effects. (See guidance *A Harmonized Approach to Estimating the Safe Starting Dose for Clinical Trials of Therapeutics in Healthy Volunteers.*)

11

*Contains Nonbinding Recommendations*

392
393    • We recommend that the NOAEL in safety pharmacology studies in suitable
394       animal species be at least one hundred times (100x) greater than the maximal
395       mass dose to be used in human studies.  We further recommend that such
396       safety pharmacology studies be completed before the medical imaging agent
397       is introduced into humans (see section III.B.1).
398
399    • We recommend that the NOAEL in short-term, repeat-dose toxicity studies in
400       suitable animal species be at least twenty-five times (25x) greater than the
401       maximal mass dose to be used in human studies.[19]  Short-term, repeat-dose
402       toxicity studies are conducted to evaluate the effects of exaggerated dose
403       regimens.  Such regimens can reveal effects not detected in studies of small
404       numbers of patients, suggest effects to be monitored in clinical studies, and
405       reveal effects that might occur in sensitive individuals.  Short-term, repeat-
406       dose toxicity studies can be performed either before the medical imaging
407       agent is introduced into humans, or concurrently with early human studies, but
408       we recommend that they be completed before phase 2 (see section III.B.1).
409
410    To establish these margins of safety, we recommend that the NOAELs be
411    assessed in properly designed and conducted studies and be appropriately
412    adjusted.  *Appropriately adjusted* means that mass dose comparisons between
413    animals and humans should be suitably modified for factors such as body size
414    (e.g., body surface area) and otherwise adjusted for possible pharmacokinetic and
415    toxicokinetic differences between animals and humans (e.g., differences in
416    absorption for products that are administered orally).[20]
417
418    We recommend that Group 1 medical imaging agents also undergo other
419    nonclinical toxicological studies as described in section III.B.1, such as
420    genotoxicity, reproductive toxicity, irritancy studies, and drug-drug interaction
421    studies.  See section III.B.1 for details and timing sequence.
422
423    i.    Additional considerations
424
425    FDA may still consider a medical imaging agent Group 1 even if its NOAELs are
426    slightly less than the multiples specified above.  For example, FDA will also take
427    into consideration, among other things, how close the NOAELs are to the
428    multiples specified above, the amount of safety information known about
429    chemically similar and pharmacologically related medical imaging agents, the

---

[19] Short-term, repeated-dose toxicity studies may identify toxicities associated with accumulation of a medical imaging agent or its metabolites.  In addition, even if such accumulation is not anticipated (e.g., non-metabolized medical imaging agents with short half-lives), short-term repeated-dose toxicity studies may identify toxicities caused by repeated toxic insults, each of which may be below the threshold of detection in expanded-acute, single-dose toxicity studies.

[20] For example, if drug elimination is based on a physiologic function that reflects blood flow, we then recommend that scaling on body surface area be used.

FDA000312

*Contains Nonbinding Recommendations*

430    nature of observed animal toxicities, and whether adverse events have occurred
431    during initial human experience, including the nature of such adverse events (see
432    section IV.B.1.b).
433
434    ii.    Formulations used in nonclinical studies
435
436    We recommend that the formulation used to establish safety margins in
437    nonclinical studies be identical to the formulation that will be used in clinical
438    trials and that is intended for marketing.  We also recommend that any differences
439    in the formulations used in the clinical trials and nonclinical studies be specified
440    so that any effect on the adequacy of the nonclinical studies can be determined.
441    Bridging studies may be helpful when changes in the formulation are apt to
442    change the pharmacokinetics, the pharmacodynamics, or safety characteristics of
443    the drug.[21]
444
445    In some cases, it may be infeasible or impractical to administer the intended
446    clinical formulation to animals in multiples of the maximal human mass dose
447    specified above (e.g., the volume of such an animal mass dose may be excessive).
448    We recommend that sponsors discuss their plans with FDA before studies are
449    initiated.  In these cases, alternative strategies can be employed, such as dividing
450    the daily mass dose (e.g., into a morning and evening dose), or by using a more
451    concentrated formulation of the medical imaging agent, or the maximal feasible
452    daily mass dose can be administered.
453
454    b.    Results of initial human experience
455
456    In addition to those considerations described above for nonclinical studies, FDA
457    also intends to consider the following when evaluating whether a medical imaging
458    agent is a Group 1 agent.
459
460    •    Whether safety issues were identified during initial human use of the medical
461        imaging agent in appropriately designed studies that include adequate and
462        documented standard clinical safety evaluations.  Identification of any adverse
463        events during initial human use that were not predicted from effects observed
464        in animals could be considered significant, regardless of severity.  If adverse
465        events occur at any time during human studies, we intend to conduct a risk
466        assessment to determine whether the medical imaging agent should be
467        reconsidered as a Group 2 medical imaging agent.  This risk assessment will
468        examine the type, frequency, severity, and potential attribution of the adverse
469        events with respect to what is known about the pharmacology of the drug.  For
470        example, the safety profile of a specific drug class may be well known, so that
471        the occurrence of a common, nonserious adverse event, such as headache,
472        would not be of particular concern.  However, in a drug class in which
473        microparticles of varying sizes are administered, the occurrence of the same
474        adverse event might be a signal of microcirculatory compromise.

---

[21] See guidance *S7A Safety pharmacology studies for human pharmaceuticals.*

13

FDA000313

*Contains Nonbinding Recommendations*

475
476   • We recommend that human pharmacokinetic studies of the
477      radiopharmaceutical be performed during phase 1 to collect information about
478      the disposition of the radioactivity in humans. Such data help facilitate
479      adequate comparisons of exposure between humans and the species used in
480      the nonclinical studies and allow a more meaningful assessment of the
481      relevance of the animal safety data (e.g., toxicokinetics).
482
483   *2.    Clinical Use Considerations*
484
485   Another way to be considered a Group 1 agent is by adequately documenting extensive
486   prior clinical use without development of a safety signal. This means showing that there
487   were no human toxicity or adverse events with clinical mass doses (and activities, if
488   applicable) of the agent, under conditions of adequate safety monitoring, and that the lack
489   of human toxicity was adequately documented. We recommend that the methods used to
490   monitor for adverse events be documented. Literature may be of limited value in
491   establishing the clinical safety of a drug because most published studies focus on
492   efficacy, with little or no description of any safety assessments.
493
494   An agent can be identified as Group 1 based on the clinical-use considerations at any
495   time during drug development (e.g., after the conditions specified in this section have all
496   been met).
497
498   **C.    Radiation Safety Assessment for All Diagnostic Radiopharmaceuticals**
499
500   *1.    General Considerations*
501
502   We recommend that an IND sponsor submit sufficient data from animal or human studies
503   to allow a reasonable calculation of the radiation absorbed dose to the whole body and to
504   critical organs upon administration to a human subject (21 CFR 312.23(a)(10)(ii)). At a
505   minimum, we recommend that radiation absorbed dose estimates be provided for all
506   organs and tissues in the standardized anthropomorphic phantoms established in the
507   literature (e.g., by the Medical Internal Radiation Dose (MIRD) Committee of the Society
508   of Nuclear Medicine). For diagnostic radiopharmaceuticals, we also recommend
509   calculation of the *effective dose* as defined by the International Commission on
510   Radiological Protection (ICRP) in its ICRP Publication 60 (this quantity is not
511   meaningful for therapeutic radiopharmaceuticals).
512
513   When a diagnostic radiopharmaceutical is being developed for pediatric use, the radiation
514   absorbed dose should be provided for all age groups in which the agent is intended to be
515   used, as provided by standard anthropomorphic phantoms established in the literature
516   (i.e., newborn, 1-year-old, 5-year-old, 10-year-old, and 15-year-old).
517
518   We recommend that the amount of the radiation absorbed dose delivered by internal
519   administration of diagnostic radiopharmaceuticals be calculated by standardized methods,
520   such as the absorbed fraction method described by the MIRD Committee and the ICRP.

FDA000314

*Contains Nonbinding Recommendations*

521
522    We also recommend that the methodology used to assess radiation safety be specified
523    including reference to the body models that were used.  We recommend that the
524    mathematical equations used to derive the time activity curves and the radiation absorbed
525    dose estimates be provided along with a full description of assumptions that were made.
526    We further recommend that sample calculations and all pertinent assumptions be listed
527    and submitted.  We recommend that the reference to the body, organ, or tissue model
528    used in the dosimetry calculations be specified, particularly for new models being tested.
529    If a software program was used to calculate the radiation doses, we recommend that you
530    provide (1) a full description of the code, including official name, version number, and
531    computing platform; (2) a literature citation for the code; and (3) photocopies of the
532    code's output, preferably showing all of the user input data and model choices.
533
534    We recommend that safety hazards for patients and health care workers during and after
535    administration of the radiolabeled product be identified, evaluated, and managed
536    appropriately.
537
538    *2.    Calculation of Radiation Absorbed Dose to the Target Organs or Tissues*
539
540    For established radionuclides used with a diagnostic agent (e.g., Tc-99m, In-111), we
541    recommend that the following items be determined based on the average patient as
542    defined by the MIRD phantom:
543
544    •    The tissue or organ in which a significant accumulation of radioactivity occurs (i.e.,
545        *source* organ)

546    •    The amount of radioactivity that accumulates in these tissues, expressed as a
547        percentage of the administered activity

548    •    The times at which radioactivity accumulation was observed in these tissues.  We
549        recommend that observations be made at two or more times during each phase of
550        radioactivity accumulation or clearance from the source regions.  If there is rapid
551        accumulation in a region and nonexponential clearance, two to three time points may
552        be sufficient to characterize the kinetic behavior.  If there are two phases of clearance,
553        we recommend at least two points of observation during each phase to adequately
554        characterize the biokinetics.  A description of the kinetic behavior of the activity
555        accumulation and clearance from these tissues.  This is most typically shown as
556        *biological half-times* for accumulation and clearance, although other representations
557        may be used.

558    •    The time-integral of activity for the accumulation of radiopharmaceutical in these
559        source tissues or organs.  For purposes of this guidance, this *time-integral* is defined
560        as the "cumulated activity" or "residence time" by the MIRD Committee in various
561        publications.

562    •    A description of how this time-integral was calculated.  This should be based
563        primarily on the accumulation and kinetic behavior in the source organs.  We
564        recommend that you specify the method used to calculate the time-integrals (e.g.,

FDA000315

*Contains Nonbinding Recommendations*

565    numerical integration, regression analysis, or compartment model analysis).  We also
566    recommend that you provide a description of how the terminal portion of the time-
567    activity curve for a given source region was integrated (e.g., assuming only physical
568    decay after the last data point, some rate of biological elimination estimated by two or
569    more of the later data points, or a fitted function continued to infinite time).

570    •   A description of how these time-integrals for source regions were combined with
571        dose conversion factors to calculate the radiation absorbed dose to all target regions.
572        If hand calculations were performed, we recommend that you specify the source of
573        dose conversion factors and provide copies of all calculations.  If an electronic
574        spreadsheet was used, we recommend that you provide printouts and electronic copies
575        of the spreadsheets to verify the formulas used.  If a computer program was used, we
576        recommend that you provide a complete description of the code and version number
577        as well as documentation of the code input and output.

578    For new radionuclides used with diagnostic agents, the same principles apply and we
579    recommend that you provide the same information.  If you want guidance on these
580    calculations, we recommend that you consult the appropriate review division.

581    *3.    Maximum Radiation Absorbed Dose*
582
583    We recommend that the amount of radioactive material administered to human subjects
584    be the smallest radiation absorbed dose practical to perform the procedure while
585    providing an adequate diagnostic examination for evaluation by the physician.
586
587    We recommend that calculations include the radiation absorbed dose contributions made
588    by all potential radionuclide contaminants that may be present in the product.
589
590    We recommend that you perform calculations to anticipate possible changes in dosimetry
591    that might occur in the presence of diseases in organs that are critical to metabolism or
592    excretion of the diagnostic radiopharmaceutical. For example, renal dysfunction may
593    cause significant, slow-clearing accumulation in one or both kidneys (and thus a high
594    dose to kidneys and adjacent tissues) and/or a larger fraction of the administered activity
595    to be cleared by the hepatobiliary system (or vice versa).
596
597    We recommend that possible changes in dosimetry resulting from patient-to-patient
598    variations in antigen or receptor mass be considered in dosimetry calculations.  For
599    example, a large tumor mass may result in a larger-than-expected radiation absorbed dose
600    to a target organ from a diagnostic radiopharmaceutical that has specificity for a tumor
601    antigen.  (For the purposes of dose calculation, a primary tumor, without metastases, can
602    be regarded as part of the organ in which it arises and its activity can be added to that of
603    the organ.)
604
605    We recommend that the mathematical equations used to derive the estimates of the
606    individual organ time activity curves and the radiation absorbed doses be provided along
607    with a full description of assumptions that were made.  We recommend that sample
608    calculations and all pertinent assumptions be listed.
609

16

FDA000316

*Contains Nonbinding Recommendations*

610      We recommend that calculations of radiation absorbed dose estimates be performed
611      assuming freshly labeled material (to account for the maximum amount of radioactivity)
612      as well as the maximum shelf life of the diagnostic radiopharmaceutical (to allow for the
613      upper limit of accumulation of radioactive decay contaminants).  We recommend that
614      these calculations:
615

616      •   Include radiation absorbed doses from x-ray procedures that are part of the study (i.e.,
617         would not have occurred but for the study).  The possibility of follow-up studies
618         should be considered for inclusion in the dose calculations.

619      •   Be expressed as milligray (mGy) per megabecquerel (MBq) and as rad per millicurie
620         (mCi) of the administered radiopharmaceutical

621      •   Be expressed as mGy and rad for a typical administered quantity of the
622         radiopharmaceutical

623      •   Be presented in a tabular format and include individual radiation absorbed doses for
624         the target tissues or organs and the organs listed above in section IV.D.1

625

FDA000317

*Contains Nonbinding Recommendations*

# GLOSSARY

**Effective dose:** The sum of the weighted equivalent doses in all the tissues and organs of the body, given by the expression $E = \sum W_T H_{T,R}$, where $W_T$ is the weighting. Effective dose, defined in 1990 by the International Commission on Radiological Protection, allows the conversion of the risk from partial body irradiations to those of whole body irradiations.

**Mass dose:** The mass or weight of the ligand or carrier, including the radionuclide, administered to the subject.

**No observed adverse effect level (NOAEL)**: The highest radiation absorbed dose tested in an animal species without adverse effects detected.

**No observed effect level (NOEL)**: The highest radiation absorbed dose tested in an animal species with no detected effects.

**Radiation absorbed dose:** The energy absorbed per unit mass. This is the fundamental dosimetric quantity in radiological protection. Its unit is the joule per kilogram, which is given the special name gray (Gy). The older quantity was the rad, where 1 Gy = 100 rads.

**Repeat-dose toxicity study**: A study that investigates the toxicities produced when a pharmaceutical is administered repeatedly during a given period of more than 24 hours. A repeat-dose toxicity study evaluates the effects of exaggerated dose regimens. Usually all animals in a repeat-dose toxicity study are terminated the day after the final dose; however, a recovery period may be included in the design to test the reversibility of effects. An interim sacrifice is sometimes included to detect effects that may occur after a few doses.

**Safety pharmacology study**: A study that investigates the potential undesirable pharmacodynamic effects of a substance on physiologic functions in relation to exposure levels.

**Special toxicology study**: A study conducted when something about the nature of the drug or how it is used raises a concern, or when previous nonclinical or clinical findings on the product or a related product have indicated special toxicological concerns. Examples include a local irritation study conducted to test the effects of potential misadministration or extravasation.

**Standard/expanded acute toxicity study**: A study that investigates toxicities produced by a pharmaceutical when it is administered in one dose. During a period not exceeding 24 hours, doses may be split due to large volumes or high concentrations. An expanded acute toxicity study includes more measures of toxicities than a standard acute toxicity study.

FDA000318

# Guidance for Industry

## Developing Medical Imaging Drug and Biological Products

## Part 2:  Clinical Indications

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**June 2004**
**Clinical Medical**

FDA000319

# Guidance for Industry

## Developing Medical Imaging Drug and Biological Products

## Part 2:  Clinical Indications

*Additional copies of this Guidance are available from:*

*Division of Drug Information HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane, Rockville, MD  20857*
*(Phone 301-827-4573)*
*Internet:   http://www.fda.gov/cder/guidance/index.htm.*

*or*

*Office of Communication, Training and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*Internet:   http://www.fda.gov/cber/guidelines.htm.*
*Mail: the Voice Information System at 800-835-4709 or 301-827-1800.*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**June 2004**
**Clinical Medical**

FDA000320

# Table of Contents

I.    INTRODUCTION ................................................................................................. 2

II.   SCOPE — TYPES OF MEDICAL IMAGING AGENTS .................................... 3

   A.    Contrast Agents ........................................................................................... 3

   B.    Diagnostic Radiopharmaceuticals ............................................................. 4

III.  INDICATIONS FOR MEDICAL IMAGING AGENTS .................................... 4

   A.    Structure Delineation ................................................................................. 5

      1. Locating and Outlining Normal Anatomic Structures ................................................ 6
      2. Distinguishing Between Normal and Abnormal Anatomy ........................................ 6

   B.    Disease or Pathology Detection or Assessment ........................................ 7

   C.    Functional, Physiological, or Biochemical Assessment ........................... 8

   D.    Diagnostic or Therapeutic Patient Management ..................................... 8

   E.    Multiple or Other Indications .................................................................. 10

IV.   CLINICAL TRIALS TO DETERMINE EFFECTIVENESS OF MEDICAL
IMAGING AGENTS .............................................................................................. 10

   A.    General Considerations for Establishing Accuracy and Validity of a Test ............ 11

   B.    Clinical Usefulness .................................................................................... 12

   C.    Defined Clinical Settings .......................................................................... 14

   APPENDIX:  MEDICAL LITERATURE ............................................................ 16

   GLOSSARY ............................................................................................................ 18

FDA000321

*Contains Nonbinding Recommendations*

# Guidance for Industry[1]

# Developing Medical Imaging Drug and Biological Products
## Part: 2  Clinical Indications

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. An alternative approach may be used if such approach satisfies the requirements of the applicable statutes and regulations.  If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.  If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.    INTRODUCTION

This guidance is one of three guidances intended to assist developers of medical imaging drug and biological products (*medical imaging agents*) in planning and coordinating their clinical investigations and preparing and submitting investigational new drug applications (INDs), new drug applications (NDAs), biologics license applications (BLAs), abbreviated NDAs (ANDAs), and supplements to NDAs or BLAs.  The three guidances are*:  Part 1: Conducting Safety Assessments*; *Part 2:  Clinical Indications*; and *Part 3: Design, Analysis, and Interpretation of Clinical Studies*.

Medical imaging agents generally are governed by the same regulations as other drugs or biological products.  However, because medical imaging agents are used solely to diagnose and monitor diseases or conditions as opposed to treat them, development programs for medical imaging agents can be tailored to reflect these particular uses.  Specifically, this guidance discusses our recommendations on selecting and studying clinical indications for medical imaging agents administered in vivo.[2]

---

[1] This guidance has been prepared by the Division of Medical Imaging and Radiopharmaceutical Drug Products and the Office of Therapeutics Research and Review in the Center for Drug Evaluation and Research (CDER) at the Food and Drug Administration.

[2] In response to the requirements of the Food and Drug Administration Modernization Act of 1997, FDA amended the drug and biologics regulations (21 CFR 315 and 601) by adding provisions for the evaluation and approval of in vivo radiopharmaceuticals used in the diagnosis or monitoring of diseases (64 FR 26657, May 17, 1999).  This guidance elaborates on the provisions contained in that regulation.

FDA000322

*Contains Nonbinding Recommendations*

36
37  FDA's guidance documents, including this guidance, do not establish legally enforceable
38  responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should
39  be viewed only as recommendations, unless specific regulatory or statutory requirements are
40  cited.  The use of the word *should* in Agency guidances means that something is suggested or
41  recommended, but not required.
42
43  A glossary of common terms used in diagnostic medical imaging is provided at the end of this
44  document.
45
46
47  **II.    SCOPE — TYPES OF MEDICAL IMAGING AGENTS**
48
49  This guidance discusses medical imaging agents that are administered in vivo and are used for
50  diagnosis or monitoring with a variety of modalities, such as radiography, computed tomography
51  (CT), ultrasonography, magnetic resonance imaging (MRI), and radionuclide imaging.  The
52  guidance is not intended to apply to the development of in vitro diagnostic or therapeutic uses of
53  these agents.[3]
54
55  Medical imaging agents can be classified into at least two general categories, contrast agents and
56  diagnostic radiopharmaceuticals.
57
58      **A.    Contrast Agents**
59
60  As used in this guidance, a contrast agent is a medical imaging agent used to improve the
61  visualization of tissues, organs, and physiologic processes by increasing the relative difference of
62  imaging signal intensities in adjacent regions of the body.  Products include, but are not limited
63  to (1) iodinated compounds used in radiography and CT; (2) paramagnetic metallic ions (such as
64  ions of gadolinium, iron, and manganese) linked to a variety of molecules and used in MRI; and
65  (3) microbubbles, microaerosomes, and related microparticles used in diagnostic
66  ultrasonography.

---

[3] The guidance is not intended to apply to the development of research drugs that do not provide direct patient
benefit with respect to diagnosis, therapy, prevention, or prognosis, or other clinically useful information.  These
include radioactive drugs for research that are used in accordance with 21 CFR 361.1.  Section 361.1(a) states that
radioactive drugs (defined in 21 CFR 310.3(n)) are generally recognized as safe and effective when administered
under specified conditions to human research subjects in the course of a project intended to obtain basic information
about the metabolism of a radioactively labeled drug or about human physiology, pathophysiology, or biochemistry.
 However, if a radioactive drug is used for immediate therapeutic, diagnostic, or similar purposes or to determine the
safety and effectiveness of the drug in humans, or if the radioactive drug has a pharmacological effect in the human
body, an IND is required.  FDA is developing a guidance on determining when research with radioactive drugs may
be conducted under § 361.1.

The Agency recognizes the potential of imaging agents as research tools for aiding the development of therapeutic
drugs, and some of the principles in the guidance may be applicable to such research.  Sponsors of such imaging
research agents are urged to contact the Division of Medical Imaging and Radiopharmaceutical Drug Products for
advice on development of the imaging research agent.

FDA000323

*Contains Nonbinding Recommendations*

67
68       **B.    Diagnostic Radiopharmaceuticals**
69
70   As used in this guidance, a *diagnostic radiopharmaceutical* is (1) an article that is intended for
71   use in the diagnosis or monitoring of a disease or a manifestation of a disease in humans and that
72   exhibits spontaneous disintegration of unstable nuclei with the emission of nuclear particles or
73   photons or (2) any nonradioactive reagent kit or nuclide generator that is intended to be used in
74   the preparation of such an article.[4]   The FDA interprets this definition to include articles that
75   exhibit spontaneous disintegration leading to the reconstruction of unstable nuclei and the
76   subsequent emission of nuclear particles or photons.
77
78   Diagnostic radiopharmaceuticals are generally radioactive drugs or biological products that
79   contain a radionuclide that typically is linked to a ligand or carrier.[5]   These products are used
80   with planar imaging, single photon emission computed tomography (SPECT), positron emission
81   tomography (PET), or with other radiation detection probes.
82
83   Diagnostic radiopharmaceuticals used for imaging typically have two distinct components.
84
85   •   A radionuclide that can be detected in vivo (e.g., technetium-99m, iodine-123,
86       indium-111).

87   The radionuclide typically is a radioactive molecule with a relatively short physical half-life
88   that emits radioactive decay photons having sufficient energy to penetrate the tissue mass of
89   the patient.  These photons can then be detected with imaging devices or other detectors.

90   •   A nonradioactive component to which the radionuclide is bound that delivers the
91       radionuclide to specific areas within the body.

92   This nonradionuclidic portion of the diagnostic radiopharmaceutical often is an organic
93   molecule such as a carbohydrate, lipid, nucleic acid, peptide, small protein, or antibody.
94
95   As technology advances, new products may emerge that do not fit into the traditional categories
96   of contrast agents and radiopharmaceuticals (e.g., agents for optical imaging, magnetic
97   resonance spectroscopy, combined contrast and functional imaging).  It is anticipated, however,
98   that the general principles discussed here could apply to these new diagnostic products.
99   Developers of these products should contact the appropriate reviewing division for advice on
100  product development.
101
102
103
104  **III.    INDICATIONS FOR MEDICAL IMAGING AGENTS**
105

---

[4] 21 CFR 315.2 and 601.31.

[5] In this guidance, the terms *ligand* and *carrier* refer to the entire nonradionuclidic portion of the diagnostic
radiopharmaceutical.

FDA000324

*Contains Nonbinding Recommendations*

106  The labeled indications for medical imaging agents fall within the following general categories:
107
108  • Structure delineation
109  • Disease or pathology detection or assessment
110  • Functional, physiological, or biochemical assessment
111  • Diagnostic or therapeutic patient management
112
113  The above categories do not represent a hierarchy or progression (e.g., a *structure delineation*
114  indication does not need to precede a *disease assessment* indication).  In addition, indications
115  from different categories could be granted for the same imaging agent.  Approval also may be
116  possible for categories of indications not listed above.
117
118  Under section 505(d) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 355(d)),
119  FDA cannot approve a new drug application (NDA) unless it contains adequate tests
120  demonstrating whether the proposed drug product is safe for use under the conditions prescribed,
121  recommended, or suggested in its proposed labeling.[6]  All drugs have risks, including risks
122  related to the intrinsic properties of the drug, the administration process, the reactions of the
123  patient, and incorrect diagnostic information.  Incorrect diagnostic information includes
124  inaccurate structural, functional, physiological, or biochemical information; false positive or
125  false negative diagnostic determinations; and information leading to inappropriate decisions in
126  diagnostic or therapeutic management.  Even if risks are found to be small, all drug development
127  programs must obtain evidence of drug effectiveness under section 505 of the Act.  Simply
128  generating an image, for which the implications to the patient are not understood, does not
129  confer benefits to the patient.
130
131  In determining the most appropriate indication for a medical imaging agent, special
132  considerations may apply to agents that may pose significant patient risk, for example, biological
133  medical imaging agents that are frequently immunogenic.  The development of antibodies after
134  intermittent, repeated administration can alter the pharmacokinetics, biodistribution, safety,
135  and/or imaging properties of such agents and, potentially, of immunologically related agents. For
136  agents that pose significant risk and where the clinical benefit is generally not readily apparent,
137  an indication of *disease or pathology detection or assessment* or *diagnostic or therapeutic*
138  *patient management* is more appropriate.  If one of the other indications (i.e*., structure*
139  *delineation* or *functional, physical or biochemical assessment*) will be sought for an agent that
140  may pose significant patient risk, we recommend that the development plan be discussed with
141  the review division.
142
143       **A.     Structure Delineation**
144
145  As described in the following sub-sections, at least two types of labeled indications for structure
146  delineation are possible: (1) locating and outlining normal (or variants of normal) anatomic
147  structures and (2) distinguishing between normal and abnormal anatomy in a defined clinical
148  setting.  Ordinarily, the ability to locate and outline normal structures or distinguish between

---

[6] For approval of a biological license application, the safety of the proposed product must be demonstrated under section 351(a) of the Public Health Service Act (42 U.S.C. 262(a)).

FDA000325

*Contains Nonbinding Recommendations*

149  normal and abnormal anatomy can *speak for itself* with respect to the clinical value of the
150  information and will not require additional information substantiating clinical usefulness.
151
152          *1.      Locating and Outlining Normal Anatomic Structures*
153
154          We recommend that a medical imaging agent intended for this type of indication be able
155          to locate and outline normal (or variants of normal) anatomic structures.  We recommend
156          that the product clarify the spatial relationship of the visualized normal structure with
157          respect to other body parts or structures. Such a medical imaging agent could distinguish
158          normal structures that cannot be seen well with other imaging agents or modalities.  For
159          example, a contrast agent developed to image the normal parathyroid glands could be
160          clinically useful because it could help surgeons plan and perform thyroid surgery.
161
162          *2.      Distinguishing Between Normal and Abnormal Anatomy*
163
164          We recommend that a medical imaging agent intended for this type of indication be able
165          to locate and outline both normal and abnormal anatomic structures.  We recommend that
166          the agent also clarify the spatial relationships of the normal and abnormal anatomic
167          structure(s) with respect to other body parts or structures.  Imaging agents that identify
168          abnormalities common to one or more disease entities (and therefore not specific to a
169          particular disease) could be eligible for a structural indication.  Examples of this type of
170          agent include:
171
172          •   An agent that nonspecifically enhances the airway lumen to distinguish dilated
173              bronchi from normal bronchi and categorizes the bronchiectasis anatomically
174              (e.g., as cylindric, sacculated, or fusiform)
175          •   An agent that nonspecifically enhances the joint cavity to evaluate and describe
176              meniscal or ligamentous injuries of the knee
177          •   An agent that outlines the vascular system to identify structural narrowing,
178              dissections, aneurysms, and relationships to normal vasculature
179          •   A contrast agent that localizes or outlines masses
180
181          In the preceding examples, the agent's ability to outline abnormal anatomy may also be
182          supportive of a disease detection indication in a specific population (section III.B).  If the
183          sponsor can demonstrate that use of the agent provides clinical benefit in this population,
184          a disease detection indication might be appropriate.
185

6

FDA000326

*Contains Nonbinding Recommendations*

186          **B.          Disease or Pathology Detection or Assessment**
187
188    We recommend that a medical imaging agent intended for disease or pathology detection be able
189    to detect and locate a specific disease or pathological state in at least one defined clinical
190    setting.[7] The medical imaging agent could be used alone or in combination with other diagnostic
191    procedures to achieve this labeled indication.
192
193    Examples of medical imaging agents for which this type of indication may be appropriate
194    include:
195
196        •    An agent that can bind to multiple regions of the brain but is intended to detect or assess
197              the extent of a specific neurological disease, such as Parkinson's disease
198        •    A radiolabeled monoclonal antibody that can attach to a unique tumor antigen to detect
199              the presence of, or extent of, a mass with this tumor antigen (e.g., breast cancer)
200
201    We recommend that efficacy trials for these indications be conducted in subjects presenting for
202    diagnostic evaluation of a specific disease or condition in a defined clinical setting.  This is
203    because the likelihood of disease or the spectrum of disease (e.g., severity or stage) is dependent
204    on the clinical setting.  Examples of two common clinical settings are (1) providing a diagnosis
205    in patients with suspected disease and (2) monitoring and assessing the extent, rate of
206    progression, or other aspects of the specific disease in patients previously diagnosed with the
207    disease.  An indication of detection of disease or pathology in an asymptomatic population (a
208    screening indication) may be appropriate if the sensitivity of the imaging modality is high
209    enough and the rate of false positives is low enough (see also diagnostic or therapeutic patient
210    management, section III.D).
211
212    It is likely that the clinical usefulness and the diagnostic performance of the medical imaging
213    agent will differ in each clinical setting.[8]  We recommend that if a medical imaging agent is
214    being developed to diagnose a particular disease, efficacy trials generally enroll subjects in
215    whom the disease status is unknown, but in whom specific aspects of the clinical presentation
216    have led to the desire for more diagnostic information.  That is, we recommend that the trials
217    include the intended population in the appropriate clinical setting.  Data from subjects known
218    definitely to have (or to not have) the disease of interest may be of limited value because
219    estimates of diagnostic performance derived from a known disease population may not apply to
220    performance in the intended population.
221
222
223

---

[7] See section IV.C for a definition of *defined clinical setting*.

[8] Studying patients with known disease provides information useful in developing a hypothesis for testing in
subsequent clinical trials.  Typically, such clinical settings are not used to establish efficacy in disease or pathology
detection.

7

FDA000327

*Contains Nonbinding Recommendations*

224   **C.  Functional, Physiological, or Biochemical Assessment**
225
226 We recommend that a medical imaging agent intended to provide functional, physiological, or
227 biochemical assessment be able to evaluate the function, physiology, or biochemistry of a tissue,
228 organ system, or body region.  This type of indication could apply to agents used to detect either
229 a reduction or an increase of a normal functional, physiological, or biochemical process.  The
230 indication *functional, physiological, or biochemical assessment* could be limited to assessment
231 of functional, physiological, or biochemical processes when disturbances of these processes are
232 common to several diseases or conditions and they are not diagnostic for any particular disease
233 or condition.
234
235 The indication *functional, physiological, or biochemical assessment* is appropriate for patients
236 when evaluations of functional, physiological, or biochemical aspects of a tissue, organ, or body
237 region would provide clinically useful information.
238
239 Examples of medical imaging agents with *functional, physiological, or biochemical assessment*
240 indications include:
241
242  &bull; A contrast agent to assess cardiac ejection fraction or myocardial wall motion

243  &bull; A radiopharmaceutical that assesses metabolism of a substrate where the normal pattern
244   of metabolism in that organ or tissue is well known
245
246 To establish efficacy in clinical studies, we recommend that the functional, physiological, or
247 biochemical measurements of the medical imaging agent be compared with those of a reference
248 product or a procedure of known high validity (i.e., a truth standard).  Ideally, we recommend
249 that the high validity of this reference product or truth standard be documented thoroughly and
250 critically before its use in clinical studies intended to demonstrate effectiveness of the test-
251 imaging agent.  We recommend that a functional indication be studied in the wide spectrum of
252 diseases and disease severity states that affect the functional endpoint.  For example, a sponsor
253 might seek an indication of measuring myocardial left ventricular function.  To ensure that the
254 test is valid in the patient population most likely to be referred for testing, the sponsor might
255 design studies that include subjects with different cardiac diseases, such as dilated
256 cardiomyopathy, valvulopathy, hypertrophic cardiomyopathy, and myocardial infarction,
257 including subjects with normal function as well as those with mild, moderate, and severe
258 dysfunction.  In that case, separate studies for each disease would not be needed.
259
260 If no standard of truth applies to the proposed use of a medical imaging agent for functional,
261 physiological, or biochemical assessment, we recommend that a clinical trial be conducted to
262 determine that the findings are clinically useful (see section IV.B).
263
264   **D.  Diagnostic or Therapeutic Patient Management**
265
266 We recommend that a medical imaging agent intended for the indication *diagnostic or*
267 *therapeutic patient management* be able to improve patient management decisions (e.g., the need
268 for further diagnostic testing or the use of specific therapeutic interventions) or improve patient

FDA000328

*Contains Nonbinding Recommendations*

269  outcomes when used in a defined clinical setting.[9]  Included in this indication is the ability to
270  provide information (such as the presence of a certain receptor in a type of cancer patient) that
271  can predict survival or patient response to a particular type of therapeutic drug.
272
273  To obtain approval for a diagnostic or therapeutic patient management indication, we
274  recommend that adequate and well-controlled investigations demonstrate that patient
275  management decisions or outcomes are, in fact, improved by use of the medical imaging agent.
276  The medical imaging agent can be used alone or in combination with other diagnostic procedures
277  to achieve this labeled indication.  Studies might involve randomization into one arm with
278  testing and patient management based on the testing results in accordance with a prespecified
279  algorithm compared to a nontesting arm that proceeded to treatment as defined by current
280  standards.  Patient outcomes such as recovery, survival, and response rates that are based on the
281  treatment standard could be collected and compared.
282
283  Examples of medical imaging agents for which this type of indication may be appropriate are:
284
285  • Products shown to provide improved clinical decisions about whether suspected cardiac
286    patients should undergo further invasive, diagnostic testing, such as with coronary
287    angiography (i.e., use for diagnostic patient management)
288
      • Products that predict whether a patient has a better prognosis with tumor resection
289        instead of with chemotherapy (i.e., use for therapeutic patient management)
290
291  We recommend that the trials demonstrate that diagnostic or therapeutic management is
292  improved when using the medical imaging agent compared to management without use of the
293  medical imaging agent.  The medical imaging agent can be used in conjunction with other tests
294  to influence a patient diagnostic or therapeutic management decision.  We suggest that it would
295  not be sufficient simply to demonstrate that the results of the test drug were used to direct a
296  change in patient management, even to an intervention that is well established.  Rather, we
297  recommend that the sponsor establish whether the change was better or worse for the patient.
298  For example, when using a new imaging agent in determining whether to perform breast biopsy
299  versus repeat clinical breast examination followed by mammography, the sponsor should
300  show whether use of the test drug results in fewer or greater numbers of unnecessary biopsies or
301  undiagnosed cancers than use of a comparator.  We recommend that this principle also be
302  applied to studies to demonstrate a therapeutic patient management claim:  the sponsor should
303  show that use of the new imaging agent leads to better patient therapy choices than result from
304  the use of existing methods of managing therapy.  If sponsors do not wish to perform such
305  follow up, we recommend that they instead seek an indication for disease or pathology detection
306  or assessment.
307
308  To obtain the indication *diagnostic or therapeutic patient management* for a medical imaging
309  agent that identifies unrecognized disease in asymptomatic individuals (e.g., used in a screening
310  setting), we recommend that a sponsor show that use of the test decreases morbidity or mortality,

---

[9] See section IV.C for a definition of *defined clinical setting*.

FDA000329

*Contains Nonbinding Recommendations*

311  or provide existing data that show that early detection and treatment of the disease decreases
312  morbidity or mortality.
313
314        **E.    Multiple or Other Indications**
315
316  The indication categories outlined above are flexible, and indications for medical imaging agents
317  need not be mutually exclusive.  A labeled indication can include several indication categories.
318  For example, a diagnostic radiopharmaceutical could be developed as an aid in the diagnosis of
319  lung cancer for the labeled indication *disease or pathology detection or assessment*.  This
320  diagnostic radiopharmaceutical could also be evaluated in subpopulations of patients with lung
321  cancer for its ability to provide information that leads directly to appropriate therapeutic
322  management decisions (e.g., using test results to determine what combination of surgery,
323  radiotherapy, and chemotherapy is most appropriate).
324
325  Structural and functional aspects of diseases or conditions sometimes are evaluated together with
326  imaging in clinical practice (e.g., use of a contrast agent to evaluate cardiac anatomy and
327  segmental wall motion).  In such cases, we recommend that clinical studies evaluate the effect of
328  the imaging agent on assessments of both structure and function.
329
330  Functional evaluations of diseases or conditions may be accomplished for various purposes.  For
331  example, a drug may have a functional indication for the evaluation of cardiac ejection fraction.
332  Subsequently, the drug may be developed for a therapeutic management indication for the
333  evaluation of perfusion or wall motion abnormalities to predict response to surgical intervention.
334
335  For indications that do not fall within the categories identified above (e.g., providing prognostic
336  information based on imaged gene expression), we recommend that the applicant or sponsor
337  consult FDA on the nature of the desired labeled indication and how to establish effectiveness
338  for it.
339
340
341  **IV.    CLINICAL TRIALS TO DETERMINE EFFECTIVENESS OF MEDICAL**
342  **        IMAGING AGENTS**
343
344  In general, establishing effectiveness has two components:  (1) establishing the accuracy of the
345  test and (2) establishing the clinical value of the test.  In some cases, a test that provides accurate
346  information in describing a clinical condition is of well-established value.  Generally, this is true
347  for proposed indications for structure delineation and disease or pathology detection or
348  assessment.  When there are established methods of seeking similar information and the only
349  issue is comparing the accuracy of the new and old methods, the clinical usefulness of the
350  indication need not be reestablished.  Many functional, physiological, or biochemical
351  assessments are similarly well established as useful (ejection fraction, renal function, myocardial
352  wall motion) but others (glucose utilization by various parts of the body, presence of serotonin
353  receptors, cerebral blood flow, palmitate metabolism) may not be.  Where the clinical value of
354  valid information is not established, we recommend that additional information establishing its
355  value be developed.  This recommendation applies to all drugs, including therapeutic drugs, for
356  which the indication or mechanism of action for an indication is not accepted or well understood

FDA000330

*Contains Nonbinding Recommendations*

357   in the medical community.
358
359   Demonstration of improved patient management means more than assessment of the accuracy of
360   the test.  Either by reference to prior data or through new trials, we recommend that this claim
361   show that the test really makes a difference in outcome or management.  Of course, the impact of
362   a test may be considered obvious (e.g., staging of breast cancer is disease or pathology detection
363   or assessment indication).  In some cases, the test will have plain therapeutic implications, as
364   would be the case for effective staging of some other malignancies, although, in many cases, trial
365   data should be collected.
366
367   We recommend that investigations establish the validity  (generally assessed by describing the
368   sensitivity, specificity, positive predictable value and negative predictive value in relevant
369   settings) and reliability (how reproducible the test results are) of the imaging agent.  These test
370   characteristics can provide information on risk-benefit as well, including estimates of risk of
371   incorrect diagnosis.  Safety information obtained in studies (see the companion guidance *Part 3:*
372   *Design, Analysis, and Interpretation of Clinical Studies*) will also contribute to an Agency risk-
373   benefit assessment.  The clinical usefulness of an imaging agent may be obvious from a
374   description of what it can demonstrate (or supportable by evaluation of the literature), or it may
375   be appropriate to demonstrate the agent's usefulness.  We recommend that clinical studies and
376   related methods for establishing effectiveness be performed in defined clinical settings that
377   reflect the proposed indications.
378
379       **A.      General Considerations for Establishing Accuracy and Validity of a Test**
380
381   To establish efficacy in clinical studies, we recommend that the accuracy and/or validity of the
382   structural delineation, functional, physiological, or biochemical assessment and disease or
383   pathology detection generally be demonstrated by comparing the performance of the medical
384   imaging agent with that of a reference product or a truth standard in a relevant clinical setting.
385
386   To provide adequate estimates of the validity and reliability of the medical imaging agent over
387   the full range of conditions for which it is intended to be used, we recommend that medical
388   imaging agents be evaluated in studies with appropriate representation of sufficient numbers of
389   subjects (1) with and without the abnormalities or diseases in question (over the full spectrum of
390   the condition or disease presentation) and (2) with other conditions, processes, or diseases that
391   could affect the interpretation of the imaging results (e.g., inflammation, neoplasm, infection,
392   trauma).  We recommend that sponsors justify the inclusion or exclusion of selected
393   subpopulations during clinical development.  We recommend that studies of agents for
394   functional, physiological, or biochemical assessment indications provide a quantitative or
395   qualitative understanding of how the measurement varies in normal and abnormal subjects or
396   tissues, including the variable's normal range, distribution, and confidence intervals in these
397   subjects or tissues.  We believe it is critical to identify the range that is normal and the values
398   that indicate an abnormality.  When possible, we recommend that the minimum detectable limits
399   and reproducibility of the measurement be assessed.
400

11

FDA000331

*Contains Nonbinding Recommendations*

401  Reproducibility assessments are most meaningful when performed within the same subject.
402  However, under some circumstances this practice might be unethical, in which case the sponsor
403  should consider alternative approaches to testing reproducibility (e.g., in animals).
404
405  In cases when a valid reference product or a truth standard is unavailable or infeasible, the
406  validity of the information obtained can be demonstrated in clinical studies showing a beneficial
407  clinical outcome.  We recommend that the sponsor discuss these issues with the Agency prior to
408  initiation of phase 3 studies.
409
410      **B.    Clinical Usefulness**
411
412  Under section 505 of the Act (or, for a biologic, section 351 of the PHS Act) and its
413  implementing regulations, FDA cannot approve a drug without evidence that the drug's benefit
414  to patients outweighs its risks:
415
416   •   Sponsors are not asked to re-demonstrate the benefits already shown by diagnosing a
417       patient's specific disease or defining anatomy or functional status.  However, under
418       section 505 of the Act or section 351 of the PHS Act, the sponsor must demonstrate that
419       the agent's benefits justify the risks.
420
421   •   For an indication for which the benefits of an imaging agent have not yet been shown,
422       such as imaging a new biochemical process, a sponsor should conduct clinical trials to
423       demonstrate the agent's clinical prognostic value, the diagnostic performance
424       characteristics of the test agent compared to existing testing, the test's ability to predict
425       appropriate therapy, or the test's ability to help select appropriate further diagnostic
426       testing over existing testing.
427
427  The use of medical imaging agents without defined benefits and without an understanding of
428  how the imaging results can be used for patient management might cause harm to patients even
429  if the agent has low toxicity.  Such harm might include (1) conducting unnecessary diagnostic
430  testing based on the results of the agent, (2) directing patients to invasive procedures or
431  inappropriate or unnecessary therapy, and (3) creating unnecessary patient anxiety from
432  *abnormal* test results.
433
434  Medical imaging results may have clinical usefulness in some settings but not in others; it is,
435  therefore, important to prospectively define and study the imaging agent in the clinical setting of
436  intended use.  We recommend that a medical imaging agent be able to provide accurate and
437  reliable information that, in one of a number of ways, facilitates clinical management, including
438  (1) helping make an accurate diagnosis, (2) contributing to beneficial clinical outcome (e.g., by
439  helping choose the right therapy), or (3) providing accurate prognostic information. All
440  indications under section III should reflect these benefits, which are then weighed by FDA
441  against the agent's risks as part of an approval decision.  Once clinical usefulness is established,
442  other benefits of imaging agents, such as safety advantages and enhanced convenience to
443  patients over existing marketed products, can be considered.
444

FDA000332

*Contains Nonbinding Recommendations*

445   Depending on the specific indication, clinical usefulness can generally be established in two
446   ways:  (1) by direct demonstration in studies carried out during clinical development and (2) by
447   reference to historical data.  In circumstances when the measure is well established as useful in
448   the medical literature, the clinical benefit of the measure does not need to be re-established (e.g.,
449   ejection fraction or myocardial wall motion are widely used measures of cardiac function with
450   known prognostic and therapeutic implications).  Even if the new measure has not been used
451   before, we suggest that clinical usefulness can be established historically when the information
452   being obtained has been shown to be useful when obtained by other means.  For example, if a
453   product is able to establish the early detection of colon polyps without the need for colonoscopy,
454   the clinical benefit of the use of this product can be inferred because treatment is available for
455   this disease (polypectomy), and the test would allow people to avoid unnecessary colonoscopy
456   (i.e., clinical usefulness has been established indirectly).  In such situations, clinical usefulness
457   can be documented by a critical and thorough analysis of the medical literature and any historical
458   precedents.
459
460   For indications in which it cannot be established from prior knowledge, we recommend that
461   clinical usefulness be established through new trials during development.  For example, we
462   recommend that clinical usefulness be established directly for a medical imaging agent that has
463   been shown in a research setting to bind specifically to particular receptors, but where it has not
464   yet been established that assessment of such binding adds to the accuracy of diagnosis,
465   contributes to beneficial clinical outcome, or provides accurate prognostic information.  For
466   novel technologies relying on mechanisms for imaging never approved before, we recommend
467   that a plan for establishing clinical usefulness be incorporated into the development plan of a
468   medical imaging agent.  In general, we recommend that clinical usefulness be evaluated
469   prospectively in the principal clinical studies of efficacy.  We recommend that sponsors assess
470   how the novel technology imaging results are used and how usefulness to the patient is
471   confirmed.
472
473   For a contrast agent to be considered clinically useful, we recommend that, when used in
474   combination with an imaging device, the agent be able to provide useful information or other
475   advantages (such as improved imaging time or convenience) beyond that obtained by the
476   imaging device alone.  That is, we recommend that imaging with the contrast agent have added
477   benefit when compared to imaging without the contrast agent.
478
479   To illustrate how effectiveness could be evaluated, consider the following possible approaches:
480
481   1.    Compare the new test and the established (comparator) test, which could be either
482         another test or a truth standard, such as pathology.  Ideally, both a comparator and
483         a truth standard are employed so that the diagnostic performance measures of the
484         new test can be compared to those of the comparator.  We recommend that the
485         population studied include the spectrum of presenting patients that would be
486         expected to undergo the new test, and that standard analyses be performed on
487         sensitivity and specificity, positive predictive value, and negative predicative
488         value.  If the comparator test is established as clinically useful through controlled
489         clinical trials or literature and is considered the standard of care by the practicing

13

FDA000333

*Contains Nonbinding Recommendations*

490    community, comparing the new test to the comparator could be sufficient to
491    demonstrate the usefulness of the new test.
492
493    2.    Compare the new test added to the current standard test battery to a truth standard
494          (such as pathology).  If the new test added to the standard battery shows greater
495          sensitivity and specificity than the standard test battery without the new test, that
496          result alone could be sufficient.  Or, if the new test detects some lesions that the
497          standard tests miss (greater sensitivity) and the result is of accepted clinical value
498          (i.e., leads to improved patient management and has a very low false positive
499          rate), that result alone could be sufficient.
500
501    Note:  Situation 2 would be similar to imaging with and without the new test to determine
502    the contribution of the new imaging test.
503
504    For 1 and 2, the results of the new test would be presumed to be of prognostic,
505    therapeutic, or diagnostic value, and the new imaging drug would be presumed to
506    improve these aspects.  If that is not the case, we recommend that the value be
507    documented through a randomized clinical trial. The new test (or the new test added to
508    the standard testing battery) could be compared to standard testing without the new test to
509    determine if the new test improves clinical outcomes or prognosis.  Refer to Part 3 of the
510    medical imaging guidances, section IV.D.1, for additional discussion.
511
512    **C.    Defined Clinical Settings**
513
514    We recommend that a *defined clinical setting* reflect the circumstances and conditions under
515    which the medical imaging agent is intended to be used.[10]  Generally, the choice of anticipated
516    labeled indications will determine the clinical setting for the trials.  In some cases, an
517    appropriately designed trial may contain several clinical settings.
518
519    For example, a medical imaging agent intended to detect prostate cancer (a disease specific
520    indication) could be developed for use in different defined clinical settings such as:
521
522    •    For asymptomatic, healthy men for early detection screening

523    •    For use in men presenting with a high clinical index of suspicion for prostate cancer
524          either by physical examination or abnormal prostate specific antigen testing

525    •    For use in men with existing diagnosis of prostate cancer to evaluate recurrence

---

[10] Note that use of a *defined clinical setting* in studies of medical imaging agents also tends to anchor both the
*pretest probability* and the *spectrum* (e.g., severity or stage) of the disease or condition under study.  Thus, when
evaluated in a defined clinical setting, diagnostic performance measures that vary with the pretest probability of the
disease or condition (e.g., positive and negative predictive values, accuracy), or that can vary with the spectrum of
the disease or condition (e.g., sensitivity, specificity, positive and negative predictive values, accuracy) tend to take
on values that are relatively constant for that defined clinical setting.  See section III B.

FDA000334

*Contains Nonbinding Recommendations*

526  We recommend that the circumstances and conditions under which the medical imaging agent is
527  intended for use be evaluated in clinical trials and be described in the labeling using the
528  following mechanisms:
529
530  1.  Specify aspects of the medical history and physical examination that are pertinent for
531      determining the likelihood of the disease or condition that is in question. For example:
532
533      •  A medical imaging agent intended to detect breast cancer might be evaluated for use
534         in the assessment of (1) otherwise healthy women over 40 years of age, (2) women
535         with a family history of breast cancer, or (3) women presenting with palpable breast
536         masses or abnormal mammograms.
537
538  2.  Specify a patient population that is at a particular step in the diagnostic or patient
539      surveillance sequence. For example:
540
541      •  A diagnostic radiopharmaceutical may be intended to evaluate patients in an
542         emergency room with equivocal clinical and laboratory findings of a myocardial
543         infarction, or to evaluate the location and extent of a myocardial infarction in patients
544         with definitive findings.
545
545      •  An agent may be intended for use in an outpatient office setting to monitor disease
546         progression. Typically, we recommend that such an imaging agent be studied using
547         repeated, periodic surveillance imaging of ambulatory patients in an outpatient
548         setting.
549
550  3.  Specify any other diagnostic assessments that are to be performed in the evaluation of
551      this patient population. We recommend that this delineation include describing how the
552      medical imaging agent should be used with respect to other diagnostic tests or
553      evaluations, including (1) whether the medical imaging agent is intended to be used
554      together with, or as a replacement for, other diagnostic tests or modalities and (2) how
555      the use of the medical imaging agent is influenced by the results of other diagnostic
556      evaluations.
557
558  Pooling efficacy data (additive derivation of summary statistics) across defined clinical settings
559  may only be of limited value because differences in disease prevalence and in pathophysiology
560  may result in different diagnostic performance (sensitivity, specificity, positive and negative
561  predictive value) in different settings. Pooled results may suggest that the product is useful in all
562  the evaluated clinical settings and may obscure the evidence of differential usefulness in each
563  one of the settings. Of course, data from independent trials in different clinical settings may be
564  useful in determining the overall labeling in one or more clinical settings. The number and type
565  of populations to be studied depends on the type of the indication and clinical uses sought by the
566  sponsor. If there are data showing that the benefits from use of a medical imaging agent in a
567  particular clinical setting exceed the risks, that can be reflected on the labeling.
568
569
570

15

FDA000335

*Contains Nonbinding Recommendations*

571
572                          **APPENDIX: MEDICAL LITERATURE**
573
574    On occasion, the medical literature may provide critical information on various aspects of the
575    safety or efficacy of a product.  Considerations in the use of the medical literature are described
576    in the FDA guidance for industry *Providing Clinical Evidence of Effectiveness for Human Drug*
577    *and Biological Products*.  In applying these fundamental principles to imaging trials, we
578    recommend that sponsors consider whether the methods section in a relevant literature article
579    describes a prospective protocol in sufficient detail to assess the strengths and weaknesses of the
580    protocol design features discussed in this medical imaging guidance.  For example, the design
581    features that are critical include selection of the patient population, clinical setting, image
582    handling, image reading plan for the test product and the standard of truth, use of an accepted
583    standard of truth, the statistical plan, and use of appropriate steps to eliminate bias.  As literature
584    studies are often completed for purposes other than drug approval, the relevance of the selected
585    endpoints to the proposed indication should be justified.
586
587    We recommend that a critical review of the literature present the method used for the literature
588    search, the criteria used to review the data, and the criteria used to determine the applicability of
589    the results.  Although we recommend that each article be reviewed and summarized, we also
590    recommend that the key articles be discussed more extensively.
591
592    Typically, articles in the imaging literature provide limited data on safety, so that additional
593    safety studies may be called for.  Other information that can be supplied either fully or partially
594    by the literature include:
595
596    •   Information on human drug safety: population exposed, types of adverse events and how they
597        were monitored and reported, reliability of data collection

598    •   Pharmacology

599    •   Toxicology studies

600    •   Biopharmaceutical information
601
602    In the FDA guidance for industry, *Providing Clinical Evidence of Effectiveness for Human Drug*
603    *and Biological Products*, the Agency discusses the use of the medical literature by sponsors.  We
604    recommend:
605
606    •   Independent substantiation of experimental results.  Multiple studies from different authors
607        provide greater support.
608        —Replication of findings in usually two or more adequate and well-controlled human
609        investigations
610        —Similar study questions, populations, diseases or conditions or indications being
611        studied with the same imaging agent
612        —Studies from more than a single center (or from more than a single investigator) for
613        independence of finding

FDA000336

*Contains Nonbinding Recommendations*

614   • A showing that studies were conducted by groups with properly documented operating
615      procedures and a history of implementing such procedures effectively

616   • Prospective design to minimize bias

617   • A showing that a sufficient number of patients were enrolled in the studies to provide results
618      that are valid (we recommend this be documented by a sample size discussion in the article)

619   • A showing that there is a sufficient level of detail of information in the studies to assess:
620      —Mass dose(s) and radiation dose(s) used and regimen(s) used for dosage administration
621      —Image acquisition, including device settings, timing and interval of imaging, and views
622      obtained
623      —Image blinding method used, how images were handled and presented to the blinded
624      reader, details on sequential unblinding if used, methods used by the core laboratory before
625      images were presented to the blinded reader, and how multiple lesions were tracked
626      —Details of how the imaging agent is made so that FDA can assess the identity of an agent
627      used in multiple studies if that agent is made locally
628          --Use and description of controls to minimize bias:  for example, randomization,
629          blinding, central reading versus local reading
630          --Statistical plans, prespecified analytic methods, prospectively defined study endpoints,
631          and a full accounting of the study population enrolled
632          --Study endpoints that are objective and not dependent on investigator judgment.
633          Description of imaging features used by the blinded readers to reach their decision.  For
634          diagnostic tests where endpoints are interpretive, we recommend use of a well-accepted
635          truth standard, such as pathology.  If study endpoints are also compared to an active
636          imaging control drug or modality, that imaging approach must be approved for the
637          indication being studied.  We recommend the endpoint be clinically useful.
638      —Robust results that yield a conclusion of efficacy that is consistent with the prospective
639      protocol design and that do not require post-hoc analyses
640
641
642
643
644
645

FDA000337

*Contains Nonbinding Recommendations*

646                                   **GLOSSARY**
647
648   *Note*:  Subjects in trials of medical imaging agents are often classified into one of four groups
649   depending on (1) whether disease is present (often determined with a truth standard or gold
650   standard) and (2) the results of the diagnostic test of interest (positive or negative).  The
651   following table identifies the variables that are used to estimate the parameters defined below.
652

| Test Result: | Disease: | | |
|---|---|---|---|
| | **Present (+)** | **Absent (-)** | |
| **Positive (+)** | **TP (a)**<br>true positive=TP | **FP (b)**<br>false positive=FP | **m1 = a+b =**TP+FP<br>total with positive test |
| **Negative (-)** | **FN (c)**<br>false negative=FN | **TN (d)**<br>true negative=TN | **m2 = c+d =**FN+TN<br>total with negative test |
| | **n1 = a + c =** TP+FN<br><br>total with disease | **n2 = b +d=**FP+TN<br><br>total without disease | **N = a+b+c+d**<br>=TP+FP+FN+TN<br>total in study |

653
654
655   **Accuracy**:  (1) In common usage, *accuracy* is the quality of being true or correct.  (2) As a
656   measure of diagnostic performance, *accuracy* is a measure of how faithfully the information
657   obtained using a medical imaging agent reflects reality or *truth* as measured by a truth standard
658   or *gold standard*.  Accuracy is the proportion of cases, considering both positive and negative
659   test results, for which the test results are correct (i.e., concordant with the truth standard or *gold*
660   *standard*.)  Accuracy = (a+d)/N = (TP+TN)/(TP+FP+FN+TN).
661
662   **Comparator:**  An established test against which a proposed test is compared to evaluate the
663   effectiveness of the proposed test.  A comparator usually means an agent or modality approved
664   for a similar indication.  (See also definition for *reference product*.)
665
666   **Negative predictive value:**  The probability that a subject does not have the disease when the
667   test result is negative.  Synonyms include *predictive value negative*.  Negative predictive value =
668    d/m2 = TN/(TN+FN).  By application of Bayes' Rule, the negative predictive value also can be
669   defined as a function of the pretest probability of disease (p), sensitivity, and specificity:
670   negative predictive value = [(1-p) • specificity]/[(1-p) • specificity + p • (1- sensitivity)].
671
672   **Positive predictive value:**  The probability that a subject has the disease when the test result is
673   positive.  Synonyms include *predictive value positive*.  Positive predictive value = a/m1 =
674   TP/(TP+FP).  By application of Bayes' Rule, the positive predictive value also can be defined as
675   a function of pretest probability of disease (p), sensitivity, and specificity:  positive predictive
676   value = [(p • sensitivity)/[p • sensitivity + (1-p) • (1- specificity)].
677
678   **Precision:**  A measure of the reproducibility of a test, including reproducibility within and
679   across doses, rates of administration, routes of administration, timings of imaging after product
680   administration, instruments, instrument operators, patients, and image interpreters, and possibly

18

FDA000338

*Contains Nonbinding Recommendations*

681   other variables.  Precision is usually expressed in terms of variability, using such measures as
682   confidence intervals and/or standard deviations.  Precise tests have relatively narrow confidence
683   intervals (or relatively small standard deviations).
684
685   **Reference product:**  An FDA-approved drug product having an indication similar to that of an
686   investigational drug or biological product to which it is being compared for the purpose of
687   evaluating the effectiveness of the investigational drug or biological product.
688
689   **Sensitivity:**  The probability that a test result is positive when the subject has the disease.
690   Synonyms include *true positive rate*.  Sensitivity = $a/n1$ = TP/(TP+FN).
691
692   **Specificity:**  The probability that a test result is negative when the subject does not have the
693   disease.  Synonyms include *true negative rate*.  Specificity = $d/n2$ = TN/(TN+FP).
694
695   **Truth standard (gold standard):**  An independent method of measuring the same variable
696   being measured by the investigational drug or biological product that is known or believed to
697   give the *true* value of a measurement.

FDA000339

# Guidance for Industry

## Developing Medical Imaging Drug and Biological Products

## Part 3:  Design, Analysis, and Interpretation of Clinical Studies

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Drug Evaluation and Research (CDER)
Center for Biologics Evaluation and Research (CBER)

June 2004
Clinical Medical

FDA000340

# Guidance for Industry

## Developing Medical Imaging Drug and Biological Products

## Part 3: Design, Analysis, and Interpretation of Clinical Studies

*Additional copies of this Guidance are available from:*

*Division of Drug Information HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane, Rockville, MD  20857*
*(Phone 301-827-4573)*
*Internet:  http://www.fda.gov/cder/guidance/index.htm.*

*or*

*Office of Communication, Training and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*Internet:  http://www.fda.gov/cber/guidelines.htm.*
*Mail: the Voice Information System at 800-835-4709 or 301-827-1800.*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**June 2004**
**Clinical Medical**

FDA000341

# Table of Contents

I.    INTRODUCTION ......................................................................................... 3

II.   SCOPE — TYPES OF MEDICAL IMAGING AGENTS .......................... 4

   A.   Contrast Agents ........................................................................................ 4

   B.   Diagnostic Radiopharmaceuticals ......................................................... 4

III.  GENERAL CONSIDERATIONS IN THE CLINICAL EVALUATION OF MEDICAL IMAGING AGENTS ...................................................................... 5

   A.   Phase 1 Studies ......................................................................................... 5

   B.   Phase 2 Studies ......................................................................................... 6

   C.   Phase 3 Studies ......................................................................................... 7

IV.  ADDITIONAL CONSIDERATIONS IN THE CLINICAL EVALUATION OF EFFICACY ...................................................................... 7

   A.   Selecting Subjects .................................................................................... 7

   B.   Imaging Conditions and Image Evaluations ......................................... 8

      1. Imaging Conditions .............................................................................. 8
      2. Methods and Considerations for Image Evaluation ........................... 8
      3. Steps in Image Evaluation ................................................................... 9
         a. Assessing objective image features ................................................ 9
         b. Image interpretation ....................................................................... 10
      4. Endpoints in Trials .............................................................................. 10
         a. Image interpretations as endpoints ................................................ 10
         b. Objective image features as endpoints ........................................... 11
         c. Subjective image assessments as endpoints ................................... 11
         d. Clinical outcomes as endpoints ..................................................... 11
      5. Case Report Forms .............................................................................. 12
      6. CRFs for Image Evaluation ................................................................ 12
      7. Blinded Imaging Evaluations .............................................................. 12
         a. Fully blinded image evaluation ...................................................... 13
         b. Image evaluation blinded to outcome ............................................ 14
         c. Sequential Unblinding ..................................................................... 15
         d. Unblinded image evaluations ......................................................... 15
      8. Independent Image Evaluations .......................................................... 16
         a. Consensus image evaluations ......................................................... 16
         b. Repeated image evaluations by the same reader ........................... 16
      9. Offsite and Onsite Image Evaluations ................................................ 17
      10. Assessment of Interreader and Intrareader Variability ................... 17
      11. Protocol and Nonprotocol Images .................................................... 18
         a. Protocol images .............................................................................. 18
         b. Nonprotocol images ........................................................................ 19
      12. Separate or Combined Image Evaluations ........................................ 19
         a. Separate image evaluations ............................................................ 19
         b. Combined image evaluations .......................................................... 20

FDA000342

**C.  Truth Standards (Gold Standards)** ................................................................................ **22**

**D.  Comparison Groups** ....................................................................................................... **23**

*1.  Comparison to an Agent or Modality Approved for a Similar Indication* ................................. *23*
    a. Noninferiority studies ................................................................................................. 24
    b. Agreement studies ..................................................................................................... 25
*2.  Comparison to Placebo* ................................................................................................. *26*

**V.  STATISTICAL ANALYSIS** ............................................................................................ **26**

**A.  Statistical Methods** ....................................................................................................... **27**

**B.  Diagnostic Performance** ............................................................................................... **28**

**GLOSSARY** ...................................................................................................................... **29**

FDA000343

*Contains Nonbinding Recommendations*

# Guidance for Industry[1]
## Developing Medical Imaging Drug and Biological Products
## Part 3: Design, Analysis and Interpretation of Clinical Studies

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. An alternative approach may be used if such approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.    INTRODUCTION

This guidance is one of three guidances intended to assist developers of medical imaging drug and biological products (*medical imaging agents*) in planning and coordinating their clinical investigations and preparing and submitting investigational new drug applications (INDs), new drug applications (NDAs), biologics license applications (BLAs), abbreviated NDAs (ANDAs), and supplements to NDAs or BLAs. The three guidances are: *Part 1: Conducting Safety Assessments*; *Part 2: Clinical Indications*; and *Part 3: Design, Analysis, and Interpretation of Clinical Studies*.

Medical imaging agents generally are governed by the same regulations as other drug and biological products. However, because medical imaging agents are used solely to diagnose and monitor diseases or conditions as opposed to treat them, development programs for medical imaging agents can be tailored to reflect these particular uses. Specifically, this guidance discusses our recommendations on how to design a clinical development program for a medical imaging agent including selecting subjects and acquiring, analyzing, and interpreting medical imaging data.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are

---

[1] This guidance has been prepared by the Division of Medical Imaging and Radiopharmaceutical Drug Products and the Office of Therapeutics Research and Review in the Center for Drug Evaluation and Research (CDER) at the Food and Drug Administration.

FDA000344

*Contains Nonbinding Recommendations*

40  cited.  The use of the word *should* in Agency guidances means that something is suggested or
41  recommended, but not required.
42
43  A glossary of common terms used in diagnostic medical imaging is provided at the end of this
44  document.
45
46
47  **II.    SCOPE — TYPES OF MEDICAL IMAGING AGENTS**
48
49  This guidance discusses medical imaging agents that are administered in vivo and are used for
50  diagnosis or monitoring with a variety of modalities, such as radiography, computed tomography
51  (CT), ultrasonography, magnetic resonance imaging (MRI), and radionuclide imaging.  The
52  guidance is not intended to apply to the development of in vitro diagnostic or therapeutic uses of
53  these agents.[2]
54
55  Medical imaging agents can be classified into at least two general categories:
56
57      **A.    Contrast Agents**
58
59  As used in this guidance, a contrast agent is a medical imaging agent used to improve the
60  visualization of tissues, organs, and physiologic processes by increasing the relative difference of
61  imaging signal intensities in adjacent regions of the body.  Types of contrast agents include
62  (1) iodinated compounds used in radiography and CT; (2) paramagnetic metallic ions (such
63  as ions of gadolinium, iron, and manganese) linked to a variety of molecules and microparticles
64  (such as superparamagnetic iron oxide) used in MRI; and (3) microbubbles, microaerosomes,
65  and related microparticles used in diagnostic ultrasonography.
66
67      **B.    Diagnostic Radiopharmaceuticals**
68
69  As used in this guidance, a *diagnostic radiopharmaceutical* is (1) an article intended for use in
70  the diagnosis or monitoring of a disease or a manifestation in humans and that exhibits
71  spontaneous disintegration of unstable nuclei with the emission of nuclear particles or photons or

---

[2] The guidance is not intended to apply to the development of research drugs that do not provide direct patient
benefit with respect to diagnosis, therapy, prevention, or prognosis, or other clinically useful information.  These
include radioactive drugs for research that are used in accordance with 21 CFR 361.1.  Section 361.1 states that
radioactive drugs (defined in 21 CFR 310.3(n)) are generally recognized as safe and effective when administered
under specified conditions to human research subjects in the course of a project intended to obtain basic information
about the metabolism of a radioactively labeled drug or about human physiology, pathophysiology, or biochemistry.
 However, if a radioactive drug is used for immediate therapeutic, diagnostic, or similar purpose or to determine the
safety and effectiveness of the drug in humans, or if the radioactive drug has a pharmacological effect in the body,
an IND is required.  FDA is developing a guidance on determining when research with radioactive drugs may be
conducted under § 361.1.

The Agency recognizes the potential of imaging agents as research tools for aiding the development of therapeutic
drugs, and some of the principles of the guidance may be applicable to such research..  Sponsors of such imaging
research agents are urged to contact the Division of Medical Imaging and Radiopharmaceutical Drug Products for
advice on development of the imaging research agent.

FDA000345

*Contains Nonbinding Recommendations*

72  (2) any nonradioactive reagent kit or nuclide generator that is intended to be used in the
73  preparation of such an article.[3]  As stated in the preamble to FDA's proposed rule on Regulations
74  for In Vivo Radiopharmaceuticals Used for Diagnosis and Monitoring, the Agency interprets this
75  definition to include articles that exhibit spontaneous disintegration leading to the reconstruction
76  of unstable nuclei and the subsequent emission of nuclear particles or photons (63 FR 28301 at
77  28303; May 22, 1998).
78
79  Diagnostic radiopharmaceuticals are generally radioactive drugs or biological products that
80  contain a radionuclide that typically is linked to a ligand or carrier.[4]  These products are used in
81  planar imaging, single photon emission computed tomography (SPECT), positron emission
82  tomography (PET), or with other radiation detection probes.
83
84  Diagnostic radiopharmaceuticals used for imaging typically have two distinct components.
85

86  • A radionuclide that can be detected in vivo (e.g., technetium-99m, iodine-123,
87    indium-111).

88    The radionuclide typically is a radioactive atom with a relatively short physical half-life
89    that emits radioactive decay photons having sufficient energy to penetrate the tissue mass
90    of the patient.  These photons can then be detected with imaging devices or other
91    detectors.

92  • A nonradioactive component to which the radionuclide is bound that delivers the
93    radionuclide to specific areas within the body.

94    This nonradionuclidic portion of the diagnostic radiopharmaceutical often is an organic
95    molecule such as a carbohydrate, lipid, nucleic acid, peptide, small protein, or antibody.

96  As technology advances, new products may emerge that do not fit into these traditional
97  categories (e.g., agents for optical imaging, magnetic resonance spectroscopy, combined contrast
98  and functional imaging).  It is anticipated, however, that the general principles discussed here
99  could apply to these new diagnostic products.  Developers of these products are encouraged to
100 contact the appropriate reviewing division for advice on product development.
101
102
103  **III.    GENERAL CONSIDERATIONS IN THE CLINICAL EVALUATION OF**
104  **MEDICAL IMAGING AGENTS**
105
106      **A.    Phase 1 Studies**
107

---

[3] 21 CFR 315.2 and 601.31.

[4] In this guidance, the terms *ligand* and *carrier* refer to the entire nonradionuclidic portion of the diagnostic
radiopharmaceutical.

FDA000346

*Contains Nonbinding Recommendations*

108    The general goal of phase 1 studies[5] of medical imaging agents is to obtain pharmacokinetic and
109    human safety assessments of a single mass dose and increasing mass doses of a drug or
110    biological product. We recommend that evaluation of a medical imaging agent that targets a
111    specific metabolic process or receptor include assessments of its potential effects on these
112    processes or receptors.
113
114    We recommend that, for diagnostic radiopharmaceuticals, organ and tissue distribution data over
115    time be collected to optimize subsequent imaging protocols and calculate radiation dosimetry
116    (see Part I, section IV.D).  We also recommend that, as appropriate, pharmacokinetic and
117    pharmacodynamic evaluations be made of the intact diagnostic radiopharmaceutical, the carrier
118    or ligand, and other vial contents, especially when large amounts of cold components are present
119    as determined by absolute measurement or by relative concentration of labeled to unlabeled
120    carrier or ligand.  This can be achieved by administering large mass doses of a medical imaging
121    agent with low specific activity, administering the contents of an entire vial of a medical imaging
122    agent (assuming that this approximates a worst-case scenario in clinical practice), or both.
123    Because of potential toxicities, this approach may not be appropriate for some drugs nor for most
124    biological products.  In such cases, we recommend you contact the review division.
125
126        **B.    Phase 2 Studies**
127
128    The general goals of phase 2 studies of medical imaging agents include (1) refining the agent's
129    clinically useful mass dose and radiation dose ranges or dosage regimen (e.g., bolus
130    administration or infusion) in preparation for phase 3 studies, (2) answering outstanding
131    pharmacokinetic and pharmacodynamic questions, (3) providing preliminary evidence of
132    efficacy and expanding the safety database, (4) optimizing the techniques and timing of image
133    acquisition, (5) developing methods and criteria by which images will be evaluated, and
134    (6) evaluating other critical questions about the medical imaging agent.  With the
135    accomplishment of these elements, phase 3 development should proceed smoothly.
136
137    We recommend that sponsors explore the consequences of both mass dose and radiation dose (or
138    dosage regimen) adjustment on image acquisition and on the safety or effectiveness of the
139    administered product.  We recommend that additional exploration include adjusting the
140    following if relevant:
141
142        • Character and amount of active and inactive ingredients
143        • Amount of radioactivity
144        • Amount of nonradioactive ligand or carrier
145        • Specific activity
146        • Radionuclide that is used
147

---

[5] See also the guidance *Content and Format of Investigational New Drug Applications (INDs) for Phase-1 Studies of Drugs, Including Well-Characterized, Therapeutic, Biotechnology-Derived Products*.  This and all other guidances cited in this document are available at FDA's Web site at http://www.fda.gov/cder/guidance/index.htm.

FDA000347

*Contains Nonbinding Recommendations*

148  We recommend that methods used to determine the comparability, superiority, or inferiority of
149  different mass and radiation doses or regimens be discussed with the Agency.  To the extent
150  possible, the formulation that will be used for marketing should be used during phase 2 studies.
151  When a different formulation is used, we recommend that bioequivalence and/or other bridging
152  studies be used to document the relevance of data collected with the original formulation.
153
154  We recommend that phase 2 studies be designed to define the appropriate patient populations
155  and clinical settings for phase 3 studies.  To gather preliminary evidence of efficacy, however,
156  both subjects with known disease (or patients with known structural or functional abnormalities)
157  and subjects known to be normal for these conditions may be included in clinical studies.
158  However, for products that are immunogenic or exhibit other toxicities, use of healthy subjects
159  may not be appropriate. We recommend that methods, endpoints, and items on the case report
160  form (CRF) that will be used in critical phase 3 studies be tested and refined.
161
162            **C.      Phase 3 Studies**
163
164  The general goals of phase 3 efficacy studies for medical imaging agents include confirming the
165  principal hypotheses developed in earlier studies, demonstrating the efficacy and continued
166  safety of the medical imaging agent, and validating instructions for use and for imaging in the
167  population for which the agent is intended.  We recommend that the design of phase 3 studies
168  (e.g., dosage, imaging techniques and times, patient population, and endpoints) be based on the
169  findings in phase 2 studies.  We recommend that the formulation intended for marketing be used,
170  or bridging studies be performed.
171
172  When multiple efficacy studies are performed, the studies can be of different designs.[6]  To
173  increase the extent to which the results can be generalized, we recommend the studies be
174  independent of one another and use different investigators, clinical centers, and readers that
175  perform the blinded image evaluations (see section IV.B).
176
177
178  **IV.    ADDITIONAL CONSIDERATIONS IN THE CLINICAL EVALUATION OF**
179  **EFFICACY**
180
181  The following sections describe special considerations for the evaluation of efficacy in clinical
182  trials for medical imaging agents (see *Part 2: Clinical Indications,* section IV, for
183  recommendations on general considerations for establishing effectiveness, clinical usefulness,
184  and clinical setting).
185
186            **A.      Selecting Subjects**
187
188  We recommend that subjects included in phase 3 clinical efficacy studies be representative of the
189  population in which the medical imaging agent is intended to be used.  We also recommend that
190  the protocol and study reports specify the method by which patients were selected for

---

[6] See the guidance *Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products.*

FDA000348

*Contains Nonbinding Recommendations*

191  participation in the study (e.g., consecutive subjects enrolled, random selection) to facilitate
192  assessments of potential selection bias (e.g., using a comparator test result to pre-select subjects
193  most likely to have the desired image finding).[7]
194
195  **B.    Imaging Conditions and Image Evaluations**
196
197  The following guidance may be customized to the specific medical imaging drug, biological
198  product, or imaging modality under development. (The term *images* is nonspecific and may refer
199  to an individual image or to a set of images acquired from different views, different sequences
200  and timing.)
201
202  *1.    Imaging Conditions*
203
204  We recommend that the effects of changes in relevant imaging conditions (e.g., timing of
205  imaging after product administration, views, instrument settings, patient positioning) on
206  image quality and reproducibility, including any limitations imposed by changes in such
207  conditions, be evaluated in early product development.  We recommend that subsequent,
208  phase 3 efficacy trials substantiate and possibly refine these conditions for use.
209  Appropriate imaging conditions, including limitations, can be described in the product
210  labeling.
211
212  *2.    Methods and Considerations for Image Evaluation*
213
214  We recommend that methods and criteria for image evaluation (including criteria for
215  image interpretation) be evaluated in early product development. Subsequently, we
216  recommend that the methods and criteria that are anticipated for clinical use be employed
217  and substantiated in the phase 3 efficacy trials.  For example, early clinical trials might
218  compare ways in which regions of interest on images are selected or ways in which an
219  organ will be subdivided on images for purposes of analysis.  Similarly, early clinical
220  trials might evaluate which objective image features (e.g., lesion conspicuity, relative
221  count rate density) appear to be most affected by the medical imaging agent and which of
222  these are most useful in image interpretation, such as making a determination of whether
223  a mass is benign or malignant (see section IV.B.3).
224
225  We recommend that the most appropriate of these methods and criteria for image
226  evaluation be incorporated into the protocols of the phase 3 efficacy trials.

---

[7] To aid in the subsequent use of this information in clinical trial design, the pretest odds or pretest probabilities of
disease can be used as part of the selection criteria as a method of ensuring enrollment of the population of intended
use and/or as part of the patient stratification or subsetting criteria for analysis.  We recommend that the range of
pretest probabilities enrolled be determined by the type of clinical setting that will support the labeling (e.g., a
screening setting, a case finding setting, a pivotal decision setting).  We recommend that the pretest odds or
probabilities be estimated for all subjects after enrollment, but before any trial results are made available.  We also
recommend that these odds and probabilities be derived from prespecified criteria for disease (e.g., history, physical
findings, results of other diagnostic evaluations) according to prespecified algorithms.  We recommend that the
estimated pretest odds and probabilities of disease should be compared with the pretest odds and probabilities
actually observed in the studies.  (See the glossary for the definition of terms relating to pretest odds and
probabilities for study analysis.)

FDA000349

*Contains Nonbinding Recommendations*

227
228    A description of the appropriate methods and criteria for image evaluation, including
229    limitations, should be described in the product labeling.
230
231    We recommend that sponsors seek FDA comment on the designs and analysis plans for
232    the principal efficacy trials before they are finalized. In some cases, special protocol
233    assessments may be appropriate (see guidance for industry *Special Protocol Assessment*).
234    In addition, we recommend that the following elements be completed and submitted to
235    the IND before the phase 3 efficacy studies enroll subjects:
236
237    • Proposed indications for use
238    • Protocols for the phase 3 efficacy trials
239    • Investigators' brochure
240    • CRFs to be used by on-site investigators
241    • Plan for blinded image evaluations[8]
242    • CRFs to be used by the blinded readers
243    • Statistical analysis plan
244    • Plan for on-site image evaluation and intended use of such evaluation in patient
245      management, if any
246
247    We recommend that sponsors submit a single comprehensive statistical analysis plan for
248    each principal efficacy study. We recommend that this statistical analysis plan be part of
249    the study protocol, include the plan for blinded image evaluations, and be submitted to
250    the protocol before images have been collected.
251
252    3.    *Steps in Image Evaluation*
253
254    The evaluation of medical images generally consists of two distinct steps: assessing
255    objective image features and interpreting findings on the image.
256
257        a.    Assessing objective image features
258
259        As used in this guidance, *objective image features* are attributes on the image that
260        are either visually perceptible or that can be detected with instrumentation.
261        Examples of objective image features include signal-to-noise ratios; degree of
262        delineation; extent of opacification; and the size, number, or density of lesions.
263
264        Objective image features can be captured on scales that are continuous (e.g., the
265        diameter of a mass), ordinal (e.g., a feature can be classified as definitely
266        increased, probably increased, neither increased nor decreased, probably
267        decreased, definitely decreased), or dichotomous (e.g., a feature can be classified
268        as present or absent).
269

---

[8] *Blinded* image evaluations may also be referred to as *masked* or as *uninformed* image evaluations.

FDA000350

*Contains Nonbinding Recommendations*

270 Medical imaging agents have their intended effects by altering objective image
271 features. We recommend that both the nature and location of such changes on the
272 image be documented fully during image evaluations in clinical trials intended to
273 demonstrate efficacy. We also recommend that such documentation also include
274 changes that are unintended or undesirable. For example, a diagnostic
275 radiopharmaceutical intended for cardiac imaging also might localize in the liver,
276 thereby obscuring visualization of parts of the heart.
277
278 When possible, it is often desirable to perform both a qualitative visual evaluation
279 of images as well as a quantitative analysis of images with instrumentation.
280 However, a quantitative image analysis with instrumentation by itself may not be
281 sufficient to establish efficacy of the medical imaging agent, such as in cases
282 where images are not intended (or not likely) to be evaluated quantitatively with
283 instrumentation in clinical practice.
284
285     b.     Image interpretation
286
287 As used in this guidance, an *image interpretation* is the explanation or meaning
288 that is attributed to objective image features. We recommend that interpretations
289 of image features be supported by objective, quantitative, and/or qualitative
290 information derived from the images. For example, the interpretation that cardiac
291 tissue seen on an image is infarcted, ischemic, or normal might be supported by
292 objective image features such as the extent and distribution of localization of the
293 medical imaging agent in the heart (e.g., increased, normal, decreased, or absent),
294 the time course of such localization, and how these features are affected by
295 exercise or pharmacologic stress.
296
297   *4.   Endpoints in Trials*
298
299 Medical imaging agents could be developed for structural delineation; functional,
300 physiological, or biochemical assessment; disease or pathology detection or assessment;
301 diagnostic or therapeutic patient management; or multiple or other indications. The
302 primary endpoints (response variables) relate to the indication's clinical usefulness (see
303 Part 2: Clinical Indications, section IV.B).
304
305     a.     Image interpretations as endpoints
306
307 Image interpretations that are clinically useful can be incorporated into the
308 primary endpoint in phase 3 clinical trials. For example, the primary analysis
309 endpoints of a trial for a medical imaging agent intended for the indication
310 *disease or pathology detection or assessment* might be the proportions of subjects
311 with and without the disease who are properly classified against an appropriate
312 truth standard. In this example, the interpretation that a pulmonary lesion seen on
313 an image is benign or malignant has direct clinical meaning and can be
314 incorporated into the primary endpoint.
315

10

FDA000351

*Contains Nonbinding Recommendations*

316    b.    Objective image features as endpoints
317
318    When the clinical usefulness of particular objective image features is obvious and
319    apparent, the objective imaging features can be incorporated into the primary
320    endpoint.  For example, in a study of a medical imaging agent intended for brain
321    imaging, the ability to delineate anatomy that indicates the presence or absence of
322    cranial masses on images has direct clinical usefulness. The primary endpoint
323    (e.g., cranial mass detection) serves as the primary basis for the indication for the
324    product (e.g., the medical imaging agent is indicated for detecting cranial masses
325    in patients in a particular defined clinical setting).
326
327    However, in some cases the clinical usefulness of particular objective image
328    features may not be readily apparent without additional interpretation.  In these
329    cases, we recommend that the objective image features serve as secondary
330    imaging endpoints.  For example, the finding that a medical imaging agent alters
331    the conspicuity of masses differentially could lead to the interpretation that
332    specific masses are benign or malignant; acute or chronic; inflammatory,
333    neoplastic, or hemorrhagic; or lead to some other clinically useful interpretations.
334    The interpretations can be incorporated into the primary endpoint and can serve as
335    the primary basis for the indication for the product.  However, the objective image
336    feature of lesion conspicuity might be designated more appropriately as a
337    secondary imaging endpoint.
338
339    c.    Subjective image assessments as endpoints
340
341    As used in this guidance, *subjective image assessments* are perceptions or
342    inferences made by the reader.  Such assessments are tangible and cannot be
343    measured objectively.  For example, a conclusion that use of a medical imaging
344    agent alters *diagnostic confidence* is a subjective assessment as is the conclusion
345    that a medical imaging agent provides *more diagnostic information*.
346
347    We recommend that subjective image assessments be linked to objective image
348    features so that the objective basis for such assessments can be understood.
349    Subjective image assessments can be difficult to validate and replicate.  They may
350    introduce bias as well.  Therefore, subjective image assessments should not be
351    used as primary imaging endpoints.
352
353    d.    Clinical outcomes as endpoints
354
355    Clinical outcomes, such as measurement of symptoms, functioning, or survival,
356    are among the most direct ways to measure clinical usefulness.  Clinical outcomes
357    can serve as primary endpoints in trials of medical imaging agents.  For example,
358    the primary endpoint of a trial of a medical imaging agent intended for the
359    indication *therapeutic patient management* in patients with colon cancer might be
360    a response variable that measures changes in symptoms, functioning, or survival.
361

11

FDA000352

*Contains Nonbinding Recommendations*

362    5.    *Case Report Forms*
363
364    We recommend that case report forms (CRFs) in trials of medical imaging agents
365    prospectively define the types of observations and evaluations for investigators to record.
366    In addition to data that are usually recorded in CRFs (e.g., inclusion/exclusion criteria,
367    safety findings, efficacy findings), we recommend that the onsite investigator's CRF for a
368    medical imaging agent capture the following information:
369
370        • The technical performance of the diagnostic radiopharmaceutical used in the
371          study, if any (e.g., specific activity, percent bound, percent free, percent
372          active, percent inactive)
373
374        • The technical characteristics and technical performance of the imaging
375          equipment (e.g., background flood, quality control analysis of the imaging
376          device, pulse height analyzer)
377
378        • Methods of image acquisition, output processing, display, reconstruction, and
379          archiving of the imaging study
380
381    The collection and availability of the data on the CRF may be important for labeling how
382    the imaging agent is intended to be administered and the appropriate device settings for
383    optimal imaging.
384
385    6.    *CRFs for Image Evaluation*
386
387    We recommend that imaging CRFs be designed to capture imaging endpoints, including
388    objective features of the images as well as the location and interpretation of any findings.
389    We recommend that interpretations of image features be supported by objective
390    quantitative or qualitative information derived from the images.  We recommend that
391    image interpretations be recorded as distinct items from the assessments of the objective
392    image features.  We also recommend that items on the CRFs for image evaluation be
393    carefully constructed to gather information without introducing a bias that suggests the
394    answer that is being sought.  We recommend that the proposed labeled indication be
395    clearly derived from specific items in the CRF and from endpoints and hypotheses that
396    have been prospectively stated in the protocol.
397
398    7.    *Blinded Imaging Evaluations*
399
400    We recommend that image evaluations be designed to demonstrate that the specific
401    effects of the medical imaging agent, as manifested in the images, provide such
402    information reproducibly and apart from other possible confounding influences or biases.
403    We recommend that blinded image evaluations by multiple independent readers be
404    performed in the phase 3 efficacy studies.
405
406    We recommend that either a *fully blinded image evaluation* or an *image evaluation*
407    *blinded to outcome* by independent readers serve as the principal image evaluation for

12

FDA000353

*Contains Nonbinding Recommendations*

408    demonstration of efficacy.[9]  Alternatively, both types of image evaluations can be used; if
409    so, the evaluations can be performed through sequential unblinding.  Both primary and
410    secondary imaging endpoints should be evaluated in this manner.  We recommend that
411    the nature and type of information available to the readers be discussed with FDA before
412    the trials are initiated.
413
414    In addition to the items outlined in the sections below, we recommend that plans for
415    blinded image evaluations include the following elements:
416
417    • We recommend that the protocol clearly specify the elements to which readers are
418      blinded.
419
420    • We recommend that meanings of all endpoints be clearly understood for consistency.
421      We recommend that terms to be used in image evaluation and classification be
422      defined explicitly in the image evaluation plan, including such terms as *technically
423      inadequate*, *uninterpretable*, *indeterminate*, or *intermediate*.  Blinded readers can be
424      trained in scoring procedures using sample images from phase 1 and phase 2 studies.
425
426    • We recommend that images be masked for all patient identifiers.
427
428    • We recommend that blinded readers evaluate images in a random sequence.
429      *Randomization* of images refers to merging the images obtained in the study (to the
430      fullest degree that is practical) and then presenting images in this merged set to the
431      readers in a random sequence.
432
433      For example, when images of several diagnostic radiopharmaceuticals read by the
434      same criteria are being compared to establish relative efficacy (e.g., a comparison of a
435      test drug or biological product to an established drug or biological product), we
436      recommend the readers evaluate individual images from the merged set of images in a
437      random sequence.
438
439          a.    Fully blinded image evaluation
440
441      During a *fully blinded image evaluation*, we recommend that readers not have any
442      knowledge of the following types of information:
443
444    • Results of evaluation with the truth standard, of the final diagnosis, or of
445      patient outcome
446
447    • Any patient-specific information (e.g., history, physical exam, laboratory
448      results, results of other imaging studies)
449

---

[9] See section IV.B.8 for a definition of *independent readers*.

13

FDA000354

*Contains Nonbinding Recommendations*

450  We recommend that general inclusion and exclusion criteria for patient
451  enrollment, other details of the protocol, or anatomic orientation to the images not
452  be provided to the readers.
453
454  During a *fully blinded image evaluation* in studies where images obtained by
455  different treatments are being evaluated, we recommend that readers not have
456  knowledge of treatment identity, to the greatest extent to which that is possible.[10]
457  For example, in a comparative study of two or more medical imaging agents (or
458  of two or more doses or regimens of a particular medical imaging agent), we
459  suggest the blinded readers not know which agent (or which dose or regimen) was
460  used to obtain a given image.
461
462  For contrast agents, we suggest this also can include lack of knowledge about
463  which images were obtained before product administration and which were
464  obtained after product administration, although sometimes this is apparent upon
465  viewing the images.
466
467  In cases where the instructions for image evaluation differ according to treatment
468  (e.g., as might be the case when images are obtained using different imaging
469  modalities), blinding the readers to treatment identity may be infeasible.
470
471  b.    Image evaluation blinded to outcome
472
473  As in a *fully blinded image evaluation*, we recommend that readers performing an
474  *image evaluation blinded to outcome* not have any knowledge of the results of
475  evaluation with the truth standard, of the final diagnosis, or of patient outcome.
476
477  However, in an *image evaluation blinded to outcome,* the readers might have
478  knowledge of particular elements of patient-specific information (e.g., history,
479  physical exam, laboratory results, or results of other imaging studies).  In some
480  cases, the readers also might be aware of general inclusion and exclusion criteria
481  for patient enrollment, other details of the protocol, or anatomic orientation to the
482  images.  We recommend that the particular elements about which the reader will
483  have information be standardized for all patients and defined prospectively in the
484  clinical trial protocol, statistical plan, and the blinded image evaluation plan.
485
486  In studies where images obtained by different treatments are being evaluated
487  (including *no treatment*, such as in unenhanced image evaluation of a contrast
488  agent), we recommend that the readers not have knowledge of treatment identity,
489  to the greatest extent to which that is possible (see section IV.B.7.a).
490

---

[10] This is the common meaning of *blinding* in therapeutic clinical trials.  See the ICH guidelines *E8 General Considerations for Clinical Trials* and *E9 Statistical Principles for Clinical Trials*.

FDA000355

*Contains Nonbinding Recommendations*

491          c.      Sequential Unblinding
492
493          As used in this guidance, *sequential unblinding* is an assessment where readers
494          typically evaluate images with progressively more information (e.g., clinical
495          information) on each read.  Sequential unblinding might be used to provide
496          incremental information under a variety of conditions that may occur in routine
497          clinical practice (e.g., when no clinical information is available, when limited
498          clinical information is available, and when a substantial amount of information is
499          available).  This can be used to determine when or how the test agent should be
500          used in a diagnostic algorithm.  We recommend that a typical s*equential*
501          *unblinding* image evaluation be a three-step process.
502
503          •   We recommend that a fully blinded image evaluation be performed.  We
504              recommend that this evaluation be recorded and locked in a dataset by
505              methods that can be validated.  In a *locked* dataset, we recommend that it not
506              be possible to alter the evaluation later when additional information is
507              available, or if input is received from the clinical investigators, other readers,
508              or the sponsor.
509          •   We recommend that an image evaluation blinded to outcome be performed.
510              We recommend this evaluation be recorded and locked in the dataset.
511          •   To determine diagnostic performance of the imaging agent, we recommend
512              that the result of the above two blinded evaluations be compared to the results
513              of evaluation with the truth standard (or of the final diagnosis, or of patient
514              outcome).
515
516          Such sequential unblinding can be expanded to include other types of image
517          evaluations where additional clinical information is provided to the readers.  If
518          sequential unblinding is used, we recommend that the protocol specify the
519          hypothesis that is to be evaluated at each step.  Also, we recommend that the
520          protocol specify which image evaluation will be the primary one for determining
521          efficacy.[11]
522
523          d.      Unblinded image evaluations
524
525          In an *unblinded image evaluation,* readers are aware of the results of patient
526          evaluation with the truth standard, of the final diagnosis, or of patient outcome.
527          Unblinded readers also typically are aware of patient-specific information
528          (e.g., history, physical exam, laboratory results, results of other imaging studies),
529          of treatment identity where images obtained by different treatments (including no
530          treatment) are being evaluated, of inclusion and exclusion criteria for patient

---

[11] The labeling should reflect the image methods (blinded, sequentially unblinded, or unblinded, as appropriate) that
provided substantial evidence that the Agency used to reach an approval decision and to develop appropriate
labeling recommendations for use.

FDA000356

*Contains Nonbinding Recommendations*

531  enrollment, other details of the protocol, and of anatomic orientation to the
532  images.
533
534  Unblinded image evaluations can be used to show consistency with the results of
535  fully blinded image evaluations or image evaluations blinded to outcome.  We
536  recommend that these blinded and unblinded image evaluations use the same
537  endpoints so that the results can be compared.  However, we recommend that
538  unblinded image evaluations not be used as the principal image evaluation for
539  demonstration of efficacy.  The unblinded readers may have access to additional
540  information that may alter the readers' diagnostic assessments and may confound
541  or bias the image evaluation by these readers.
542
543  *8.    Independent Image Evaluations*
544
545  Two events are independent if knowing the outcome of one event says nothing about the
546  outcome of the other.  Therefore, as used in this guidance, *independent readers* are
547  readers that are completely unaware of findings of other readers (including findings of
548  other blinded readers and onsite investigators) and are readers who are not otherwise
549  influenced by the findings of other readers.  To ensure that blinded reader's evaluations
550  remain independent, we recommend that each blinded reader's evaluation be locked in
551  the dataset shortly after it is obtained and before additional types of image evaluations are
552  performed (see section IV.B.7.c).
553
554  a.    Consensus image evaluations
555
556  As used in this guidance, *consensus image evaluations* (*consensus reads*) are
557  image evaluations during which readers convene to evaluate images together.
558  Consensus image evaluations can be performed after the individual readings are
559  completed and locked.  However, readers are not considered independent during
560  consensus reads and therefore we recommend that such reads not serve as the
561  primary image evaluation used to demonstrate the efficacy of medical imaging
562  agents.  Although a consensus read is performed by several readers, it is actually a
563  single image-evaluation and is unlikely to fulfill our interest in image evaluations
564  by multiple blinded readers.  As with the individual blinded evaluations, we
565  recommend that the consensus reads be locked once obtained and before
566  additional types of blinded readings are performed.
567
568  b.    Repeated image evaluations by the same reader
569
570  In studies where readers evaluate the same image multiple times (e.g., as in
571  sequential unblinding, or in readings designed to assess *intra*reader variability),
572  we recommend that the readings be performed independently of one another to
573  the fullest extent practical.  The goal is to minimize *recall bias*.  We further
574  recommend that readers be unaware, to the fullest extent practical, of their own
575  previous image findings and not be otherwise influenced by those previous
576  findings.

FDA000357

*Contains Nonbinding Recommendations*

577
578    We recommend that different pages in the CRF be used for the two image
579    evaluations and that each image evaluation be performed with sufficient time
580    between readings to decrease recall and without reference to prior results.
581
582    9.    *Offsite and Onsite Image Evaluations*
583
584    As used in this guidance, *offsite image evaluations* are image evaluations performed at
585    sites that have not otherwise been involved in the conduct of the study and by readers
586    who have not had contact with patients, investigators, or other individuals involved in the
587    study. We recommend that Phase 3 trials include offsite image evaluations that are
588    performed at a limited number of sites (or preferably at a centralized site). In such offsite
589    evaluations, it is usually easier to control factors that can compromise the integrity of the
590    blinded image evaluations and to ensure that the blinded readers perform their image
591    evaluations independently of other image evaluations.
592
593    As used in this guidance, o*nsite image evaluations* are image evaluations performed by
594    investigators involved in the conduct of the protocol or in the care of the patient. The
595    term also can refer to blinded image evaluations performed at sites involved with the
596    conduct of the study. Onsite investigators may have additional information about the
597    patients that was not predefined in the clinical trial protocol. Such additional information
598    may alter the investigators' diagnostic assessments and may confound or bias the image
599    evaluation by the investigators. Therefore, we recommend that onsite image evaluations
600    usually not be used as the principal image evaluation for demonstration of efficacy, but
601    be regarded as supportive of the blinded image evaluations.
602
603    However, we suggest onsite investigators who are blinded to *truth* (e.g., blinded to any
604    test result that makes up the truth standard, to the final diagnosis, and to patient final
605    outcome as in an image evaluation blinded to outcome see (section IV.B.7.b)) can be
606    used for principal image evaluation. In such instances, we recommend that all clinical
607    information available to the investigator at the time of the image evaluation be clearly
608    specified and fully documented. We also recommend that a critical assessment of how
609    such information might have influenced the readings be performed. In addition, we
610    recommend that an independent blinded evaluation that is supportive of the finding of
611    efficacy be performed.
612
613    10.    *Assessment of Interreader and Intrareader Variability*
614
615    We recommend that at least two blinded readers (and preferably three or more) evaluate
616    images for each study that is intended to demonstrate efficacy. (The truth standard,
617    however, may be read by a single blinded reader.) The use of multiple readers allows for
618    an evaluation of the reproducibility of the readings (i.e., interreader variability) and
619    provides a better basis for subsequent generalization of any findings. Ideally, we
620    recommend that each reader view all of the images intended to demonstrate efficacy,
621    both for the investigational imaging agent and the truth standard, so that interreader
622    agreement can be measured. In large studies, where it may be impractical to have every

17

FDA000358

623    image read by each reader, a properly chosen subset of images can be selected for such
624    duplicate image evaluations.  We recommend that consistency among readers be
625    measured quantitatively (e.g., with the kappa statistic).
626
627    We recommend that *intra*reader variability be assessed during the development of
628    medical imaging agents.   This can be accomplished by having individual blinded readers
629    perform repeated image evaluations on some or all images (see section IV.B.8.b).
630
631    *11.     Protocol and Nonprotocol Images*
632
633    Images obtained in a clinical trial of a medical imaging agent can generally be considered
634    either protocol or nonprotocol images.
635
636      a.      Protocol images
637
638    As used in this guidance, *protocol images* are images obtained under protocol-
639    specified conditions and at protocol-specified time points with the goal of
640    demonstrating or supporting efficacy.  We recommend that efficacy evaluations
641    be based on the evaluations of such protocol images.  We also recommend that all
642    protocol images (e.g., not just those images determined to be evaluable) be
643    evaluated by the blinded readers, including images of test patients, control
644    patients, and normal subjects.  In addition, we recommend that evaluation of the
645    protocol images be completed before other images, such as nonprotocol images,
646    are reviewed by the readers (see section IV.B.11.b).
647
648    In some cases where large numbers of images are obtained or where image tapes
649    are obtained (e.g., cardiac echocardiography), sponsors have used image selection
650    procedures.  This is discouraged because the selection of images can introduce the
651    bias of the selector.
652
653    We recommend that sponsors specify prospectively in protocols of efficacy
654    studies how missing images (and images that are technically inadequate,
655    uninterpretable or show results that are indeterminate or intermediate) will be
656    handled in the data analysis. Sponsors are encouraged to incorporate analyses in
657    the statistical analysis plan that incorporate the principle of *intention-to-treat*, but
658    that are adapted to a diagnostic setting (e.g., *intention-to-diagnose* considers all
659    subjects enrolled in a diagnostic study regardless of whether they were imaged
660    with the test drug and regardless of the image quality).[12]  Images (including truth
661    standard images) may be missing from analysis for many reasons, including
662    patient withdrawal from the study, technical problems with imaging, protocol

---

[12] The *intention-to-treat principle* is defined as the principle that asserts that the effect of a treatment policy can be best assessed by evaluating on the basis of the intention to treat a subject (i.e., the planned treatment regimen) rather than the actual treatment given.  As a consequence, we recommend that subjects allocated to a treatment group be followed up, assessed, and analyzed as members of that group irrespective of their compliance with the planned course of treatment (see *E9 Statistical Principles for Clinical Trials*, p. 28).

FDA000359

*Contains Nonbinding Recommendations*

663    violations, and image selection procedures.  We suggest that appropriate methods
664    be prospectively developed to deal with missing values in the primary response
665    variable analysis.[13]
666
667        b.        Nonprotocol images
668
669    As used in this guidance, *nonprotocol image* refers to an image that is not a
670    protocol image, as defined above (see section IV.B.11.a).  These are sometimes
671    obtained for exploratory purposes and are excluded from the locked phase 3
672    datasets.
673
674    *12.    Separate or Combined Image Evaluations*
675
676    Performance of a separate image evaluation does not preclude performance of a
677    combined image evaluation, and vice versa.  If multiple image evaluations are performed,
678    however, we recommend that the protocol specify which image evaluation will serve as
679    the primary evaluation and which image evaluations are secondary.
680
681        a.        Separate image evaluations
682
683    As used in this guidance, a *separate* image evaluation has a reader evaluate test
684    images obtained from a patient independently of other test images obtained from
685    that patient, to the fullest degree practical.[14]  A reader evaluates each test image
686    for a patient on its own merits without reference to, or recall of, any other test
687    images obtained from that patient, to the fullest degree practical.
688
689    A separate image evaluation often can be performed by combining test images
690    obtained under different conditions (or at different times) into an intermixed set.
691    Images in this intermixed set can then be evaluated individually in random order
692    so that multiple images are not viewed simultaneously, and so that images are not
693    evaluated sequentially within patients.  Alternatively, test images obtained under
694    one condition (or at a particular time) can be evaluated individually in a random
695    order, followed by an evaluation in random order of the individual test images
696    obtained under different conditions (or at different times).
697
698    As described in the first example below, we recommend that an appropriately
699    designed separate image evaluation be performed when a goal of a study is to
700    make comparative inferences about product performance (e.g., to compare the
701    diagnostic performance of one medical imaging agent with another).  As
702    described in the second example, an appropriately designed separate image
703    evaluation also can be used to demonstrate that a contrast agent contributes
704    additional information to images obtained with the device alone.

---

[13] See *E9 Statistical Principles for Clinical Trials*, p. 31.

[14] In the special case where only two test images are being evaluated, a *separate* image evaluation may also be referred to as an *unpaired* image evaluation.

FDA000360

*Contains Nonbinding Recommendations*

<u>Example 1:  Comparative inferences of product performance</u>

In a comparative study designed to show that the diagnostic performance of a new medical imaging agent is superior to that of an approved agent and that the new agent can replace the approved agent (see section IV.D.1), we recommend that an appropriate separate image evaluation of test images be performed as the principal image analysis. The *test images* in this case are the images obtained with the new and the approved medical imaging agents.  The two agents are not intended to be used together in actual clinical practice, and we therefore recommend that the goal of such an *unpaired* image evaluation be to show that the information obtained with the new agent is clinically and statistically superior to the information obtained with the approved agent.  For any given patient, we recommend that images obtained with the new agent be evaluated independently of the evaluation of the images obtained with the approved agent, to the fullest degree practical.

If desired, a side-by-side (*paired)* comparison of images obtained with the new agent and the approved agent can be performed as a secondary image analysis. However, such a side-by-side comparison may yield estimates of diagnostic performance that are biased. The blinded reader may tend to *overread* the presence of masses on the image obtained with the new agent in such a paired comparison. Similarly, the blinded reader may tend to *underread* the image obtained with the new agent in a paired evaluation where a mass is not seen clearly on the image obtained with the approved agent.

In general, these procedures for image evaluation also are applicable to studies designed to show noninferiority.  We recommend that sponsors seek Agency comment on proposed study designs and analytical plans before enrolling patients in such studies (see also section IV.D.1 for additional discussion).

<u>Example 2:  Contribution of additional information by a contrast agent</u>

In a study intended to demonstrate that a contrast agent contributes additional information to images obtained with the device alone, it is often highly desirable to perform an appropriate separate image evaluation of test images as the principal image analysis (see the next section for an alternative approach).  The *test images*, in this case, include both the images obtained before administration of contrast (the *unenhanced* images) and those obtained after administration of contrast (the *enhanced* images).  We recommend that the goal of such an unpaired image evaluation be to show that the information obtained from the enhanced image is clinically and statistically superior to the information obtained from the unenhanced image.

b.    Combined image evaluations

FDA000361

*Contains Nonbinding Recommendations*

751    As used in this guidance, a *combined* image evaluation has a reader
752    simultaneously evaluate two or more test images that were obtained under
753    different conditions or at different times with respect to agent administration.[15]  A
754    combined image evaluation may resemble the conditions under which the product
755    will be used clinically.  For example, in some clinical situations both unenhanced
756    and enhanced imaging studies are typically performed in patients.[16]  If so, such
757    images often are evaluated concurrently in a comparative fashion.[17]  However, as
758    noted above, such combined image evaluations may increase the likelihood that
759    bias will be introduced into the image evaluations (e.g., by systematic overreading
760    or underreading particular findings on images).
761
762    A combined image evaluation can be performed by creating a set of combined
763    images for each patient.  These sets can then be presented to the blinded readers
764    in random sequence.
765
766    When this type of reading is performed, however, we recommend that an
767    additional independent *separate* image evaluation be completed on at least one of
768    the members of the combination.  We recommend that the member chosen be the
769    member that usually is obtained under the current standard of practice (e.g., the
770    unenhanced image).  In this way, differences in the evaluations of the combined
771    reading with those of the separate reading can be assessed.  When the goal is to
772    show that the medical imaging agent adds information to images, we suggest that
773    these differences demonstrate that the information from the combined images is
774    clinically and statistically superior to information obtained from the separate
775    image alone.  The results of the combined and separate image evaluations can be
776    analyzed statistically using paired comparisons.
777
778    For example, when a two-dimensional ultrasound study of blood vessels is
779    performed with a microbubble contrast agent, a combined image evaluation could
780    be performed by evaluating for each patient the unenhanced and enhanced images
781    side-by-side (or in close temporal proximity).  A separate independent evaluation
782    of the unenhanced image of the blood vessel (i.e., images obtained with the
783    device alone) for each patient could also be performed.  Assessing the differences
784    for each patient between the results of the combined reading with those of the
785    separate readings could allow the effects of the microbubble on the images to be
786    determined.

---

[15] In the special case where only two test images are being evaluated, a *combined* image evaluation can also be referred to as a *paired* image evaluation.

[16] Also, combined images may refer to results from the test drug and modality plus images from a different modality.

[17] Under sections 505 and 502 of the Act, if images are evaluated only in a combined fashion, the approved labeling of the medical imaging agent likely will have to specify that combined evaluations should be performed in clinical practice.  If such labeling restrictions are not desired, we recommend that additional separate image evaluations be performed.

FDA000362

*Contains Nonbinding Recommendations*

787
788    As noted above, we recommend that combined and separate image evaluations be
789    performed independently of one another to decrease recall bias (see section
790    IV.B.8.b).  We recommend that different pages in the CRF be used for the
791    combined and separate evaluations and that the combined and separate image
792    evaluations be performed at different times without reference to prior results.
793
794    We recommend that when differences between the combined and separate images
795    are to be assessed, the combined CRF and separate CRF contain items or
796    questions that are identical so that differences can be calculated and biases can be
797    reduced by avoiding questions asking for comparative judgment.
798

## C.    Truth Standards (Gold Standards)

800
801  A truth standard provides an independent way of evaluating the same variable being assessed by
802  the investigational medical imaging agent.  A truth standard is known or believed to give the true
803  state of a patient or true value of a measurement.  Truth standards are used to demonstrate that
804  the results obtained with the medical imaging agent are valid and reliable and to define summary
805  test statistics (e.g., sensitivity, specificity, positive and negative predictive value).  We
806  recommend that the following general principles be incorporated prospectively into the design,
807  conduct, and analysis of the phase 3 efficacy trials for medical imaging agents:
808
809    1.    We recommend that the test results obtained with the medical imaging agent be
810    evaluated without knowledge of the results obtained with the truth standard and without
811    knowledge of outcome (see section IV.B.7).
812
813    2.    We recommend that the true state of the subjects (e.g., diseased or nondiseased)
814    be determined with a truth standard without knowledge of the test results obtained with
815    the medical imaging agent.
816
817    3.    We recommend that truth standards not include as a component any test results
818    obtained with the test medical imaging agent (i.e., to avoid *incorporation bias)*.  This is
819    because the features of the test image obtained with the test agent (e.g., the *enhanced*
820    *image)* are likely to be correlated to the features of the image obtained with the device
821    alone (e.g., the *unenhanced image)*.  For example, in the case of a CT contrast agent
822    intended to visualize abdominal masses, unenhanced abdominal CT images should not be
823    included in the truth standard.  However, components of the truth standard might include
824    results from other imaging modalities (e.g., MRI, ultrasonography).
825
826    4.    We recommend that evaluation with the truth standard be planned for all enrolled
827    subjects, and the decision to evaluate a subject with the truth standard not be affected by
828    the test results with the medical imaging agent under study.  For example, if patients with
829    positive results with the test agent are evaluated preferentially with the truth standard (as
830    compared to patients with negative test results), the results of the study may be affected
831    by *partial verification bias*.  Similarly, if patients with positive results with the test agent
832    are evaluated preferentially with the truth standard and those with negative test results are

22

FDA000363

*Contains Nonbinding Recommendations*

833    evaluated preferentially with a less rigorous standard, the results of the study may be
834    affected by *differential verification bias*.[18]
835
836    We encourage sponsors to seek FDA comment when it is anticipated that a meaningful
837    proportion of enrolled subjects might not be evaluated with the truth standard or might be
838    evaluated with a less rigorous standard.  In such situations, it may be appropriate to
839    evaluate clinical outcomes for the enrolled subjects (see section IV.D.4).
840
841    From a practical perspective, diagnostic standards are derived from procedures that are
842    considered more definitive in approximating the truth than the test agent.  For
843    example, histopathology or long-term clinical outcomes may be acceptable diagnostic standards
844    for determining whether a mass is malignant.  Diagnostic standards may not be error free, but for
845    purposes of the clinical trial, they generally are regarded as definitive.  However,
846    misclassification of disease by the truth standard can lead to positive or negative biases in
847    diagnostic performance measures (*misclassification bias*).  Thus, we recommend that the choice
848    of the truth standard be discussed with the Agency during design of the clinical trials to ensure
849    that it is appropriate.
850
851    After the truth standard has been selected, we recommend that the hypothesis for the summary
852    test statistic in reference to the truth standard be determined and prospectively incorporated into
853    the study protocol.  We recommend that the hypothesis and expected summary statistics reflect
854    the intended clinical setting for use of the imaging agent (e.g., screening test, sequential
855    evaluation, alternative to or replacement of another imaging study (see section V)).
856
857    **D.    Comparison Groups**
858
859    Before selecting comparison groups, discussions with the Agency are recommended.  General
860    principles relating to the choice of control groups in clinical trials are set forth in the ICH
861    guideline *E10 Choice of Control Group and Related Issues in Clinical Trials* (ICH *E10*), and
862    these principles are applicable to diagnostic trials.
863
864    *1.    Comparison to an Agent or Modality Approved for a Similar Indication*
865
866    If the test agent is being developed as an advance over an approved drug, biological
867    product, or other diagnostic modality, we recommend that a direct, concurrent
868    comparison to the approved comparator(s) be performed.  We recommend that the
869    comparison include an evaluation of both the safety and the efficacy data for the
870    comparator(s) and the test agent.  Because of disease variability, typically such
871    comparisons are performed in the same patient.  We recommend that the image
872    evaluation for the test product or modality be done without knowledge of the imaging
873    results obtained from the approved products or modalities (see section IV.B.7).
874

---

[18] Partial verification bias and differential verification bias are forms of *diagnostic work-up bias*.

FDA000364

*Contains Nonbinding Recommendations*

| | |
|---|---|
| 875 | We recommend that information from both the test and comparator images (i.e., using the |
| 876 | new and old methods) be compared not only to one another but also to an independent |
| 877 | truth standard.  This will facilitate an assessment of possible differences between the |
| 878 | medical imaging agent and the comparator and will enable comparative assessments of |
| 879 | diagnostic performance.  Such assessments could be obtained, for example, by comparing |
| 880 | estimates of sensitivity, specificity, positive and negative predictive values, likelihood |
| 881 | ratios, related measures, or receiver operating characteristic (ROC) curves for the |
| 882 | different diagnostic agents.  Note that two medical imaging agents could have similar |
| 883 | values for sensitivity and specificity in the same set of patients, yet have poor agreement |
| 884 | rates with each other.  Similarly, two medical imaging agents could have good agreement |
| 885 | rates, yet both have poor sensitivity and specificity values.  In ROC analysis, overall |
| 886 | areas under the curves obtained with different agents may be comparable, but areas under |
| 887 | partial spans of the curves may be dissimilar.  Likewise, one diagnostic agent may have |
| 888 | superior diagnostic performance characteristics over another at one point on the ROC |
| 889 | curve, but may have inferior diagnostic performance characteristics at a different point |
| 890 | (see section V.B). |
| 891 | |
| 892 | When a medical imaging drug or biological product is being developed for an indication |
| 893 | for which other drugs, biological products, or diagnostic modalities have already been |
| 894 | approved, a direct, concurrent comparison to the approved drug, biological product, or |
| 895 | diagnostic modality is encouraged.  However, prior approval of a medical imaging agent |
| 896 | for use in a particular indication does not necessarily mean that the results of a test with |
| 897 | that agent alone can be used as a truth standard.  For example, if a medical imaging agent |
| 898 | has been approved on the basis of sufficient concordance of findings with truth as |
| 899 | determined by histopathology, we recommend that assessment of the proposed medical |
| 900 | imaging agent also include determination of truth by histopathology.  In this case, the |
| 901 | direct and concurrent comparison of the proposed medical imaging agent to the approved |
| 902 | agent with histopathology serving as the truth standard best measures the performance |
| 903 | difference between the two agents. |
| 904 | |
| 905 | In studies that compare the effects of a test agent with another drug, biological product, |
| 906 | or imaging modality, we recommend that any images obtained using a nontest agent that |
| 907 | are taken before enrollment be used only as enrollment criteria.  We recommend that |
| 908 | these images not be part of the database used to determine test agent performance.  Such |
| 909 | baseline enrollment images have inherent selection bias because they are unblinded and |
| 910 | based on referral and management preferences.  We recommend that test agent |
| 911 | administration be within a time frame when the disease process is expected not to have |
| 912 | changed significantly.  This provides for a fair, balanced comparison between the test and |
| 913 | the comparator agent. |
| 914 | |
| 915 | a.    Noninferiority studies |
| 916 | |
| 917 | Trials can be designed to show that a new test agent is not inferior to a reference |
| 918 | product.  In general, the requirements for such studies are more stringent that the |
| 919 | requirements for studies designed to show superiority.  Imaging studies, in |
| 920 | particular, can lack assay sensitivity for several reasons, including inappropriate |

FDA000365

921 study population, lack of objective imaging endpoints, and inaccuracy in the truth
922 standard.  Moreover, assay sensitivity is difficult to validate because imaging
923 studies often lack historical evidence of sensitivity to drug effects, and it is not
924 always clear that the conduct of the imaging procedures and the subsequent image
925 evaluations did not undermine the trial's ability to distinguish effective treatments
926 from less effective ones.  ICH *E10* provides further guidance on these matters.
927
928 We recommend that noninferiority studies be based on a concurrent comparison
929 of the test agent and a reference product and that such studies use objectively
930 defined endpoints validated by an acceptable truth standard.  Such designs allow
931 comparative assessment of the diagnostic (or functional) performance of the new
932 and reference tests.  For example, if the study endpoint is the presence or absence
933 of disease, the sensitivities and specificities of the test product and the reference
934 product can each be compared.  The statistical hypotheses may be superiority,
935 noninferiority, or both.  If the test agent is to be used primarily to rule out disease,
936 high negative predictive value and thus high sensitivity might be more important
937 than specificity.  The objective then would be to show that the new agent, when
938 compared to the reference test, is superior with regard to sensitivity but not
939 inferior with regard to specificity.
940
941 When the study design includes a truth standard but no comparison to a reference
942 product, the performance levels of the new test agent can only be compared to
943 some fixed threshold (e.g., prespecified levels of sensitivity and specificity).  The
944 statistical objective should then be to show superiority to the threshold values.
945 Such values should be based on substantial clinical evidence supporting the
946 assertion that exceeding the thresholds clearly demonstrates product efficacy.
947
948 To obtain a noninferiority claim against a reference product, a sponsor should
949 show that its test agent has been shown to have similar performance
950 characteristics as the reference product and can be used as an alternative modality
951 in a precisely defined clinical setting.  In other situations, the noninferiority
952 comparison might only serve as a demonstration of efficacy of the test product.
953 Generally, non-inferiority trials are designed to show that new and comparator
954 test performance differ at most by a clinically acceptable margin that has been
955 agreed to by the Agency.  We recommend that noninferiority trials be carefully
956 planned and that discussions with the Agency begin early in the development
957 program.
958
959 b.    Agreement studies
960
961 Similarity between a new test agent and a reference product can also be shown by
962 demonstrating that both agents consistently give identical results.  In this case, the
963 use of a truth standard is not possible, and the objective is to show agreement
964 between test and comparator outcomes even though the validity (accuracy) of the
965 outcomes cannot be verified.  High agreement between a new test product and a

FDA000366

*Contains Nonbinding Recommendations*

966    reference product can support a claim that the new test is an acceptable alternative
967    to the reference product.
968
969    In agreement studies, assay sensitivity is critical.  In particular, outcomes should
970    be objectively defined and the two agents should be compared in subjects who
971    represent an appropriate spectrum of disease conditions.  For example, showing
972    that two diagnostic tests give the same positive diagnosis for a large percentage of
973    the trial subjects might not be sufficient.  We recommend that the sponsor also
974    demonstrate that the test agent and the reference product respond similarly when a
975    negative diagnosis prevails and that the probability of discordant outcomes is
976    negligible.  When outcomes are multivalued as opposed to dichotomous,
977    agreement should be shown across the entire range of test values.
978
979    An agreement hypothesis should not imply that the agreement between test and
980    comparator outcomes exceeds agreement among comparator outcomes.  Thus, an
981    understanding of intra-test and intra-reader variability should be taken into
982    account.  For example, consider a new pharmacological stress agent used with
983    myocardial perfusion imaging to assess perfusion defects.  One possible design
984    would be to apply the comparator procedure to all subjects for a first evaluation
985    and, for a second evaluation, randomize subjects to receive either the comparator
986    procedure or the new test agent.  This would allow the inter-test agreement to be
987    directly compared with the intra-test agreement of the comparator using a
988    noninferiority hypothesis.
989
990    Because agreement studies do not provide direct evidence of new test validity,
991    they are difficult to design and execute effectively.  Therefore, we recommend
992    that sponsors pursue agreement studies in limited circumstances and consider
993    alternative designs that employ an acceptable truth standard.
994
995    *2.    Comparison to Placebo*
996
997    Whether the use of a placebo is appropriate in the evaluation of a medical imaging agent
998    depends on the specific imaging agent, proposed indication, and imaging modality.  In
999    some cases, the use of placebos can help reduce potential bias in the conduct of the study
1000    and can facilitate unambiguous interpretation of efficacy or safety data.  However, in
1001    some diagnostic studies (such as ultrasonography), products that are considered to be
1002    placebos (e.g., water, saline, or vehicle) can have some diagnostic effects.  We
1003    recommend that these be used as controls to demonstrate that the medical imaging agent
1004    has an effect above and beyond that of its vehicle.
1005
1006
1007    **V.    STATISTICAL ANALYSIS**
1008
1009    We recommend that statistical methods and the methods by which diagnostic performance will
1010    be assessed be incorporated prospectively into the statistical analysis plan for each study (see
1011    section IV.B.2).  In addition, we recommend that each study protocol clearly state the hypotheses

FDA000367

*Contains Nonbinding Recommendations*

1012   to be tested, present sample size assumptions and calculations, and describe the planned
1013   statistical methods and other data analysis considerations.  The ICH guideline *E9 Statistical*
1014   *Principles for Clinical Trials* provides guidance on these matters.
1015
1016            **A.       Statistical Methods**
1017
1018   One part of imaging evaluation is the determination of how well the test measures what it is
1019   intended to measure (validity).  The overall diagnostic performance of the product can be
1020   measured by factors such as sensitivity, specificity, positive and negative predictive values, and
1021   likelihood ratios.   Outcome validity can be demonstrated by a showing that use of the test
1022   enhances a clinical result.
1023
1024   The reliability of an imaging agent reflects the reproducibility of the result (i.e., the value of a
1025   measure repeated in the same individual, repeated evaluations of the same image by different
1026   readers, or repeated evaluations of the same image by the same reader).  (See the glossary for
1027   other related definitions.)
1028
1029   Many studies of imaging agents are designed to provide dichotomous, ordered, or categorical
1030   outcomes.  We think it important that appropriate assumptions and statistical methods be applied
1031   in their analysis.  Statistical tests for proportions and rates are commonly used for dichotomous
1032   outcomes, and methods based on ranks are often applied to ordinal data.  We recommend that
1033   study outcomes be stratified in a natural way, such as by center or other subgroup category, and
1034   the Mantel-Haenszel[19] procedures provide effective ways to examine both binomial and ordinal
1035   data.  We recommend that exact methods of analysis, based on conditional inference, be
1036   employed when necessary.  We recommend that the use of model-based methods also be
1037   encouraged.  These models include logistic regression models for binomial data and proportional
1038   odds models for ordinal data.  Log-linear models can be used to evaluate nominal outcome
1039   variables.
1040
1041   In studies that compare images obtained after the administration of the test agent to images
1042   obtained before administration, dichotomous outcomes are often analyzed as matched pairs,
1043   where differences in treatment effects can be assessed using methods for correlated binomial
1044   outcomes.   These studies, however, may be problematic because they often do not employ
1045   blinding and randomization.  For active- and placebo-control studies, including dose-response
1046   studies, crossover designs can often be used to gain efficiency.  We recommend that subjects be
1047   randomized to order of treatment.  If subjects are not randomized to order of treatment, we
1048   otherwise recommend that the order in which images are evaluated be appropriately randomized.
1049    We recommend that study results from a crossover trial always be analyzed according to
1050   methods specifically designed for such trials.
1051

---

[19] For more on this topic, see Fleiss, Joseph, L., *Statistical Methods for Rates and Proportions*, 2nd ed., 1981, John
Wiley and Sons, New York; and Woolson, Robert, *Statistical Methods for the Analysis of Biomedical Data*, 1987,
John Wiley and Sons, New York.

FDA000368

*Contains Nonbinding Recommendations*

1052    **B.    Diagnostic Performance**
1053
1054    Diagnostic validity can be assessed in a number of ways.  For example, both the unenhanced and
1055    enhanced images could be compared to the truth standard, and the sensitivity and specificity of
1056    the unenhanced image could be compared to that of the enhanced image.  Two different active
1057    agents can be compared in the same manner.  Diagnostic comparisons can also be made when
1058    there are more than two outcomes to the diagnostic test results.  Common methods used to test
1059    for differences in diagnosis include the McNemar test and the Stuart Maxwell test.[20]  In addition,
1060    we recommend that confidence intervals for sensitivity, specificity, and other measures be
1061    provided in the analyses.  ROC analysis also may be useful in assessing the diagnostic
1062    performance of medical imaging agents over a range of threshold values.[21]  For example, ROC
1063    analysis can be used to describe the relative diagnostic performance of two medical imaging
1064    agents if each test can be interpreted using several thresholds to define a positive (or negative)
1065    test result (see section IV.D.1).  For all planned statistical analyses, we recommend that details
1066    of the analysis methods and specific hypotheses to be tested be stated prospectively in the
1067    protocol as part of the statistical analysis plan.  We recommend that sponsors seek Agency
1068    comment on the design of and statistical approach to analyses before the protocols are finalized.
1069

---

[20] Ibid.

[21] For an introduction to this topic, see Metz, Charles E., *Basic Principles of ROC Analysis,* Seminars in Nuclear
Medicine 1978;VIII(4):283-298.  For a current treatment of statistical issues in diagnostic trials, see Zhou, Xiao-
Hua, et al., *Statistical Methods in Diagnostic Medicine*, 2002, John Wiley and Sons, New York.

FDA000369

*Contains Nonbinding Recommendations*

1070 **GLOSSARY**
1071
1072 *Note:* Subjects in trials of medical imaging agents are often classified into one of four groups
1073 depending on (1) whether disease is present (often determined with a truth standard or *gold*
1074 *standard*) and (2) the results of the diagnostic test of interest (positive or negative).  The
1075 following table identifies the variables that are used to estimate the parameters defined below.
1076

| Test Result: | Disease: | | |
|---|---|---|---|
| | **Present (+)** | **Absent (-)** | |
| **Positive (+)** | **TP (a)** true positive=TP | **FP (b)** false positive=FP | **m1 = a+b** = TP+FP total with positive test |
| **Negative (-)** | **FN (c)** false negative=FN | **TN (d)** true negative=TN | **m2 = c+d** = FN+TN total with negative test |
| | **n1 = a+c** = TP+FN total with disease | **n2 = b+d** = FP+TN total without disease | **N = a+b+c+d** = TP+FP+FN+TN total in study |

1077
1078
1079 **Accuracy**:  (1) In common usage, *accuracy* is the quality of being true or correct.  (2) As a
1080 measure of diagnostic performance, *accuracy* is a measure of how faithfully the information
1081 obtained using a medical imaging agent reflects reality or *truth* as measured by a truth standard
1082 or *gold standard*.  Accuracy is the proportion of cases, considering both positive and negative
1083 test results, for which the test results are correct (i.e., concordant with the truth standard or *gold*
1084 *standard*).  Accuracy = (a+d)/N = (TP+TN)/(TP+FP+FN+TN).
1085
1086 **Comparator:**  An established test against which a proposed test is compared to evaluate the
1087 effectiveness of the proposed test.  A comparator usually means an agent or modality approved
1088 for a similar indication.  (See also the definition of *reference product*.)
1089
1090 **Likelihood ratio**:  A measure that can be interpreted either as (a) the relative *odds* of a
1091 diagnosis, such as being diseased or nondiseased, for a given test result, or (b) the relative
1092 *probabilities* of a given test result in subjects with and without the disease.  This latter
1093 interpretation is analogous to a relative risk or risk ratio.
1094
1095 1.    For tests with dichotomous results (e.g., positive or negative test results), the likelihood
1096      ratio of a positive test result can be expressed as LR(+), and the likelihood of a negative
1097      test result can be expressed as LR(-).  See the equations below:
1098

1099 $$LR(+) = \frac{\frac{a}{n1}}{\frac{b}{n2}} = \frac{sensitivity}{1 - specificity} = \frac{TruePositiveRate}{FalsePositiveRate} = \frac{\frac{a}{b}}{\frac{n1}{n2}} = \frac{PostTestOdds(+)}{PreTestOdds}$$

1100

29

FDA000370

*Contains Nonbinding Recommendations*

1101
$$LR(-) = \frac{\frac{c}{n1}}{\frac{d}{n2}} = \frac{1 - sensitivity}{specificity} = \frac{FalseNegativeRate}{TrueNegativeRate} = \frac{\frac{c}{d}}{\frac{n1}{n2}} = \frac{PostTestOdds(-)}{PreTestOdds}$$

1102
1103  LR(+):       *Interpreted as relative odds:* LR(+) is the post-test odds of the disease
1104                        (among those with a positive test result) compared to the pretest odds of
1105                        the disease.
1106
1107                        *Interpreted as relative probabilities:* LR(+) is the probability of a positive
1108                        test result in subjects with the disease compared to the probability of a
1109                        positive test result in subjects without the disease.
1110
1111  LR(-):       *Interpreted as relative odds*: LR(-) is the post-test odds of the disease
1112                        (among those with a negative test result) compared to the pretest odds of
1113                        the disease.
1114
1115                        *Interpreted as relative probabilities:* LR(-) is the probability of a negative
1116                        test result in subjects with the disease compared to the probability of a
1117                        negative test result in subjects without the disease.
1118
1119  2.    For tests with several levels of results, such as tests with results expressed on ordinal or
1120        continuous scales, the likelihood ratio can be used to compare the proportions of subjects
1121        with and without the disease at different levels of the test result.  Alternatively, the
1122        likelihood ratio can be used to compare the post-test odds of disease at a particular level
1123        of test result compared with the pretest odds of disease.  Thus, the generalized likelihood
1124        ratio can reflect diagnostic information at any level of the test result.
1125
1126  **Negative predictive value:**  The probability that a subject does not have the disease when the
1127  test result is negative.  Synonyms include *predictive value negative*.  Negative predictive value =
1128  d/m2 = TN/(TN+FN).
1129
1130  By application of Bayes' Rule, the negative predictive value also can be defined as a function of
1131  pretest probability of disease (p), sensitivity, and specificity:
1132
1133  Negative predictive value = [(1-p) • specificity]/[(1-p) • specificity + p • (1-sensitivity)]
1134
1135  **Odds:**  The probability that an event will occur compared to the probability that the event will
1136  not occur.  Odds = (probability of the event)/(1 - probability of the event).
1137
1138  **Positive predictive value:**  The probability that a subject has disease when the test result is
1139  positive.  Synonyms include *predictive value positive*.  Positive predictive value = a/m1 =
1140  TP/(TP+FP).
1141
1142  By application of Bayes' Rule, the positive predictive value also can be defined as a function of
1143  pretest probability of disease (p), sensitivity, and specificity:

FDA000371

*Contains Nonbinding Recommendations*

1144
1145    Positive predictive value = (p • sensitivity)/[p • sensitivity + (1-p) • (1-specificity)]
1146
1147    **Post-test odds of disease:**  The odds of disease in a subject after the diagnostic test results are
1148    known.  Synonyms include *posterior odds of disease*.  For subjects with a positive test result, the
1149    post-test odds of disease = a/b = TP/FP.  For subjects with a negative test result, the post-test
1150    odds of disease = c/d = FN/TN.  The following expression shows the general relationship
1151    between the post-test odds and the likelihood ratio: Post-test odds of disease = Pretest odds of
1152    disease x Likelihood ratio.
1153
1154    **Post-test probability of disease:**  The probability of disease in a subject after the diagnostic test
1155    results are known.  Synonyms include *posterior probability of disease*.  For subjects with a
1156    positive test result, the post-test probability of disease = a/m1 = TP/(TP+FP).  For subjects with a
1157    negative test result, the post-test probability of disease = c/m2  = FN/(TN+FN).
1158
1159    **Precision:**  A measure of the reproducibility of a test, including reproducibility within and
1160    across doses, rates of administration, routes of administration, timings of imaging after product
1161    administration, instruments, instrument operators, patients, and image interpreters, and possibly
1162    other variables.  Precision is usually expressed in terms of variability, using such measures as
1163    confidence intervals and/or standard deviations.  Precise tests have relatively narrow confidence
1164    intervals (or relatively small standard deviations).
1165
1166    **Pretest odds of disease:**  The odds of disease in a subject before doing a diagnostic test.
1167    Synonyms include *prior odds of disease.*  Pretest odds of disease = n1/n2 = (TP+FN)/(TN+FP).
1168
1169    **Pretest probability of disease:**  The probability of disease in a subject before doing a diagnostic
1170    test.  Synonyms include *prevalence of disease* and *prior probability of disease*.  Pretest
1171    probability of disease = n1/N = (TP+FN)/(TP+FP+FN+TN).
1172
1173    **Probability:**  The likelihood of occurrence of an event, expressed as a number between 0 and 1
1174    (inclusive).
1175
1176    **Receiver operating characteristic (ROC) curve:**  A graphical representation of pairs of values
1177    for *true positive rate* (or sensitivity) and the corresponding *false positive rate* (or 1-specificity)
1178    for a diagnostic test.  Each pair is established by classifying the test result as *positive* when the
1179    test outcome equals or exceeds the value set by a given threshold, and *negative* when the test
1180    outcome is less than this threshold value.  For example, if a five-point ordinal scale is used to
1181    rate the likelihood of malignancy for a tumor (e.g., definitely benign, probably benign,
1182    equivocal, probably malignant, definitely malignant), setting the threshold at *equivocal* will
1183    classify tumors as malignant (i.e., a *positive* test result) when the test outcome is at this level or
1184    higher and will classify tumors as nonmalignant (i.e., a *negative* test result) when the test
1185    outcome is less than this level.  To generate an ROC curve, the sensitivity and specificity of the
1186    diagnostic test are calculated and graphed for several thresholds (e.g., all values of the rating
1187    scale).  In a typical ROC curve, values for *true positive rate* (or sensitivity) are plotted on the
1188    vertical axis, and the corresponding values for *false positive rate* (or 1-specificity) are plotted on
1189    the horizontal axis.

31

FDA000372

*Contains Nonbinding Recommendations*

1190
1191 **Reference product:** An FDA-approved drug product having an indication similar to that of an
1192 investigational drug or biological product to which it is being compared for the purpose of
1193 evaluating the effectiveness of the investigational drug or biological product.
1194
1195 **Sensitivity:** The probability that a test result is positive when the subject has the disease.
1196 Synonyms include *true positive rate*. Sensitivity = a/n1 = TP/(TP+FN).
1197
1198 **Specificity:** The probability that a test result is negative when the subject does not have the
1199 disease. Synonyms include *true negative rate*. Specificity = d/n2 = TN/(TN+FP).
1200
1201 **Truth standard (gold standard):** An independent method of measuring the same variable
1202 being measured by the investigational drug or biological product that is known or believed to
1203 give the *true* value of a measurement.

FDA000373

# Guidance for Industry:

## New Contrast Imaging Indication Considerations for Devices and Approved Drug and Biological Products

*Additional copies are available from:*
*Office of Combination Products, HFG-3*
*Office of the Commissioner*
*Food and Drug Administration*
*15800 Crabbs Branch Way*
*Rockville, MD  20855*
*(Tel) 301-427-1934*
*(Fax) 301-427-1935*
*http://www.fda.gov/oc/combination*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Combination Products (OCP) in Office of the Commissioner**
**Center for Devices and Radiological Health (CDRH)**
**Center for Drug Evaluation and Research (CDER)**

**December 2009**

FDA000374

*Contains Nonbinding Recommendations*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 3

II.     SCOPE ................................................................................................................... 4

III.    TERMINOLOGY .................................................................................................. 4

IV.     BACKGROUND .................................................................................................... 5

V.      GENERAL PRINCIPLES .................................................................................... 6

VI.     WHAT TYPE OF MARKETING SUBMISSION TO PROVIDE ........................... 10

VII.    ILLUSTRATIONS FOR WHEN A DEVICE SUBMISSION (510(K) OR PMA) IS
        SUFFICIENT AND AN NDA SUBMISSION IS NOT NECESSARY ..................... 12

VIII.   ILLUSTRATIONS FOR WHEN BOTH A DEVICE SUBMISSION AND AN NDA
        SUBMISSION MAY BE NECESSARY FOR A DEVICE MODIFICATION ......... 14

IX.     CONSIDERATIONS FOR HOLDERS OF IMAGING DRUG APPLICATIONS .. 17

X.      PREMARKET DEVELOPMENT CONSIDERATIONS ........................................ 18

XI.     POSTMARKET CONSIDERATIONS ................................................................. 20

XII.    INTERACTION WITH FDA AND THE REVIEW PROCESS ............................... 20

XIII.   HOW MAY I OBTAIN MORE INFORMATION? ................................................ 22

APPENDIX 1 -  MEDICAL IMAGING PRODUCT LABELING CONVENTIONS ......... 23

APPENDIX 2 – TYPE OF MEDICAL IMAGING PRODUCTS ........................................... 24

FDA000375

# Guidance for Industry[1]
# New Contrast Imaging Indication Considerations for Devices and Approved Drug and Biological Products

> This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public.  You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations.  If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.  If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.    INTRODUCTION

FDA intends this guidance to assist developers[2] of medical imaging devices and imaging drug/biological products (hereinafter more generally referred to as drugs or drug products) that provide image contrast enhancement in determining:

- When the imaging device developer may add certain new imaging contrast indications to its device for use with already approved imaging drugs without a need for a modification of the drug labeling;
- When the imaging drug developer may add certain new imaging contrast indications to its drug for use with already approved imaging devices without a need for a modification of the device labeling, and
- What type of marketing submission(s) [3] the imaging drug or imaging device developer should submit to FDA to request approval/clearance to add a new imaging contrast indication.

FDA intends for the principles in this guidance to promote timely and effective premarket review of, and to promote consistent, appropriate regulation and labeling for imaging drugs and devices.  These principles are intended to: 1) promote consistency in the type of scientific or technical information submitted to establish a new imaging contrast indication for use regardless of the type of marketing submission, and 2) to promote compatibility in labeling indication statements.

---

[1] This guidance has been prepared by Office of Combination Products, in the Office of the Commissioner, in conjunction with the Center for Devices and Radiological Health and the Center for Drug Evaluation and Research.

[2] For purposes of this document, the term developer includes manufacturers, sponsors, and other holders of marketing applications for medical imaging device, drug, or biological products.

[3] For purposes of this document, the term submission and application are used interchangeably and apply to drug, device, and biological product marketing applications or premarket notifications.

FDA000376

*Contains Nonbinding Recommendations*

This document supplements existing guidance referred to later in this document developed by the Center for Devices and Radiological Health (CDRH), the Center for Drug Evaluation and Research (CDER), and the Center for Biological Evaluation and Research (CBER), and the Office of Combination Products (OCP).

This guidance does not address the specific scientific or technical content to provide in a regulatory submission to demonstrate safety and effectiveness or substantial equivalence of an imaging product(s) for specific indications.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.


## II.    SCOPE

As part of the Medical Device User Fee Amendments of 2007 (MDUFA) Commitment for the Performance Goals and Procedures, in the September 27, 2007 Agreement letter,[4] FDA agreed to develop guidance for medical imaging devices used with "contrast agents or radiopharmaceuticals." Specifically, item I.N of the commitment letter states the "*FDA will, after consultation with affected parties, develop a guidance document intended to ensure timely and effective review of, and consistent and appropriate postmarket regulation and labeling recommendations for, diagnostic imaging devices used with imaging contrast agents and/or radiopharmaceuticals approved for the same or different indications. Draft guidance will be published by the end of FY 2008, and will be subject to a 90-day comment period. FDA will issue a final guidance within one year of the close of the public comment period.*" Draft guidance was published on September 30, 2008; the comment period closed on January 5, 2009. FDA held meetings with imaging industry stakeholders in July 2008 and August 2009. This document fulfills FDA's commitment to issue the final guidance called for by the commitment letter.


## III.    TERMINOLOGY

For purposes of this document, the following conventions apply.

- <u>Imaging drug</u>: Imaging drugs are drugs and biological products (including radiopharmaceuticals) intended for use in medical imaging. This description is generally consistent with the term contrast agent.

---

[4] http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/Overview/MedicalDeviceUserFeeandModernizationActMDUFMA/UCM109102.pdf

FDA000377

*Contains Nonbinding Recommendations*

- Indication statement: Indication statement, for the purposes of this document, is synonymous with the definition of *Indication and Usage* under 21 CFR 201.57 and the definition of *Indications for Use* under 21 CFR 814.20(b)(3)(i).[5] The approved indication is included in the FDA approval letters and accompanying labeling for NDAs, BLAs, and PMAs.[6] The indication is stated in the Indication for Use Statement form that accompanies the premarket notification 510(k) clearance letter. FDA expects that other sections of the labeling would clarify but not expand the use beyond the indication statement.[7]

- Imaging contrast indication: Imaging contrast indication is a statement in the indication section of the imaging drug labeling that describes the use of the drug. Generally, when an imaging drug is intended to be used with a specific imaging device, the imaging contrast indication also appears in the device labeling.

  Existing FDA guidance identifies imaging drug contrast indications in four broad indication areas.[8] For additional information see section VI.B *Considerations for When an NDA is Appropriate*.

## IV.    BACKGROUND

Medical imaging is a rapidly developing area with the potential to provide novel diagnostic information to guide patient management or to facilitate image guided direct delivery of diagnostic or therapeutic products to previously inaccessible areas of the body. Medical imaging technologies are also important for several critical path methodologies (e.g., biomarkers, surrogate markers, and personalized medical decision making).

Most medical imaging depends solely on the device technology to produce and display images; e.g., ultrasound (US), computerized tomography (CT), magnetic resonance imaging (MRI), and traditional radiology (x-ray) techniques. However, imaging drugs are sometimes used in conjunction with these imaging devices to provide image

---

[5] 21 CFR 201.57 (c)(2) *Indications and usage.* "This [labeling] section must state that the drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a manifestation of a recognized disease or condition, or for the relief of symptoms associated with a recognized disease or condition."  21 CFR 814.20(b)(3)(i) *Indications for Use* "A general description of the disease or condition the device will diagnose, treat, prevent, cure, or mitigate, including a description of the patient population for which the device is intended."

[6] NDA (new drug application), BLA (biologics license application), PMA (premarket approval application). For purposes of this document references to an NDA includes BLA submissions.

[7] For purposes of this document, the indication statement is distinct from the sponsor's intended use summary provided in a 510(k) notification under 21 CFR 807.92(a)(5).

[8] FDA Guidance for Industry, *Developing Medical Imaging Drug and Biological Products: Part 2, Clinical Indications*;
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071603.pdf

FDA000378

*Contains Nonbinding Recommendations*

enhancement. For example, for CT and MRI, the addition of an imaging drug may improve the visualization of tissues, organs, and physiologic processes in part by increasing the relative difference of imaging signal intensities in adjacent regions of the body.

For other imaging technologies such as radiopharmaceutical imaging (SPECT or PET),[9] the device alone cannot produce a usable image. Therefore, in order to produce and display a usable image, it is necessary to administer an imaging drug to the patient before using the imaging device. For additional background on the types of imaging products, see Appendix 2.

Although intended to be used together, technological advancements with imaging devices and imaging drugs generally may not proceed at the same rate. Historically, imaging device software and hardware engineering technologies that utilize imaging drugs evolve rapidly (i.e., changes occur once or twice a year) and typically out-pace development of new imaging drugs or new indications for already approved imaging drugs. Device advancements may create an opportunity for a new indication using an approved imaging drug without necessitating a change to the imaging drug's labeling; i.e. dose, rate, or route of administration. For example, if a drug that is approved for use in imaging the lung is systemically distributed in the body, new device software might allow the identical drug to produce an image of the liver. However, if the drug and device manufacturer do not cooperate to seek approval to add the new liver imaging indication in the drug labeling, the pathway to market the new indication using the new device technology alone is often unclear. The purpose of this guidance is to describe the principles and provide examples under which drug or device developers can seek marketing approval/clearance to add new imaging contrast indications to the medical device using an already approved imaging drug.

In developing these principles, FDA considered the scientific and technical issues that may occur when using imaging drugs and devices together, approaches to leverage prior Agency decisions, approaches to ensure consistency of information regardless of the type of submission being used to establish new imaging contrast indications, and approaches to ensure the consistency of the regulatory vehicle for submission under the drug, biological product, or device provisions being used to establish similar types of imaging contrast indications.

## V.    GENERAL PRINCIPLES

To ensure the safe and effective use of both imaging drugs and imaging devices, FDA believes that, the imaging drug and imaging device labeling should be generally consistent. Within this context, however, under appropriate circumstances as described in this document, the labeling of the imaging device alone may be able to provide

---

[9] SPECT stands for single photon emission computerized tomography; PET stands for positron emission computerized tomography.

FDA000379

*Contains Nonbinding Recommendations*

sufficient information about a new imaging contrast indication when using an imaging drug in accordance with its approved drug labeling. This instance may occur when the device technology does not change the drug characteristics <u>and</u> when the drug use is otherwise consistent with its approved imaging drug labeling.[10] In other instances the imaging drug labeling may be able to provide sufficient information about a new imaging contrast indication using an imaging device in accordance with its approved device labeling. In determining consistency with approved labeling, FDA's considerations include, for example, labeling for the indication statement, dosing regimen (dose, rate, route of administration), conditions of use, patient population, and safety information. The Agency notes that individual imaging contrast indications may present unique or complex issues of safety or effectiveness that necessitate a review approach that varies from the one set forth below. Nonetheless, the agency expects to review most premarket applications for imaging product indications involving a drug and a device under the following approach to determine whether a submission should be provided for the imaging device, imaging drug, or for both imaging products.

1. <u>Imaging device submission</u>: When a new imaging device or device modification enables an approved imaging drug (i.e., at its approved formulation, dose, dosing regimen, rate, and route of administration) to be used for a new imaging contrast indication in a manner that is consistent with its approved indication, in most cases, FDA expects that a device submission from the device application holder alone would be sufficient to add the new imaging contrast indication to the device. The device submission would be either an original device application for a new device or supplemental device application for a modified device. Through this process, the imaging device developer would add the modified imaging contrast indication to the device labeling without the need for a change to the imaging drug labeling. For example, when new device software allows for the enhancement of the sensitivity and specificity of the same imaging site already identified in the approved imaging drug labeling, and the drug is administered in accordance with its approved labeling <u>and</u> the labeling does not need revision to ensure safety and effectiveness, the Agency believes in most instances a device submission and device labeling change alone should suffice.

2. <u>Imaging drug submission</u>: In contrast, when an imaging drug modification (i.e., formulation, dosage, rate, or route of administration) enables the currently approved/cleared imaging device to be used for a new indication for use without a change to the device, the NDA/BLA holder should submit a supplement to FDA to request approval for such a change. For example, an NDA submission would be most appropriate for a drug reformulation that allows enhanced biodistribution to a new area, but uses the same imaging software. In most instances, FDA expects a submission of an NDA submission to be sufficient to add such an indication to the drug labeling without the need for a submission of a device application or a labeling change to the imaging device.

---

[10] Examples of imaging device - drug interactions that may affect the characteristics of the imaging drug include ultrasound rupture of microbubbles and light activation of molecules to release a singlet oxygen species. The safety and efficacy of these changes may vary depending on the different tissues being imaged.

FDA000380

*Contains Nonbinding Recommendations*

3. <u>Imaging device and imaging drug submissions</u>:  In some instances, however, the device modification required to support the new imaging contrast indication may cause the drug and device to interact in a manner that affects the safety or effectiveness of the product(s), may change the imaging dosing, safety or effectiveness information, or may produce labeling inconsistencies.  In such circumstances, FDA expects that both the drug and device labels would need to be revised to ensure the safe and effective use of both products for the new imaging contrast indication.  If this is the case, the following principles would apply:

- When a new device or an imaging device modification necessitates a change in the imaging drug formulation, dosage, rate, or route of administration of the currently approved imaging indication, or when the new or modified device is for a new indication not in the approved drug labeling, FDA will generally expect a submission from the holders of both the drug and device applications to ensure labeling conformity.  For example, if a change in device design provides for enhanced imaging at lower doses of the drug, FDA may determine the new drug dosing information should be included in both the imaging drug and device labels in order to help ensure that the drug will be used safely and effectively;

- When an imaging drug modification (i.e., formulation, dosage, rate, or route of administration) necessitates a change in the approved imaging device performance characteristics, specifications, or design for its currently approved/cleared imaging indication or for a new indication for use, FDA will generally expect a submission of both a drug and a device application to add the new indication and to ensure labeling consistency.  For example, an NDA supplement would be appropriate for a change in an ultrasound drug formulation to enhance drug stability for an existing indication; and a device submission would be appropriate for a corresponding change in the ultrasound device design to image the reformulated drug.

Regardless of which label (imaging device or imaging drug or both) adds the new imaging contrast indication, the safety and effectiveness of the new indication should be established by data collected from appropriately designed clinical trials using both the imaging drug and the imaging device.  In general, FDA expects that the regulatory approval pathway (e.g., 510(k), PDP, PMA, PMA supplement, NDA, NDA efficacy supplement, NDA 505(b)(2), or NDA labeling supplement) should not affect the scientific and technical information that is most appropriate for establishing the safety and effectiveness of the new imaging contrast indication.  (For additional information see Section IX, *Premarket Development Considerations*.)  Further, the labeling of product(s) that adds the new indication statement should reflect the essential information that establish the imaging contrast indication; e.g., the clinical study description, imaging device characteristics and settings, imaging drug dosing regimen, target organ.  By developing labeling that relies on consistent types of information, FDA intends to minimize the potential for misleading information across the imaging drug and device labels for similar indications.

FDA000381

*Contains Nonbinding Recommendations*

### A.    Determination of Lead Center Responsible for Premarket Review

Most imaging devices and drugs approved for use with a class of imaging products do not meet the definition of a combination product under 21 CFR Part 3; e.g., when an imaging device is approved for use with a class of imaging drugs (e.g., gadolinium contrast) or when a drug is approved for use with a class of devices (e.g., MRI).[11]  If an imaging device is not a combination product, a manufacturer of an imaging device who intends to develop a new imaging contrast indication for use with a class of imaging drugs should submit a device application to CDRH for review.  During the review process, CDRH will consult with CDER on issues including, but not limited to, the scientific/technical, risk/benefit, labeling, potential interaction issues for the drug or drug class.[12]  Similarly, a manufacturer of an imaging drug who intends to develop a new imaging contrast indication for use with a class of devices should submit a drug application to CDER for review.  CDER will consult with CDRH on all device related issues.

However, in some instances, the use of a certain diagnostic imaging device and imaging drug may constitute a combination product under 21 C.F.R. 3.2(e)(3).[13]  For example, a specific imaging drug used to bind receptors for imaging that uses a dedicated software algorithm may constitute a combination product.  Although a detailed discussion of how FDA applies combination product authorities is beyond the scope of this guidance, if a manufacturer has a combination product, the lead center determination will be in accordance with the primary mode of action regulatory provisions.[14]  Manufacturers of a specific drug-device imaging product may wish to contact FDA Office of Combination Products to discuss whether a request for designation would be useful.[15]

As described further in Section XI, *Interaction with FDA and the Review Process,* for the developer of an imaging device wishing to add a new imaging contrast indication for a class of imaging drugs, the supportive clinical trial(s) should be conducted under the Investigational Device Exemption regulations at 21 CFR 812 with a submission to CDRH.  Similarly, for the developer of an imaging drug wishing to add new imaging contrast indications for a class of devices, the supportive clinical trials should proceed under the Investigational New Drug regulations at 21 CFR Part 312 with a submission to CDER.  For a combination product, the submission should proceed under the lead center

---

[11] Although these class products do not meet the definition of a combination product at 21 CFR 3.2, the use of each product is integrally related to the approved indications and the products would be prescribed for use with each other.

[12] Imaging drug and biological products including radiopharmaceuticals are regulated in CDER.

[13] 21 CFR 3.2(e)(3) "A drug, device, or biological product packaged separately that according to its investigational plan or proposed labeling is intended for use only with an approved individually specified drug, device, or biological product where both are required to achieve the intended use, indication, or effect and where upon approval of the proposed product the labeling of the approved product would need to be changed, e.g., to reflect a change in intended use, dosage form, strength, route of administration, or significant change in dose."

[14] Final rule for *Definition of the Primary Mode of Action of a Combination Product*, published August 25, 2005, Federal Register, http://edocket.access.gpo.gov/2005/pdf/05-16527.pdf,  See 21 CFR 3.4.

[15] FDA guidance *How to write a request for designation;*
http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm

FDA000382

*Contains Nonbinding Recommendations*

as determined by the product specific primary mode of action and typically the investigational application would be of the type administered by the lead center.

## VI.    WHAT TYPE OF MARKETING SUBMISSION TO PROVIDE

Under the concepts set forth in Section V *General Principles,* FDA believes certain new imaging contrast indications that are consistent with imaging drug labeling can be reviewed in a device submission alone when they entail only device modifications and when a change in the approved drug labeling would not be necessary.  In other circumstances both a device and drug marketing submission may be necessary.[16] Therefore, when a device sponsor considers what type of submission(s) may be appropriate for their device change, there are two issues to consider: What type of device application should be submitted and when would a drug submission be appropriate?  To assist in determining the type of device application to submit, CDRH previously issued two guidance documents that may be useful in determining the type of device application to submit when adding a new contrast imaging indication: a) Guidance for Industry: *General/Specific Intended Use (1998)* and b) *Deciding When to Submit a 510(k) for a Change to an Existing Device (1997).*  While neither is intended to apply to drug products or combination products, these guidance documents do provide starting point principles for determining whether a 510(k) or PMA is most appropriate.[17]   The following section VI.A applies these concepts to imaging devices.  Section VI.B provides considerations for when a NDA is appropriate.  Section VII and VIII provide further illustrations on the types of marketing submissions.

### A.  Considerations for the type of device submission: 510(k) or PMA

In determining whether a new device or a modified device is appropriate for review and clearance under a 510(k), FDA intends to assess whether the proposed device can be deemed substantially equivalent to a predicate device in accordance with 21 CFR 807.100(b), which states the following.

> "(1) The device has the same intended use as the predicate device; and
>  (2) The device:
>     (i) Has the same technological characteristics as the predicate device; or
>     (ii)(A) Has different technological characteristics, such as a significant change in the materials, design, energy source, or other features of the device from those of the predicate device;

---

[16] OCP is currently developing a guidance document for public review and comment that will address the factors FDA expects to consider in determining whether a single or multiple marketing applications should be submitted for a combination product.

[17] FDA's guidance on *Deciding When to submit a 510(k) for a Change to an Existing Device* states in the "Scope" section that the "guidance is not intended to apply, although it may, to combination products, such as drug/device or biologic/device combinations."  FDA's *Guidance for Industry: General/Specific Intended Use (1998)* provides information on medical devices for purposes of determining substantial equivalence. It does not provide details on combination products under device applications or changes to add a drug use.

FDA000383

*Contains Nonbinding Recommendations*

(B) The data submitted establishes that the device is substantially equivalent to the predicate device and contains information, including clinical data if deemed necessary by the Commissioner, that demonstrates that the device is as safe and as effective as a legally marketed device; and (C) Does not raise different questions of safety and effectiveness than the predicate device."

Typically, FDA receives 510(k) submissions for: 1) adding the use of an approved imaging drug to the labeling of a 510(k) device that is cleared for use without an imaging drug, or 2) for using a new or modified device with an approved imaging drug for a new imaging contrast indication not provided in the drug labeling.

FDA's first step in determining the appropriate type of device submission is to assess whether the sponsor's selected predicate device is appropriate. If the proposed device has a different intended use from the intended use identified in the cleared predicate device, the proposed device will receive a not substantially equivalent (NSE) determination based on a new intended use, and, therefore, will be reviewed under a PMA or De Novo application.

Once an appropriate predicate device is considered acceptable by FDA, the decision on whether the proposed device may be substantially equivalent to the predicate device depends on the evaluation of the technologic characteristics and the evaluation of safety and effectiveness questions as illustrated in the CDRH 510(k) decision tree.[18]  FDA notes that since the imaging drug is part of the device indication, these questions should include questions related to the imaging drug.  After the review is completed, if the proposed device is considered NSE to the predicate device due to questions of safety and effectiveness, the sponsor will be advised to submit a PMA or De Novo application.

After a determination about what type of device submission is appropriate, the developer should consider whether its proposed indication would be a new indication for the imaging drug or would create a labeling inconsistency for the drug.  If so, then an NDA should be submitted along with the device application.

## B.  Considerations for When an NDA is appropriate.

Imaging drug indication differences are based on whether the indication is within the original imaging categories identified in Section V, *General Principles* and whether the conditions of use are the same.  A determination of when an NDA submission should be provided depends on the consistency with the labeled indication and on the safety or effectiveness information (e.g., patient population, dose, dosing regimen, frequency of repeat studies, concomitant medication, and risk factors).  Imaging drug indications do not expressly address the concept of general vs. specific indications as referenced above for determining the type of device submission; instead imaging drug indications are categorized as: 1) Structural delineation, 2) Disease or pathology detection or assessment,

---

[18] Additional information is available under 510(k) Memorandum K-86-3 issued June 30, 1986; http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm081383.htm

FDA000384

*Contains Nonbinding Recommendations*

3) Functional, physiological or biochemical assessment, or 4) Diagnostic or patient management.[19]  As explained in the guidance document referenced below, any change from one category to another is considered a new indication.  Device changes that would generally be inconsistent with an existing drug label and for which an NDA submission would be appropriate include changes such as the following:

- Change in drug imaging indication category (change from structural to disease or pathology detection),
- Change in patient population,
- Change in dose, rate, route, or dosing regimen,
- Change in safety profile, or
- Change in the device labeling that could introduce confusing or misleading information for healthcare providers when relying on the imaging device, imaging drug or both labels.

Therefore, the initial step in determining whether a device proposed change is consistent with the drug labeling is to carefully consider the approved indication of the drug.  The appropriate type of submission may be an NDA efficacy or labeling supplement. (For additional information see Section IX, *Considerations for Holders of Imaging Drug Applications*.)

## VII.    ILLUSTRATIONS FOR WHEN A DEVICE SUBMISSION (510(K) OR PMA) IS SUFFICIENT AND AN NDA SUBMISSION IS NOT NECESSARY

As provided by the examples below, there are circumstances where the device proposed change is consistent with the existing drug indication and can be reviewed under a 510(k)/PMA alone.  In such an instance, a submission of an NDA supplement to change the drug label would not be necessary before approving or clearing the device.

Scenario: Both the imaging device and one specific imaging drug (gadolinium) are cleared and approved, respectively, for contrast magnetic resonance angiography (MRA) of the aortoilliac region.  The device developer submits a new 510(k) requesting clearance for its device modified by adding quantitative measurement to its existing software to increase the sensitivity/specificity detecting aortoilliac lesions with of 95% stenosis using the approved imaging drug.  The approved imaging drug label's clinical trials section identifies the primary endpoint as a visual comparison of pre and post contrast images detecting lesions with > 50% stenosis.

---

[19] FDA Guidance for Industry, *Developing Medical Imaging Drug and Biological Products: Part 2, Clinical Indications*;
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071603.pdf

FDA000385

*Contains Nonbinding Recommendations*

1.  Is 510(k) or PMA appropriate?

    For purposes of this scenario, the sponsor's cleared MRA device for use with the approved aortoilliac imaging drug would be an acceptable predicate for the increased sensitivity and specificity of the lesion detection.  However, the use of the MR device and specific gadolinium imaging drug to add specific quantification of aortoilliac lesions at 95% stenosis may raise different questions of safety and effectiveness (e.g., the validation of the sensitivity and specificity of a quantitative measure as compared to a visual display of qualitative data that would be subject to clinical interpretation).  As such, the 510(k) may be found to be NSE.

2.  Is an NDA supplement appropriate?

    No, an NDA supplement would not be necessary.  The gadolinium imaging drug is approved to evaluate aortoilliac occlusive disease in adults with known or suspected peripheral vascular disease.  The approved labeling clinical trials section identifies the primary endpoint as a visual comparison of pre and post contrast images in order to detect lesions with > 50% stenosis.  The device software increases the sensitivity/specificity of the visual detection or adds a computer assisted component to aid the detection to lesions that would be within the aortoilliac MRA imaging drug's indication.  Therefore, the device modification would be consistent with the approved indication of the approved imaging drug.

The following additional examples further illustrate other device proposed labeling changes (regardless of device submission type) that are considered within the imaging drug indication and for which an NDA submission would not be necessary.

a.  <u>Imaging drug for Ultrasound (US)</u>:

    An approved imaging drug (ultrasound microbubble) is indicated for structural delineation of the left ventricular endocardial border in patients with suboptimal non-contrast echocardiography.  Assume that the device design is changed to add gating to increase the sensitivity and specificity of the LVO (left ventricular opacification) and border detection.  The device change does not alter the approved drug indication; and therefore, an NDA supplement is not necessary.  However, if the gating was to measure left ventricular ejection fraction, this use would not be consistent with the approved drug's indication.

b.  <u>Imaging drug for Computerized Tomography (CT)</u>:

    Most imaging iodinated contrast drugs are indicated for CECT (contrast enhanced) imaging of the head and body, excretory urography, and peripheral venography.  CT scans have evolved to Multidector CT scanners.  The addition of imaging iodinated contrast drug enhancement to the device

FDA000386

*Contains Nonbinding Recommendations*

labeling using Multidector CT within same areas and dosing as approved in CECT would be considered within the approved imaging drug's indication.[20]

c.  Imaging Drug for MR – Body Indication:

According to the currently approved labeling, MR imaging gadolinium drugs with a "body" indication are considered as limited to the intrathoracic (excluding the heart), intraabdominal, and retroperitoneal regions.  Device MR modifications for gadolinium enhancement to increase structural identification of masses within these regions (but not within specific organs) are considered to be within the approved drug imaging indication.

## VIII.   ILLUSTRATIONS FOR WHEN BOTH A DEVICE SUBMISSION AND AN NDA SUBMISSION MAY BE NECESSARY FOR A DEVICE MODIFICATION

As provided by the examples below, there are circumstances where the device proposed labeling change is inconsistent with the existing drug's indication and cannot be reviewed under a 510(k)/PMA alone.  Therefore, a submission and approval of an NDA supplement to change the drug label would be necessary before or concurrent with approval or clearance of the device.

**Scenario 1 - Ultrasound Contrast (US):** The device is cleared for general US non-contrast imaging in several areas of the body and for contrast enhanced echocardiography using FDA approved US imaging drugs in accordance with their labeling.  The imaging drug (microbubble) is approved for use in patients with suboptimal echocardiograms to opacify the left ventricular chamber and to improve the delineation of the left ventricular endocardial border.  The device has been modified and the sponsor submitted a 510(k) requesting clearance to add the use of the US imaging drug: 1) for the identification of myocardial perfusion defects, 2) for imaging low flow/smaller vessels in abdomen and peripheral vascular disease for the detection and assessment of aneurysms, plaque, and intimal thickness, and 3) to qualitatively assess tumors, monitor growth, vascularization & treatment effectiveness.

1.  Is a 510(k) or PMA appropriate?

For the purposes of this scenario, the sponsor selected its own cleared US device as the predicate.  FDA expects that the US device will have different technological characteristics when using the US imaging device and microbubble in different areas of the body (e.g., the wash-in/wash-out techniques to improve delineation of the LV border vs. rupture the microbubble for identification of the myocardial perfusion defects vs.

---

[20] FDA notes that imaging iodinated contrast drug labels do not specify the use of Multidector CT.

FDA000387

evaluation of peripheral vessels or aneurysms). These technological differences raise different safety and effectiveness questions as compared to the predicate device which include: interactions of the device megahertz energy that may rupture the microbubbles that may lead to adverse events, new clinical endpoints, new patient populations, and different benefits/risks ratio analysis. Also, the use of the US imaging drug for myocardial perfusion defects is a change from a cardiac general structural identification to a disease/pathology detection indication. The use in other areas of the body, and the use for aneurysms or intimal plaque measurements are substantially different indications with patient management implications. The quantitative assessment of tumor growth would raise different questions of safety and effectiveness for the new imaging endpoint correlation with disease outcomes. For these reasons, the 510(k) would be considered NSE.

2.  Is an NDA supplement appropriate?

    Yes, an NDA supplement would be appropriate because each of these proposed indications is different from the existing imaging drug indication as follows.

    a. The US imaging drug is not approved for evaluation of cardiac/ myocardial perfusion. The existing US imaging drug indication is for the opacification of the left ventricle and visualization of the LV endocardial border (structural). A new use for myocardial perfusion imaging in patients with suspected or known coronary artery disease would represent a new functional or diagnostic indication even though it is in the same organ. New efficacy data would be needed to document image findings. New safety data would be needed using the different US wash-in/wash-out techniques and ultrasound mechanical index values to evaluate possible microsphere cavitations or rupture with associated arrhythmias.

    b. As above, the existing US imaging drug indication does not include an evaluation of a vessel. Overall, the new evaluation of vascular structures, aneurysm, plaque or intimal thickness raises new safety and effectiveness (risk/benefit) questions related to demonstration that contrast US meaningfully enhances structure delineation disease/pathology detection or patient management (depending upon the endpoints) compared to non-contrast US. The clinical utility of certain endpoints (e.g. measurements of change in plaque or intimal thickness) would need verification. As such, this use would be considered as a new specific indication and not similar to the existing US imaging drug's indication.

    c. Also, similar to the other indications in this scenario, the proposed use of the US imaging drug to qualitatively assess tumors, monitor growth, vascularization and treatment effectiveness is not part of the existing US LV endocardial border indication. This use would be a change from a structural to a functional, disease/pathology detection indication or a patient

FDA000388

*Contains Nonbinding Recommendations*

management indication (depending upon the endpoints).  These proposed uses would all be new indications for which safety and effectiveness verification would be needed.  An NDA supplement should be provided to establish the new indications and associated revisions to the imaging drug's labeling.

**Scenario 2 - MR Contrast Breast imaging:** The MR device is cleared for non-contrast breast imaging in patients with abnormal mammograms or non-palpable breast lesions.  The device developer would like to submit a 510(k) requesting clearance for use of gadolinium imaging drugs to enhance breast imaging in the same patient population.  At the time of submission, an FDA approved gadolinium imaging drug labeled for breast MR imaging does not exist.

1.  Is a 510(k) or PMA appropriate?

    For the purposes of this scenario, the sponsor selected its own cleared device as the predicate.  Since the predicate device was cleared with the same indication as the proposed device, but without the use of the gadolinium imaging drug, it would be considered an acceptable predicate for a 510(k) submission.  However, the 510(k) submission for the imaging device for use with the imaging drug could not be found substantially equivalent to the predicate until an imaging drug was concurrently approved for breast imaging.

2.  Is an NDA supplement appropriate?

    Yes, to date FDA has not approved a gadolinium imaging drug for breast contrast enhancement.[21]  Based on current practice standards, this use would likely be a change from structural imaging to a disease or pathology detection imaging drug indication.  There would be new safety and effectiveness issues for this new indication.  An NDA efficacy supplement would be expected.

**Scenario 3 - Qualitative to Quantitative Imaging:**  The device is cleared for MR contrast imaging for qualitative structural identification of lesions in several areas of the body including the liver.  An MR gadolinium imaging drug is approved for qualitative dynamic and hepatic phase imaging of focal liver lesions during a single imaging session.  The device modification is to add software enhancements to add dynamic MR imaging of the liver to quantitatively assessment of tumors to monitor growth, vascularization, and treatment effectiveness.

1.  Is a 510(k) or PMA appropriate?

    For this scenario, the sponsor identified its cleared device as the predicate.  However, the technological enhancements to add quantitative imaging are different from the original design and, as such, raise different questions of safety

---

[21] Based on currently labeled gadolinium imaging drugs, the "body" indication statement is limited to the intrathoracic (excluding the heart), intraabdominal, and retroperitoneal regions. In this indication, specific organs are not part of the indication. Also, the breast is extrathoracic.

FDA000389

*Contains Nonbinding Recommendations*

and effectiveness for treatment response (e.g., the validation of the sensitivity and specificity of discrete quantitative measures of drug uptake to product specific diagnostic information such as lesion density, pattern, and configuration). For this reason, the 510(k) may be considered NSE.
2.  Is an NDA supplement appropriate?

Yes, for the imaging drug (gadolinium) already approved for liver MR imaging, an NDA supplement should be submitted for the new indication. The approved MR gadolinium imaging drug is for T1-weighted magnetic resonance imaging (MRI) of the liver to detect and characterize lesions in adults with known or suspected focal liver disease. This indication is a mixed structural and pathology detection characterization (e.g., hepatocellular carcinoma, cholangiocarcinoma, metastasis, focal lymphoma, presence or absence of a lesion). However, the specific quantitation of tumors to monitor growth, vascularization & treatment effectiveness is a patient management indication that is not part of the approved imaging drug's indication. Presumably, the dynamic image involves kinetic measures and new end points that are used to make pathology/disease evaluations that would be considered as a new indication. An NDA efficacy supplement should be submitted to achieve imaging drug labeling for the new indication.

In all of the above scenarios, when the 510(k) is found to be NSE (not substantially equivalent) to a predicate, the submission should be a PMA. If the submitter would like FDA to consider a DeNovo petition, FDA recommends having a detailed discussion that includes consideration of what type of Special Controls Guidance could be developed to mitigate the risks of the device.

## IX.    CONSIDERATIONS FOR HOLDERS OF IMAGING DRUG APPLICATIONS

Holders of an NDA or BLA for an imaging drug or biological product who seek to develop new contrast indications that refer to information developed in a device submission should submit supplements to their NDA/BLA. In addition, if FDA approves or clears a new imaging contrast indication in a device submission (which did not require a change to the drug labeling), the NDA/BLA holder may nevertheless submit a labeling supplement to add the indication to the imaging drug. Furthermore,

- If the NDA holder wishes to request exclusivity, then an efficacy supplement should be submitted.[22]
- When an NDA holder wishes to add clarifications to an imaging drug label and an NDA supplement is not otherwise needed, these labeling changes would be submitted as a labeling supplement.

---

[22] Under 21 CFR 314.108, FDA may grant drug product exclusivity for studies not conducted or sponsored by the applicant. On a case-by-case basis, FDA will consider whether exclusivity may be appropriate when relying on studies submitted in the PMA/510(k).

17
FDA000390

*Contains Nonbinding Recommendations*

- If the NDA proposes a new indication, new dose, or new dose rate or route, that requires new device technology, then in parallel with the NDA efficacy supplement, the device sponsor would submit the appropriate device submission in accordance with the principles under Section VI, *What type of Device Marketing Submission to Provide.*

## X. PREMARKET DEVELOPMENT CONSIDERATIONS

### A. Considerations for Data Necessary to Support Approval of a New Imaging Contrast Indication

As noted in Section III. *Terminology,* there are four large categories of imaging contrast indications.  Existing FDA guidance documents provide recommendations on what to include in a submission and how to submit device technology information on certain devices (ultrasound, MRI, SPECT, PET).[23]  In other existing FDA guidance documents, the Agency also provides detailed recommendations on the data necessary to establish the safety and effectiveness of different types of imaging contrast indications associated with imaging drug and biological products (*Developing Medical Imaging Drug and Biological Products*, Part I, 1, 2 and 3).[24]  This set of documents includes information respectively on the following:
- Conducting Safety Assessments;
- Clinical Indications; and
- Design, Analysis, and Interpretation of Clinical Studies

Further, for the subset of imaging products that are combination products, the FDA guidance *Early Development Considerations for Innovative Combination Products* provides information on how known information might be useful in product development.[25]

FDA recommends that manufacturers of imaging drug-device combination products or manufacturers of imaging devices for use with an imaging drug class consider these existing guidance documents as a starting point for development plans for their specific

---

[23] Emission Computed Tomography Devices and Accessories (SPECT and PET) and Nuclear Tomography Systems;
http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM073797.pdf; Magnetic Resonance Diagnostic Device;
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073817.htm
[24] FDA guidance *Developing Imaging Drug and Biological Products, Part 1: Conducting Clinical Safety Assessment,*
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071600.pdf ; *Part 2: Clinical Indications*;
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071603.pdf;   *Part 3: Design, Analysis and Interpretation of Clinical Studies,*
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071604.pdf
[25] *Early Development Considerations for Innovative Combination Products;*
http://www.fda.gov/RegulatoryInformation/Guidances/ucm126050.htm

FDA000391

*Contains Nonbinding Recommendations*

imaging contrast indication.  Because of the breadth, innovation and complexity of these imaging drug-device systems, there is no single clinical trial design that would be appropriate for all products or indications.  However, FDA expects that the scientific and technical questions posed by a specific imaging contrast indication, patient population, and set of products would be similar regardless of the center lead or type of marketing submission being used.  Thus, most new imaging contrast indications should include comparable documentation collected from appropriately designed clinical trials of the imaging drug-device as well as preclinical test results, and, when appropriate, device software or new technology validation.

FDA recognizes that the type and volume of data necessary to submit may vary in accordance with such factors as the indication, patient population, safety questions, and drug characteristics.  When the dose, dosing regimen, rate and route of administration of the imaging drug is the same and the device does not interact with the drug, it is likely that FDA guidance *Developing Imaging Drug and Biological Products* Part 3: *Design, Analysis and Interpretation of Clinical Studies* will be the most relevant guidance.  Further, in some instances the type of trial design may be tailored to focus on certain issues; e.g., electrophysiologic studies to evaluate effect of microbubble rupture on ventricular arrhythmia.  Also, as appropriate, in some instances published literature or other public documents may be able to provide the information to establish an indication.

    1.   Imaging Drug Class Considerations

When an imaging device manufacturer is considering a new imaging contrast indication for a broad class of imaging drugs (e.g., gadolinium), in developing the clinical trial designs, the manufacturer should consider what is common and what is unique about the class of drugs.  For example, each class of imaging drugs described in Section IV. *Background* (e.g., microbubbles, paramagnetic metallic ions linked to different chemicals, iodinated products, and diagnostic radiopharmaceuticals added to drug products and monoclonal antibodies that target specific receptors) may have a common indication and certain general safety characteristics.  Within a class also there may be different doses, different risk profiles, or other unique labeling.  Further, within a broad imaging class there may be different characteristics as the class evolves; e.g., changes in chelates, carriers, ligands, or other features of the imaging drug.  As new generations of imaging drugs are approved, their indications may be different.

In designing a trial for a class of FDA approved drugs, FDA recommends that the design(s) include features to address differences as appropriate within the class of imaging drugs.  Also, it would be important to consider what is different about the new indication or patient population.[26]  It may be necessary to determine how the

---

[26] Most imaging drug classes (e.g., gadolinium, microbubbles, and radiopharmaceuticals) have a Black Box Warning regarding different types of serious adverse events.  The clinical trial design should consider the relevance of the existing safety profile to the proposed new use.  For example, magnetic resonance imaging of the renal arteries using an approved drug that has known toxicity in patients with renal insufficiency, the combined use raises new questions of safety and effectiveness of using the drug in a different risk population than that provided in the approved drug label for brain imaging.

FDA000392

*Contains Nonbinding Recommendations*

device should be used with imaging drugs that have different dosing requirements. These data should be established in early studies, before determining the pivotal trial design to establish imaging drug dosing or device energy differences that should be in labeling to ensure safety and effectiveness. Alternatively, imaging device developers may consider establishing an indication for only one imaging drug in a class.

2.  Imaging Device Class Considerations

Imaging devices typically have similar indications or intended use. However, within an imaging drug class there may be differences that should be considered in developing the device settings to ensure consistent performance characteristics. Also, there may be device settings that should be preset and locked for safety and effectiveness. For imaging drug manufacturers considering a new imaging contrast indication for a class of devices, FDA recommends considerations of clinical trial designs that study the similarities and differences in the class of marketed imaging devices that are most appropriate for the new indication. Also, it is important to consider what imaging device changes have occurred since your imaging drug was first approved. For the new imaging contrast indication, FDA also recommends considering trial designs that encompass both the most recently cleared/approved imaging devices as well as those that are most widely available.

# XI.  POSTMARKET CONSIDERATIONS

The holder of an approved device submission that includes the specific new imaging contrast indication should monitor the approved drug's labeling as well as other changes to the drug. In certain instances, FDA may require such monitoring or other postmarket surveillance related to the drug upon approval or clearance of the device submission.[27] Further, to enhance postmarket safety reporting, while many imaging device and imaging drugs do not meet the definition of a combination product, the reporting principles for combination products may be useful to sponsors whose labeling includes the use of a differently regulated product and who may receive reports about that differently regulated product.[28]

# XII.  INTERACTION WITH FDA AND THE REVIEW PROCESS

Early communication and discussion between manufacturers and FDA should include concurrent discussion with the centers and, as appropriate, OCP. Early dialogue allows manufacturers to obtain initial feedback on the kinds of preclinical and clinical data that may be necessary for their product and proposed new imaging contrast indication. Such

---

[27] 21 CFR Part 803, 814.82, 822.
[28] FDA published postmarket safety reporting requirements for combination products; *Federal Register, Vol 74, No 189, October 1, 2009, page 50744.*

*Contains Nonbinding Recommendations*

communication may identify critical issues for product development and help to ensure an efficient development and approval process. Further, early and frequent communication provides the opportunity for FDA to establish its intercenter review team and to develop the appropriate scientific expertise to facilitate timely and efficient reviews of any future submissions.

FDA strongly encourages a manufacturer who is considering medical imaging development for use with a class of imaging products to contact the center that typically regulates its product to request preliminary intercenter guidance. CBER, CDER and CDRH provide guidance on milestone/collaboration meetings throughout the development process and submission of investigational and marketing applications. Pre-investigational (pre-IND) and pre-IDE) meetings are particularly useful for discussing innovative combination products.[29] Ideally the meeting background package should provide a comprehensive discussion of the proposed imaging contrast indication, the device technology, a copy of the existing drug labeling, and outline of the type of clinical studies being proposed. During ongoing development, pre-marketing submission meetings are also helpful to discuss marketing application content, as well as the sequence and timing of modular submissions or when more than one marketing submission will be provided for the combination product. Guidance on how to arrange developmental meetings can be obtained on the CDER,[30] CBER,[31] and CDRH[32] websites.

The manufacturer should contact the lead center to schedule meetings in accordance with the milestones applicable to the lead center. The lead center will consult with other centers or agency components as needed in accordance with the scientific and technical issues in the submission. As described further in Section V.A *Determination of Lead Center Responsible for Premarket Review,* for device manufacturers who are considering trials to add new imaging contrast indications using a class of imaging drugs, the lead center would be CDRH. For a combination product, the lead center is determined by the primary mode of action.[33]

OCP is available formally or informally to address jurisdictional, developmental, premarket review, cross-labeling, and postmarket regulatory consistency issues. Also, OCP is available to provide guidance for products that do not meet the definition of a combination product, but raise similar questions. During product development, protocol

---

[29] IND stands for investigational new drug application; IDE stands for investigational device exemption.
[30] See http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm
[31] See
http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm
[32] See
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/default.htm and, *Early Collaboration Meetings Under the FDA Modernization Act, Final Guidance for Industry and CDRH Staff*;
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073604.htm
[33] When the imaging drug and device meet the definition of a combination product, the labeling principles in this document would not affect the lead center assignment based on the primary mode of action. The principles affect only which label should contain the new information.

FDA000394

*Contains Nonbinding Recommendations*

design, submission coordination, and labeling, the reviewing centers intend to consult/collaborate in making these assessments, as appropriate. FDA further intends to rely on its existing *SOPP for Intercenter Consultative and Collaborative Review Process[34]* to promote timely and effective review.

As appropriate, OCP will assist in developing additional focused procedures for the imaging review divisions/branches. These procedures should provide for an Intercenter Imaging Team to review clinical protocols, labeling and other practices to ensure consistency of developmental approaches and relevance of results to submit under either the drug, biological, or device provisions. The review would include, but is not limited to, the scientific/technical, risk/benefit, labeling, or potential interaction issues for the drug or drug class with the device(s). FDA expects that such intercenter procedures will promote consistency in labeling and acceptability of new indications requested based on prior agency determinations regardless of the regulatory provisions used for approval or clearance.

## XIII. HOW MAY I OBTAIN MORE INFORMATION?

OCP is available as a resource to developers and review staff throughout the lifecycle (assignment, development, premarket review and postmarket regulation) of a combination product. The Office can be reached at (301) 427-1934 or by email at combination@fda.gov. In addition, the Office maintains an updated list of FDA guidance documents that developers may find helpful in the development of their products. The guidance is available at the Office's Internet Website at http://www.fda.gov/CombinationProducts/default.htm.

In addition each center maintains a guidance webpage that provides comprehensive information on the types of products or constituent parts regulated in the center. For medical imaging drug products, the CDER Guidance webpage is accessible at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm. The CDRH Guidance and Device Advice web page is accessible at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/default.htm. Selected specific guidance documents that may useful for imaging drugs and imaging devices include, but are not limited to, the following.

- Applications under section 505(b)(2);
  http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm079345.pdf
- Criteria for Significant Risk Investigations of Magnetic Resonance Diagnostic Devices;
  http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm072686.htm

---

[34] Standard Operating Procedures and Policies: *Intercenter Consultative and Collaborative Review Process*; http://www.fda.gov/CombinationProducts/GuidanceRegulatoryInformation/ucm119234.htm

FDA000395

*Contains Nonbinding Recommendations*

- Early Development Considerations for Innovative Combination Products;
  http://www.fda.gov/oc/combination/innovative.pdf
- Exploratory IND studies;
  http://www.fda.gov/RegulatoryInformation/Guidances/ucm126050.htm
- FDA Radiological Health Program: Ultrasound Imaging;
  EmittingProducts/RadiationEmittingProductsandProcedures/MedicalImaging/ucm115357.htm
- Guideline for Device Master Files;
  http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketApprovalPMA/ucm142714.htm
- Guidline for Drug Master Files;
  http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm122886.htm
- FDA guidance *Developing Imaging Drug and Biological Products, Part 1: Conducting Clinical Safety Assessments,*
  http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071600.pdf; *Part 2: Clinical Indications*;
  http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071603.pdf; *Part 3: Design, Analysis and Interpretation of Clinical Studies,*
  *http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm071604.pdf*
- Supplements to Approved Applications for Class III Medical Devices: Use of Published Literature, Use of Previously Submitted Materials, and Priority Review;
  http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080183.htm

## APPENDIX 1 -  MEDICAL IMAGING PRODUCT LABELING CONVENTIONS

1. Imaging drug indication statement:  Imaging drug labels typically are more specific and may follow the illustration below:

   Drug X is a [*drug class*] gadolinium based contrast agent indicated for [*administration*] intravenous administration in [*imaging procedure*] magnetic resonance imaging of the [*body region*] brain and spine to [*clinical use*] visualize lesions with abnormal vascularity in [*population, age*] adult or pediatric patients (age 2 or older) with known or suspected CNS lesions including tumors.

2. Imaging device imaging contrast indication statement:  The degree of specificity in the labeling of imaging devices varies.  In some instances, imaging device labeling refers to the approved imaging drug or drug class.  In other instances, the labeling identifies the use with an imaging drug but does not refer to the drug class.  In still other instances, the use with an imaging drug is implicit in the design of the device

FDA000396

*Contains Nonbinding Recommendations*

software but does not explicitly appear in the labeling.  The following example may be used for a device indication statement:

> Device Y is indicated for [*imaging procedure*] magnetic resonance imaging of the breast with [*drugs X, Y, Z* ] or [*FDA approved for*] as a second line (after mammography) diagnostic procedure [*clinical use*] to aid in the evaluation of breast lesions in patients [*population*] with an abnormal breast examination or an abnormal mammogram.  *Limitations* [*if applicable*] Device Y is not indicated for breast cancer screening and is not an alternative to biopsy.

## APPENDIX 2 – TYPE OF MEDICAL IMAGING PRODUCTS

Medical imaging devices are marketed under the device provisions of the Act.  Medical imaging drugs and biological products are marketed under the drug and biological provisions of the Act.

Most imaging drugs are modality specific and chemically distinct from one another.[35] For example:

- X-ray and CT imaging drugs are iodine-containing compounds that in part are specifically designed to absorb x-rays.
- MRI imaging drugs contain paramagnetic metallic ions, most commonly gadolinium, iron or manganese.  These imaging drugs are designed in part to alter the magnetic properties of water present in the body.
- US imaging drugs typically consist of a gas contained within a lipid or protein shell (i.e., microbubbles or related microparticles).  These products are designed in part to reflect sound waves.
- Nuclear imaging drugs, also known as radiopharmaceuticals, contain in part a radionuclide that exhibits spontaneous disintegration of unstable nuclei with the emission of nuclear particles or photons.
- Light sensitive (emitting, absorption) imaging drugs contain molecules for activation by electromagnetic energy or light at specific wavelengths.

In addition to these general properties, these imaging drugs are specifically formulated to interact with the body to facilitate imaging.  For example, some bind to receptors, interact with a metabolic pathway, cross abnormal blood brain barriers, or are engulfed by macrophages.

---

[35] For purposes of this document, the term imaging or contrast drug applies to both drug and biological product including radiopharmaceutical products.

**FDA** FOOD AND DRUG ADMINISTRATION

Office of Combination Products
10903 New Hampshire Avenue (WO32)
Suite 5129
Silver Spring, MD 20993-0002

October 26, 2018

Mr. Ed Powers
President, CEO
Genus Medical Technologies
215 Chesterfield Business Pkwy
Chesterfield, MO 63005

Re : Request for Designation
Genus Barium Sulfate
Our File Number: RFD180046
Received: October 22, 2018

Dear Mr. Powers:

Your Request for Designation RFD180046 has not been filed because it does not contain the information required by our regulation, 21 CFR Part 3. The attached document explains those sections of the RFD that need to be added or modified in order to meet the requirements of the regulation. Your submission has been closed. Please submit a new RFD that includes the requested information.

Additional information about the RFD process, and in particular, the information that must be included in an RFD (see section 3.7) can be found at the following websites:

http://www.fda.gov/CombinationProducts/RFDProcess/default.htm
http://www.fda.gov/CombinationProducts/GuidanceRegulatoryInformation/ucm109108.htm

We also encourage you to review our guidance document "How to Write a Request for Designation" available at:

http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm

The guidance explains the Part 3 requirements and the kind of information we need to make an appropriate jurisdictional determination.

Please don't hesitate to contact Jose L. Moreno, Ph.D at 301-796-8930 if you have any questions or need additional information.

Sincerely yours,

Thinh X. Nguyen
Director
Office of Combination Products

cc: Jose L. Moreno, Ph.D

FDA000399

ATTACHMENT

Re : Request for Designation
Genus Barium Sulfate
Our File Number: RFD180046
Received: October 22, 2018

Request for Designation RFD180046 has not been filed because it does not include:

- Description of the product

*An inadequate description of the product was provided. Please provide a complete description of the product (see comments below regarding "Chemical, physical, or biological composition.")*

- Chemical, physical, or biological composition;

*1) Your submission indicates that there are three different formulations of your product, Vanilla SilQ Barium Smoothie, Vanilla SilQ HD, Vanilla SilQ MD. However, you have not provided a complete description of each of these formulations. Please be aware that you must describe your final product in full. Please provide a listing of all ingredients/components (active and inactive) for each formulation of your proposed product, the amount of each ingredient, and purpose/function of all ingredients. Furthermore, you have stated that "[o]ne of Genus's products is sold and distributed with a 5 mL flavor pack, which is a food product." Please clarify which formulation of your product is sold and distributed with the cited flavor pack and also provide a listing of all ingredients/components (active and inactive) in the flavor pack, the amount of each ingredient, and purpose/function of all ingredients on it. In addition, clarify how the flavor pack is combined with the rest of your product ingredients/components. This information is necessary in order to fully understand your product's composition. 2) According to the information in your submission, the various formulations of your product are provided in a powder form that is reconstituted with water. Could you please clarify if the water used for reconstitution of the powder is part of your proposed product? This information is necessary in order to properly consider all of your product components during our classification and jurisdictional assessment.*

- Dose and route of administration of drug or biologic;

*3) You have stated that "[b]arium sulfate is a powder for oral suspension available in 2.1 % w/v, (2.0 % w/w), 96% w/w, and 98% w/w for oral administration." However, you have also stated that the "method of administration are determined by the individual technique of radiography professionals and may vary with differing patient and procedure characteristics." As such, it is unclear the meaning of this statement. Please clarify what methods of administration and procedures are you referring to. This information is necessary to fully understand how your product is used.*

- The sponsor's recommendation as to which agency component should have primary jurisdiction, with accompanying statement of reasons.

*4) While it appears that you have provided a recommendation (i.e. for classification), this cannot be considered adequate as it does not appear to include a recommendation for the jurisdictional assignment of your product. Please provide a complete recommendation (i.e. for classification and jurisdictional assignment of your product) that takes into account all of the product components. Furthermore, you must also provide the basis for such a recommendation. Also, please note that your recommendation must be consistent with the analysis presented in Section 9 on your RFD submission.*

- Other relevant information

*5) On Section 13 of your submission you cited prior correspondence between your company and the Agency. You have provided a link to an online repository where this information is located. However, you must include all information that you may consider relevant as part of the RFD submission unless it is cited to a publicly available source. Please provide any communication*

FDA000400

*that you consider relevant as part of your revised submission, so it can be considered during the assessment of your product.*

FDA000401